1  ALAN ALEXANDER BECK
   LAW OFFICE OF ALAN BECK
2  2692 HARCOURT DRIVE
3  SAN DIEGO, CA 92123
   (619) 905-9105
4  STATE BAR NO. 276646
5  ALAN.ALEXANDER.BECK@GMAIL.COM
   ATTORNEYS FOR PLAINTIFFS
6  RUSSELL FOUTS AND
7  TAN MIGUEL TOLENTINO

STEPHEN D. STAMBOULIEH
STAMBOULIEH LAW, PLLC
P.O. BOX 4008
MADISON, MS 39130
(601) 852-3440
STEPHEN@SDSLAW.US
MS BAR NO. 102784
 *ADMITTED PRO HAC VICE

8

9          IN THE UNITED STATES DISTRICT COURT

10         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11

12

| | |
|---|---|
| 13  **RUSSELL FOUTS and TAN MIGUEL TOLENTINO,** | 19-cv-01662-BEN-JLB |
| 14 | |
| 15                           Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| 16      **v.** | |
| 17  **XAVIER BECERRA, in his official capacity as the Attorney General of the State of California,** | |
| 18 | |
| 19                           Defendant. | Judge:         Hon. Roger T. Benitez |
| 20 | Courtroom:   5A<br>Hearing Date: December 7, 2020<br>Hearing Time: 10:30 AM |

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      Introduction ........................................................................... 1

II.     Precedent Precludes A Finding That Batons Are Dangerous .............. 1

        A.      California Makes No Showing that Billies Are Unusual .......... 4

        B.      California's Ban is Not Longstanding ....................................... 5

III.    Pursuant to *Duncan*, Either a Categorical Approach or Strict
        Scrutiny Applies .......................................................................... 9

        A.      In Any Event, California Law Fails Intermediate Scrutiny ...... 11

IV.     Conclusion ................................................................................ 20

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**CASES**

4

*Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) ............................9, 12, 14

5

6

*Binderup v. AG of United States*, 836 F.3d 336 (3d Cir. 2016) ............................6, 7

7

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016)..................................3, 14, 16, 19

8

*District of Columbia v Heller*, 554, 647 US 570; 128 S Ct 2783; 171 L Ed 2d 637

9

10

   (2008) ...............................................................................................................passim

11

*Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019)........................11, 13, 18

12

*Duncan v. Becerra,* 970 F.3d 1133 (9th Cir. 2020)...........................................1, 5, 10

13

14

*Estate of Clemente Najera-Aguirre v. Cty. of Riverside*, No. ED CV 18-762-DMG

15

   (SPx), 2019 U.S. Dist. LEXIS 229033 (C.D. Cal. Nov. 15, 2019).......................16

16

*Green v. Compton*, No. C-90-3637-JPV, 1992 U.S. Dist. LEXIS 4595  (N.D. Cal.

17

18

   Mar. 24, 1992)........................................................................................................17

19

*Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014)..................10

20

*Jarboe v. Cty. of Orange*, No. SACV 05-00202-JVS(ANx), 2010 U.S. Dist. LEXIS

21

22

   155482 (C.D. Cal. July 29, 2010) .........................................................................16

23

*Maloney v. Singas*, 106 F. Supp. 3d 300 (E.D.N.Y. 2015) .....................................10

24

*Maloney v. Singas*, 351 F. Supp. 3d 222 (E.D.N.Y. 2018) ............................4, 5, 10

25

*Murphy v. Guerrero*, 2016 U.S. Dist. LEXIS 135684 (D. N. Mar. I. Sep. 28, 2016)

26

27

   ...............................................................................................................................12

28

*People v. Davis*, 214 Cal. App. 4th 1322 ..................................................................2

*State v. Deciccio*, 315 Conn. 79......................................................................2, 3, 8, 13

*Tyler v. Hillsdale Cnty. Sheriff's Dep't,* 837 F.3d 678 (6th Cir.)................................7

*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012)................................................3

*United States v. Miller*, 307 U.S. 174 (1939) ......................................................8, 14

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ..............................................7

**STATUTES**

§ 265.01(1) (New York Penal Code)..........................................................................9

18 U.S.C. § 922(g)(1) ................................................................................................7

18 U.S.C. § 922(g)(4) ................................................................................................7

6 CMC § 10210(a)(1) ..............................................................................................12

Cal. Penal Code § 22210 ..........................................................................9, 11, 12, 13

Cal. Penal Code § 26840 ..........................................................................................13

Cal. Penal Code § 27540(e) ......................................................................................13

Cal. Penal Code § 31615 ..........................................................................................13

Nev. Rev. Stat. 202.350(3) .........................................................................................5

**OTHER AUTHORITIES**

Baton Training Manual Student Text, March 2006..................................................14

Charles S. Petty, Deaths in Police Confrontations When Oleoresin Capsicum is

    Used (Feb. 2004) ................................................................................................15

D. Kopel, 'The Second Amendment in the Nineteenth Century,' 1998 BYU L. Rev.

    1359 .....................................................................................................................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Robert Dowlut, The Right to Arms: Does the Constitution or the Predilection of

Judges Reign? 36 OKLA. L.REV. 65 (1983) ..........................................................6

Plaintiffs' Memo in Opposition to Defendant's Motion for Summary Judgment
(19-cv-01662-BEN-JLB)

## I. INTRODUCTION

The State would have this Court believe that billies are dangerous and unusual and their ban longstanding in contravention of precedent. If it fails to convince the Court of that, California further argues that intermediate scrutiny should apply despite the Ninth Circuit's recent ruling in *Duncan v. Becerra,* 970 F.3d 1133 (9th Cir. 2020). Finally, California proffers that there is a reasonable fit between California's ban and public safety because law enforcement officer and security guards are given special training. But California fails to explain why private citizens could not receive this training. And they have not explained why this ban is proper as-applied to Plaintiffs who have already received equivalent training. If the Second Amendment has any weight at all, a ban on the possession of billies must fall. For all the reasons laid out below, this Court should deny California's motion and grant Plaintiffs' motion for summary judgment.[1]

## II. PRECEDENT PRECLUDES A FINDING THAT BATONS ARE DANGEROUS

The State argues that billies are dangerous, but the California State court rulings California relies on do not support this proposition. And even if they did, this position is foreclosed by Circuit precedent. As a preliminary matter, collapsible batons are not particularly dangerous. "Police departments adopting the use of

---

[1] Plaintiffs have already briefed considerable portions of the analysis at issue in their Memorandum of Points and Authorities in Support of their Motion for Summary Judgment and annexed exhibits (*See* Doc. 21). For purposes of not burdening the record with duplicative filings, Plaintiffs adopt and rely on their documentary evidence submitted with their previous filing.

1

expandable metal batons, which are also referred to as collapsible batons, have done so because they are intermediate force devices that, when appropriately used, are unlikely to cause death or serious bodily injury, more comfortable for officers to wear and carry, and more easily accessible than conventional fixed batons." *See State v. Deciccio*, 315 Conn. 79, 99, 105.

California primarily relies on *People v. Davis*, 214 Cal. App. 4th 1322. However, in *Davis*, the defendant was caught with a modified baseball bat "while driving his pickup truck". *People v. Davis*, 214 Cal. App. 4th 1322, 1325. Thus, not only was he outside his home when caught, the arm at issue in that case was "a modified baseball bat" and not a policeman's baton at issue in this litigation. *Id* at 1327. The *Davis* Court found "[w]e need not determine whether the statute is unconstitutional to the extent it prohibits possession of certain weapons in the home". *Id*. at 1332. Thus, this case is inapposite to Plaintiffs' challenge because Plaintiffs challenge California's ban <u>in the home</u> on batons.  Furthermore, despite California arguing "billies are dangerous weapons", *Davis* did not even rule on whether the arm at issue in that case was dangerous within the context of Second Amendment law. *See* Def.'s Memorandum at 13. Within the context of Second Amendment law, "dangerous" is a legal term of art. It does not mean whether or not an arm is literally

dangerous because all arms are, by definition, literally dangerous.[2]  That said, an arm being merely dangerous

> cannot be used to identify arms that fall outside the Second Amendment. First, the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. *See Heller*, supra, at 627, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (contrasting "'dangerous and unusual weapons'" that may be banned with protected "weapons . . . 'in common use at the time'"). Second, even in cases where dangerousness might be relevant, the Supreme Judicial Court's test sweeps far too broadly. *Heller* defined the "Arms" covered by the Second Amendment to include "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" [*District of Columbia v Heller*, 554, 647 US 570; 128 S Ct 2783; 171 L Ed 2d 637 (2008)].

*Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J. concurring).

California's argument does the same. "However, it is difficult to see how this is so since *Heller* concluded that handguns are not sufficiently dangerous to be banned." *State v. Deciccio*, 315 Conn. 79, 133-134. If a baton is "dangerous" then all arms are "dangerous" which is a position precluded by *Heller*. The Ninth Circuit found a machine gun is dangerous because a "modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds… Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns." *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012). A policeman's baton is not as dangerous

---

[2] "'[A]rms' refer to "weapons of offence, or armour of defence," or "anything that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another,". *See District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).

as a handgun and it certainly is not as dangerous as a machinegun. Thus, it simply is not dangerous for purposes of Second Amendment law.

## A. CALIFORNIA MAKES NO SHOWING THAT BILLIES ARE UNUSUAL

As argued in Plaintiffs' moving papers, *Heller* holds that the Second Amendment applies prima facie to all bearable arms. The burden is on the State to rebut that argument and they failed to do so. California in fact concedes that is has failed to produce any evidence of "the number of billies that are lawfully possessed by civilians in the United States," Def.'s Memorandum at 14. Thus, California has failed to rebut the presumption that billies are common arms. This Court should follow *Heller*'s precedent which has been reaffirmed by the Ninth and Second Circuit to presume that billies are common arms.[3]

Furthermore, Defendant cannot meet its burden simply by demonstrating that billies are not "in common use," but that Defendant must show, at a minimum, that nunchakus are "not typically possessed by law-abiding citizens for lawful purposes." *Maloney v. Singas*, 351 F. Supp. 3d 222, 227 (E.D.N.Y. 2018). This California has failed to do. Plaintiffs have already presented evidence that batons are typically used for lawful purposes. This Court should follow the lead of Southern District of New York when confronted with a similar situation. "Therefore, because Defendant has

---

[3] In *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015), the Second Circuit struck a ban on a pump-action rifle because the state focused exclusively on semiautomatic weapons and "the presumption that the Amendment applies remain[ed] unrebutted."

failed to demonstrate, by clear and convincing evidence, or even by a preponderance, that nunchakus are not typically used by law-abiding citizens for lawful purposes, she has failed to rebut the presumption that the possession and use of nunchaku is within the scope of the Second Amendment's protections". *Maloney*, 351 F. Supp. 3d at 237.

## B.   CALIFORNIA'S BAN IS NOT LONGSTANDING

Plaintiffs rely on their moving papers which address most of California's longstanding arguments.  Even if this Court finds laws from the early 20th century sufficiently old to be considered longstanding, California's laws do not demonstrate that there is a longstanding history of banning billies. In *Duncan*, the Ninth Circuit rejected the proposition that large capacity magazine bans were longstanding.  "In sum, laws restricting ammunition capacity emerged in 1927 and all but one have since been repealed. *Cf. Heller*, 554 U.S. at 632 ("[W]e would not stake our interpretation of the Second Amendment upon a single law . . . that contradicts the overwhelming weight of other evidence regarding the [Second Amendment].")*. Duncan v. Becerra*, 970 F.3d 1133, *32 (9th Cir. 2020).  Here, California has been able to identify three states, including itself, with billy bans from the early 20[th] century.   And, Nevada, while restricting billies, does not outright ban them as California does.  *See* Nev. Rev. Stat. 202.350(3) (allowing sheriff of any county to issue a permit to carry "concealed weapon" but not including a permit to "carry a pistol, revolver, or other firearm.") Three states do not contradict the overwhelming

weight of other evidence that billies are protected arms which are afforded Second Amendment protection.

Unlike colonial bans on felon possession which were ubiquitous,[4] California only can identity three states that banned the ownership of billies during the early 20th century.  These isolated snippets are just one tiny part of the historical inquiry. For them to be probative of the Second Amendment's meaning, they would have to be considered in light of all the other evidence from all the other states throughout our history—not only the statutes, but also the many cases and contemporary historical accounts reflecting the people's understanding of the scope of the right. The fact there is no evidence prohibitions on possession existed until the 20th century and even then, only in three states shows throughout American history people have understood the right to arms to include billies. Thus, even if this Court finds early 20th century laws can be evidence of a longstanding prohibition (which it should not) California has produced insufficient evidence to support that its billy ban is longstanding.

Even if a law from the early 20th century is longstanding and thus, presumptively lawful, Plaintiffs have rebutted this presumption. "Unless flagged as irrebuttable, presumptions are rebuttable." *Binderup v. AG of United States*, 836 F.3d 336, 350 (3d Cir. 2016) (citations omitted).  In *Binderup*, the Third Circuit reviewed

---

[4] *See* Robert Dowlut, The Right to Arms: Does the Constitution or the Predilection of Judges Reign? 36 OKLA. L.REV. 65, 96 (1983).

an as-applied challenge by a felon to the federal ban on felons owning firearms. It first described its previous precedent to explain how to rebut a presumption of constitutionality:

> In that regard, we first determined that "*Heller*'s statement regarding the presumptive validity of felon gun dispossession statutes does not foreclose' an as-applied challenge." … Next, we explained what was required to mount a successful as-applied Second Amendment challenge to [18 U.S.C.] § 922(g)(1). We looked to the "historical pedigree" of the statute to ascertain "whether the traditional justifications underlying the statute support a finding of permanent disability in this case." … For the reasons discussed, we concluded that "[t]o raise a successful as-applied challenge, [one] must present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections." … We explained further: For instance, a felon convicted of a minor, non-violent crime might show that he is no more dangerous than a typical law-abiding citizen. Similarly, a court might find that a felon whose crime of conviction is decades-old poses no continuing threat to society."

*Binderup*, 836 F.3d at 362 (citations and punctuation omitted).

This is in accord with the Sixth Circuit's reasoning in *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 690 (6th Cir.) which found some people who have been involuntarily committed may have Second Amendment rights. "As the Seventh Circuit has recognized, the *Heller* Court's observation regarding the presumptive lawfulness of longstanding bans is precautionary, not conclusive…[*United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)] (emphasis added)." *Tyler*, 837 F.3d at 687. "In the face of what is at best ambiguous historical support, it would be peculiar to conclude that [18 U.S.C.] § 922(g)(4) does not burden conduct within the ambit of

the Second Amendment as historically understood based on nothing more than *Heller*'s observation that such a regulation is 'presumptively lawful.' 554 U.S. at 627 n.26. We proceed to step two, then, with an understanding that people who have been involuntarily committed are not categorically unprotected by the Second Amendment." *Id.* at 690.

By analogy, this Court should find that Plaintiffs have rebutted the presumption of constitutionality if it finds California's ban on billies longstanding. First, the traditional justification for banning billies is that they were arms not used for lawful purposes. This justification can be rebutted on two grounds. Whatever the case was in 1917, the policeman's batons that Plaintiffs wish to buy are not typically used for criminal purposes. Rather they serve a traditional militia function. "*Miller* implies that possession by a law-abiding citizen of a weapon that could be part of the ordinary military equipment for a militia member, or that would contribute to the common defense, is protected by the Second Amendment," *Duncan v. Becerra,* 265 F. Supp. 3d 1106, 1116. Historically, policing was a militia function. "Furthermore, the widespread use of the baton by the police, who currently perform functions that were historically the province of the militia; see, e.g., D. Kopel, 'The Second Amendment in the Nineteenth Century,' 1998 BYU L. Rev. 1359, 1534 demonstrates the weapon's traditional military utility." *State v. Deciccio,* 315 Conn. 79, 133, 105 A.3d 165, 200 (2014).

The statute has been broadened over the years by decisions of the California

Courts to include far more than it originally prohibited to the point it now bans essentially any bludgeon for purposes of self-defense.  Plaintiffs have shown that police batons are less dangerous than arms which are legal to own.  For all these reasons, even if this Court finds that California's baton ban is longstanding and thus, presumptively constitutional, it should find that Plaintiffs have rebutted that presumption and subject it to constitutional scrutiny.

## III.   PURSUANT TO *DUNCAN*, EITHER A CATEGORICAL APPROACH OR STRICT SCRUTINY APPLIES

For all the reasons raised in Plaintiffs' moving papers, they maintain this Court should find California's ban on billies unconstitutional applying a categorical approach. California contends that "Plaintiffs cannot argue that California's restrictions amount to a 'categorical ban'" because the statute prohibits different types of bludgeons in various portions of the statute. That is a spurious argument. *See* Def.'s Memorandum at 19, fn 9. The statutory scheme operates as a ban on bludgeons for self-defense. "Even "ordinarily harmless objects" can qualify as a billies under section 22210." *Id.* at p. 4. Thus, it is a categorical ban. If the categorical approach does not apply, circuit precedent advises this Court to apply strict scrutiny.

This is because a complete ban on a protected arm implicates the core Second Amendment right as the Northern District of New York found in striking a complete ban on electric arms. "As an initial matter, § 265.01(1)'s complete ban on the civilian possession and use of tasers and stun guns implicates Avitabile's core constitutional right as a law-abiding citizen to protect himself in his own home with a weapon

commonly used for that purpose." *Avitabile v. Beach*, 368 F. Supp. 3d 404, 414 (N.D.N.Y. 2019). This is in accord with the *Maloney* court which found "[t]he centuries-old history of nunchaku being used as defensive weapons, [*Maloney v. Singas*, 106 F. Supp. 3d 300, 314 n.22, (E.D.N.Y. 2015)] strongly suggests their possession, like the possession of firearms, is at the core the Second Amendment. Nonetheless, even as recreational items, nunchaku may still be at the core of the Second Amendment's protections." *Maloney v. Singas*, 351 F. Supp. 3d 222, 238. Somewhat shockingly, California does not as much cite to the *Duncan* which is the most recent Circuit decision on point as to the level of scrutiny to which to apply on a complete ban on a protected arm. Rather it relies on cursory cites to *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014) and jumps to the proposition that intermediate scrutiny is appropriate.  However, *Jackson* supports the application of strict scrutiny when dealing with bans on protected arms.

> [I]n *Jackson*, we held that a bar on the sale of hollow-point ammunition within city limits was not a severe burden because San Francisco residents could still own that ammunition within the home. [citation omitted] We thus applied intermediate scrutiny to the regulation. See id. Stated differently, we implied that strict scrutiny likely applies if a law completely bans the possession of a certain class of ammunition (there, hollow-point bullets).

*Duncan*, 970 F.3d at *50.

Furthermore, *Duncan* is the closest circuit case on point and it directly supports that application of strict scrutiny for all the reasons raised in Plaintiffs' moving papers.  Finally, Circuit precedent is clear, this Court should apply strict scrutiny.

California has made no argument that its ban survives strict scrutiny and thus, the law is unconstitutional if this Court applies it. Even it does not and applies intermediate scrutiny California's ban must fail.

### A. IN ANY EVENT, CALIFORNIA LAW FAILS INTERMEDIATE SCRUTINY

California claims that section 22210 promotes public-safety by seeking to reduce the prevalence of billy-club use in crime, such as assault, robbery, rioting, and vigilantism. *See* Def.'s Memorandum at 14.  However, California does not support that argument with any analysis or evidence of how section 22210's ban on billies in the home actually promotes that interest. "Yet, as the Second Circuit cautioned, 'on intermediate scrutiny review, the state cannot 'get away with shoddy data or reasoning.' To survive intermediate scrutiny, the defendants must show 'reasonable inferences based on substantial evidence' that the statutes are substantially related to the governmental interest." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1161 (S.D. Cal. 2019).

California simply has not presented any evidence to show how banning the possession of billies in the home promotes any of these government interests.[5]  More to the point, applying this logic, California could ban literally any tool or weapon that could be conceivably use as a weapon.  This position was already rejected in *Heller*

---

[5] The State provides two examples of baton crime.  One in Portland, Oregon (which doesn't ban batons) and one in California (which bans batons).  Def.'s Memorandum at pp. 16-17.  Plaintiffs addressed the argument regarding criminal misuse which is foreclosed by *Heller* on page 23 of their Memorandum in Support of Summary Judgment.

as to handguns which are far deadlier than batons and more likely to be used in crime. If the District of Colombia cannot ban handguns in the home, California cannot ban batons in the home. "The right to use lethal force in self-defense is the right to kill if necessary to protect oneself or others, which is why the common law and SAFE impose stringent standards on its use. *See* 6 CMC § 10210(a)(1) (lethal force is used to 'reasonably prevent the immediate use of force by an aggressor'). But when the right is lawfully exercised, the government's interest in protecting the life of the aggressor cannot render self-defense less effective at the expense of the victim. Here, the Commonwealth seeks to restrict weapons that are effective for self-defense for the very reason that makes them effective. That is not a legitimate reason." *Murphy v. Guerrero*, 2016 U.S. Dist. LEXIS 135684, *61 (D. N. Mar. I. Sep. 28, 2016). "In short, a mere generalized appeal to public safety and crime prevention as the justification for a total and complete ban on a whole class of arms is precisely the kind of 'shoddy reasoning' that even intermediate scrutiny forbids. [citation omitted] ('[O]n intermediate scrutiny review, the state cannot get away with shoddy data or reasoning.')." *Avitabile,* 368 F. Supp. 3d at 420-421.

Second, California argues section 22210 promotes public-safety by ensuring that only trained and certified individuals are permitted to possess billy clubs. In other words, police officers and security guards. Plaintiffs do not concede that it is constitutional to require private citizens to receive training to own billies in their homes. However, even if it is, California does not explain why private citizens could

not receive this training. And they have not explained why this ban is proper as-applied to Plaintiffs who have already received this training or the equivalent to it. How can it be that California allows private citizens to be trained to own firearms but not billies?[6] There is no reason that private citizens could not receive the same training as security guards and safely handle billies.[7] There is not a reasonable fit between complete banning billies and California's interest. "[A] reasonable fit would surely make an exception for a Department of Justice-vetted, privately-trained, citizen who legally owns firearms like Plaintiffs…California's statute does not except such proven, law-abiding, trustworthy, gun-owning individuals. Quite the opposite." *Duncan*, 366 F. Supp. 3d at 1171.[8]

---

[6] Cal. Penal Code §§ 26840, 27540(e), 31615.

[7] California's argument that section 22210 "promotes public-safety by ensuring that only trained and certified individuals are permitted to possess billy clubs" is arguably a concession that the <u>Plaintiffs'</u> ownership of billies (because they both have training with billies) does not diminish public safety and therefore admits that the ban is not properly tailored. *See* Def.'s Memorandum at p.14.

[8] California's attempt to distinguish *State v. Deciccio* is impressive but unpersuasive. They argue that the Conn. Supreme Court struck the baton restriction at issue because it was "internally inconsistent". Def.'s Memorandum at p. 10, fn 5. However, the opinion actually evaluated the existing statutory scheme and found that it placed an undue burden on the defendant's right to possess and keep his dirk knife and police baton in his home by making it impossible for him to transport those weapons there, *State v. Deciccio*, 315 Conn. 79, 150. And it then found the transport ban was a substantial burden on the litigant's rights and thus unconstitutional. The only difference between *Deciccio* and this case is that the burden on Plaintiffs' rights in this case is greater since California completely bans batons. Finally, to the extent that the court relied on batons use by law enforcement, this position is not erroneous. "The Supreme Court also recognizes that the Second Amendment guarantee includes firearms that have "some reasonable relationship to the preservation or efficiency of

(continued…)

Defendant includes Exhibit "15" which is the Baton Training Manual Student Text, March 2006 version, of the California Bureau of Security and Investigative Services.  This text instructs students where and where not to strike with a baton.  It also instructs the student on defensive uses of the baton.  The text instructs that "[w]hen the baton is use, the aggressor is likely to suffer some injury.  However, if it is used correctly, injury will be minimal."  *See* Def.'s Exhibit "15" at p. 11.  A prospective baton purchaser could read through this material and be comfortable carrying his or her baton and without endangering public safety.

California makes the argument that "baton use has declined as other less-than-lethal options have become more widely available" (Def.'s Memorandum at p. 13, fn 8) and that Plaintiffs could "arm themselves with other less-than-lethal weapons or devices (e.g., a stun gun, pepper spray, or an alarm device), or even lethal weapons (e.g., a shotgun or handgun) to engage in lawful self-defense in the home."  Def.'s Memorandum at 13.  That position was rejected in *Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.");  *Caetano*, 136 S. Ct. at 1033 (Alito, J., concurring) ("[T]he right to bear other weapons

---

a well regulated militia." [*United States v. Miller*, 307 U.S. 174, 178 (1939)]. *Miller* implies that possession by a law-abiding citizen of a weapon that could be part of the ordinary military equipment for a militia member, or that would contribute to the common defense, is protected by the Second Amendment," *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1116 (S.D. Cal. 2017).

is 'no answer' to a ban on the possession of protected arms.”); *Avitabile,* 368 F. Supp. 3d at 420 (“[T]he State's general appeal to public safety is particularly hard to square with its suggestion, made repeatedly in its briefs and at oral argument, that Avitabile should just go out and buy a handgun, or perhaps a few more shotguns or rifles, if he wants to better protect himself”).  Moreover, there are many situations where a billy is a preferred weapon to others.  If a drunken person mistakenly, but belligerently enters Plaintiffs' homes, it is likely they would not want to resort to lethal force.

Using pepper spray in the home sounds like a good way to contaminate the entire room and subject both you and the person attacking you to its effects.  Pepper spray is an inflammatory agent. It inflames the mucous membranes in the eyes, nose, throat and lungs. Sometimes one will see this being used in forms of riot control because of its broad dispersal.  It causes closing of the eyes, difficulty breathing, runny nose, and coughing.  Pepper spray is typically found as an aerosol spray and all forms of pepper spray disperse Oleoresin Capsicum (the active ingredient in pepper spray) through the air. This means that bystanders close to an intended target will suffer the effects of the pepper spray as well. There have been cases of subjects dying after being pepper sprayed by law enforcement officers; generally, these subjects have respiratory issues such as asthma, serious heart problems, or substantial amounts of stimulative drugs in their systems. *See* Charles S. Petty, Deaths in Police Confrontations When Oleoresin Capsicum is Used (Feb. 2004), available at https://www.ncjrs.gov/pdffiles1/nij/grants/204029.pdf.

Additionally, the person deploying the pepper spray may suffer from blowback. "Deputy Missel believed plaintiff was reaching for the handgun inside the truck; therefore, he drew a canister of pepper spray from his belt with his left hand and sprayed plaintiff's face. [] The direction of the wind caused pepper spray to blow back into the deputy's eyes as well." *Jarboe v. Cty. of Orange*, No. SACV 05-00202-JVS(ANx), 2010 U.S. Dist. LEXIS 155482, at *6 (C.D. Cal. July 29, 2010); "Ponder deployed pepper spray, which partially blew back in Ponder's face due to wind and did not appear to affect Najera." *Estate of Clemente Najera-Aguirre v. Cty. of Riverside*, No. ED CV 18-762-DMG (SPx), 2019 U.S. Dist. LEXIS 229033, at *6 (C.D. Cal. Nov. 15, 2019).

Stun guns similarly are less effective than batons in many circumstances and which is why police departments aren't issued them. Stun guns like *Caetano*'s "are designed to stun a person with an electrical current" by running a current between two metal prongs on the device and placing the prongs in direct contact with the person. *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1029. In light of the fact they are small direct contact weapons, a person must get much closer to an assailant than with a baton. This heightens the odds that a person defending themselves could be wrestled to the ground compared to if they use a billy which offers a certain amount of range when striking with it.

A Taser is like a stun gun and Plaintiffs address it because it often is misdescribed as a stun gun. It is an electroshock arm sold by AXON Enterprise

(formerly known as Taser International, Inc.). A "'Taser," shoots out wires tipped with electrodes that can deliver an electrical current from a distance. Tasers can also be used like a stun gun without deploying the electrodes—a so-called 'dry stun.'" *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1029. In dry stun mode, Tasers suffer from all the same issues as stun guns.

While there are situations where Tasers are an effective defense tool, there are many situations where a billy is a more effective defense tool. If an assailant is wearing a heavy jacket, a billy is a much better option because the Taser's barb will likely not effectively penetrate and disable the attacker.[9]  If the assailant is discovered in your home at close range, there may not be sufficient range to deploy the Taser and a billy is a more effective option.  The Pulse is the civilian model of the Taser. It can only be used once before it needs to be reloaded or it becomes a stun gun with the "dry stun" feature.

California's argument that Plaintiffs could use an alarm merits little discussion. California is presumably suggesting that Plaintiffs hope that their alarm is triggered if an intruder arrives and again hope that the police arrive.  However, that does little for Plaintiffs in the interim period while dealing with an intruder in their home. "[T]he police typically arrive after it is too late. With rigor mortis setting in,

---

[9] "Sergeant Trujillo first attempted to subdue plaintiff by using a taser gun. The taser gun was ineffective, however, because it could not penetrate plaintiff's body armor of clothing and bed linen."  *Green v. Compton*, No. C-90-3637-JPV, 1992 U.S. Dist. LEXIS 4595, at *2 (N.D. Cal. Mar. 24, 1992).

they mark and bag the evidence, interview bystanders, and draw a chalk outline on the ground. But the victim, nevertheless, is dead, or raped, or robbed, or traumatized." *Duncan*, 366 F. Supp. 3d at 1137.[10] With a billy, Plaintiffs have an additional tool to deploy for their means of self-defense to fight off an assailant while they wait for the police who may or may not arrive. [11]

Finally, California asserts that Plaintiffs can arm themselves with firearms.[12] While both Plaintiffs can legally own firearms and in some circumstances, they might even be willing to use one, it is not an appropriate tool in all circumstances. "Countless people may have reservations about using deadly force, whether for

---

[10] It is unclear if Defendant is claiming that the home should have an alarm or if the Plaintiffs should themselves carry one of those personal alarm devices that emit loud noises akin to a whistle.

[11] Defendant makes the argument that billies are not needed for self-defense, and then quotes interrogatory responses from Plaintiffs. *See* Def.'s Memorandum, p.10 fn. 6. Defendant asked Plaintiffs if they were "unable to engage in lawful self-defense without a billy." Obviously, Plaintiffs can defend themselves with lethal weapons. Plaintiff Fouts responded, as Defendant stated, and that he essentially seeks less lethal alternatives. *See* Exhibit "4" to Def.'s Motion. Plaintiff Tolentino responded, as Defendant stated, that he is "restricted in what tools [he] has available to defend [himself]." *See* Exhibit "5" to Def.'s Motion. While neither of these Plaintiffs are lawyers, they both claim the need for self-defense in their answers to the Interrogatories taken as a whole. *See* Exhibit "4" to Def.'s Motion, Int. No. 10: "… the issue is not about using a Billie in an apprehension or control manner, it is to defend oneself or another from an attack and harm. Self-defense is a God given right and protected by the constitution." *See also* Exhibit "5" to Def.'s Motion, Int. No. 7: billies "are a non-lethal self-defense tool."

[12] While California does not mention knives as an alternative, knives suffer from the same issues as firearms. They can be deadly weapons that are inappropriate in some self-defense situations Plaintiffs may find themselves.

---

18

moral, religious, or emotional reasons—or simply out of fear of killing the wrong person." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1033 (Alito, J., concurring). If a belligerent person that is not threatening deadly force breaks into Plaintiffs' houses possibly due to being intoxicated, Plaintiffs may not wish to deploy a firearm but still may need to defend themselves.  A billy is <u>their</u> preferred option in this situation. They have training with billies and are comfortable using them.  Ultimately California's position is simply foreclosed by *Heller*. Even if this Court applies intermediate scrutiny, California cannot justify its ban.

Defendant makes a strange assertion that a billy "is not well suited to self-defense, even if it could conceivably be used for self-defense." Def.'s Memorandum at p. 10, citing Fichtner Dec. at ¶ 33.  The problem with this statement is that Fichtner didn't say that.  Fichtner, the State's expert, stated "While a baton (and any weapon) can be used for self-defense, it is a specialized law-enforcement tool designed to obtain compliance by others and serves specific and important law-enforcement functions."  The same can be said for a Taser, a Glock 17, pepper spray, or any other self-defense item.  This is common sense that needs no expert commentary: self-defense tools are designed to "obtain compliance", i.e., stop attacking me.

Fichtner's entire argument is summed up in ¶ 35 of his Declaration: he believes "batons should be reserved for trained law enforcement personnel and other trained professionals who need batons to perform their official duties."  Plaintiffs' Expert Rebuttal witness, Mr. Leofuldo Tablanza II, explained that he didn't believe

"civilians need[ed] to be certified to carry a [baton].  It is possibly taking away one of the tools that they will be able to defend themselves with."  Plaintiffs' Exhibit C, p.6.   The only apparent disagreement between the two experts is that Fichtner believes it is a law enforcement only tool and necessarily needs training, and Plaintiffs' expert doesn't think one needs certification to carry one.  Fichtner's report though, cuts against the State's arguments regarding training when both Plaintiffs have that training and there is no exemption for Plaintiffs' to have billies.

The Defendant even claims that the ban on billies protects "law enforcement and the public by ensuring that peace officers have access to an effective intermediate-force compliance tool to prevent unnecessary escalations of force in the performance of their official duties, which would be undermined if civilians are able to possess the same tool."  *See* Def.'s Memorandum at p. 15.  Yet just two pages earlier, Defendant claims that Plaintiffs could arm themselves with stun guns, pepper spray, alarm devices or even handguns.  *Id*. at p. 13.  Notwithstanding alarm devices, law enforcement already carries pepper spray, the Taser and a handgun.  They also carry a baton for one of the reasons the Defendant states: batons are "an effective intermediate-force compliance tool to prevent unnecessary escalations in force…" *Id*. at 15. There is no reason to ban Plaintiffs from having that same level of defense.

## IV.  CONCLUSION

If the Second Amendment has any purchase, Plaintiffs should have the right to defend themselves with a baton in the home. This Court should grant

1   Plaintiffs' Motion for Summary Judgement and deny Defendant's Motion.

2   Dated: October 5, 2020

3

4   /s/ Alan Alexander Beck                    /s/ Stephen D. Stamboulieh
    Alan Alexander Beck                        Stephen D. Stamboulieh
5   Law Office of Alan Beck                    Stamboulieh Law, PLLC
    2692 Harcourt Drive                        P.O. Box 4008
6   San Diego, CA  92123                       Madison, MS  39130
    (619) 905-9105                             (601) 852-3440
7   State Bar No. 276646                       stephen@sdslaw.us
    Alan.alexander.beck@gmail.com              MS Bar No. 102784
8   Attorneys for Plaintiffs                   *Admitted Pro Hac Vice
    RUSSELL FOUTS and
9   TAN MIGUEL TOLENTINO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Memo in Opposition to Defendant's Motion for Summary Judgment
(19-cv-01662-BEN-JLB)