UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL FOUTS, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California, et al.,<br><br>                              Defendants. | Case No.:  19-cv-1662-BEN (JLB)<br><br>**Order Denying Plaintiffs' Motion for Summary Judgment and Granting Defendants' Cross-Motion for Summary Judgment** |

## I.     INTRODUCTION

Since 1917, the State of California has made it a crime for the average citizen to possess a weapon known as a billy.  Like S&H Green Stamps, over the years the billy's popularity has come and gone, yet the billy law remains.  But for the threat of violating the criminal statute, Plaintiffs would possess a billy or baton for self-defense.  Plaintiffs challenge the law as an infringement on their federal constitutional right to keep and bear arms.  In this case of first impression, both sides move for summary judgment.  Because the 104-year-old state law qualifies as "longstanding," it is a permissible restriction on a dangerous, but less-than-lethal, unusual weapon.  Therefore, Plaintiffs' motion is denied and Defendants' motion is granted.

## II.   BACKGROUND

California's dangerous weapon statute was enacted in 1917, not long after the first airplane was invented by the Wright Brothers in 1903.[1]  The 1917 statute criminalized the possession of "any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles."[2]  The billy restrictions have remained in effect through various reenactments and re-codifications up to the present day.  Plaintiffs challenge the part of California Penal Code § 22210 which prohibits possessing an "instrument or weapon of the kind commonly known as a billy."  Section 22210 states in full,

> Except as provided in Section 22215 and Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any leaded cane, or any *instrument or weapon of the kind commonly known as a billy*, blackjack, sandbag, sandclub, sap, or slungshot, is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

(Emphasis added).  The statute does not define "billy."  Plaintiffs use the terms "billy" and "baton" interchangeably.[3]  Defendants use the terms "billy," "billy club," and

---

[1]     The first successful flight took place at Kitty Hawk, North Carolina, in December 1903.  *See* Smithsonian National Air and Space Museum at https://airandspace.si.edu/exhibitions/wright-brothers/online/fly/1903/index.cfm. Invented by Glenn H. Curtiss, the first flight of an amphibious aircraft took place over the waters of San Diego Bay, California, in 1911.  *See* San Diego Air & Space Museum at https://sandiegoairandspace.org/collection/item/curtiss-a-1-triad.

[2]     Stats. 1917, ch. 145, § 2.  The billy statute was reenacted in 1923 as Stats. 1923, ch. 339, § 1, and re-codified in 1953 as former California Penal Code § 12020.  The current statute was re-codified in 2010 as California Penal Code § 22210.

[3]     *See* Plaintiffs' Mem. of Points and Authorities in Supp. of Sum. Jgt., at n.1.  In support of their use of the terms billy and baton interchangeably, Plaintiffs cite a federal habeas corpus decision: *Robertson v. Harris*, No. C 10-05027 EJD (PR), 2015 WL

"baton" interchangeably.[4]  But "billy" is an old name given to an old wooden police tool, while the collapsible metal baton is a modern police invention.  What the instrument or weapon that is commonly known as a "billy" looks like is not at all clear at this point in history, as both the term and the tool have gone out of style.[5]

The California Court of Appeal in *People v. Leffler*, No. B283175, 2018 WL 3974150, at *3 (Cal. Ct. App. Aug. 20, 2018), offers some help.  *Leffler* noted that a collapsible baton falls within the list of weapons prohibited by § 22210, but the court did not describe the weapon commonly known to be billy.  *Leffler* explained, "[a]lthough the word 'baton' is not included in the statutory language, it has long been held that the statute encompasses a variety of bludgeoning instruments."  *Id*. (citing *People v. Grubb*, 63 Cal.2d 614, 621 (1965)).  In its opinion, *Leffler* resorted to several dictionaries for help defining a "billy."[6] In addition to prohibiting whatever a literal billy might be, the

_____

4196521, at *13 (N.D. Cal. July 10, 2015), *aff'd sub nom. Robertson v. Pichon*, 849 F.3d 1173 (9th Cir. 2017).

As an aside, it is difficult to see how *Robertson* stands for the notion that the terms billy and baton are interchangeable.  In *Robertson*, the petitioner was arrested with an expandable baton in his vehicle.  He was convicted in state court under the billy statute. In his later federal habeas petition, he argued the state court erroneously applied state law.  Yet, errors of state law are not cognizable claims in a federal habeas corpus proceeding – something the federal *Robertson* court recognized in its opinion.  The court explained, "Petitioner's claim that the state court incorrectly defined a billy by using a broader definition is a claim that the state court erred in applying state law, and is not cognizable on federal habeas."  *Id*. at *13 (citations omitted).  In other words, *Robertson* does not hold that an expandable baton and a billy are the same instrument or weapon. *Robertson* said no more than this: questioning the state court's interpretation of state law about the definition of a billy is not cognizable in a federal habeas corpus proceeding.

[4]     Defendants' Mem. of Points and Authorities in Supp. of Sum. Jgt., at n.1.
[5]     Plaintiffs do not bring a vagueness challenge so the statute is accepted as defined and interpreted by the courts of the state.
[6]     According to *Leffler*, Webster's 3d New International Dictionary (2002) defined a billy as "a heavy, usually wooden weapon for delivering blows."  Vocabulary.com (http://www.vocabulary.com) defined a billy as "a short, stout stick used mainly by

California Supreme Court held that the statute's term "billy" also includes additional objects that may have both innocent uses and criminal uses, depending on the circumstances of possession.  *See People v. Grubb*, 63 Cal.2d 614 (1965) (in bank).  *Grubb* held, for example, that an altered baseball bat, taped at the smaller end and heavier at the other end, when carried in a vehicle obviously not for playing baseball, falls within California's prohibition on possessing a billy.  *Id*. at 621 (emphasis added).  *Grubb* explained,

> Thus we hold that the statute embraces instruments other than those specially created or manufactured for criminal purposes; it specifically includes those objects "of the kind commonly known as a . . . billy."  The concomitant circumstances may well proclaim the danger of even the innocent-appearing utensil.  *The Legislature thus decrees as criminal the possession of ordinarily harmless objects when the circumstances of possession demonstrate an immediate atmosphere of danger.*  Accordingly the statute would encompass the possession of a table leg, in one sense an obviously useful item, when it is detached from the table and carried at night in a "tough" neighborhood to the scene of a riot.  On the other hand the section would not penalize the Little Leaguer at bat in a baseball game.  Applying this test to the instant case, we find the possession of the altered baseball bat, taped at the smaller end, heavier at the unbroken end, carried about in the car, obviously usable as a "billy," clearly not transported for the purpose of playing baseball, violates the statute.

*Id.* (emphasis added).  California courts, then, have decided that § 22210's prohibition of the billy includes both the historical billy, as well as other ordinarily harmless clubbing objects in circumstances where possession demonstrates an immediate atmosphere of

---

police officers to defend themselves when necessary, and which may also be known as a baton or truncheon.  The Oxford English Dictionary Online (http://www.oed.com) defined a billy as "a highwayman's club; a bludgeon; ... a policeman's truncheon." *Leffler*, at *2–3.

danger.  With this understanding in mind, it is time to review the regulation under Second Amendment doctrine.

### III.   LEGAL STANDARD

The standards for evaluating a motion for summary judgment are well known and have changed little since discussed by the U.S. Supreme Court in a trilogy of cases from 1986.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden of establishing the absence of a genuine dispute of material fact.  *Celotex*, 477 U.S., at 323.  A court views the evidence in the light most favorable to the non-movant and draws reasonable inferences in the non-movant's favor.  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, __ F.4th __, 2021 WL 3671384, at *3 (9th Cir. Aug. 19, 2021).  A scintilla of evidence in support of the plaintiff's position is insufficient.  *Anderson,* 477 U.S. 242, at 255.  When parties cross-move for summary judgment, a court evaluates each motion separately.  *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010).

In this case, both parties agree that a billy is an "arm" as described by the Second Amendment right to keep and bear arms.[7]  And both parties agree that a Second

---

[7]    Of course, a billy is not a firearm.  Even so, the Second Amendment protects a right to keep and bear arms that do not fire.  The Supreme Court explains that "'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms.'"  *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016).  Thus, it protects non-firing arms such as electronic stun guns, nunchakus, and cavalry swords.  *Id.* (stun guns); *Avitabile v. Beach*, 368 F. Supp. 3d 404, 412 (N.D.N.Y. 2019) (tasers and stun guns); *Maloney v. Singas*, 351 F. Supp. 3d 222, 234 (E.D.N.Y. 2018) (nunchakus); *Presser v. People of State of Ill.*, 116 U.S. 252, 254 (1886) (implicitly assuming Presser's cavalry

5

Amendment analytical approach is proper.  Under this approach, the Attorney General argues that a billy is beyond Second Amendment protection for two reasons.  First, the 104-year old statute qualifies as a "longstanding" prohibition.  Second, a billy is a dangerous and unusual weapon.  This Court agrees that Cal. Penal Code § 22210 is a longstanding regulation.  Under Ninth Circuit precedent, that ends the matter.

## IV.   ANALYSIS

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."  *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008).  This right is incorporated against the states under the Fourteenth Amendment.  *McDonald*, 561 U.S. 742.

In *Heller*, the United States Supreme Court created an analytical framework for understanding and applying the Second Amendment.  In this Court's view, one first asks is the arm dangerous and unusual?  "We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Heller*, 554 U.S. at 627.  If it is not unusual, then the question is asked, is the arm commonly possessed by law abiding citizens for lawful purposes?  If the answer is "yes," that should end the inquiry as to whether the arm can be owned or possessed.  Nowhere, in either *Heller* or *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016), did the United States Supreme Court then go on to apply a level of scrutiny: strict, intermediate, or rational basis.

---

sword was an "arm.");  *cf. United States v. Davis*, 906 F. Supp. 2d 545, 557 (S.D.W. Va. 2012) (bulletproof vest is not an "arm").

6

Second, the Court said, "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S., at 626.  So, what does that mean?  A citizen may not own or possess (with regulatory exceptions) a bazooka, a flamethrower, or an automatic weapon like the M-16.  It also means that a citizen may not bring an otherwise protected weapon, for example an AR-15 rifle, into a school, the Capitol, a courthouse, a church, or other sensitive places where a legislative body has prescribed reasonable regulations. *Id.* ("Nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ."); *cf., Solomon v. Cook Cty. Bd. of Comms.*, No. 17-cv-6144, 2021 WL 4147167, at *21 (N.D. Ill. Sept. 13, 2021) (forest preserve district is not a "sensitive place" under *Heller*).  And here is where levels of scrutiny do become applicable – the more restrictive the regulation on possession or use, logically, the greater the scrutiny is to be applied.

Third, notwithstanding that a weapon may otherwise be constitutionally protected, its possession or use for *unlawful* purposes is not protected.  In other words, a handgun, rifle, or shotgun may generally be protected by the Second Amendment, but the same firearm may lose its constitutional protection if it is possessed or used for a criminal purpose.  This is a familiar concept in criminal law.  Finally, a restriction that has a historical pedigree may also pass constitutional muster (for example, felon-in-possession laws and machinegun tax stamp requirements). *Id.* at 626-27.

With that in mind, this Court would apply this analytical framework to the case before it and ask, what is a billy?  Is a golf club or a rolling pin a billy?  Is a billy dangerous and unusual?  The parties agree that a billy can be dangerous.  There is no

evidence about whether a billy is common or unusual.[8]  Is a billy commonly possessed by law abiding citizens for lawful purposes?  There is argument, but there is no evidence.  Is a billy the type of weapon that is useful for service in the militia?[9]  Again, there is

---

[8]  There is a lack of evidence from either party.  Had the *Heller* analysis here not been cut short by virtue of concluding the billy prohibition is longstanding, the lack of evidence would probably have changed the outcome.

The plaintiffs do not have to shoulder the burden of proving that they are entitled to enjoy Second Amendment rights.  The command of the Amendment is that the right to keep and bear arms "shall not be infringed."  It follows that when a citizen complains in a facial challenge that the government is infringing, then it is the government that must carry the burden of justifying its restriction of Second Amendment rights.  The government must prove its restriction is "longstanding" or that it is well tailored.  "[S]ince the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require."  *Bd. of Trs. of State Univ. of N.Y.*, 492 U.S., at 480 (citation omitted)); *Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011) (government bears the burden of justifying its action under heightened standard of judicial review); *United States v. Cunningham*, No. 20-cr-104-CJW-MAR, 2021 WL 2593766, at *11 (N.D. Iowa June 24, 2021) ("Ordinarily, the Government bears the burden of proving that the regulated activity is not protected by the Second Amendment.") (citing *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012)).  If the burden of proof is shouldered, the government regulation survives scrutiny.  If the government does not bear its burden of proof, then the citizen prevails.

The Attorney General says that the state should not have the initial burden of proving a billy is *not* commonly possessed for lawful purposes.  But this is exactly wrong.  The constitutional imperative is on the government to not infringe.  The correct starting orientation is that no arm may be prohibited.  The presumption in favor of rightfully possessing a citizen's arm was made during the adoption of the Second Amendment.

Here, there is no evidence that a billy is uncommon or commonly owned only for unlawful purposes.  Because the government bears the burden, these arms are presumptively lawful to own.  However, because the government has successfully borne it burden of demonstrating that the regulation of a billy is longstanding, according to controlling precedent, the regulation is deemed beyond the scope of the Second Amendment.

[9]  The Supreme Court also recognizes that the Second Amendment guarantee includes arms that have "some reasonable relationship to the preservation or efficiency of a well-regulated militia." *United States v. Miller*, 307 U.S. 174, 178 (1939).  *Miller*

argument, but no evidence.  Because the government has the burden, the lack of evidence would cut in favor of Plaintiffs' challenge.  But this case ends early under the Ninth Circuit's pre-emptive carve-out for longstanding restrictions, described next.

### A.  The Ninth Circuit's Two-Step Framework for Second Amendment Cases

The Ninth Circuit has developed its own two-step framework for Second Amendment cases.  *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (en banc); *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) ("two-step Second Amendment inquiry"); *Yukutake v. Conners*, No. cv 19-00578 JMS-RT, 2021 WL 3625307, at *5 (D. Haw. Aug. 16, 2021) ("The Ninth Circuit -- along with the majority of other circuit courts -- has adopted a two-step inquiry to implement the *Heller* framework.").  The Ninth Circuit approach applied below is slightly different from the *Heller* approach described above.  The first step of the Ninth Circuit approach asks whether the regulation or prohibition is outside the scope of the Second Amendment.  *Young*, 992 F.3d at 783.  If it is within the scope, for the second step, the Ninth Circuit understands *Heller* to require one of three levels of scrutiny.[10]  *Heller* does not actually say anything about how to apply three levels of scrutiny.  But it does say heightened scrutiny is required.  Here, however,

---

implies that possession by a law-abiding citizen of a weapon commonly owned, that could be part of the ordinary military equipment for a militia member and would contribute to the common defense, is also protected by the Second Amendment.  *Heller* and *Miller* are consistent.  As *McDonald* puts it, "in *Heller*, we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias."  *McDonald*, 561 U.S., at 787; *see also Caetano*, 136 S. Ct., at 1028.

[10]  "If a regulation amounts to a destruction of the Second Amendment right, it is unconstitutional under any level of scrutiny; a law that implicates the core of the Second Amendment right and severely burdens that right receives strict scrutiny; and in other cases in which Second Amendment rights are affected in some lesser way, we apply intermediate scrutiny."  *Young*, 992 F.3d at 784 (quotation marks and citations omitted).

no level of scrutiny is applied because the analysis of the billy regulation ends at step one.

### 1. Step One -- Historical Regulation

Ninth Circuit precedent requires looking for a regulation's historical pedigree as a first step. In determining whether a given regulation falls within or without the scope of the Second Amendment, the Ninth Circuit asks, "whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (internal quotes and citations omitted). The Ninth Circuit says that if the regulation qualifies as longstanding, the law may be upheld without further analysis (*i.e.*, without continuing to step two). *Young* instructs,

> First, we ask if the challenged law affects conduct that is protected by the Second Amendment. We base that determination on the historical understanding of the scope of the right. We are to inquire whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood. Laws restricting conduct that can be traced to the founding era and are historically understood to fall outside of the Second Amendment's scope may be upheld *without further analysis*. Accordingly, a regulation does not burden conduct protected by the Second Amendment if the record contains evidence that the subjects of the regulations have been the subject of longstanding, accepted regulation. We are looking for historical prevalence. Similarly, we may uphold a law *without further analysis* if it falls within the presumptively lawful regulatory measures that *Heller* identified.

*Young*, 992 F.3d at 783–84 (internal quotations marks and citations omitted) (emphasis added).

This Court does not read the Second Amendment or *Heller* to require stopping a constitutional inquiry *without further analysis*. A presumptively lawful firearm restriction may, upon further analysis, actually be at odds with the Second Amendment.

Why should a longstanding regulation be kept permanently beyond the reach of constitutional review?  If judges accept *Young*'s invitation to uphold firearm restrictions without further analysis, a longstanding firearm restriction may be left stuck in the past, only because it has not been challenged before the present.  Indeed, a restriction may not have been challenged in the past because, prior to *Heller*'s decision in 2008, it was said that an individual lacked Article III standing to assert an individual Second Amendment right.[11]  Prior to 2008, most judicial thinking about the Second Amendment was incorrect. Lower court opinions did not acknowledge that the Second Amendment conferred an individual right to own firearms, or that the right applied against the states.  *See e.g., United States v. Hancock*, 231 F.3d 557, 565–66 (9th Cir. 2000) ("[T]his court has concluded that 'the Second Amendment is a right held by the states, and does not protect the possession of a weapon by a private citizen.'") (citation omitted).[12]  Other jurists have questioned the notion of a Second Amendment carve-out for longstanding restrictions and presumptively lawful regulations.  *See Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 418 (4th Cir. 2021), *as amended* (July 15, 2021) ("We do not, however, read the word 'longstanding' in *Heller* as a standalone exception to the Second Amendment. . . . *Heller*'s historical, textual, and structural analysis counsels against creating a freestanding category of laws exempt from Second Amendment scrutiny based solely on how long similar laws have existed."); *see also Kanter v. Barr*, 919 F.3d 437, 453–54 (7th Cir. 2019) (Barrett, C.J., dissenting) ("[D]oes 'presumptively lawful' mean that such regulations are presumed lawful unless a historical

---

[11]     *Silveira v. Lockyer*, 312 F.3d 1052, 1066-67 (9th Cir. 2002) ("Because we hold that the Second Amendment does not provide an individual right to own or possess guns or other firearms, plaintiffs lack standing to challenge the AWCA.").

[12]     *See also Hickman v. Block*, 81 F.3d 98, 101 (9th Cir. 1996) ("We follow our sister circuits in holding that the Second Amendment is a right held by the states, and does not protect the possession of a weapon by a private citizen.").

study shows otherwise?  Does it mean that as-applied challenges are available?  . . . Does the word 'longstanding' mean that prohibitions of recent vintage are suspect?").

Of course, whether this Court agrees or not, it is bound to follow binding precedent.  So, in this case, if the regulation on the possession of a billy is a historically-approved prohibition, then it is deemed beyond the ambit of the Second Amendment and it will be upheld without further inquiry, as required. *See Young*, 992 F.3d at 783.

### 2.  California Penal Code § 22210 is a 104-Year-Old Longstanding Regulation

One court recently observed that for the courts called upon to define the boundaries of the Second Amendment, "uncharted frontiers remain."  *Drummond v. Robinson Township*, __ F.4th __, 2021 WL3627106 *1 (3rd Cir. August 17, 2021).  This case about whether a prohibition on billy possession qualifies as "longstanding" lies in an area where maps are yet to be drawn.  *Holloway v. Att'y Gen. United States*, 948 F.3d 164, 181 (3d Cir. 2020) (Fisher, CJ., dissenting) ("[N]either courts nor scholars have agreed on the precise contours of this category -- and in particular how 'longstanding' a regulation must be.").

Treading lightly and cutting a first path, given our Circuit's precedent, this Court holds that the California billy prohibition is a historically approved regulation.  On this question, the Court finds that there are no genuine issues of material fact.  It follows that the restriction on possessing a billy is longstanding and therefore beyond Second Amendment scrutiny.

How did we arrive at this place?  Unlike modern restrictions that have no historical pedigree, for example, prohibitions on AR-15 platform rifles (the oldest of which is 32 years old),[13] or prohibitions on large capacity magazines (the oldest of which is 31 years

---

[13]   *See Miller v. Bonta*, No. 19-cv-1537-BEN (JLB), 2021 WL 2284132, at *9 (S.D. Cal. June 4, 2021) ("Second, a ban on modern rifles has no historical pedigree.  Prior to the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, flare launchers,

old),[14] or mandatory ammunition background checks (which is two years old),[15] or the shrinking handgun roster provisions (which is less than one year old),[16] the prohibition on a billy has been in place in California for a century.  And the California ban is not an anomaly.  Similar bans on billies were enacted in other states a century ago and continue in existence today.

Historical inquiries often begin with the question of how an arm was regulated at the time the United States Constitution and the Bill of Rights were ratified.  *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) ("This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification."); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (considering the year of ratification, 1791, as the critical year for determining the Amendment's historical meaning).  For state laws, some courts look to the year the Fourteenth Amendment was ratified.  *See e.g., Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified.")) (citations omitted); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) ("If the Government demonstrates that the challenged statute 'regulates activity falling outside the scope of the Second

_____

or barrel shrouds.  In fact, prior to California's 1989 ban, so-called assault weapons were lawfully manufactured, acquired, and possessed throughout the United States.").

[14]     *See Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021) ("The oldest statute limiting the permissible size of a detachable firearm magazine, on the other hand, is quite young.  In 1990, New Jersey introduced the first ban on detachable magazines, banning magazines holding more than 15 rounds.").

[15]     *See Rhode v. Becerra*, 445 F. Supp. 3d 902, 911 (S.D. Cal. 2020) ("For the last 170 years, California citizens were able to purchase wanted or needed ammunition without background checks.").

[16]     *See Renna v. Becerra*, No. 20-cv-2190-DMS-DEB, 2021 WL 1597933, at *6 (S.D. Cal. Apr. 23, 2021) ("[T]he regulations at issue are not longstanding.  AB 2847's three-for-one provision is precisely the opposite, having gone into effect on January 1, 2021.").

Amendment right as it was understood at the relevant historical moment -- 1791 [Bill of Rights ratification] or 1868 [Fourteenth Amendment ratification] -- then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.'").  Unfortunately, while wooden sticks may have been used as weapons since the dawn of Man,[17] the weapon known as a billy apparently did not exist at the time of the founding of our nation.  Later on, when the Fourteenth Amendment was ratified, the billy was only beginning its arc of popularity with policemen as the establishment of municipal police departments began to spread.

In trying to "get the history right," courts rely on the parties to direct the focus to the principal historical sources and appropriate precedents.  *Young*, 992 F.3d at 785-86. In this case, the parties might have been more helpful.  Digging into history is the work of historians rather than judges.  Consequently, like the court said in *Young*, "this is a legal opinion, not a dissertation, so we are likely to fall short in some way."  *Id.*

---

[17]     *State v. Kessler*, 289 Or. 359, 371–72, 614 P.2d 94, 100 (1980) ("The club is considered the first personal weapon fashioned by humans.") (citing O. Hogg, *Clubs to Cannon* 19 (1968)).

The billy[18] is often described as a policeman's billy club.[19]  Policemen and police departments were not a feature of American government 1789.  In fact, 80 years later, a

---

[18]      Neither party offers evidence of what, precisely, the weapon is that is commonly known as a billy.  Defendants offer a definition based on their expert's personal opinion, but it is not an expert opinion about what citizens commonly understand a "billy" to be.[18]  Defendants' expert, a Special Agent Supervisor for the California Department of Justice, opines that "a billy is a cylindrical stick or club made of wood, rubber, plastic, or metal that can be used as a compliance tool or bludgeon."  Decl. of John D. Echeverria, Exh. 1 (Dkt. 22-3) (Decl. of Brian Fichtner) at ¶ 13.  Yet, the agent does not explain the basis for his opinion.  He mentions the expandable baton in describing his law enforcement experience, but he does not mention a "billy."  *Id.* at ¶ 4 ("expandable baton"), ¶ 6 (same), ¶ 8 (same), ¶ 10 (same), ¶ 11 ("the 'ASP' expandable baton"), ¶ 12 ("expandable baton"), and ¶ 16 ("my principal experience and training have been with the ASP baton").

One might look for clues to the meaning of a billy in contemporary or historical writings.  Unfortunately, the term "billy" as a kind of weapon is not found in the Corpus of Contemporary American English (a searchable compendium of one billion American writings).  *See* www.english-corpora.org/coca.  The term "billy" is only used together with the term club, as in "billy club."  Even there, "billy club" was found in no more than 94 references from the past 30 years.  Looking at earlier writings, the term "billy" by itself (as used in the statute) is found only four times in the context of a weapon in the Corpus of Historical American English (a searchable compendium of 475 million texts reaching back to the 1810's).  *See* www.english-corpora.org/coha.  The references date from the years 1904, 1906, 1908, and 1927.  Few people are alive today that were alive in 1927, the last time the term "billy" was used as a name for a weapon in a major print publication.  There "billy" was used to describe a police instrument in an article titled "Official Lawlessness," in *Harper's* magazine, 1927-10, p 605-614 (" . . . and identified five detectives as having administered the rubber hose, that favorite police weapon which hurts more than a billy or club, yet leaves no marks.").

In *People v. Mulherin*, 140 Cal.App. 212 (1934), a California Court of Appeal approved of a jury instruction that defined a "billy" as "a bludgeon, as one for carrying in the pocket; a policeman's club."  Admittedly, the decision is a slender reed upon which to rest a definition.  The weapon at issue in *Mulherin* was not a policeman's club at all, but something much different.  The weapon at issue was described as consisting of "a large number of metal washers strung upon a rawhide leather thong.  The washers form two parallel masses, each approximately 3 inches long, with the rawhide strung through one mass and back through the other, and then knotted.  The excess length of the rawhide

city police department was still something of a novelty. "[M]unicipal police departments were a recent development in 1871 and were far from universal."[20] "Among the first departments in America were the Boston and New York City Police Departments, founded in 1839 and 1845 respectively."[21]

In 1889, in Los Angeles, California, the city's first few policemen were ready to patrol and they were outfitted with some sort of club. "In March 30, 1889, all patrol personnel . . . proudly displayed new uniforms. With their introduction came these words from Chief Glass: You will keep your coats buttoned, stars pinned over your left breast on the outside of your coat and hold your clubs firmly. The patrolman's equipment included a 45-70 rifle, a revolver, handcuffs, whistle and baton."[22] Describing New York City after the Civil War, one scholar reports, "[t]here were many calls, including by the chief of police, for returning to the antebellum norm of police armed only with billy clubs. The [New York] state's Concealed Weapons Act of 1866 had made the carrying

---

forms a loop on the opposite side of the knot from the washers." *Id.* at 213. The weapon, the *Mulherin* court decided, qualified as a "slungshot."

[19] Decl. of Stephen D. Stamboulieh in Supp. of Ps' Mtn. for Sum. Jgt., Exh. A (Dkt. 21-2) (Decl. of Russell Fouts), at ¶ 2 ("I desire to purchase the same type of baton/billy that policemen are usually issued."); *Id.*, Exh. B (Decl. of Tan Miguel Tolentino), at ¶ 2 (same); *id.*, Exh. D (Expert Report and Decl. of Brian Fichtner), at ¶ 14 ("A police baton qualifies as a billy under California Penal Code section 22210."); *Id.*, Exh. E (Defendants' Response to Interrogatory No. 6) ("A police baton is an 'instrument or weapon of the kind' or class commonly known as a billy club and thus falls within the scope of California Penal Code section 22210.").

[20] David Jacks Achtenberg, *Taking History Seriously: Municipal Liability Under 42 U.S.C. S 1983 and the Debate over Respondeat Superior*, 73 Fordham L. Rev. 2183, 2249 (2005).

[21] Erin Sheley, *The Constable's Blunder and Other Stories: Narrative Representations of the Police and the Criminal in the Development of the Fourth Amendment Exclusionary Rule*, 2010 Mich. St. L. Rev. 121, 146 (2010).

[22] *See* History of the Los Angeles Police Department (http://laphs.org/history-of-the-lapd).

of 'sling shot, *billy*, sand-club or metal knuckles and any dirk or dagger, or sword cane or air gun' a felony."[23]

That neither the policeman nor the policeman's billy were features of American life at the end of the eighteenth century, does not end the matter. The Supreme Court holds that the Second Amendment extends to all arms, "even those that were not in existence at the time of the founding." *Caetano*, 577 U.S., at 411. What does end the matter for constitutional purposes is that possessing a billy has been a subject of criminal law regulation for a very long time.

Today, the policeman's billy is a relic of the past.[24] "In the 1970's, 80's and 90's, the police departments used a PR-24, which is basically just a stick with a handle on it. *Before that*, the police departments used a Billy club, which was basically just a stick with [no] handle. In the late 1990's and early 2000's, they were starting to transition from the PR-24 to . . . a collapsible metal baton."[25] Spectacles such as Alabama state troopers beating 1960's civil rights marchers over the head with a billy, and the 1991 televised beating of an African-American DUI suspect by Los Angeles Police Department officers with police billies,[26] hastened the end of police use. "After incidents such as the beating of Rodney King, the use of straight clubs declined out of public image

---

[23]    Michael A. Bellesiles, *Firearms Regulation: A Historical Overview*, 28 Crime & Just. 137, 165 (2001) (citations omitted) (emphasis added).

[24]    *See e.g.,* "Chicago Police Discard Time Honored Billy", Chicago Tribune 1927 ("Another time honored symbol of police authority -- the billy club -- has passed into history, at least so far as the Chicago police force is concerned. 'We have discarded the billy club as an almost useless weapon,' Chief Collins announced yesterday. 'Only a few men, those who are still walking beats, carry them anymore. The era of street tights with sticks, bricks, and fists, when it was often necessary for a bluecoat to crack a few heads with his billy, has disappeared,' the chief explained. 'Nowadays the rowdies and crooks carry pistols, in their pockets and machine guns in their high powered cars.'").

[25]    Decl. of John D. Echeverria, Exh. 2 (Dkt. 22-4) (Decl. of Leofuldo Tablanza II) at 5 (emphasis added).

[26]    *See Koon v. United States*, 518 U.S. 81, 86–87 (1996) (describing assault of Rodney King by Los Angeles Police Officers with police batons).

concerns.  The availability of TASERs, pepper spray, and collapsible batons along with a greater concern for officer safety have also contributed to the reduced use of the traditional straight club."[27] As legal commentators note, today the low-power billy club is absent from modern policing,

> Police today have the means to impose unfathomable harm. From SWAT teams to high-powered assault rifles, battering rams and flash-bang explosives, they employ a range of munitions and auxiliary devices more apt to the battlefield than a suburban street.  Technology has also expanded the available means of (ostensibly) non-lethal force, like Tasers and pepper spray.  The constraints that may have worked to keep police in line when officers wielded a handgun or a billy club are no longer sufficient in a world of overwhelming police force.[28]

Nevertheless, while police no longer carry a billy on their equipment belt, preferring instead a collapsible metal baton, criminals still make billy weapons and California still prosecutes cases of billy possession under §22210.[29]

The Ninth Circuit has not yet decided a case involving a 104-year-old statute prohibiting an arm, or an arm that has come and gone out of fashion.  What the Ninth Circuit has addressed is a two-year-old ballot initiative in *Fyock* and a 1996 amendment

---

[27]     Decl. of John D. Echeverria, Exh. 3 (Dkt. 22-5) (History and Use of the Billy Club) at 7.

[28]     Barry Friedman & Maria Ponomarenko, *Democratic Policing*, 90 N.Y.U. L. Rev. 1827, 1875 (2015).

[29]     *See e.g.*, *People v. Shanklin*, No. B297497, 2020 WL 946272, at *3 (Cal. Ct. App. Feb. 27, 2020) (defendant charged with possession of a billy or blackjack under § 22210 based on small wooden club or "tire buddy" in his vehicle); *People v. Williams*, No. E071337, 2019 WL 5885088, at *1 (Cal. Ct. App. Nov. 12, 2019), *review denied* (Jan. 15, 2020) (defendant charged with possession of a billy/blackjack under § 22210 where two-foot long wooden baton/billy club was by the driver's seat); *People v. Twiford*, No. C 082106, 2018 WL 1444560, at *2 (Cal. Ct. App. Mar. 23, 2018) (defendant convicted of possessing a billy club under § 22210 where 14-inch piece of rebar with paracord wrapped handle was inside defendant's backpack while shoplifting).

in *Chovan,* while bypassing the question of a 1923 statute in *Silvester*.  At the long end of the historical spectrum, in *Teixeira v. County of Alameda*, 873 F.3d 670, 684 (9th Cir. 2017), the Ninth Circuit began its historical survey with the 1689 English Bill of Rights for its review of a zoning restriction on a firearm store.[30]  And *Young* reached back to 1299 to decide that Hawaii's restriction on the open carrying of a firearm was longstanding.[31]  The history of the billy statute falls somewhere in between.

In *Fyock*, the Ninth Circuit suggested that "several state regulations from the early twentieth century," "[a]lthough not from the founding era . . . might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record."  *Fyock*, 779 F.3d at 997.  Thus, *Fyock* strongly suggests that California's prohibition of billy possession qualifies as longstanding.  Plaintiffs, however, object that *Fyock*'s musing on this point is dicta. After all, the question before the Ninth Circuit in *Fyock* was the constitutionality of a two year old ballot measure criminalizing possession of a firearm magazine able to hold more than 10 rounds.[32]  And the first regulation on the size of a magazine in any state was enacted in 1990 – not the early twentieth century.[33]  So, Plaintiffs are right to object.

---

[30]    *Teixeira* concluded that there is no historical authority suggesting the Second Amendment confers a freestanding right to sell firearms.  873 F.3d at 687.

[31]    992 F.3d at 826 ("Hawai'i's restrictions have deep roots in the Statute of Northampton and subsequent English and American emendations, and do not infringe what the Court called the 'historical understanding of the scope of the right.' Those restrictions are within the state's legitimate police powers and are not within the scope of the right protected by Second Amendment.  That means that Young's challenge to Hawai'i's restrictions fails at step one of our framework and 'may be upheld without further analysis.'") (internal quotations and citations omitted).

[32]    *Fyock*, 779 F.3d at 994 ("In November 2013, Sunnyvale voters passed Measure C, thereby amending the Municipal Code to include the large-capacity magazine restriction at issue in this appeal.").

[33]    "The oldest statute limiting the permissible size of a detachable firearm magazine, on the other hand, is quite young. In 1990, New Jersey introduced the first ban on

*Fyock* relied on *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 196 (5th Cir. 2012). *Nat'l Rifle Ass'n*, in turn, decided that "[f]or now, we state that a longstanding, presumptively lawful regulatory measure—whether or not it is specified on *Heller*'s illustrative list—would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework." *Id*. In other words, *Nat'l Rifle Ass'n* surmised that if a regulation is longstanding, then it is outside of Second Amendment protection. The Fifth Circuit was reviewing a regulation on the minimum age for gun ownership. History showed that by 1923, twenty-two states and the District of Columbia had similar regulations. *Id.* at 202. Yet, the Fifth Circuit sidestepped the question of whether the regulation qualified as longstanding. Instead, it assumed the statute did not qualify as longstanding and progressed to step-two analysis. *Id.* at 204-05.

*Nat'l Rifle Ass'n,* in turn*,* relied on *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1253 (D.C. Cir. 2011)) which opined, "[a] regulation that is 'longstanding,' which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right; concomitantly the activities covered by a longstanding regulation are presumptively not protected from regulation by the Second Amendment." In *Heller II*, the District of Columbia Court of Appeals decided that handgun registration requirements are longstanding in American law with many coming into existence in the early twentieth century. Consequently, *Heller II* decided that the District of Columbia registration requirement did not impinge upon Second Amendment rights. *Id*. at 1254. Though not controlling, *Heller II* is persuasive authority that

---

detachable magazines, banning magazines holding more than 15 rounds. N.J.S. 2C:39 (1990). Eight other states eventually followed. The federal government first regulated detachable magazines in 1994." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1149 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated,* 988 F.3d 1209 (9th Cir. 2021), *appeal heard and submitted June 22, 2021*.

California's statute, 104 years in existence, also qualifies as having "long been accepted by the public." *Heller II* suggests that § 22210, being a statute from the same time period, likewise does not impinge on Second Amendment protections.

Dismissing *Fyock* as dicta, Plaintiffs look to *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013).  In *Chovan*, the Ninth Circuit addressed the constitutionality of 18 U.S.C. § 922(g)(9).  Section 922(g)(2) prohibits domestic violence misdemeanants from possessing firearms.  The government argued that the prohibition qualified as longstanding.  The *Chovan* court was reluctant to agree.  "We do not agree," said the court.  *Chovan* explained, "it is not clear that such prohibitions are so longstanding.  The first federal firearm restrictions regarding violent offenders were not passed until 1938, as part of the Federal Firearms Act."  *Id*. at 1137  If the Ninth Circuit says it is skeptical that a statute from 1938 qualifies as longstanding, would a billy prohibition just twenty years older qualify as longstanding?  This time, Defendants object that *Chovan*'s statement is dicta.  And with good reason.  *Chovan* noted that § 922(g)(2)'s prohibition on misdemeanant firearm possession was actually of much more recent vintage (*i.e.*, 1996) – thus, it was hardly longstanding.  *Id*. ("In fact, domestic violence misdemeanants were not restricted from possessing firearms until 1996, with the passage of the Lautenberg Amendment to the Gun Control Act of 1968. Pub. L. No. 104–208, § 658, 110 Stat. 3009, 3009–371 (1996).").  So, Defendants' objection is also valid.

Along the way, *Chovan* discussed the treatment of § 922(g) in other circuits and noted the diversity of opinions on whether the statute qualifies as longstanding.  The Eleventh Circuit upheld the § 922(g) prohibition as analogous to longstanding regulations and therefore presumptively lawful.  *Id.* at 1134 (citing *United States v. White*, 593 F.3d 1199, 1205 (11th Cir. 2010)); *see also United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (upholding § 922(g) as longstanding but with little discussion) and (Tymkovich, CJ., concurring) (discussing the debate among historians concerning whether felon dispossession laws existed at the time of the founding or are creations of the twentieth century and not longstanding).  On the other hand, the First, Fourth, and

Seventh Circuits upheld § 922(g)'s prohibition after applying intermediate scrutiny, with the Fourth Circuit finding the historical evidence to be inconclusive on whether the prohibition was longstanding. *Id.* at 1135 (citing *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011), *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010), *United States v. Staten*, 666 F.3d 154, 167 (4th Cir. 2011), and *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc)). The fact that the courts of appeal disagree over whether a federal statute enacted in 1938 and amended in 1996 qualifies as longstanding, highlights the lack of agreed markers to guide the inquiry for California's billy prohibition.

Defendants contend *Chovan* is not helpful. Instead, Defendants point to *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016). In *Silvester*, the Ninth Circuit upheld a mandatory 10-day waiting period between purchase and delivery of a firearm. The state's waiting period statute has existed since 1923 (at that time it was a one-day waiting period). *Id.* at 823. Defendants rely, in particular, on the concurring opinion of Chief Judge Sidney R. Thomas. The concurrence would have found that the waiting period requirement was sufficiently longstanding to be considered presumptively lawful. *Id.* at 831 (Thomas, CJ., concurring). The concurrence opined that "[t]he term 'longstanding' is not restricted to the time of the founding of the Republic." *Id.* Moreover, the concurrence noted that two other states (Connecticut and North Dakota) had similar laws in 1923. *Id.* The reasoning of the concurrence, augurs in favor of finding that the billy restriction (in existence since 1917 along with similar laws in other states) qualifies as a presumptively lawful longstanding regulation.

*Silvester'*s majority, however, did not decide that the 1923 statute qualified as "longstanding." Instead, as several other courts have done, the majority sidestepped the step one inquiry. Instead, the *Silvester* majority assumed, without deciding, that a waiting period was within the scope of the Second Amendment and continued to step two to apply a level of scrutiny. *Id.* at 826-27. While the *Silvester* decision provides a clear indication that one member of the court would conclude the billy statute is longstanding, the binding decision of the majority leaves the question unanswered.

Finally, Plaintiffs rely on the decision of Connecticut's Supreme Court in *State v. DeCiccio*, 105 A.3d 165, 208 (2014).  In *DeCiccio*, a military veteran was convicted of transporting a collapsible baton and a dirk knife in his vehicle under a state statute that prohibits having a dangerous weapon in a motor vehicle, including "a police baton or nightstick."  A jury found him guilty for using his Jeep to transport the baton and knife from his former residence in Connecticut to his new residence in Massachusetts.  *Id*. at 170–71.  The state supreme court found *Heller* protected DeCiccio's right to keep the collapsible police baton in his home for self-defense.  *Id.* at 171.  Then applying means-end scrutiny, the court scrutinized the categorical bar on transporting those weapons by motor vehicle from a former home to a new home and concluded the prohibition impermissibly infringed DeCiccio's Second Amendment rights.  *Id.* at 171-72, 208 ("We conclude that the state has not provided sufficient reason for extending the ban on transporting dirk knives and police batons to a scenario, like the present one, in which the owner of those weapons uses his vehicle to move them from a former residence to a new one.").

For a step-two inquiry, *DeCiccio*'s means-end analysis is sound and this Court would likely agree.  The difference in this case is that *DeCiccio* did not engage in a step-one historical analysis -- and for good reason.  It would be difficult to argue that the provision was "longstanding" because the "police baton or nightstick" language of the Connecticut statute was the product of a 1999 amendment.  *See id.* at n.11 ("In 1999, the legislature amended General Statutes . . . to include within their purview 'any police baton or nightstick'....").  Consequently, however persuasive it would be at step two, *DeCiccio* does not help decide whether the California billy regulation qualifies as longstanding at step one.

### 3. Billy Regulation in Other States

*Heller* cautioned that when deciding whether a regulation is longstanding, "we would not stake our interpretation of the Second Amendment upon a single law, in effect in a single city, that contradicts the overwhelming weight of other evidence regarding the

right to keep and bear arms for defense of the home." *Heller*, 554 U.S. at 632.  Here, California's billy law is not a one-of-a-kind experiment.  A survey of state law provides a picture of many states placing prohibitions or regulations on billies for over a century.

To begin, Defendants point out that a billy ban was put in place in Nevada in 1925 using statutory language identical to the California prohibition.[34]  Defendants also demonstrate that in the State of New York, a billy ban has been in place since 1908, also using statutory language identical to the California ban.[35]  And Defendants cite legislation from the era of the Fourteenth Amendment ratification that concealed carrying of a billy was deemed a crime in New York as early as 1866.[36]  Lastly, Defendants show that in the Commonwealth of Pennsylvania, carrying a concealed "handy-billy" was a crime as early as 1875.[37]

This Court's own research finds that West Virginia prohibited the carrying of a billy in 1882.[38]  In 1886, Maryland made it a crime to carry a billy concealed or to carry a billy openly with the intent or purpose of injuring another.[39]  In 1887, Michigan enacted Act No. 129, Public Laws 1887, § 1 prohibiting the concealed carrying of a "pocket billy."[40]  In 1891, the Territory of Oklahoma prohibited the carrying of a billy.[41]

---

[34]    Defs' Request for Judicial Notice (Dkt. #22-19), Exh. 3.
[35]    Defs' Request for Judicial Notice (Dkt. #22-19), Exh. 4; s*ee also Young*, 992 F.3d at 811-12 (citing 1913 N.Y. Laws 1627–30, vol. III, ch. 608, § 1).
[36]    Defs' Request for Judicial Notice (Dkt. #22-19), Exh. 5.
[37]    Defs' Request for Judicial Notice (Dkt. #22-19), Exh. 6.
[38]    *State ex rel City of Princeton v. Buckner*, 377 S.E.2d 139 n.4 (W.V. 1988) (citing 1882 W.Va. Acts, ch. 135, §7).
[39]    *Lawrence v. State*, 2021 WL3502925 *7-8 (Ct. App. Md. Aug. 10, 2021).
[40]    *People v. Pendleton*, 44 N.W. 615 (Mich. 1890); *see also* Mich. Penal Code § 750.224(1)(d).  Michigan courts have found that the modern collapsible baton falls within the state's prohibition on a billy.  *Shahit v. City of Detroit Police Officer Tosqui*, No. 04-71538, 2005 WL 1345413, at *15 (E.D. Mich. June 1, 2005), *aff'd sub nom. Shahit v. Tosqui*, 192 F. App'x 382 (6th Cir. 2006) (finding that even if a baton does not fit within the definition of a "bludgeon," it fits within the definition of a "billy").
[41]    1891 Okla. Sess. Laws 495, art. 47, § 2 (cited in *Young*, 992 F.3d at 801).

In 1915, North Dakota prohibited the concealed carrying of a "billy."[42]  In 1929, Missouri made it a crime to carry a "billy' in an automobile while transporting liquor.[43] In 1937, as a U.S. territory, Hawaii prohibited a person from carrying concealed, or within a vehicle, a "billy."  In addition, it was unlawful in Hawaii for a person to be "found armed with any . . . billy."[44]  Also in 1937, Illinois made it a crime to possess a billy with intent to use it unlawfully or to carry a billy concealed.[45]

Rhode Island criminalized possessing or carrying any weapon of the kind "commonly known as a billy" since at least 1956.[46]  In 1969, Ohio joined the ranks and prohibited the carrying of a "billyclub."[47]  In 1980, an Oregon court struck down, as violating the state's own constitutional analog of the Second Amendment, an existing Oregon statute prohibiting the possession of a billy.[48]  New Jersey currently prohibits possession of dangerous weapons including a billy.[49]  Massachusetts criminalizes being armed with, or having on one's person, a "billy" while committing a breach of the peace.[50]  Mississippi imposes a sentencing enhancement for committing a carjacking while armed with a billy.[51]  Current Illinois law makes possessing a "billy" during the

---

[42]   *State v. Brown*, 165 N.W. 520 (N.D. 1917) (citing ch. 83 of the Laws of 1915).
[43]   *State v. Carter*, 64 S.W.2d. 687 (Mo. 1933) (citing Mo. Revised Statutes 1929, §4517).
[44]   Hawaii Stat. § 134-51.
[45]   *People v. McMurray*, 62 N.E.2d 793 (Il. 1945) (citing Il. Rev. Stat. 1937, chap. 38, ¶ 152).
[46]   R.I. Gen. Laws § 11-47-42.
[47]   *State v. Haugabrook*, 272 N.E. 213 (Cty. Ct. Oh. 1971) (citing Ohio R.C. §2923.012).
[48]   *State v. Kessler,* 289 Or. 359 (1980); *see also State v. Blocker*, 291 Or. 255 (1981).
[49]   N.J Stat. 2C:39-1(r).
[50]   Mass. Stat. 269 §10(b).
[51]   Miss. Stat. § 97-3-117(2).

commission of a felony a sentencing enhancement.[52] And Wisconsin provides for the issuing of a license to a person to be able to lawfully carry concealed a "billy club."[53]

As noted earlier, *Young* teaches that a regulation does not burden conduct protected by the Second Amendment if, after looking for historical prevalence, there is evidence that the challenged restriction has been the subject of longstanding, accepted regulation. 992 F.3d at 783-84.  And as *Heller II* observed, "longstanding" "necessarily means it has long been accepted by the public . . . [and is] not likely to burden a constitutional right." 670 F.3d at 1253.  The weapon known as a billy has been the subject of regulation in at least twenty states -- beginning in the 1800's and continuing to the present.  The historical prevalence of nationwide restrictions is sufficient to conclude that government regulation of a billy has long been accepted by the public.[54] *Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018), said, "'longstanding, accepted regulations' may come from the early-twentieth century and need not trace their roots back to the Founding, so long as their 'historical prevalence and significance is properly developed in the record." *Id.* at 1003-04.[55] California Penal Code § 22210's prohibition on possessing an "instrument or weapon commonly known as a billy" passes this test.

Plaintiffs argue that the historical prevalence raises merely a rebuttable presumption of constitutionality and that they have rebutted the presumption.[56]  The

---

[52]   Il. Stat. Ch. 720, § 5/33A-1(c)(3).
[53]   Wisc. Stat. § 175.60.
[54]   *Cf. Jones v. Becerra*, 498 F. Supp. 3d 1317, 1325 (S.D. Cal. 2020) ("The inquiry as to whether a regulation is longstanding necessarily requires the Court to examine the history of the law.  When analyzed through the lens of history and tradition, it is apparent that a number of gun regulations have co-existed with the Second Amendment right.") (*citing Heller II*, 670 F.3d at 1274).
[55]   It is noted, however, that *Pena* considered a 1999 California statute known as the Unsafe Handgun Act.  In so doing, it assumed without deciding that the statute would survive Second Amendment scrutiny under step one and proceeded to apply step two scrutiny.  898 F.3d a6 976.
[56]   Plaintiffs' Oppo. to Defs' Mot. for Sum. Jgt., at 6.

assertion is unsupported by anything more than a scintilla of evidence.  But it does not matter under Ninth Circuit precedent.  As noted earlier, once an arms regulation qualifies as longstanding, it is upheld without further inquiry.  *Young*, 992 F.3d at 783.  Therefore, as there are no genuine issues of material fact requiring a trial, Plaintiffs' motion for summary judgment is denied and Defendants' motion for summary judgment is granted.

**B.  Step Two – Not Commonly Owned for Lawful Purposes**

If § 22210 was not a longstanding regulation, the Second Amendment analysis would move to step two.  *Young*, 992 F.3d at 784.  As applied to the California prohibition here, *Heller* would ask: is the weapon prohibited by § 22210 commonly possessed by law-abiding citizens for lawful purposes?  According to interpretations by California state courts, interpretations which federal courts must respect, the arms prohibited by § 22210 are *not* commonly owned for lawful purposes.

For example, in *Liscotti*, the defendant was convicted of possession of a billy in violation of § 22210.  The weapon was described as *a baseball bat wrapped in nylon rope, with a hole bored in its center, and a lead bolt implanted in its core.  People v. Liscotti*, 219 Cal.App.4th 1, 5 (2013).  The altered bat was a weapon *not* normally possessed by a law-abiding citizen for a lawful purpose.  In contrast, the court of appeal wrote, "it appears to us to be a weapon which, by its very nature, increases the risk of violence in any given situation, is a classic instrument of violence, and has a homemade criminal and improper purpose."  *Id*.  The court of appeal continued, "it appears to be the type of tool that a brawl fighter or a cowardly assassin would resort to using, designed for silent attacks, not a weapon that would commonly be used by a good citizen."  *Id*.  The state prohibition on possession of such a weapon is consistent with *Heller*'s Second Amendment test.

Another example comes from *People v. Canales*, 12 Cal.App.2d 215, 217 (1936), where the defendant was convicted *inter alia* of possessing a billy under the predecessor of § 22210.  There, the billy was a weapon described as *a club, 14¼ inches long, thicker at one end, with nails driven into the larger end, and covered with tape*.  It is difficult to

imagine a club with nails being commonly possessed by law-abiding citizens for lawful purposes.  This kind of weapon would also fail *Heller*'s hardware test.

*Heller* held that the core of the Second Amendment right is to preserve the right of law-abiding citizens to defend hearth and home.  554 U.S. at 635; *see also Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) ("Second Amendment guarantees are at their zenith within the home.").  "As we put it, self-defense [is] 'the central component of the right itself.'" *McDonald*, 561 U.S. at 787.  Were there a preponderance of evidence demonstrating that a policeman's billy is commonly owned by law abiding citizens for defense of the home, a (newly enacted – not longstanding) statute like § 22210 would run headlong into the *Heller* test and the statute would be struck down. *Cf., Bauer*, 858 F.3d at 1222 (quoting *Silvester*, 843 F.3d at 821) ("A law that imposes such a severe restriction on the fundamental right of self-defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny.").  That is not the case here.

Beyond the old policeman's billy, does California Penal Code § 22210 criminalize possession of a golf club, or a rolling pin, or plumbing pipe, as a "billy"?  To reiterate what California's Supreme Court said in *Grubb*, "concomitant circumstances may well proclaim the danger of even the innocent-appearing utensil."  63 Cal.2d at 621.  Section 22210 prohibits possession of even "ordinarily harmless objects when the circumstances of possession demonstrate an immediate atmosphere of danger."  *Id.*  So, the answer is that it depends on the circumstances of possession.  *Grubb* explained, "the statute [§ 22210] would encompass the possession of a table leg, in one sense an obviously useful item, when it is detached from the table and carried at night in a "tough" neighborhood to the scene of a riot.  On the other hand the section would not penalize the Little Leaguer at bat in a baseball game."  *Id.*

## V.    CONCLUSION

Plaintiffs constitutional challenge to California Penal Code § 22210 as it applies to instruments or weapons commonly known as a billy ends at step one.  Under controlling

1   precedent precluding further analysis, because the 104-year-old regulation is

2   longstanding, it is therefore beyond the sweep of the Second Amendment.  Plaintiffs'

3   motion for summary judgment is denied and Defendants' cross motion for summary

4   judgment is granted.

5       Dated September 22, 2021.

6

7       _____

8       Hon. Roger T. Benitez
        UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28