ROB BONTA
Attorney General of California
BENJAMIN M. GLICKMAN
Supervising Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
ANTHONY P. O'BRIEN
Deputy Attorney General
State Bar No. 232650
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-6002
  Fax:  (916) 324-8835
  E-mail:  Anthony.OBrien@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his*
*official capacity as Attorney General of the*
*State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RUSSELL FOUTS et al.,**<br><br>Plaintiff,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>Defendant. | Case No. 3:19-cv-01662-BEN-JLB<br><br>**DEFENDANT'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF OCTOBER 17, 2022**<br><br>Dept:          5A<br>Judge:        Hon. Roger T. Benitez<br><br>Action Filed:      September 1, 2019 |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................... 1

BACKGROUND ..................................................................................... 3

    I.      Historical Overview of California's Prohibition on Billies ................. 3

          A.    History of Billies and Police Batons ......................................... 3

          B.    California's 105-Year-Old Restrictions on Billies...................... 6

    II.     Procedural History ................................................................. 7

ARGUMENT ........................................................................................ 8

    I.      Overview of *Bruen*'s Text-and-History Standard for Analyzing Second Amendment Claims.................................................... 8

    II.     California's Billy Club Restrictions Satisfy the Text-and-History Standard............................................................................... 14

          A.    Plaintiffs Cannot Establish that the Billy Club Restrictions Burden Conduct Protected by the Plain Text of the Second Amendment ..................................................... 15

              1.    Plaintiffs Bear the Burden of Showing that Section 22210 Regulates Conduct Protected by the Plain Text of the Second Amendment.................................... 15

              2.    Billy Clubs Are Not Protected "Arms" Under the Second Amendment Because They Are Not Commonly Used for Self-Defense. .............................. 17

          B.    Section 22210's Restrictions on Billy Clubs Are Consistent with the Nation's Traditions of Similar Weapons Regulations ............................................................ 22

              1.    The Second Amendment does Not Limit the States' Police Powers to Address Public Safety Threats as They Arise .......................................................... 23

              2.    Historical Regulations of Dangerous or Unusual Weapons Are Ubiquitous in American History, Including the Relevant Periods Surrounding the Ratification of the Second and Fourteenth Amendments.................................................... 24

                     a.    The Attorney General Needs Only Show that Section 22210 Is "Relevantly Similar" to the Historical Tradition of Regulating Dangerous or Unusual Weapons ........................................... 24

                     b.    Medieval and Pre-Founding English History ...... 25

                     c.    Colonial and Early National History:  Laws Enacted Around the Time of the Ratification of the Second Amendment.................................. 28

i

1

## TABLE OF CONTENTS
(continued)

2

                                                                    **Page**

3

        d.    Antebellum and Postbellum History: Laws
            Enacted Around the Time of the Ratification

4

            of the Fourteenth Amendment ............................ 29

        e.    Twentieth Century History ................................. 31

5

     3.    The Historical Billy Club Restrictions Are

6

        Relevantly Similar to Section 22210 ............................ 32

        a.    Comparable Burden ............................................ 32

7

        b.    Comparable Justification ..................................... 34

8

III.    If the Court is Inclined to Rule in Plaintiffs' Favor, the Attorney
     General Requests Additional Time to Further Develop the

9

     Historical Record on Billy Club Restrictions ..................................... 35

10

CONCLUSION ..................................................................... 36

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

<u>**Page**</u>

3

CASES

4

5

*Burdick v. Takushi*
504 U.S. 428 (1992) ........................................................................ 16

6

*Caetano v. Massachusetts*
577 U.S. 411 (2016) ................................................................. 10, 17

7

8

*Clark v. Cmty. for Creative Non-Violence*
468 U.S. 288 (1984) ........................................................................ 16

9

10

*Defense Distributed v. Bonta*
No. 22-6200-GW-AGRx, 2022 WL 15524977 (C.D. Cal. Oct. 21,
2022) ................................................................................................ 15

11

12

*District of Columbia, et al. v. Heller*
554 U.S. 570 (2008) .................................................................*passim*

13

14

*Duncan v. Becerra*
366 F. Supp. 3d 1131 (S.D. Cal. 2019) ..................................... 18, 19

15

16

*Duncan v. Bonta*
19 F.4th 1087 (9th Cir. 2021) ................................................... 18, 19

17

18

*Ezell v. City of Chicago*
651 F.3d 684 (7th Cir. 2011) .......................................................... 31

19

20

*Fouts v. Bonta*
561 F. Supp. 3d 941 (S.D. Cal. 2021) .....................................*passim*

21

22

*Heller v. District of Columbia*
670, F.3d 1244 (D.C. Cir. 2011) .............................................. 11, 22

23

24

*Jackson v. City & Cnty. of San Francisco*
746 F.3d 953 (9th Cir. 2014) ............................................................ 9

25

26

*Kennedy v. Bremerton Sch. Dist.*
142 S. Ct. 2407 (2021) .................................................................... 16

27

28

iii

1

2

## TABLE OF AUTHORITIES
### (continued)

Page

3

4

*Kolbe v. Hogan*
849 F.3d 114 (4th Cir. 2017) ................................................................. 22

5

6

*Konigsberg v. State Bar of Cal.*
366 U.S. 36 (1961) ............................................................................... 23

7

8

*McDonald v. City of Chicago*
561 U.S. 742 (2010) ....................................................................*passim*

9

10

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*
No. 22-cv-501-BLF, __ F. Supp. 3d __ (N.D. Cal. Aug. 3, 2022) ................... 15

11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
142 S. Ct. 2111 (2022) ................................................................*passim*

12

13

*People v. Baugh*
20 Cal. App. 5th 438 (2018) .................................................................. 7

14

15

*People v. Bell*
49 Cal. 3d 502 (1989) .......................................................................... 6

16

17

*People v. Brown*
227 Cal. App. 4th 451 (2014) ................................................................ 7

18

19

*People v. Canales*
12 Cal. App. 2d 215 (1936) ................................................................... 7

20

21

*People v. Davis*
214 Cal. App. 4th 1322 (2013) ........................................................ 20, 21

22

*People v. Fannin*
91 Cal. App. 4th 1399 (2001) ................................................................ 5

23

24

*People v. Grubb*
63 Cal. 2d 614 (1965) .................................................................... 6, 20

25

26

*People v. King*
38 Cal. 4th 617 (2006) ..................................................................... 6, 7

27

28

*People v. Leffler*
No. B283175, 2018 WL 3974150 (Cal. App. Aug. 20, 2018) ..................... 3, 4

iv

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*People v. Lisciotti*

4

    219 Cal.App. 4th Supp. 1 (2013)................................................................20

5

*People v. Makovsky*

6

    3 Cal. 2d 366 (1935)..............................................................................5

7

*People v. Mayberry*

8

    160 Cal. App. 4th 165 (2008)..................................................................5

9

*People v. Mercer*

    42 Cal. App. 4th Supp. 1 (1995)..............................................................3

10

*People v. Mulherin*

11

    140 Cal. App. 212 (1934)....................................................................3, 5

12

*People v. Ocasio*

13

    28 N.Y. 3d 178 (2016)..............................................................6, 21, 24

14

*People v. Starks*

15

    130 N.E.3d 556 (Ill. 2019)....................................................................21

16

*People v. Williams*

17

    100 Cal. App. 149 (1929)......................................................................5

18

*Peruta v. Cnty. of San Diego*

19

    824 F.3d 919 (9th Cir. 2016) ...........................................................26, 27

20

*State v. Kessler*

21

    289 Or. 359, 614 P.2d 94 (Or. 1980)................................................20, 21

22

*United States v. Miller*

23

    307 U.S. 174 (1939) ..........................................................................18

24

*Young v. Hawaii*

    992 F.3d 765 (9th Cir. 2021) .............................................................7, 26

25

*Zablocki v. Redhail*

26

    434 U.S. 374 (1978) ..........................................................................16

27

28

v

# TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

720 Ill. Comp. Stat. 5/24-1(a)(1)-(2) (2021) ........................................................ 21

Cal. Stats. 1917, Chapter 145, § 1 ......................................................................... 6

California Penal Code
    § 12020 ............................................................................................................ 7
    § 22210 .................................................................................................... *passim*

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4 ...................... 29

1905 Ind. Acts 677 ................................................................................................ 29

1798 Ky. Acts 106 ................................................................................................ 29

1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots,
    Routs And Unlawful Assemblies, chap. 17, § 1 ............................................ 29

1804 Miss. Laws 90, An Act Respecting Slaves, § 4 ........................................... 29

New York Penal Law § 265.01 ............................................................................ 21

Oregon Revised Statutes 166.520 ........................................................................ 21

Tennessee Code Ann. § 39-17-1307(a)(1) ........................................................... 21

**CONSTITUTIONAL PROVISIONS**

English Bill of Rights
    Article VII (1689) ........................................................... 25, 26, 27, 28

Oregon Constitution
    Article I, § 27 .......................................................................................... 20

United States Constitution
    Amendment I ............................................................................................ 23
    Amendment II .................................................................................. 13, 17

**OTHER AUTHORITIES**

1 Blackstone ch. 1 (1769) .................................................................................... 26

vi

# TABLE OF AUTHORITIES
### (continued)

**Page**

1 Wm. & Mary ch. 2, § 7 ........................................................................25

33 Hen. 8, ch. 6 § 1 at 832 (1541) ..........................................................27

An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the
   Evil Consequences Thereof, reprinted in *Cumberland Gazette*
   (Portland, Me.), Nov. 17, 1786, at 1 ...................................................29

C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev, 741, 773
   (1993).................................................................................................14

Cal. Stats. 1917, Chapter 145, § 1 ...........................................................6

Cal. Stats. 1923, Chapter 339, § 1 ...........................................................7

John Forrest Dillon, *The Right to Keep and Bear Arms for Public and
   Private Defence*, 1 Cent. L. J. 259, 285 (1874)..................................25

Patrick J. Charles, *Armed in America: A History of Gun Rights from
   Colonial Militias to Concealed Carry* 62 (Prometheus 2018)............27

PoliceOne Staff, *History and Use of the Billy Club* (Nov. 16, 2016),
   *available at* https://www.police1.com/police-
   history/articles/history-and-use-of-the-billy-club-
   lCrwpOflpDTkHY2B (last visited Nov. 26, 2022) ...............................4

Robert Escobar, *Saps, Blackjacks, and Slungshots: A History of
   Forgotten Weapons* 82-83 (Gatekeeper Press 2018)............................5

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual":
   Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016).......22

Somerset Record Society, Vol. XX, at 332 (1904) .................................27

**INTRODUCTION**

The Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), fundamentally altered the legal standard for evaluating Second Amendment claims. Instead of the two-step framework that the Ninth Circuit and most other federal courts of appeals had adopted for resolving those claims, *Bruen* held that courts must apply a standard "rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. Under this new "text-and-history" standard, courts must determine whether "the Second Amendment's plain text" protects the conduct in which the plaintiff wishes to engage, and if it does, then decide whether the regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. But, at the same time, the Court also made clear that the Second Amendment is not a "regulatory straightjacket." *Id.* at 2133. It does not prevent states from adopting a "'variety' of gun regulations," *id.* at 2162 (Kavanaugh, J., concurring), and "experiment[ing] with reasonable firearms regulations" to address threats to the public, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion).

Under the Court's new text-and-history standard, and consistent with its prior Second Amendment precedents, California's restriction on the acquisition, manufacture, and possession of billy clubs (also referred to as "billies") is a permissible exercise of the State's traditional police powers that fully comports with the Second Amendment. As it did in the prior proceedings, the Court should uphold the challenged provisions of California Penal Code section 22210 ("Section 22210").[1] The Court previously analyzed the history of state regulation of billy clubs, determining that California's restrictions are part of a long line of state

---

[1] In support of Section 22210's constitutionality, the Attorney General relies on evidence in the existing record as well as the testimony presented in the additional declarations filed herewith: the Declaration of Robert Spitzer ("Spitzer Decl."); the Declaration of Dennis Baron ("Baron Decl."); and the Declaration of Robert Escobar ("Escobar Decl."). The Attorney General incorporates by reference herein the contents of those declarations.

1    regulations of billy clubs dating back to 1866, shortly before the ratification of the

2    Fourteenth Amendment.  Under the new *Bruen* standard, much of that analysis

3    remains relevant.  This brief supplements the historical record in this case and

4    reexamines the constitutionality of California's law under the new standard.

5        ***First***, Plaintiffs cannot show that the plain text of the Second Amendment

6    covers their proposed conduct of acquiring and possessing billy clubs.  Under

7    *Bruen*'s text-and-history standard, Plaintiffs must as a threshold matter demonstrate

8    that the Second Amendment's protection for people keeping or bearing arms for

9    self-defense covers their proposed conduct (i.e., acquiring and possessing billy

10   clubs).  Plaintiffs in this case cannot meet that burden because billy clubs are not

11   commonly used for self-defense.

12       ***Second***, even if the plain text of the Second Amendment covers possession of

13   billy clubs, the Attorney General has satisfied his burden in demonstrating that

14   California's restriction on the possession of billy clubs is "consistent with the

15   Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.  As

16   previously held by this Court, California has a longstanding history of restricting

17   the possession of billy clubs and other dangerous weapons, as the existing

18   restriction has remained in the books for 105 years.  What's more, other states have

19   similar restrictions dating back to the ratification of the Fourteenth Amendment.

20   And even if such an extensive history of billy club restrictions were not sufficient,

21   *Bruen*'s admonition that the government is not required to identify a "historical

22   twin" or "dead ringer" to justify a law, *id.* at 2133, permits consideration of laws

23   regulating other dangerous, blunt-force weapons enacted around the time that the

24   Second and Fourteenth Amendments were ratified, including those enacted during

25   the colonial era.  Section 22210 is constitutional so long as it "impose[s] a

26   comparable burden on the right of armed self-defense" as its historical

27   predecessors, and so long as the burdens of the modern and historical laws are

28   "comparably justified."  *Id.* at 2133.  That is the case here.

Throughout Anglo-American history, governments have adopted restrictions on "dangerous" or "unusual" weapons, *District of Columbia, et al. v. Heller*, 554 U.S. 570, 627 (2008) (*citing* 4 Blackstone 148-49), while allowing law-abiding residents to possess and acquire other weapons for self-defense purposes.  Section 22210 is a part of that tradition.  The numerous restrictions enacted around the time that the Second and Fourteenth Amendments were ratified—such as restrictions on other blunt weapons predating the billy club—responded to existing threats to public safety confronting governments at the time of enactment, including concealable weapons that were used frequently in interpersonal assault and homicide.  And as the use of the billy club became more common as an instrument for criminal purposes, governments shifted focus to restrict billies and other blunt weapons posing threats to public safety.  This history provides ample relevantly similar analogues to California's restrictions on billy clubs.  For this reason, the Court should again enter judgment in the Attorney General's favor and hold that the billy club restrictions in Section 22210 are consistent with the Second Amendment.

## BACKGROUND

### I. HISTORICAL OVERVIEW OF CALIFORNIA'S PROHIBITION ON BILLIES

#### A. History of Billies and Police Batons

A "billy" is historically understood to be a specialized club, capable of being carried on the person, and widely adopted by law enforcement as a compliance tool or impact weapon.  Generally speaking, the term "billy" referred to "a policeman's club."  *People v. Mulherin*, 140 Cal. App. 212, 216 (1934); *see also People v. Mercer*, 42 Cal. App. 4th Supp. 1, 5 (1995) ("Webster's New World Dictionary defines a 'billy' as 'a club or heavy stick; truncheon, esp. one carried by a policeman.'" (citation omitted)); *People v. Leffler*, No. B283175, 2018 WL 3974150, at *2 (Cal. App. Aug. 20, 2018) (noting that a "billy" or "billy club" is also known as "a policeman's truncheon"); Compl. (Dkt. 1) ¶ 35.

3

The billy—i.e., "police officer's club, mace, truncheon, nightstick, or baton"—"is as old as the [law-enforcement] profession itself,"[2] and in the nineteenth and twentieth centuries, soon became "the signature tool of early police officers" in the United Kingdom and, later, the United States.[3]

As noted by this Court, some larger cities and counties in the United States began forming police departments in the mid-1800s. *Fouts v. Bonta*, 561 F. Supp. 3d 941, 951-52 (S.D. Cal. 2021), (discussing creation of police departments in Boston in 1839, New York City in 1845, and Los Angeles in 1889), *vacated on other grounds*, No. 21-56039, 2022 WL 4477732, at *1 (9th Cir. Sept. 22, 2022). In this country, the billy was originally adopted for law-enforcement purposes at approximately the same time as the growth of municipal police departments.[4]

Police officers' billies were made of a variety of materials and varied in size and shape. They could be wooden. *See People v. Leffler*, No. B283175, 2018 WL 3974150, at *2 (Cal. App. Aug. 20, 2018) (describing a "billy" as "a heavy, usually wooden weapon for delivering blows; a short, stout stick used mainly by police officers to defend themselves when necessary, and which may also be known as a baton or truncheon" (internal citations omitted)). They could also be rubber, plastic, or metal. Spitzer Decl., ¶ 10; Compl. (Dkt. 1) ¶ 35; *see also* Escobar Decl.,

---

[2] PoliceOne Staff, *History and Use of the Billy Club* (Nov. 16, 2016), PoliceOne.com, *available at* https://www.police1.com/police-history/articles/history-and-use-of-the-billy-club-lCrwpOflpDTkHY2B (last visited Nov. 26, 2022). Copy is included in the Compendium to the Supplemental Brief ("Supplemental Brief Compendium").

[3] *Id.* (discussing the founding of London's first police department in 1829 and early use of billies).

[4] *See id.* ("Billy clubs were the first less-lethal weapon used by police officers to subdue criminals and maintain public order.").

¶ 15 (noting that the terms "billy club" or billy" also encompasses weapons such as the metal telescoping batons known as ASP batons).

In the mid-1800s and early 1900s, as law-enforcement use of billies expanded, billies fell into the hands of criminals, gaining a reputation for illicit use and—along with other impact weapons such as blackjacks, saps, and slungshots[5]—became part "of the arsenal of the 'public enemy,' the 'gangster.'" *Mulherin*, 140 Cal. App. at 215; *see also Makovsky*, 3 Cal. 2d at 368 (describing undercover operation to procure blackjacks and billies from store operator). This criminal arsenal threatened public safety and law-enforcement officers.[6] By the 1850s, newspaper references to billies associated the weapon with both police and criminal activity. *See* Baron Decl., ¶¶ 46-54. Faced with the cooption of the billy and related tools by criminals, many States instituted restrictions on the civilian use and possession of billies. By 1900, fourteen states (out of 45 plus the District of Columbia) had passed anti-billy club laws. Spitzer Decl., ¶ 10, Ex. B.

As noted by this Court, the billy in its initial form is now a law-enforcement relic. *Fouts*, 561 F. Supp. 3d at 951. Over time, improvements in weapons

---

[5] There is substantial overlap among billies, blackjacks, saps, slungshots, and the other impact weapons identified in California Penal Code section 22210. The "blackjack" has been referred to as "a small leather-covered club or billy, weighted at the end, and having an elastic shaft." *People v. Williams*, 100 Cal. App. 149, 151 (1929) (citation omitted); *see also People v. Makovsky*, 3 Cal. 2d 366, 268 (1935) (noting that "there is, according to the testimony, little if any difference between a billy and a blackjack, and the possession of either instrument is denounced by the statute"). The "sap" has been defined as "[a] club, a blackjack, a hose containing rocks in the middle, or any other object generally used as a bludgeon." *People v. Mayberry*, 160 Cal. App. 4th 165, 171 (2008) (citation omitted). A "slungshot" is a "small mass of metal or stone fixed on a flexible handle, strap or the like, used as a weapon." *People v. Fannin*, 91 Cal. App. 4th 1399, 1402 (2001) (citing *People v. Williams*, 100 Cal. App. 149, 151 (1929)). All of these weapons are "short, easily concealed upon the person and so weighted as to constitute effective and silent weapons of attack." *Mulherin*, 140 Cal. App. at 215 (stating that these weapons "belong to a certain species of weapon having so many characteristics in common that their slight differences are unimportant").

[6] *See* Robert Escobar, *Saps, Blackjacks, and Slungshots: A History of Forgotten Weapons* 82-83 (Gatekeeper Press 2018) (noting that a "generational war between cops and [gangs] escalated" in New York and San Francisco in the nineteenth century, involving "everything from blackjacks to sandbags"). Relevant excerpts included in Supplemental Brief Compendium.

5

1  technology led to its replacement by the modern police baton.  *See People v.*

2  *Ocasio*, 28 N.Y. 3d 178, 181 (2016) (noting that "technological advances

3  throughout the years have resulted in modifications to the traditional wooden billy,"

4  including the development of metal or synthetic batons); *Fouts*, 561 F. Supp. 3d at

5  944 (noting that a "'billy' is an old name given to an old wooden police tool, while

6  the collapsible metal baton is a modern police invention").

### B.  California's 105-Year-Old Restrictions on Billies

8      In 1917, the California Legislature enacted the Dangerous Weapons Control

9  Act to "limit as far as possible the use of instruments commonly associated with

10  criminal activity."  *People v. Bell*, 49 Cal. 3d 502, 544 (1989) (citing Cal. Stats.

11  1917, ch. 145, § 1).  Among other things, the Dangerous Weapons Control Act

12  prohibited the manufacture, sale, giving, or possession of "any instrument or

13  weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub,

14  sandbag, bludgeon, metal knuckles, [or] a dirk or a dagger."  Cal. Stats. 1917, ch.

15  145, § 1; *see also People v. King*, 38 Cal. 4th 617, 624 (2006) (citing Cal. Stats.

16  1917, ch. 145, § 1).

17      The California Supreme Court has explained that these restrictions sought "to

18  outlaw instruments which are ordinarily used for criminal and unlawful purposes,"

19  and to "check[] the possession of objects subject to dangerous use."  *People v.*

20  *Grubb*, 63 Cal. 2d 614, 620 (1965) (citation omitted).  With the exception of metal

21  knuckles, the weapons listed in the original 1917 law "belong to a certain species of

22  weapon having so many characteristics in common that their slight differences are

23  unimportant" and they all are "short, easily concealed upon the person and so

24  weighted as to constitute effective and silent weapons of attack."  *Id.*  The statute

25  defined "the prohibited instruments or weapons not in specific terms, but as being

26  of a kind commonly known as a black-jack or billie," a "purposely broad"

27  definition that was likely adopted to address the "difficulties of nomenclature" in

28

distinguishing the different types of instruments and weapons. *People v. Canales*, 12 Cal. App. 2d 215, 217 (1936).

California's restrictions on billies were reenacted in 1923, Cal. Stats. 1923, ch. 339, § 1, and recodified as former California Penal Code section 12020 in 1953. *See King*, 38 Cal. 4th at 624. In 2010, the provisions were recodified without substantive change as California Penal Code section 22210. *People v. Baugh*, 20 Cal. App. 5th 438, 443 n.2 (2018) (citing *People v. Brown*, 227 Cal. App. 4th 451, 454 n.1 (2014)). California's restrictions on billies have been in continuous effect since 1917.

## II.   PROCEDURAL HISTORY

In September 2019, Plaintiffs filed their complaint, raising facial and as-applied challenges to the constitutionality of California Penal Code section 22210's restrictions on billies under the Second Amendment. Compl. (Dkt. 1). Plaintiffs wish to acquire and possess "the same type of baton/billy [that] policemen are usually issued and an expandable baton for self-defense," and they asserted a cause of action under the Second and Fourteenth Amendments and a cause of action for declaratory judgment. *Id*. at ¶¶ 47, 59, 76–85. Plaintiffs pray for an injunction of Section 22210 "and any other relevant California law which bans the acquisition, possession, carrying or use of billies as applied to Plaintiffs and additionally against other similarly situated law abiding persons." *Id*. at Prayer for Relief.

The parties filed motions for summary judgment. Dkt. 21, 22. Following briefing, in September 2021, this Court granted the Attorney General's motion and denied Plaintiffs' motion, holding that Section 22210 does not violate the Second Amendment. *Fouts*, 561 F.Supp. 3d 941; Dkt. 41. Applying the Ninth Circuit's pre-*Bruen* framework for adjudicating Second Amendment claims, this Court held that Section 22210 is the type of longstanding regulation that must be "upheld without further inquiry" at step one of the framework. *Id*. at 949 (citing *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (en banc), *vacated*, 142 S. Ct. 2895, at

7

1   *2896 (June 30, 2022)).  The Court noted that Section 22210 was enacted more

2   than 100 years ago in 1917 and that numerous other states enacted similar

3   restrictions on billies at that time and earlier.  *See Fouts*, 561 F. Supp. 3d at 943,

4   956-58.  This Court therefore concluded that Section 22210 does not burden

5   conduct protected by the Second Amendment and that "[u]nder Ninth Circuit

6   precedent, that ends the matter."  *Id*. at 946.  This Court entered judgment for the

7   Attorney General on September 22, 2021.  Dkt. 42.

8         Plaintiffs filed a notice of appeal on September 23, 2021.  Dkt. 43.  The parties

9   completed appellate briefing of the matter and were awaiting the scheduling of oral

10  argument when the Supreme Court issued its decision in *Bruen*.  Consistent with his

11  practice in most cases pending appeal when *Bruen* was decided, on August 10,

12  2022, the Attorney General filed a Motion to Vacate and Remand for Further

13  Proceedings.  *Fouts v. Bonta*, No. 21-56039, Dkt. 29.  In that motion, the Attorney

14  General explained that *Bruen* announced a new framework for analyzing Second

15  Amendment claims.  *Id*. at 1.  In light of the new framework, the Attorney General

16  requested that the Ninth Circuit vacate this Court's judgment and remand the matter

17  back to this Court for further proceedings consistent with the new standard

18  articulated in *Bruen*.  *Id*.  On September 22, 2022, the Ninth Circuit granted the

19  Attorney General's motion, vacated this Court's judgment, and remanded the

20  matter back to this Court.  *Fouts v. Bonta*, No. 21-56039, Dkt. 34.  The Ninth

21  Circuit issued the mandate on October 14, 2022.  *Id*., Dkt. 36.

22                          **ARGUMENT**

23  **I.   OVERVIEW OF *BRUEN*'S TEXT-AND-HISTORY STANDARD FOR
24         ANALYZING SECOND AMENDMENT CLAIMS**

25        In *Bruen*, the Supreme Court addressed the constitutionality of New York's

26  requirement that individuals show "proper cause" as a condition of securing a

27  license to carry a firearm in public.  142 S. Ct. at 2123.  Before turning to the

28  merits, the Court announced a new methodology for analyzing Second Amendment

1    claims.  It recognized that lower courts had "coalesced around a 'two-step'

2    framework for analyzing Second Amendment challenges that combines history with

3    means-end scrutiny."  *Id.* at 2125.  At the first step of that approach, the

4    government could "justify its regulation by 'establish[ing] that the challenged law

5    regulates activity falling outside the scope of the [Second Amendment] right as

6    originally understood.'"  *Id.* at 2126 (citation omitted).  If that inquiry showed that

7    the regulation did not burden conduct protected by the Second Amendment, lower

8    courts would uphold the regulation without further analysis.  *Id.*  Otherwise, courts

9    would proceed to the second step, asking "how close[ly] the law c[ame] to the core

10   of the Second Amendment right and the severity of the law's burden on that right,"

11   and applying intermediate scrutiny unless the law severely burdened the "'core'

12   Second Amendment right" of self-defense in the home, in which case strict scrutiny

13   applied.  *Id.*; *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960 (9th Cir.

14   2014) (same).

15        The Supreme Court in *Bruen* declined to adopt the two-step approach.  *See*

16   142 S. Ct. at 2126.  The Court explained that its earlier decisions in *Heller* and

17   *McDonald*, 561 U.S. 742, "do not support applying means-end scrutiny in the

18   Second Amendment context."  *Id.* at 2126-27.  It then announced a new standard

19   for analyzing Second Amendment claims that is "centered on constitutional text and

20   history."  *Id.* at 2128-29.  Under this text-and-history approach,

21
22        When the Second Amendment's plain text covers an individual's
          conduct, the Constitution presumptively protects that conduct.  The
23        government must then justify its regulation by demonstrating that it
          is consistent with the Nation's historical tradition of firearm
24        regulation.

25   *Id.* at 2129-30.

26        Applying that test to the case before it, the Court held that New York's

27   "proper cause" requirement was inconsistent with the Second Amendment's text

28

9

and history, and therefore unconstitutional. *Id.* at 2134-56. New York defined "proper cause" as a showing of "special need for self-protection distinguishable from that of the general community." *Id.* at 2123. This was a "demanding" standard, *id.*, and made it "virtually impossible for most New Yorkers" "to carry a gun outside the home for self-defense," *id.* at 2156 (Alito, J., concurring). The Supreme Court had "little difficulty" concluding that the "plain text" of the Second Amendment protected the course of conduct that the *Bruen* plaintiffs wished to engaged in—"carry[ing] handguns publicly for self-defense"—reasoning that the term "'bear' naturally encompasses public carry." *Id.* at 2134.[7] The Court explained that because "self-defense is 'the *central component*' of the [Second Amendment] right itself," and because "[m]any Americans hazard greater danger outside the home than in it," it would make "little sense" to confine that right to the home. *Id.* at 2135. The Court also held that the plain text applied to the plaintiffs in *Bruen* ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects") and to the weapons that they wished to carry in public ("Nor does any party dispute that handguns are weapons 'in common use' today for self-defense"). *Id.* at 2134.

Because the plain text of the Second Amendment covered the *Bruen* plaintiffs' proposed course of conduct, the burden then shifted to the government to show that the prohibition was consistent with an accepted tradition of firearm regulation. 142 S. Ct. at 2135. The Court categorized the government's historical evidence into different historical periods: (1) medieval to early modern England, (2) the

---

[7] No party in *Bruen* disputed that the "ordinary, law-abiding, adult citizens" who were plaintiffs in the case were "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134. And no party disputed that the handguns that the plaintiffs sought to carry in public were in "common use" for self-defense and thus qualified as protected "Arms." *Id.* (citing *Heller*, 554 U.S. at 627, and *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016)).

American colonies and the early Republic, (3) antebellum America, (4) postbellum America and Reconstruction, and (5) the late 19th and early 20th centuries.  *Id.* at 2135–36.  Given that the historical evidence is used to determine the scope of the Second Amendment as it existed at the time of ratification—and remains to this day—"not all history is equal," and the Court focused on the historical evidence from the period surrounding the ratification of the Second and Fourteenth Amendments.  *Id.* at 2136.[8]

After conducting a lengthy survey of "the Anglo-American history of public carry," the Court held that New York had failed to justify its proper-cause requirement.  *Id.* at 2156.  The Court concluded that this history showed that the Second Amendment guaranteed a right to bear "commonly used arms" in public, "subject to certain reasonable, well-defined restrictions," which had not historically included a requirement that "law-abiding, responsible citizens . . . 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public."  *Id.* (citation omitted).

While *Bruen* announced a new standard for analyzing Second Amendment claims, it also made clear that governments may continue to adopt reasonable gun safety regulations.  The Court recognized that while the Second Amendment (as an enumerated constitutional right) is not a "regulatory blank check," it is also not a

---

[8] The Court suggested that historical evidence long predating ratification may be relevant, however, if it "survived to become our Founders' law" and is consistent with the traditions during the relevant historical period.  *Bruen*, 142 S. Ct. at 2136. Similarly, evidence from long after ratification of the Fourteenth Amendment, though less probative of the original understanding of the scope of the right, may still confirm the scope of that right if consistent with the text of the Second Amendment and the regulatory traditions at the time of ratification.  *Id.* at 2137 ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." (quoting *Heller v. District of Columbia*, 670, F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting))).

"regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133.  Nor does it protect a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626).  Indeed, as Justice Alito explained, *Bruen*'s majority opinion did not "decide anything about the kinds of weapons that people may possess." 142 S. Ct. at 2157 (Alito, J., concurring).

Moreover, Justice Kavanaugh—joined by Chief Justice Roberts—wrote separately to underscore the "limits of the Court's decision." *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring).  Justice Kavanaugh also reiterated the majority's view that the Second Amendment is not a "regulatory straightjacket," *id.* (quoting *Bruen*, 142 S. Ct. at 2133), and *Heller*'s observation that "the Second Amendment allows a 'variety' of gun regulations," *id.* at 2162 (quoting *Heller*, 554 U.S. at 636).[9]  In particular, Justice Kavanaugh emphasized that that the "presumptively lawful measures" that *Heller* identified—including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," laws "forbidding the carrying of firearms in sensitive places," laws "imposing conditions and qualifications on the commercial sale of arms," and laws prohibiting the keeping and carrying of "dangerous and unusual weapons"—remained constitutional, and that this was not an "exhaustive" list. *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626-27, 627 n.26).[10]

---

[9] These observations are consistent with the Court's assurances that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald*, 561 U.S. at 785 (plurality opinion) (quotation marks and citation omitted).

[10] *See also Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *accord McDonald*, 561 U.S. at 785 (plurality opinion) (the Second

12

1       Beyond these general observations, *Bruen* also provided more specific

2    guidance about how lower courts should scrutinize Second Amendment claims

3    under its new approach.  As a threshold issue, *Bruen* directs courts to assess

4    whether the "Second Amendment's plain text covers an individual's conduct,"

5    *Bruen*, 142 S. Ct. at 2126—*i.e.*, whether the regulation at issue prevents any

6    "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes, U.S. Const.

7    amend. II.  The Constitution "presumptively protects that conduct."  *Bruen*,

8    142 S. Ct. at 2126; *see also id.* at 2129–30 ("When the Second Amendment's plain

9    text covers an individual's conduct, the Constitution presumptively protects that

10   conduct."); *id.* at 2134 (examining whether the "plain text of the Second

11   Amendment" protected the *Bruen* plaintiffs' course of conduct); *id.* at 2135

12   (similar).

13       If a challenged restriction regulates conduct protected by the "plain text" of

14   the Second Amendment, *Bruen* then directs the government to justify its regulation

15   by showing that the law is "consistent with this Nation's historical tradition of

16   firearm regulation."  *Bruen*, 142 S. Ct. at 2126.  And while the Court recognized

17   that the historical analysis conducted at the first step of the two-step approach that

18   lower courts had adopted for analyzing Second Amendment claims was "broadly

19   consistent with *Heller*," *id.* at 2127, it clarified how that analysis should proceed in

20   important respects.  In some cases, the Court explained, this historical inquiry will

21   be "fairly straightforward," such as when a challenged law addresses a "general

22   societal problem that has persisted since the 18th century."  *Id.* at 2131.  But in

23   others—particularly those where the challenged laws address "unprecedented

24   societal concerns or dramatic technological changes"—the Court recognized that

25   this historical analysis requires a "more nuanced approach."  *Id.* at 2132.

26

27   ───────────────

     Amendment "by no means eliminates" state and local governments' "ability to
28   devise solutions to social problems that suit local needs and values").

To justify regulations of that sort, *Bruen* held that governments are not required to identify a "historical *twin*," and need only identify a "well-established and representative historical *analogue*." 142 S. Ct. at 2133 (emphasis in original). Thus, a modern-day regulation need not be a "dead ringer for historical precursors" to pass constitutional muster. *Id.* Instead, in evaluating whether a "historical regulation is a proper analogue for a distinctly modern firearm regulation," *Bruen* directs courts to determine whether the two regulations are "'relevantly similar.'" *Id.* at 2132 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev, 741, 773 (1993)). The Court identified "two metrics" by which regulations must be "relevantly similar under the Second Amendment": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. The Court explained that those dimensions are especially important because "'individual self-defense is "the *central component*" of the Second Amendment right.'" *Id.* (quoting *McDonald*, 561 U.S. at 767, and *Heller*, 554 U.S. at 599).[11] After *Bruen*, a modern regulation that restricts conduct protected by the plain text of the Second Amendment is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors that is "comparably justified." *Id*.

## II.   CALIFORNIA'S BILLY CLUB RESTRICTIONS SATISFY THE TEXT-AND-HISTORY STANDARD

California's restrictions on bill clubs are constitutional at both stages of the text-and-history standard. First, Plaintiffs' facial challenge to Section 22210 fails at the threshold inquiry. Specifically, Plaintiffs cannot demonstrate that the "plain text" of the Second Amendment covers their proposed course of conduct of acquiring, possessing, and using billies because they are not protected "Arms" "commonly used" for self-defense. *Bruen*, 142 U.S. at 2138. Second, even if

---

[11] *See also Heller*, 554 U.S. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right").

14

billies were considered "Arms" otherwise subject to protection by the text of the Second Amendment, Section 22210 is constitutional because it imposes a comparable burden on the right of armed self-defense as the historical analogues identified herein and is comparably justified to the regulatory burdens imposed by those historical analogues.

**A.  Plaintiffs Cannot Establish that the Billy Club Restrictions Burden Conduct Protected by the Plain Text of the Second Amendment**

**1.  Plaintiffs Bear the Burden of Showing that Section 22210 Regulates Conduct Protected by the Plain Text of the Second Amendment**

Plaintiffs cannot demonstrate that Section 22210 burdens any conduct covered by the plain text of the Second Amendment.  Under the text-and-history standard for adjudicating Second Amendment claims, the party challenging a restriction under the Second Amendment must first demonstrate that the law regulates conduct protected by the "plain text" of the Second Amendment.  *Bruen*, 142 S. Ct. at 2126; *accord id.* at 2130, 2135.  The Second Amendment "presumptively protects that conduct" only if covered by the plain terms of the amendment.  *Id.* at 2126; *see also id.* at 2129–30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct").  To establish that the plain text applies, a plaintiff must demonstrate that each of the "textual elements" of the Second Amendment's operative clause covers the proposed course of conduct.  *Id.* at 2134 (quoting *Heller*, 554 U.S. at 592); *see also Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, No. 22-cv-501-BLF, __ F. Supp. 3d __, 2022 WL 3083715, at *8 (N.D. Cal. Aug. 3, 2022) ("If the conduct at issue is covered by the text of the Second Amendment, the burden then *shifts* to the government to show why the regulation is consistent with the Nation's historical tradition of firearm regulation" (emphasis added)); *Defense Distributed v. Bonta*, No. 22-6200-GW-AGRx, 2022 WL 15524977, at *3 n.5 (C.D. Cal. Oct. 21, 2022) (explaining that *Bruen* requires "plain-text analysis *first*, *then* history *if necessary*").

15

1    *Bruen* makes clear that a party challenging a law under the Second Amendment

2    bears this threshold, textual burden; the government does not bear the burden of

3    *disproving* that the textual elements apply where the plaintiff has failed to show that

4    they do (i.e., that a given weapon is *not* commonly used for self-defense).  *See*

5    *Bruen*, 142 S. Ct. at 2134 (noting that the government "d[id] not dispute" that the

6    plain text of the Second Amendment covered the plaintiffs' proposed conduct).

7         The Supreme Court's assignment of this burden to plaintiffs is consistent with

8    how the Supreme Court "protect[s] other constitutional rights."  *Bruen*, 142 S. Ct.

9    at 2130.  As explained in *Bruen*, in free speech cases under the First Amendment,

10   "to which *Heller* repeatedly compared the right to keep and bear arms," the

11   government bears the burden of justifying its actions only "[w]hen the Government

12   restricts speech."  *Id.* at 2130 (quotation marks and citation omitted).  Plaintiffs who

13   assert free speech claims are "oblig[ed]" to "demonstrate that the First Amendment

14   even applies" to the "assertedly expressive conduct" in which they wish to engage.

15   *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).  And

16   when scrutinizing free exercise claims, the Court first asks whether the plaintiff has

17   shown that the government "has burdened his sincere religious practice pursuant to

18   a policy that is not 'neutral' or 'generally applicable.'"  *Kennedy v. Bremerton Sch.*

19   *Dist.*, 142 S. Ct. 2407, 2421–22 (2021).  "Should a plaintiff make a showing like

20   that," the burden then shifts to the government to justify its action.  *Id.* at 2422.

21   And in assessing whether an election law burdens other constitutional rights, the

22   Court first asks whether the regulation imposes a "'severe'" burden on that right or,

23   instead, only a "'reasonable, non-discriminatory restriction[].'"  *Burdick v. Takushi*,

24   504 U.S. 428, 434 (1992); *see also Zablocki v. Redhail*, 434 U.S. 374, 386 (1978)

25   ("[R]easonable regulations that do not significantly interfere with decisions to enter

26   into the marital relationship may legitimately be imposed.").  *Bruen* holds that this

27   approach applies in the Second Amendment context.

28

16

1   Thus, in any Second Amendment case, the plaintiff has the burden of

2   establishing that the challenged law regulates protected "Arms."  U.S. Const.

3   amend. II.  Whether a particular instrument, device, or weapon is protected by the

4   Second Amendment's plain text involves an examination of whether it is a

5   "bearable arm[]" at all, *Bruen* 142 S. Ct. at 2132, and, if so, whether it is

6   "commonly used" for self-defense purposes, *id.* at 2134.[12]  Here, Plaintiffs cannot

7   satisfy their threshold, textual burden.

8   **2.  Billy Clubs Are Not Protected "Arms" Under the Second**
    **Amendment Because They Are Not Commonly Used for**
9   **Self-Defense.**

10  Billy clubs do not constitute "Arms" protected by the Second Amendment

11  because they are not commonly used for self-defense.  As the Supreme Court has

12  explained, the Second Amendment protects "'instruments that constitute bearable

13  arms'" that "facilitate armed self-defense."  *Bruen*, 142 S. Ct. at 2132 (quoting

14  *Heller*, 554 U.S. at 582).

15  In *Bruen*, *McDonald*, and *Heller*, the Supreme Court held out "individual self-

16  defense" as "'the *central component*' of the Second Amendment right."  *Bruen*,

17  142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767, in turn quoting *Heller*, 554

---

18  [12] The common use inquiry occurs at the textual stage of the text-and-history
19  standard.  In *Bruen*, the Court situated the "common use" inquiry in the textual
    stage of its analysis, rather than the historical stage at which the government bears
20  the burden.  *Id.* at 2134.  Before turning to whether the plain text of the Second
21  Amendment covered the plaintiff's proposed course of conduct of carrying (*i.e.*,
    "bearing") handguns in public for self-defense, the Court confirmed that the
22  plaintiffs were "part of 'the People' whom the Second Amendment protects and
23  that "handguns are weapons 'in common use' today for self-defense."  *Id.* (citing
    *Heller*, 554 U.S. at 627, and *Caetano*, 577 U.S. at 411–12).
24
    Here, the Attorney General does not dispute that the billy is an "arm" as
25  described by the Second Amendment.  *See Caetano v. Massachusetts*, 577 U.S.
26  411, 411 (2016) (noting that "the Second Amendment extends, prima facie, to all
    instruments that constitute bearable arms").  Rather, as explained below, the
27  Attorney General submits that billies are not a protected "arms" under the Second
28  Amendment because they are not commonly used for self-defense purposes.

17

1   U.S. at 599).  And while the Court in those three cases invalidated strict laws that

2   effectively precluded most law-abiding citizens from possessing or carrying all

3   handguns—"the quintessential self-defense weapon," *Bruen*, 142 S. Ct. at 2143

4   (quoting *Heller*, 554 U.S. at 629)—the Court made clear that "the right secured by

5   the Second Amendment is not unlimited" and does not extend to "a right to keep

6   and carry any weapon whatsoever in any manner whatsoever and for whatever

7   purpose," *id.* at 2128 (quoting *Heller*, 554 U.S. at 626).  On the contrary, the

8   Second Amendment protects only those weapons that are "'in common use at the

9   time' *for lawful purposes like self defense*."  *Heller*, 554 U.S. at 624 (emphasis

10  added) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see also Bruen*,

11  142 S. Ct. at 2135 (referencing whether the subject "weapons [are] 'in common

12  use' today for self-defense" (quoting *Heller*, 554 U.S. at 627)).  This "important

13  limitation on the right to keep and carry arms," recognized in *Heller*, remains a

14  critical limitation on the Second Amendment following *Bruen*.  *See id.* at 2162

15  (Kavanaugh, J., concurring).

16      In neither *Heller* nor *Bruen* did the Court find that the Second Amendment's

17  protections were grounded in the need to bear arms for militia service, *Duncan v.*

18  *Becerra*, 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019),[13] or as a "check against

19  tyranny," *id*. at 1149.  In fact, *Bruen* repeatedly confirms that self-defense (and not

20  militia or military service) is "*the*" "central component" of the right protected by

21  the Second Amendment.  *Bruen*, 142 S. Ct. at 2133 (emphasis added) (quoting

22  *McDonald*, 561 U.S. at 767); *see also id.* at 2125 (noting that *Heller* and *McDonald*

23  "held that the Second and Fourteenth Amendments protect an individual right to

24  keep and bear arms for self-defense"); *id.* at 2128 (same).

25      And as *Bruen* make clear, the test for Second Amendment protection of a

26  particular weapon is common *use*, not common *ownership*.  *See* 142 S. Ct. at 2138

27  ───────────
    [13] Decision *aff'd* 970 F.3d 1133 (9th Cir. 2020), *rev'd* 19 F.4th 1087 (9th Cir.
28  2021) (en banc), *cert. granted* 142 S.Ct. 2895 (U.S. June 30, 2022), *vacated and remanded* 49 F.4th 1228 (9th Cir. Sept. 23, 2022).

1    (referring to "commonly *used* firearms for self-defense" (emphasis added)); *id.*

2    at 2142 n.12 (finding that pocket pistols were "commonly *used* at least by the

3    founding" (emphasis added)); *id.* at 2143 (noting that certain belt and hip pistols

4    "were commonly *used* for lawful purposes in the 1600s" (emphasis added)); *id.* at

5    2156 (describing the "right to bear commonly *used* arms in public subject to certain

6    reasonable, well-defined restrictions" (emphasis added)); *accord Heller*, 554 U.S. at

7    636 (holding that the government could not impose an "absolute prohibition of

8    handguns held *and used* for self-defense" (emphasis added)).

9        Under *Bruen*, a weapon being "commonly owned" "for lawful purposes,"

10   *Duncan*, 366 F. Supp. 3d at 1142, is not enough.  And the phrase "in common use"

11   referenced in *Bruen*, *Heller*, and *McDonald* does not simply refer to a weapon's

12   prevalence in society, or the quantities manufactured or sold.  In addition to the

13   prevalence of the weapon in society—which remains relevant, because in order to

14   be commonly used, the weapon must also be commonly possessed—courts must

15   consider the suitability of the weapon and the actual use of the weapon for self-

16   defense.  *See Duncan v. Bonta*, 19 F.4th 1087, 1105 (9th Cir. 2021), *cert. granted*,

17   *judgment vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th

18   1228 (9th Cir. 2022) (Berzon, J., concurring) ("Notably, however, *Heller* focused

19   not just on the prevalence of a weapon, but on the primary use or purpose of that

20   weapon."); *see also Heller*, 554 U.S. at 629 (explaining the "reasons that a citizen

21   may prefer a handgun for home defense," including that handguns are easier to

22   store in a location that is readily accessible in an emergency, are easier to lift and

23   aim than a long gun, and can be used with a single hand while the other hand dials

24   the police).

25       Turning to the applicable analysis, there is no evidence suggesting that billies

26   are commonly used for self-defense; therefore, they cannot be defined as an "arm"

27   under the plain text of the Second Amendment.  This Court, citing California case

28   law, has already established that "the arms prohibited by § 22210 are *not* commonly

1    owned for lawful purposes." *Fouts*, 561 F. Supp. 3d at 958 (emphasis in original)

2    (citing *People v. Lisciotti*, 219 Cal.App. 4th Supp. 1, 5 (2013)).  To the contrary,

3    Section 22210 regulates weapons that, in private hands, were "ordinarily used for

4    criminal and unlawful purposes." *People v. Davis*, 214 Cal. App. 4th 1322, 1331

5    (2013) (noting that the argument that billies are not protected by the Second

6    Amendment is supported by California case law explaining the reasons for the

7    restrictions); *see also Grubb*, 63 Cal.2d at 620 (noting that the State's anti-billy

8    legislation "obviously sought to condemn weapons common to the criminal's

9    arsenal").  Historical references to billy clubs corroborate this point, showing that

10   the weapon was not commonly used for self-defense by law-abiding citizens, but

11   rather employed as an instrument of criminal activity.  *See* Baron Decl., ¶ 39

12   (noting that a search of historical dictionaries and newspaper databases failed to

13   identify the billy "as a common self-defense weapon in use by ordinary citizens")

14   To the contrary, historical use of billy clubs was more typically associated with

15   offensive and criminal use, as opposed to use for justifiable self-defense.  Escobar

16   Decl., ¶¶ 14, 35-38.

17          Moreover, law enforcement use of billies, including the police baton, does not

18   establish their common use for self-defense.  In *State v. Kessler*, 289 Or. 359,

19   614 P.2d 94 (Or. 1980), the court held that Oregon's restriction on the possession of

20   a billy club was protected by the Oregon Constitution's right to bear arms

21   (Or. Const., art. I, § 27).  *Kessler*, 289 Or. at 372.  In that matter, the court noted

22   that:

23          the drafters intended 'arms' to include the hand-carried weapons
24          commonly used by individuals for personal defense.  The club is an
25          effective, hand-carried weapon which cannot logically be excluded
             from this term.

26

27

28

1    *Id.*  The court noted that "[t]he club is . . . commonly carried by the police."  *Id.* at

2    371-72, citing Or. Rev. Stats. 166.520 (permits peace officers to carry or possess

3    weapons commonly known as "blackjacks" or "billies").  This case, however, does

4    not establish that such weapons are commonly used for self-defense purposes by

5    individuals outside of law enforcement.  The traditional billy's modern variants,

6    like the expandable metal batons that Plaintiffs wish to possess, may be widely used

7    by law enforcement for specialized purposes, but that does not show that such

8    weapons are "typically possessed by law-abiding citizens for lawful purposes."

9    *Heller*, 554 U.S. at 624-25.

10         To the contrary, many other states—including California—have enacted and

11    maintained restrictions on the carrying of billies, which also apply to police batons.

12    *See Davis*, 214 Cal. App. 4th at 1332 ("We note, as well, the restriction contained

13    in Section [22210] does not deprive persons of their ability to defend themselves or

14    their homes, because there are alternative means to do so." (citation omitted)); *see*

15    *also, e.g.*, *Ocasio*, 28 N.Y. 3d at 181 (noting that New York's ban on possession of

16    billies—N.Y. Penal Law § 265.01—applies also to police batons).  And some states

17    that do not regulate police batons as "billies" have enacted separate restrictions that

18    apply to police batons.  Tennessee, for example, prohibits the carrying of a "club"

19    "with the intent to go armed," *see* Tenn. Code Ann. § 39-17-1307(a)(1), while

20    providing a defense for any "person possessing a club or baton" who is a security

21    guard or holds a valid certificate that "the person has had training in the use of a

22    club or baton," *id.* § 39-17-1308(a)(8).  And Illinois, which restricts the *carrying* of

23    a "billy," prohibits the possession of any "bludgeon," including a police baton.

24    720 Ill. Comp. Stat. 5/24-1(a)(1), (2) (2021); *People v. Starks*, 130 N.E.3d 556, 563

25    (Ill. 2019) (holding that a collapsible baton is a prohibited "bludgeon").

26         Because billy clubs are not commonly used for self-defense by ordinary

27    citizens, they are not "Arms" covered by the Second Amendment's plain terms and

28

1    thus entitled to a presumption of constitutional protection.  On this basis alone,

2    Plaintiffs' challenge to Section 22210 fails.

3        **B.    Section 22210's Restrictions on Billy Clubs Are Consistent with
             the Nation's Traditions of Similar Weapons Regulations**

4

5        Under the text-and-history standard, the government must justify a weapons

6    regulation only if the regulation burdens conduct protected by the plain text of the

7    Second Amendment.  Even if Plaintiffs could meet this threshold burden,

8    Section 22210's restrictions on the possession of billy clubs is consistent with the

9    Nation's tradition of regulating "dangerous [or] unusual weapons."  *Bruen*,

10   142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).[14]  As explained below,

11   pursuant to their traditional and longstanding police powers, governments have

12   enacted restrictions on certain weapons deemed to be susceptible to criminal misuse

13   and to pose significant dangers to the public, provided that law-abiding citizens

14   retained access to other arms for effective self-defense.  This tradition is seen

15   throughout our Nation's history, including around the times that the Second and

16   ────────────────

17   [14] While *Heller* and *McDonald* refer to prohibitions on "dangerous and
     unusual weapons," Blackstone refers to the crime of carrying 'dangerous *or* unusual

18   weapons.'"  *Kolbe v. Hogan*, 849 F.3d 114, 131 n.9 (4th Cir. 2017) (quoting 4
     Blackstone 148–49 (1769)) *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

19   Notably, laws enacted to regulate the possession and carrying of dangerous
     weapons characterize those weapons in different ways.  *See Bruen*, 142 S. Ct. at

20   2143 (noting that the 1686 New Jersey concealed weapons restriction applied to the
     carrying of "dangerous or *unlawful* weapons" (emphasis added)); *id*. at 2144

21   (describing 1801 Tennessee statute prohibiting any person from "privately
     carry[ing] any dirk, large knife, pistol or *any other dangerous weapon*, to the fear or

22   terror of any person" (emphasis added)).  The Supreme Court has not explained the
     meaning of the phrase "dangerous and unusual" as it relates to weapons, or

23   suggested that the phrase imposes rigid requirements on governments attempting to
     regulate such weapons. In any event, it appears that the phrase is a hendiadys—a

24   figure of speech like "cruel and unusual" and "necessary and proper," which
     involve "two terms, separated by a conjunction, [that] are melded together to form a

25   single complex expression."  Samuel L. Bray, *"Necessary and Proper" and "Cruel

26   and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016).

27

28

                                         22

Fourteenth Amendments were ratified—time periods that are particularly relevant to determining the scope of the Second Amendment as historically understood.

### 1. The Second Amendment does Not Limit the States' Police Powers to Address Public Safety Threats as They Arise

The Second Amendment is not absolute.  Since the Founding and even earlier, governments have exercised broad police powers to limit access to and use of certain types of weapons deemed to be especially dangerous.  It does not protect a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.  Government regulation is permitted, even though the text of the Second Amendment provides an "unqualified command" that the right to keep and bear arms "shall not be infringed." *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961)).  *Bruen*'s quotation from *Konigsberg* makes clear that even unqualified commands concerning the purported inviolability of constitutional rights, such as the provision that the freedoms of speech and association must not be "abridg[ed]," U.S. Const. amend. I, should not be given "a literal reading." *Konigsberg*, 366 U.S. at 49.  As with the First Amendment, the Second Amendment is not to be read literally.  "The provisions of the Constitution are not mathematical formulas," but rather are "organic living institutions transplanted from English soil" and their significance is determined "by considering their origin and the line of their growth." *Id.* (quotation marks and citation omitted).

Unlike the First Amendment, courts have only just begun to explore the historical origins of the right to keep and bear arms and to define its precise scope and exceptions.  *See Heller*, 554 U.S. at 625-26 (noting that it should not be surprising that it took the Court so long to decide a Second Amendment case, given that the Court first decided a First Amendment case in 1931).  The history of the Second Amendment demonstrates that governments enjoyed robust police powers to regulate weapons—including who may possess them, where they may be

23

possessed, and what weapons may be possessed and used.  Historical regulations on the right to keep and bear arms show that Section 22210's restrictions on billy clubs is consistent with the scope of that right as it was historically defined (and fixed in time).

> **2.    Historical Regulations of Dangerous or Unusual Weapons Are Ubiquitous in American History, Including the Relevant Periods Surrounding the Ratification of the Second and Fourteenth Amendments**

As explained below, the Attorney General need only show that Section 22210 has relevantly similar historical analogues.  That burden is easily met in this case, as relevantly similar regulations on dangerous or unusual weapons have existed throughout American history, including at the Founding and in the period immediately following the Civil War.  This Court has already examined many of those historical analogues, but under *Bruen*, Section 22210 is supported by historical restrictions on billies in particular as well as restrictions on other blunt weapons.

> **a.    The Attorney General Needs Only Show that Section 22210 Is "Relevantly Similar" to the Historical Tradition of Regulating Dangerous or Unusual Weapons**

As discussed above, *Bruen* does not require the Attorney General to identify a "historical twin" or "dead ringer" for Section 22210.  142 S. Ct. at 2133 (emphasis omitted).  That is because the law addresses "unprecedented societal concerns" and "dramatic technological changes."  *Id.* at 2132.  As noted by this Court, "the policeman's billy is a relic of the past."  *Fouts*, 561 F. Supp. 3d. at 952 (citation omitted).  Over time, improvements in weapons technology led to its replacement by modern police batons.  *See Ocasio*, 28 N.Y. 3d at 181 (noting that "technological advances throughout the years have resulted in modifications to the traditional wooden billy," including the development of metal or synthetic batons); *see also* Escobar Decl., ¶¶ 31-33 (discussion of modern use of ASP batons by law

24

enforcement); see also Expert Report and Declaration of Brian Fichtner, filed in support of Defendant's Cross-Motion for Summary Judgment, Sept. 11, 2020 (Dkt. 22-3) ("Fichtner Decl.") at ¶¶ 16-21 (same).

As explained below, this history shows that governments have been able to adopt laws like the Section 22210 consistent with the Second Amendment— restricting particular weapons and configurations thereof posing a danger to society and that were especially likely to be used by criminals, so long as the restriction did not destroy the right to armed self-defense by leaving available other weapons for constitutionally protected uses.  *See* John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285 (1874) ("It would seem to follow that while society may regulate this right . . . so as to promote the safety and good of its members, yet any law which should attempt to take it away, or materially abridge it, would be the grossest and odious form of tyranny."); *id.* at 287 ("On the one hand . . . society cannot justly require the individual to surrender and lay aside the means of self-protection in seasons of personal danger . . . . On the other hand, the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons, and the utmost that the law can hope to do is to strike some sort of balance between these apparently conflicting rights.").

### b.    Medieval and Pre-Founding English History

The Second Amendment codified a pre-existing right "inherited from our English ancestors," *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 599), and thus restrictions on that right recognized under English law prior to the founding of the United States are relevant in understanding the scope of the inherited right. Article VII of the English Bill of Rights of 1689, "the 'predecessor to our Second Amendment,'" *id.* at 2141 (quoting *Heller*, 554 U.S. at 593), guaranteed the "Protestants . . . may have Arms for their Defence suitable to their Conditions, *and*

25

1   *as allowed by Law*," *id.* (quoting 1 Wm. & Mary ch. 2, § 7) (emphasis added).

2   Among other things, the plain text of the English Bill of Rights incorporated the

3   ability of government to "allow[]" (and disallow) individuals from having certain

4   "Arms" for their defense.  *See id.*

5          This right was recognized by Blackstone as the "fifth and last auxiliary right."

6   1 Blackstone ch. 1 (1769).  According to Blackstone, the auxiliary rights were

7   "subordinate rights" "declared, ascertained and protected by the dead letter of the

8   laws" and "barriers to protect and maintain inviolate the three great and primary

9   rights, of personal security, personal liberty, and private property."  *Id.*  The fifth

10  auxiliary right of English subjects was "that of having arms for their defence,

11  suitable to their condition and degree, and *such as are allowed by law*."  *Id.*

12  (emphasis added).[15]  Blackstone went on to explain that this right was "a public

13  allowance, under *due restrictions*, of the natural right of resistance and self-

14  preservation, when the sanctions of society and laws are found insufficient to

15  restrain the violence of oppression."  *Id.* (emphasis added).  Accordingly,

16  Blackstone recognized that the right to keep and bear arms was subject to "due

17  restrictions."  *See Young*, 992 F.3d at 793 (noting that the English Bill of Rights

18  "recognized that even the right of self-defense could be curtailed by government

19  action 'as allowed by law'"), *abrogated on other grounds by Bruen*, 142 S. Ct.

20  2111.

21         Consistent with this conception of an auxiliary right that could be qualified by

22  concerns over threats to public safety and order, for hundreds of years English

23  monarchs had the power to identify certain arms that subjects could not possess or

24  carry.  *See Peruta v. Cnty. of San Diego*, 824 F.3d 919, 930–31 (9th Cir. 2016) (en

25  banc) (reviewing English prohibitions on the carrying of certain arms in the 16th

26

27         [15] Blackstone's use of the word "such" refers to the types of arms that

28  subjects were free to have.

26

and 17th centuries), *abrogated on other grounds by Bruen*, 142 S. Ct. 211.  For example, in 1541, under Henry VIII, Parliament enacted a statute prohibiting the "use or ke[eping] in his or their houses or elsewhere any Crosbowe handgun hagbutt or demy hake."  33 Hen. 8, ch. 6 § 1 at 832 (1541).[16]  Henry VIII was concerned about safety issues associated with the particular prohibited weapons; the prohibition targeted "little short handguns" and "little haquebuts," which were a source of "great peril and continual feare and danger of the kings loving subjects."  Patrick J. Charles, *Armed in America:  A History of Gun Rights from Colonial Militias to Concealed Carry* 62 (Prometheus 2018) (quotation marks and citation omitted).  Notwithstanding these dangers, Henry VIII's prohibition exempted lords living within twelve miles of the Scottish border, allowing those lords to keep and bear those weapons to defend the border.  *See* 33 Hen. VIII, ch. 6 § 18 at 835.  But in recognition of the dangers posed by these weapons, and as a way to promote peace between England and Scotland, James I repealed this limited exception and prohibited all subjects from possessing those listed weapons, in 1607.  4 Jac. I, ch. 1 (1606).[17]  As explained by Granville Sharp, a "particularly important source" on the English Bill of Rights, whose account was discussed in *Heller*:

> [The] latter expression, '*as allowed by law*,' respects the limitations in the above-mentioned act of 33 Hen. VIII, c. 6, which restrain the use of *some particular sort of arms*, meaning only such arms as were liable to be *concealed*, or otherwise favour the designs of murderers . . . .

*Peruta*, 824 F.3d at 932.

---

[16] Hagbutts and demy-hakes referred to arquebuses.  *See* Somerset Record Society, Vol. XX, at 332 (1904).

[17] And before Henry VIII prohibited the possession of crossbows and handguns, Richard II prohibited the possession of the launcegay, a 10-12-foot-long lightweight lance.  *Bruen*, 142 S. Ct. at 2140 (*citing* 7 Rich. 2, ch. 13 (1383), *and* 20 Rich. 2, ch. 1 (1396)).  Launcegays "were generally worn or carried only when one intended to engage in lawful combat or . . . to breach the peace."  *Id.*

1    Accordingly, the pre-existing right inherited from England and incorporated

2    into the Second Amendment expressly permitted government regulation of

3    particular weapons that threatened public safety and order, as demonstrated by the

4    restrictions on crossbows and short pistols in the 16th and 17th centuries.  As with

5    the English Bill of Rights, governments have been authorized to restrict access to

6    certain weapons "by law," so long as other weapons remained available for

7    constitutionally protected uses.

8          c.    **Colonial and Early National History:  Laws Enacted Around the Time of the Ratification of the Second Amendment**

9

10   Colonial governments enacted various prohibitions on the "carrying of

11   dangerous [or] unusual weapons," "a fact [that the Court] already acknowledged in

12   *Heller.*"  *Bruen*, 142 S. Ct. at 2143; *see also* Spitzer Decl., Ex. C.  Some of those

13   restrictions specified particular weapons that could not be carried.  For example,

14   New Jersey (1686) enacted restrictions on the carrying of concealable weapons in

15   public, prohibiting any person "privately to wear any pocket pistol, skeines,

16   stilettoes, daggers or dirks, or other unusual or unlawful weapons."  *See* Spitzer

17   Decl., Ex. C (citing The Grants, Concessions, And Original Constitutions of The

18   Province of New Jersey (1881)); *see also Bruen*, 142 S. Ct. at 2143 (discussing the

19   1686 New Jersey restrictions on the carrying of "dangerous or unlawful weapons").

20   Notably, this law "did not apply to all pistols, let alone all firearms," *Bruen*, 142 S.

21   Ct. at 2143, leaving other arms available to carry for self-defense.  And shortly after

22   ratification of the Second Amendment in 1791, states enacted restrictions on the

23   carrying of concealable weapons.  Some of these dangerous weapons laws

24   restricted certain weapons by name, including "bludgeons" (the earliest enacted in

25   1799) and "clubs" (seven states enacted such laws in the 1600s–1700s).  Spitzer

26   Decl., ¶¶ 9, 11; *see also id.*, Ex. B.

27   The anti-club laws enacted in the 18th century and earlier focused on the

28   carrying of clubs by enslaved people, *see* Spitzer Decl., Exs. B, C (citing 1664 New

28

York, 1798 Kentucky and 1799 Mississippi laws prohibiting slaves from carrying
dangerous weapons, including clubs), or in gatherings of groups of people in
public, *see* Spitzer Decl., Ex. C (An Act to Prevent Routs, Riots, and Tumultuous
Assemblies, and the Evil Consequences Thereof, reprinted in *Cumberland Gazette*
(Portland, Me.), Nov. 17, 1786, at 1; 1750 Mass. Acts 544, An Act for Preventing
and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1).
Virginia (1792), Delaware (1797), Mississippi, Indiana, Alabama, and Missouri
also passed similar laws preventing slaves from carrying clubs.  Baron Decl., ¶ 56.
And New Jersey banned bludgeons along with other "offensive weapons" and
burglar's tools in 1799.  *Id*. ¶ 57.  These laws demonstrate that governments at the
time of the founding were free to restrict certain types of blunt weapons, including
clubs and bludgeons.

### d. Antebellum and Postbellum History: Laws Enacted Around the Time of the Ratification of the Fourteenth Amendment

During the antebellum and postbellum period, around the time that the
Fourteenth Amendment was ratified, numerous states restricted particular weapons
deemed to be particularly dangerous or susceptible to criminal misuse.  Throughout
the 1800s, states enacted a range of laws restricting the carrying of blunt weapons.
During that century:  12 states restricted "bludgeons"; five states restricted
"clubs"[18]; 43 states restricted "slungshots"; seven states restricted "sandbags"; and

---

[18] These 18th and early 19th century laws generally prohibited slaves from
carrying clubs, *see* Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J.
M'Campbell, Eds., 1835); 1804 Ind. Acts 108, A Law Entitled a Law Respecting
Slaves, § 4; 1798 Ky. Acts 106; 1804 Miss. Laws 90, An Act Respecting Slaves, §
4; Collection of All Such Acts of the General Assembly of Virginia, of a Public and
Permanent Nature, as Are Now in Force; with a New and Complete Index. To
Which are Prefixed the Declaration of Rights, and Constitution, or Form of
Government Page 187, Image 195 (1803), or prohibited the throwing of clubs at
trains or railroad, *see* 1855 Ind. Acts 153, An Act To Provide For The Punishment
Of Persons Interfering With Trains or Railroads, chap. 79, § 1; the Revised Statutes

29

15 states broadly restricted any concealed weapon.  *See* Spitzer Decl., ¶¶ 9-12, Ex. B.  In addition, 14 states restricted "billies" during this period by name.  *See id.* Many of these laws were enacted shortly before and after the ratification of the Fourteenth Amendment.  *Id.*  This Court previously traced the lineage of state-law billy restrictions to the mid-nineteenth century.  *See Fouts*, 561 F. Supp. 3d at 956-57.  New York enacted a prohibition on the carrying of a billy "as early as 1866," followed by Pennsylvania in 1875, West Virginia in 1882, Maryland in 1886, Michigan in 1887, and the Oklahoma Territory in 1891.  *Id.*  Several jurisdictions passed legislation banning the possession or use of billies and other blunt weapons shortly after the ratification of the Fourteenth Amendment.  Baron Decl., ¶ 57 (noting the passage of laws banning billies, bludgeons, or dangerous weapons between 1868 and 1885 in Florida, St. Louis, Montana Territory, Nevada, Wyoming, New Jersey, Alabama, and New York).

The state restrictions on the use of billies and other blunt weapons followed an increase in the criminal use of such weapons in the 1800s.  Newspaper accounts of criminal activity during the 1850s through the 1900 noted the prevalence of billies and clubs used for criminal purposes and in violent skirmishes.  Baron Decl., ¶¶ 46-54.  One newspaper database—listing 447 references to "billy club" between 1865 and 1900—noted the term's common association "as a criminal's or brawler's weapon."  *Id*. at ¶ 51.  And popular culture discussions of urban street gangs from the similar time period often include illustrations of billy clubs used for intimidation and gang warfare.  Escobar Decl., ¶¶ 35-36.

The nature of government regulation of firearms and other weapons during the antebellum and postbellum periods is particularly relevant to understanding the scope of the right incorporated through the Fourteenth Amendment.  As noted in

---

of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881); 1905 Ind. Acts 677.  Spitzer Decl., Exs. B, C.

*Bruen*, the Second Amendment was made applicable to the states not in 1791, but in 1868, with the ratification of the Fourteenth Amendment. *Bruen*, 143 S. Ct. at 2138. The Court in *Bruen* did not have occasion to resolve whether courts should "primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" because, with respect to the law challenged in *Bruen*, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* Nevertheless, the Court did survey numerous statutes and cases from the antebellum and postbellum periods in assessing the scope of the right. And at least one federal circuit court has focused on the public understanding of the right as it existed in 1868. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood *when the Fourteenth Amendment was ratified*." (emphasis added). Restrictions on dangerous weapons were enacted throughout American history, and robust government regulation of arms was incorporated into the pre-existing right inherited from pre-founding England. But the antebellum and postbellum period has particular importance because the Fourteenth Amendment was ratified around that time and the framers of that amendment were confronting new challenges and public needs.

The passage of laws restricting certain blunt weapons, including billies and bludgeons, shortly after the passage of the Fourteenth Amendment further supports the understanding that billies were considered to be criminal instruments, and therefore not subject to protection under the Second Amendment.

### e.   Twentieth Century History

Although *Bruen* re-focuses the historical analysis on the periods surrounding the ratification of the Second and Fourteenth Amendments, laws enacted during the

31

early 20th century are also instructive and provide additional support for the constitutionality of Section 22210.  In *Bruen*, the Court discounted the probative value of public carry laws from the 20th century because they "contradict[ed] earlier evidence" from periods closer to the ratification of the amendments, 142 S. Ct. at 2153 n.28, but here, numerous early 20th century laws are consistent with the earlier historical analogues.

In the early 20th century, more state governments passed laws restricting the possession of billy clubs, slungshots, and other blunt weapons.  In addition to California (1917), Massachusetts (1927), and North Dakota (1915) passed laws banning billies.  Spitzer Decl., Ex. B; *see also Fouts*, 561 F. Supp. 3d at 957 (citing billy restrictions enacted in the early 1900s by North Dakota, Missouri, the Territory of Hawaii, and Illinois).  Three states—New York (1911), Michigan (1927), and North Dakota (1915)—passed laws barring bludgeons.  *Id.*  And Michigan banned clubs in 1913.  Spitzer Decl., Ex. B.

### 3.   The Historical Billy Club Restrictions Are Relevantly Similar to Section 22210

Section 22210 restrictions on billy clubs and similar weapons—including modern police batons—are relevantly similar to the historical analogues.  *Bruen* explained that a modern law is relevantly similar to a historical analogue if they are comparable in two respects:  "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Bruen*, 142 S. Ct. at 2133.  Section 22210 imposes a burden comparable to the historical analogues discussed above, and it is comparably justified in promoting public-safety goals.

### a.   Comparable Burden

Section 22210 imposes a comparable burden on the right to armed self-defense as the historical analogues, because it restricts only highly "dangerous" or "unusual" items, *Heller*, 554 U.S. at 627—such as a billy, blackjack, sandbag, sap, or slungshot—leaving law-abiding citizens access to a range of firearms and other

32

weapons to exercise their right to armed self-defense.  Unlike burdens on free speech, which would be onerous if certain types of expression were outlawed, the Second Amendment does not protect a right to any particular arm, but instead protects a more general right to armed self-defense.  *See Bruen*, 142 S. Ct. at 2118; *see also Heller*, 554 U.S. at 603.

Section 22210's burdens on the right to armed defense are comparable to, or even less than, than the burdens imposed on that right by the historical analogues. Several of the prohibitions on billies and bludgeons passed in the 1800s also prohibited possession of "other offensive weapon[s]," including "any pistol, gun, knife, [or] dirk."  Spitzer Decl., ¶ 16 (citing 1849 law incorporating City of San Francisco).  Similarly, other local laws—from the anti-slave statutes passed in the 1700s, through the territorial laws passed in the 1870s—also banned possession of pistols, in addition to billies, clubs, or bludgeons.  See Baron Decl., ¶¶ 56 (anti-slave weapons laws passed in New York (1664), Virginia (1792), Delaware (1797), Kentucky (1798)), 57 (recounting laws passed in New Jersey (1799), St. Louis (1871), Montana Territory (1871), Nevada (1872), Wyoming (1876)).

This minimal burdens imposed by Section 22210 and its historical analogues stand in stark contrast to the burdens imposed by the laws at issue in *Heller*, *McDonald*, and *Bruen*, which were found to effectively destroy the right to armed self-defense inside and outside the home.  The historical laws distinguished in *Bruen* were not comparably burdensome because those laws permitted public carry in certain circumstances, whereas the law in *Bruen* did not.  *See Bruen*, 142 S. Ct. at 2150 ("None of the[ antebellum] historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose").

Nor does it matter that many of the historical laws relied upon in this case regulated the carrying of certain weapons, instead of prohibiting their possession

33

1   altogether.  Indeed, *Heller* makes clear that laws prohibiting the *possession* of

2   especially dangerous weapons is "fairly supported by the historical tradition of

3   prohibiting the *carrying* of 'dangerous [or] unusual weapons.'"  554 U.S. at 627

4   (emphasis added).  Moreover, many states did prohibit possession of those

5   weapons.  *See* Baron Decl., ¶ 56, Spitzer Decl., Ex. C.  And there are historically

6   grounded explanations for why states regulated weapons differently in the past.

7   Since 1791—and even since 1868—American society has become increasingly

8   urbanized and has seen its population swell, demographic changes that have

9   diminished social trust and required more restrictive laws to protect the public.  *See*

10  Patrick Charles, *supra*, at 141 ("Needless to say, as the population of the United

11  States continued to grow, the small communal aspect of many American towns,

12  localities, and cities began to disintegrate, and would have required state and local

13  governments to adopt more tangible forms of restricting armed carriage.").  Nothing

14  in *Bruen* suggests that the historical analogues must have selected the same mode of

15  regulation (e.g., possession ban or carry restriction), so long as the burdens on the

16  right to armed self-defense are comparable.  *See Bruen*, 142 S. Ct. at 2132

17  ("[C]ases implicating unprecedented societal concerns or dramatic technological

18  changes . . . require a more nuanced approach.").

19      In any event, laws that regulate the carrying of certain dangerous weapons not

20  suitable for self-defense are sufficiently analogous to laws prohibiting the

21  possession of those weapons, as both impose a slight burden on the right to armed

22  self-defense.  What matters is the dangerous attributes and criminal uses of the

23  restricted weapons, and the fact that Section 22210 does not impact a range of

24  alternative arms that may be used for effective self-defense diminishes the burden

25  on the Second Amendment right.  Prohibitions on the carrying of certain dangerous

26  weapons impose a comparable burden on the right to armed self-defense to

27  prohibitions on the possession of those weapons.

28

34

### b.   Comparable Justification

In addition to imposing a comparable, minimal burden on the right to armed-self-defense, Section 22210's minimal burden is comparably justified to the historical analogues: protecting the public from criminal violence and unintended injury.  More specifically, like its historical predecessors, Section 22210 regulates weapons that are especially likely to be used for criminal purposes.

This justification—targeting weapons likely to be used for criminal purposes—accord with the justifications of firearms restrictions through Anglo-American history.  The dangerous weapons laws enacted throughout American history addressed myriad weapons that contributed to interpersonal violence and rising homicide rates.  They were justified by a similar goal of preventing violence in society by targeting on those weapons that are especially likely to be used for criminal purposes but are rarely used for lawful purposes like self-defense.  *See, e.g.*, Escobar Decl., ¶¶ 14, 35-38 (noting that billies were historically used from criminal purposes, and not for self-defense); *see also* Baron Decl., ¶ 58 (noting that laws banning offensive weapons in the American colonies and the United States singled out billy clubs as weapons used for criminal purposes).  The billy restrictions also address weapons that are susceptible to causing unintended injuries or even death when used improperly.  *See* Fichtner Decl., ¶ 26 (Dkt. 22-3) (emphasizing need for effective baton training to avoid serious injury or death when deploying an ASP baton); Escobar Decl., ¶¶ 27-30 (same).  As with the historical dangerous weapons laws, section 22210 promotes public safety interests in reducing the opportunity for such dangerous or unusual weapons to be used for criminal purposes or to cause unintended physical harm.

### III.   IF THE COURT IS INCLINED TO RULE IN PLAINTIFFS' FAVOR, THE ATTORNEY GENERAL REQUESTS ADDITIONAL TIME TO FURTHER DEVELOP THE HISTORICAL RECORD ON BILLY CLUB RESTRICTIONS

If the Court is not prepared to find that the Section 22210 is constitutional based on the existing record, the Attorney General respectfully requests three

1  additional months to complete additional expert discovery, followed by further

2  merits briefing.

3       The Ninth Circuit remanded this matter for "further proceedings consistent

4  with the United States Supreme Court's decision in [*Bruen*]," *Fouts v. Bonta*, No.

5  21-56039, Dkt. 34.  Where, as here, the challenged law addresses "unprecedented

6  societal concerns or dramatic technological changes," *Bruen* recognized that its

7  text-and-history analysis requires a "more nuanced approach."  *Id.* at 2132; *and see*

8  *supra* at 24-25, 33.

9       The current briefing schedule provides limited opportunity to prepare a record

10 that *Bruen* requires and address potential counterarguments.  If the Court

11 determines that the existing record (including the evidence submitted in support of

12 this brief) is insufficient to confirm the constitutionality of Section 22210, the

13 Attorney General respectfully requests to conduct formal expert discovery to

14 develop a more comprehensive record responsive to *Bruen*.

15                              **CONCLUSION**

16      For the reasons set forth herein, California's prohibition on the possession of

17 billy clubs comports with the Second Amendment.  The Attorney General,

18 therefore, respectfully requests that the Court enter judgment in his favor.

19 Dated:  December 1, 2022              Respectfully submitted,

20                                      ROB BONTA
                                        Attorney General of California
21                                      BENJAMIN M. GLICKMAN
                                        Supervising Deputy Attorney General
22                                      JOHN D. ECHEVERRIA
                                        Deputy Attorney General
23

24                                      s/ *Anthony P. O'Brien*

25                                      ANTHONY P. O'BRIEN
                                        Deputy Attorney General
26                                      *Attorneys for Defendant Rob Bonta, in*
                                        *his official capacity as Attorney*
27                                      *General of the State of California*

28 SA2019104813
   36746564.docx

                              36

## CERTIFICATE OF SERVICE

Case Name:  ***Fouts, et al vs. Rob Bonta***    Case No.  **3:19-cv-01662-BEN-JLB**

I hereby certify that on <u>December 1, 2022</u>, I electronically filed the following document(s) with the Clerk of the Court by using the CM/ECF system:

### DEFENDANT'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF OCTOBER 17, 2022

I certify that **all** participants in the case are registered CM/ECF users and that service will be electronically accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on <u>December 1, 2022</u>, at San Francisco, California.


<u>Vanessa Jordan</u>      *Vanessa Jordan*
Declarant      Signature