ROB BONTA
Attorney General of California
BENJAMIN M. GLICKMAN
Supervising Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
ANTHONY P. O'BRIEN
Deputy Attorney General
State Bar No. 232650
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-6002
  Fax:  (916) 324-8835
  E-mail:  Anthony.OBrien@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his
official capacity as Attorney General of the
State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RUSSELL FOUTS et al.,**<br><br>Plaintiff,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>Defendant. | Case No. 3:19-cv-01662-BEN-JLB<br><br>**DECLARATION OF ROBERT ESCOBAR**<br><br>Dept:        5A<br>Judge:      Hon. Roger T. Benitez<br><br>Action Filed:        September 1, 2019 |

**DECLARATION OF ROBERT ESCOBAR**

I, Robert Escobar, declare under penalty of perjury that the following is true and correct:

1.      I have been asked by the California Department of Justice to provide historical background on the origins and uses of billy clubs ("billies") and other dangerous bludgeoning weapons, as well as the history regarding legal restrictions on such weapons.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.      I am being compensated at a rate of $150 per hour for my work on this matter.

**BACKGROUND AND QUALIFICATIONS**

4.      I received a Bachelor's degree in history from the University of Dallas in 1995.  Atypically, this institution requires a thesis and defense for completion of an undergraduate degree.  My thesis was on the Boxer Rebellion in China (1899-1901), an event that has a strong connection to the martial arts history of Asia. Since graduating college, my primary occupation has been in business as a project manager and analysist, but I have maintained a deep interest in martial arts and the history of weapons.

5.      In martial arts, I have attained a 2nd degree black belt in Goju-Ryu karate and a 1st degree black belt Kobudo (Okinawan-Japanese weapons).  The latter martial art includes a heavy emphasis on batons and their related techniques, which itself influenced the ways in which billies and related instruments were used in the West by law enforcement.  I am a black belt member of Budo-Kai International, a martial arts organization which conducts regular seminars, and several of the head instructors leading these seminars have experience in law enforcement or the military or in providing training to one or both.  Additionally, I

1

have trained in various martial arts for over 25 years.  Besides the martial arts mentioned above, I have been trained in Krav Maga (Israeli military martial art); Brazilian Ju-Jitsu; hybrid wrestling (mixed martial arts); boxing; and HEMA (Historical European Martial Arts).

6.      I am a certified Six Sigma© Black Belt, a project management certification, and am currently employed as a Project Manager at FORVIS, a national public accounting firm. In addition my primary occupation, I am engaged on a variety of writing and research projects, including researching historical weapons.

7.      I am the author of *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* (Gatekeeper Press 2018).  This work identified and addressed a large gap in the history of impact weaponry and martial arts.  The entirety of notable, previous writings on the matter amounted to half a chapter of one book (*Fundamentals of Modern Police Impact Weapons*, 1978) and one article (*Black Belt Magazine*, 1986).  Both of these in fact only focused on the modern, 20th century versions of the bludgeons in question.  My book proved there was a wide and varied group of impact weapons that existed from the Middle Ages to modernity, being quite common in many different times and places.  The scant attention, scholarly or otherwise, paid to this weapons family was addressed by documenting instances from the history of law enforcement, organized crime, international navies, duels, the American frontier, Renaissance military training and more.  This project included discovering a historical baton-like impact weapon used for muggings, one so forgotten it has no surviving name or mention in previous weaponry texts.

8.      My research on historical weapons has been praised by a range of scholars and authorities on weapons and self-defense, including Massad Ayoob, a noted firearms and self-defense instructor; Thomas Jodziewicz, Ph.D., Professor Emeritus, former Chair of the Department of History (University of Dallas) and

2

president of the Texas Catholic History Society; Ashley Sharpe, Ph.D.,

Anthropologist- Smithsonian Tropical Research Institute; and Sir Christopher

Ricks, FBA (Fellowship of the British Academy, a distinction granted by the

United Kingdom to leading academics), former professor at Oxford University,

currently the William M. and Sara B. Warren Professor of the Humanities at Boston

University.

9.     I have completed an extensive level of research on the following

impact weapons: (1) "saps" ("soft," and hard stunning bludgeons, see below); (2)

"blackjacks" (very small, dense clubs that flex during use, see below; (3)

"slungshots" (essentially pocket flails, quite popular for the majority of American

history), which are still made and sold today, usually called monkey fists; (4)

"nunchaku" (commonly known as nunchucks); and (5) "billies" (short clubs of

various sorts).  I have also conducted extensive research into the straight razor,

another weaponry niche in which I have done more research than anyone, which I

will use in an upcoming book on the subject.  Through this research, I have gained

expertise in the origins and uses of a similar impact weapon, the billy.  My research

has included studying a range of source material—from historical court cases and to

medical evidence—in order to apprise the effectiveness of these weapons in the

hands of both the law and lawless, the trained and untrained.

10.     In my research over the years I have read and collected a wide variety

of sources on the subject of the small impact weapons of the western world, billies

being one of them.  By necessity this has included a plentitude of police and

criminal history from court records and newspaper articles in the U.S. and U.K.,

memoirs by law enforcers and breakers, as well as current and past training

manuals made by law enforcement and martial artists.  Additionally, I have

interviewed people with practical experience with these tools.

11.     I have also conducted physical experiments on my own, using all of

the objects discussed here against a variety of test materials.  One pertinent example

would be striking objects with both a solid steel baton and a collapsing one to compare results.  My ongoing martial artist training, including earning a black belt in certain weapons (kobudo), supplements my scholarly research with some level of physical experience.

12.     My conclusions are based on as clinical and fair an assessment of objective facts as I could produce. I was trained in historical methodology, although not at a graduate school level.  My statements and conclusions in this document are not based on my personal opinion regarding whether or not weapons should be legally allowed for civilians.

**SUMMARY OF CONCLUSIONS**

13.     Labels are far less important than form and function in identifying these objects.  A billy club can be made of various materials including metal and metal is not a late 20th century innovation for such, nor were synthetic materials. Softer instruments, like saps, were used by American police at various times partly as an attempt to provide the same functionality of billies but with less chance of seriously injuring the target.

14.     Police forces in the U.S. and the U.K. cautioned their officers about the danger of striking with a billy to the head due to the risk of serious injury or worse and rules prohibiting the practice under most circumstances were enforced. Striking to the head in an uncontrolled manner is how an untrained person is most likely to use any club in combat, including a billy.  And this is true regardless of whether it is used lawfully (justifiable self-defense) or otherwise.  Historically speaking and contrary to what might be expected, billies *outside of law enforcement* were predominantly carried and used in a more offensive than defensive manner. This resulted from their dedicated purpose as fighting tool, no matter how crudely built, versus common walking aids or fashion symbols (canes, walking sticks, staves) which had a peaceful primary purpose but could be used as ad-hoc clubs

when needed.  Hence, billy clubs were often associated with criminals including

muggers, pimps (brothel bullies) and gang members.

## OPINIONS

### I.   OVERVIEW OF BILLIES AND SIMILAR WEAPONS

#### A.   Billies

15.     Generally, a "billy club" (or "billy") is, based on my historical

research, any blunt force impact weapon that is short enough to be concealed on the

person and capable for one-handed use and is of fairly uniform, cylindrical form.  A

billy club is a sub-category of club, as the name implies.  This definition therefore

encompasses traditional wooden billies, such as those used by American law

enforcement as their primary impact weapon for well over 100 years, but also the

metal telescoping batons that have become the new standard in the U.S. and abroad

for law enforcement compliance devices.  Today, these expanding and collapsing

designs are commonly referred to as "ASPs" or "ASP batons" despite the

acronym's relation to one baton manufacturer (Armament Systems and Procedures,

Inc.).  It would be incorrect to assume these were the first metal billies.  An

extremely common criminal club in the United States was the lead pipe or gas pipe.

Easily harvested from a city's infrastructure in bygone days, these metal pipes were

used in muggings and gang conflicts long before the late 20th century configuration

used today by police and others.  Also, metal telescoping batons go back decades

earlier, having been invented in or about 1929 and used variously, including in

WWII by British special forces who adopted and modified the original German

design.[1]

16.     Billies have gone by various names including but not limited to

"baton," "beater," "billy," "billy club," "bully club," "club," "conk-buster," "cosh,"

_____

[1] Rick Stroud, *Kidnap in Crete: The True Story of the Abduction of a Nazi General* 157-58 (Bloomsbury USA 2015).  Relevant excerpts of sources cited in this declaration, are included in the Compendium for the Declaration of Robert Escobar, filed concurrently with this declaration and Defendant's Supplemental Brief ("Escobar Compendium")

"cudgel," "life-preserver," "priest," "rent knocker," "sap," "sap-stick," "tire checker," and "truncheon."  These terms were used with little formality and their meanings changed over time.  An important example is how clubs were called saps because they were often made out of saplings (c. late 19th century).[2]  However, the word sap became disassociated from wooden clubs and instead became attached to the types of flexible impact weapons, often made of leather, that I discuss in detail later in this declaration.  Some of the old names applied to users and uses of these tools speak to their association with crimes.

- brothel bully: a pimp who uses a blunt force impact weapon as his enforcement tool.  Example, "Slungshot… the favorite weapon of brothel bullies… burglars, and villains…"[3]  For "slungshot," see below.
- cosher: "A thief or bully armed with a cosh."[4]
- cosh boy: "…appeared in the tabloid press in 1950 to describe a style of robbery involving any blunt weapon (including adapted objects such as pieces of lead-piping)."[5]
- cosh carner: "A prostitute's bully."[6]
- cosh man: "A man (esp. a prostitute's bully) that carries a life-preserver."[7]

---

[2] etymologyonline.com, "Sap- club or stick for hitting… shortening of sapling… something you could use as a weapon to beat someone with. Also sapstick (1915).  Relevant excerpts included in the Escobar Compendium.

[3] "Delivering a Slung-Shot" Vintage illustration and caption reproduced and quoted in Robert Escobar, *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons*.  Relevant excerpts included in the Escobar Compendium.

[4] Eric Partridge, *A Dictionary of the Underworld: British and American* (Routledge Revivals 1917) (1949).  Relevant excerpts included in the Escobar Compendium.

[5] Louise A. Jackson, *Policing Youth: Britain 1945-1970* (Manchester University Press 2014).  Relevant excerpts included in the Escobar Compendium.

[6] Partridge.

[7] *Id.*

- sapping day: "A day in which a tramp finds himself involved in a timber-lesson."[8]  A "termber lesson" referred to the practice of beating homeless people with clubs in order to encourage them to leave town.

17.    Despite the variance in terminology, in terms of application, their uses have been the same: to strike an enemy so that they are overcome through pain compliance, injury, unconsciousness or even death.

18.    Through the binary lens of lethal/non-lethal taxonomy, billies are classified as non-lethal although they can kill under the right conditions.  Their less than overtly lethal nature, relative to a knife or more destructive impact weapon such as a mace, is why they were favored for so long by police forces in the United Kingdom and United States, among many other countries.  The hope was that an officer could diffuse a threat and apprehend an aggressive suspect or attacker while lowering the risk of serious injury or death to the suspect.  This explains their being carried by law enforcement personnel in the United States, along with saps and blackjacks, even after firearms were regularly issued.  A brief breakdown of these smaller, supplemental impact weapons is in order.

**B.   Saps**

19.    A sap is any sack-like container holding a dense load of weighted material that may be swung like a flail.  "Soft saps" contain loads comprised of shifting internals (metal shot, sand, sand with metal shot mixed in, coins).  Such contraptions were the world's first stun guns in both intent and effect.  The stuffing was generally hefty enough to knock someone unconscious but not enough to break bone.  Sometimes the person struck exhibited no visible mark afterwards.[9]  This made soft saps appealing to both police and criminals.  Police were attracted to the ability to deftly end a suspect's resistance while minimizing or eliminating broken

---

[8] *Id.*

[9] Ernest Abraham Hart ed., *The London Medical Record*, Vol I (Elder Smith 1873).  Relevant excerpts included in the Escobar Compendium.

bones and bleeding.  The mugger was likewise attracted to the efficiency of the tool for quickly inducing unconsciousness.  Additional benefits for the criminal were the sap's concealability, inexpensive construction, and noiseless contact.  A wooden or metal billy hitting someone's skull makes an audible sound and a bushwhacking criminal was not trying to attract attention to their criminal acts.

20.    Many users were adept at landing a well-aimed sap shot so they could render their victim unconscious.  Soft saps are particularly effective at this, when properly directed, because the impact sinks into the target, somewhat bypassing the surface.  Practitioners of East Asian martial arts call this an "internal strike."  The "sandbag," typically a tubular canvass sack stuffed with sand and tied off, is the original soft sap and its status as a longstanding weapon is confirmed by multiple Renaissance sources, with its history going back even further.[10]  The term "sandbagger" was once synonymous with mugger, even into the 20th century.[11]

21.    A sap-billy club hybrid was the overlooked soft billy club.  Soft billies were patented and sold in a variety of designs utilizing natural and synthetic materials in ways that need not be detailed here.  Some were adopted in significant numbers by police, others were not.[12]  The pertinent point is that they were meant to lessen the damage caused by their hard (generally, wood) counterparts.  To be fair, mitigating the risk of a wooden billy breaking mid-combat was also a factor with

[10] As noted in relevant excerpts of *Saps, Blackjacks and Slungshots* included in the Escobar Compendium, the Italian play Shakespeare based Othello on involved a murder plot where stockings filled with sand were to be used so no mark would be left on the victim.  Id. at 210.  Duels among the non-gentry featured sandbags going as far back as the late Middle Ages, it being among the weapons allowed in sanctioned combat. In the Renaissance the classic, long sandbag was attached to a pole to create an improbable *sandbag flail*. This was used in duels of this later era. They appear in various illustrations of the time.

[11] Jonathon Green, *Crooked Talk*: *Five Hundred Years of the Language of Crime* 24 (Random House UK 2011).  Relevant excerpts included in the Escobar Compendium.  Various other sources confirm this as well.

[12] Matthew G. Forte, *American Police Equipment: A Guide to Early Restraints, Clubs and Lanterns* 35-36 (Turn of the Century Publishers 2000). Relevant excerpts included in the Escobar Compendium.

some of the 19th and 20th century inventors. Police officer and inventor Edward Bean (1838-1908) patented and successfully sold this type of instrument for decades. Regarding the less violent nature of this type of club as well as its increased durability, author Matthew G. Forte describes Bean's motivation, "He believed wood was too unforgiving both in terms of the damage it would inflict on someone hit with a billy, and on the club itself… He thought what the world needed was a more humane club, one which would not break …"[13]

22.     Hard saps are not as gentle given their unyielding load.  A padlock in a sock is a classic example of this configuration and is obviously more prone to break bone than a sock filled with sand, no matter how densely packed.

**C.   Blackjack**

23.     The blackjack was invented by and for police in the late 19th century.[14]  These almost miniature clubs compensate for their lack of size by having a dense, cylindrical metal striking-head (almost always made of lead) that wobbles on the end of a spring or, sometimes, cable.  The entire contraption was typically encased in leather.  A very top-heavy dynamic and the whipping force generated while swinging produce the desired impact.  The first *Oxford English Dictionary* reference to them is from 1889.[15]  Before long, they became common with U.S. police and would stay that way until roughly the 1980s.  In an echo of the soft sap duality, criminals were also extremely fond of them.[16]  For example, Jack Ruby, Al Capone, and bodyguards to Jimmy Hoffa used them.[17]

---

[13] *Id*. at 35.

[14] Despite the blackjack being a very common 20th century weapon favored by police and gangsters and despite it being immortalized in noir fiction on paper and film, no one had ever discovered the blackjack's invention. See relevant excerpts of *Saps, Blackjacks and Slungshots*, included in the Escobar Compendium, for details on research and conclusion as to its origin and inventor.

[15] LeRoy Lad Panek, *Probable Cause: Crime Fiction in America* (Popular Press 1 1990).  Relevant excerpts included in the Escobar Compendium.

[16] Escobar, *Saps, Blackjacks and Slungshots* at 73-74, 135, 137-48.

[17] *Id*. at 157-59, 162.

9

### D.   Slapper, Slapjack, and Flat Sap

24.     Briefly, a flattened version of a blackjack (for all intents and purposes) was invented in the early 20th century.  Flat spring steel instead of a cylindrical coil and a two-dimensional spoon-shaped lead striking-head were both encased in leather.  The design was meant to spread the impact over a relatively flat and wide area.  Blackjacks do not have edges but hit with so small a striking area that they were notorious for causing profuse bleeding.  A further safety feature of the slapper was the spring steel allowing the instrument to flex away from the point of impact. A general rule is that the more flexible a sap or blackjack, the harder it hits.  The flattened steel was normally nowhere near as loose in action as a blackjack's coil spring.  The flat sap's overall design was an alternative to the soft sap's approach for protecting a target as much as possible while still imparting enough force to subdue someone.

## II.   LAW ENFORCEMENT ADOPTION OF IMPACT WEAPONS AS COMPLIANCE TOOLS AND MODERN POLICE BATONS

25.     The variety of impact weapons noted above speaks to the need for law enforcement to carry a blunt force tool that could be used when employing a firearm was impossible or unwarranted.

26.     Returning to our focus on billy clubs and related tools, all of these were well-understood to be dangerous, hence the plethora of attempts to lessen the impact detailed above (soft saps, soft billies, and slapjacks).  Even the blackjack's intent was to minimize destruction by letting the striking head bounce freely away from the target after impact.  However, the design failed in that respect as the bounce away does not negate the hitting force in any meaningful way.  The blackjack's allure ended up being that it is much smaller than a standard billy yet competes with it in power.

27.     The historical record vis-à-vis law enforcement in the U.S. seems to indicate that standard billy clubs were dangerous enough to warrant several attempts to circumvent their use.  This is reinforced by police guidance regarding technique.  The following excerpts are from *A Handbook for Law Enforcement Officers: Techniques and Use of the Police Baton* (FBI, Sep 1967):[18]

- ▪ "The officer who carries a baton as part of his equipment must be trained to use it properly."

- ▪ "Where to strike blows – As a general rule, short-swing and backswing blows should be directed to those places on the body where bone is close to the skin, excluding the head and face."

- ▪ "Blows to the head and face should be avoided for the following reasons: The opponent could be killed instead of merely being brought under control.  The officer has no way of determining the thickness of his opponent's skull.  A blow to the head of one opponent might kill him, whereas the same blow to the head of another could have little or no effect."

- ▪ "The police officer should have a thorough knowledge of the vulnerable areas of the body and avoid striking those blows which produce death or permanent injury."

28.     Regarding that manual, it is noteworthy that the only underlined sentences in the 42-page document are the cautionary guidance above (excluding the final quotation).

29.     The caution around striking to the head is corroborated by the longstanding experience of England's law enforcement officers, who were the model for America's original professional police forces (first Boston, then New

---

[18] *A Handbook for Law Enforcement Officers: Techniques and Use of the Police Baton* (FBI Sept. 1967), *available at* https://www.ojp.gov/pdffiles1/Digitization/18816NCJRS.pdf (last visited Nov. 22, 2021).  Relevant excerpts included in the Escobar Compendium.

York City).  "If a constable is likely to be overpowered he may draw his truncheon and use it, taking care to avoid striking anyone on the head."[19]  It was also applied to saps, blackjacks and slapjacks, these being mostly an American law enforcement phenomenon.  Guidance varied by locality, police agency, etc., but a rule of thumb was that striking above the shoulders was only warranted if an officer felt he or she was in deadly peril.  Note that this was the case even with slapjacks which are the gentlest of the police weapons detailed in this declaration.

30.    The FBI warning about training being required for baton use is well-grounded if serious injuries are to be avoided.  Untrained people defending themselves with a billy of any kind may swing wildly (and repeatedly) to the head of their opponent.  This is easily the most instinctual combat response when wielding such an implement and even trained police have been susceptible to it many times.

31.    Because ASP batons are the modern standard police baton, I will focus on them relative to their predecessors.  The collapsing and expanding nature of these tools requires a physical construction notably different from a solid piece of wood, metal or rubber.  The telescoping function necessitates a form that gets slimmer as it moves away from the handle.  Most clubs are either uniform throughout or swell at the head to maximize impact.  The Irish shillelagh would be a classic example of the latter.  Francisco Goya's painting *Duelo a Garrotazos* (Duel with Cudgels), from c.1820-1823 provides evidence from a giant in art history that such an expedient was not only found in Ireland.[20]

---

[19] House of Commons (May 17, 1889), *recorded in Hansard's Parliamentary Debates*, Third Series, Vol. CCCXXXVI 363-64 (1889).  Relevant excerpts included in the Escobar Compendium.

[20] A high-resolution image of this famous Spanish painting (Wikipedia) Francisco de Goya y Lucientes - Duelo a garrotazos - Fight with Cudgels, *available at* https://en.wikipedia.org/wiki/Fight_with_Cudgels#/media/File:Francisco_de_Goya_y_Lucientes_-_Duelo_a_garrotazos.jpg (last visited Nov. 22, 2022).  A copy of this painting is included in the Escobar Compendium.

32.     Most ASP batons are actually a continuation of that strategy, as their striking end is topped with a metal cap.  While this swells ever so slightly in terms of measurements, the metal construction of the entire tool including that cap concentrates force at the very end, just as a bulbous-headed wooden club does.  Furthermore, the miniscule size of the end cap means that the force is concentrated into a very small surface area.  This maximizes the damage one of these can cause as a swing that uses it employs the maximum length of the tool, thereby describing the widest arc in motion, and hits with that cap or knob.

33.     Telescoping batons possess unique shape, composition and are made in varying degrees of quality.  They sacrifice power in some areas that a user would instinctively expect to be ideal while optimizing it at the very tip.  When an ASP baton is used in a manner to strike with the end of the baton, the metal-based weight, length and cap combine to equal a formidable weapon that warrants the same cautions reviewed above, if not more.

## III.  HISTORICAL USERS OF BILLIES

34.     Long before England's invention of modern policing by Sir Robert Peel in 1829,[21] blunt weapons, including billy clubs, saps, and batons took on countless variations.  Saps spread from the civilian-criminal realm to policing.  Slapjacks and blackjacks took the exact opposite path—these devices were first developed for policing and spilled over to criminal use.  Billy clubs exhibit the former pattern of adoption, having existed for centuries prior to the establishment of police.  Batons of various sorts were symbols of authority in Europe for centuries prior to the establishment of the United States.[22]

---

[21] Clive Emsley, *The Great British Bobby: A History of British Policing from the 18th Century to the Present* 8, 39, 294 (Quercus 2009).  Relevant excerpts included in the Escobar Compendium.

[22] *See, e.g.,* "Portrait of the Emperor Domitian, half-length standing in profile, wearing a laurel wreath and holding a baton" by Barnardino Campi; Mutual Art, *available at* https://www.mutualart.com/Artwork/Portrait-of-the-Emperor-Domitian--half-l/2703EE42D72DE541 (last visited Nov. 29, 2022); *see also*

35.     However, on the street it was much more likely to be held by a criminal, rioter or ruffian than anyone else in the old world, prior to England's adoption of it as standard equipment for police.  And depictions of street gang activity in the United States between the 1850s and 1870s showed the common use of billy clubs as a preferred criminal weapon.[23]

36.     Fire departments were intimately intertwined with the gang warfare of the day in New York City, hence the following incident, "When Engine Company 41 was passing the intersection here at Chatham and Mulberry Streets, a gang of Dead Rabbits, supporters of rival Engine Company 21 on Worth Street, attacked them with wooden clubs, brickbats and paving stones."[24]

37.     *The Encyclopedia of Street Crime* states, "Early references to violent street crime refer to the use of simple impact weapons such as clubs or cudgels made of wood."[25]

38.     Earlier in history, we find the same in English law.  Muggings predating the formation of the United States and featuring clubs, usually referred to as a truncheon, can readily be found.  To quote one, a mugger himself stated in 1732, "I cannot deny but we us'd him very inhuman, which was by cutting him across the Hands with the Knives we carry about us; William Fleming knock'd him

"Charles V, Holy Roman Emperor" by Titian, *available at* https://en.wikipedia.org/wiki/Charles_V,_Holy_Roman_Emperor#/media/File:Elderly_Karl_V.jpg (last visited Nov. 30, 2022).  Copies of both portraits included in Escobar Compendium.

[23] *See, e.g.,* "Crime on the Lower East Side," Tenement Museum, New York, NY, *available at* https://www.tenement.org/blog/crime-on-the-lower-east-side-6-24-14/#:~:text=We%20know%20of%20a%20few%20crimes%20committed%20here%2C,of%20immigrant%20life%20on%20the%20Lower%20East%20Side, (last visited Nov. 21, 2022).  Copy is included in the Escobar Compendium.

[24] Eric Ferrara, *A Guide to Gangsters, Murderers and Weirdos of New York City's Lower East Side* (The History Press 2009).  Relevant excerpts included in the Escobar Compendium.

[25] Jeffrey Ian Ross ed., *Encyclopedia of Street Crime in America* (SAGE Publications, Inc. 2013).  Relevant excerpts included in the Escobar Compendium.

down with a little Truncheon which at the end has lead, and would have Murder'd him if we had not more Mercy."[26]

## CONCLUSION

39.    The weapons in question, including billies, are correctly classified as less than lethal but are still dangerous.  Whether traditional or modern, solid or telescoping, a billy is a dedicated weapon.  And as with any well-designed weapon, the potential for harm to someone it is used upon is significant.  Because of the danger they posed, billies were frequently associated with criminal use throughout American history, due to their concealability and striking power.

40.    The metal head of the ASP baton concentrates force into a very small area, much smaller than traditional wooden billies.  And it does so with a harder, denser material (steel).  A hit to the head that maximizes the ASP's ability to concentrate and deliver force is as potentially deadly as with any competing tool.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 30, 2022, at Irving, TX.


Robert Escobar

---

[26] "Ordinary's Accounts, 5th Jun 1732, robbery incident." Digitized records of the Old Bailey Courthouse, "London's Central Criminal Court, 1674 to 1913." Page Image - Central Criminal Court, *available at* https://www.oldbaileyonline.org/static/Ordinarys-accounts.jsp#theordinary (last visited Nov. 22, 2022).  Relevant excerpts included in the Escobar Compendium.

15

## CERTIFICATE OF SERVICE

Case Name:   ***Fouts, et al vs. Rob Bonta***      Case No.  **3:19-cv-01662-BEN-JLB**

I hereby certify that on <u>December 1, 2022</u>, I electronically filed the following document(s) with the Clerk of the Court by using the CM/ECF system:

## DECLARATION OF ROBERT ESCOBAR

I certify that **all** participants in the case are registered CM/ECF users and that service will be electronically accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on <u>December 1, 2022</u>, at San Francisco, California.

<table>
<tr><td>Vanessa Jordan</td><td><em>Vanessa Jordan</em></td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>