1

2

3

4

5

6

7

ALAN ALEXANDER BECK
LAW OFFICE OF ALAN BECK
2692 HARCOURT DRIVE
SAN DIEGO, CA  92123
(619) 905-9105
STATE BAR NO. 276646
ALAN.ALEXANDER.BECK@GMAIL.COM
ATTORNEYS FOR PLAINTIFFS
RUSSELL FOUTS AND
TAN MIGUEL TOLENTINO

STEPHEN D. STAMBOULIEH
STAMBOULIEH LAW, PLLC
P.O. BOX 428
OLIVE BRANCH, MS  38654
(601) 852-3440
STEPHEN@SDSLAW.US
MS BAR NO. 102784
 *ADMITTED PRO HAC VICE

8

9

10

11

12

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| **RUSSELL FOUTS and TAN MIGUEL TOLENTINO,**<br><br>                                  Plaintiffs,<br><br>           **v.**<br><br>**ROB BONTA, in his official capacity as the Attorney General of the State of California,**<br><br>                                  Defendant. | 19-cv-01662-BEN-JLB<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF**<br><br>Judge:          Hon. Roger T. Benitez<br>Courtroom:   5A<br>Action Filed:  September 1, 2019<br>Hearing Date: N/A |

# **TABLE OF CONTENTS**

I.      Introduction ...............................................................................1

II.     Argument ...................................................................................1

   A. Billies Are Presumptively Protected by the Second Amendment..............1

   B. California Is Not Entitled to Rely on Analogical Reasoning ...................4

   C. The Mere Possession of a Billy Does Not Implicate the Tradition of Carrying Dangerous and Unusual Weapons...........................................19

III.    California Does Not Need More Time to Create a Record......................35

Plaintiffs' Response to Defendant's Supplemental Brief
(19-cv-01662-BEN-JLB)

# TABLE OF AUTHORITIES

**CASES**

*Aymette v. State*, 21 Tenn. 154 (1840)........................................................11

*Barnett v State*, 72 Or App 585 (1985)........................................................9

*Baron Snigge v. Shirton* 79 E.R. 173 (1607)...............................................24

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)..........................................20

*Czubaroff v Schlesinger*, 385 F Supp 728  (ED Pa, 1974)........................17

*District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)................................passim

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021)...........................8

*English* v. *State*, 35 Tex. 473 (1871) .................................................12, 33

*Fouts v. Bonta*, 561 F. Supp. 3d 941 (S.D. Cal. 2021)..................................2

*Heller v. District of Columbia*, 670 F. 3d 1244 (CADC 2011).....................6

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019).............................................8

*Kennedy v. Louisiana*, 554 U.S. 407 (2008).............................................13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................7, 8

*Miller v. Bonta*, No. 19-cv-1537-BEN (JLB), 2021 U.S. Dist. LEXIS 105640 (S.D. Cal. June 4, 2021)..............................................................23

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .....................................10

*Neilson & Sarrazin v. Dickenson,* 1 Des. 133 (1785) ...............................28

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)....passim

*NRA of Am. v. Bureau of Alcohol*, 700 F.3d 185 (5th Cir. 2012)...............7

*Nunn v. State*, 1 Ga. 243 (1846)...............................................................................11

*O'Neill v. State*, 16 Ala. 65, 67 (1849) ...................................................................33

*Oregon Firearms Federation, Inc., et. al. v. Katherine "Kate" Brown, et. al.*, No.

   2:22-CV-01815-IM, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ...........................3

*Rex v. Dewhurst*, 1 State Trials, New Series 529 (1820) .........................................29

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686) ........................................................30

*Rex v. Rowland Phillips* 98 E.R. (1385) ...................................................................24

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003)...................................................20

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), *cert. denied,* 138 S.Ct. 945 (2018)

   .................................................................................................................................10

*Simpson v. State*, 13 Tenn. Reports (5 Yerg.) 356, 361 (1833)................................34

*State v Blocker*, 291 Or 255 (1981) ...........................................................................9

*State v Kessler*, 289 Or 359 (1980)............................................................................9

*State v. Dawson*, 272 N.C. 535 (1968) .....................................................................22

*State v. Delgado*, 692 P.2d 610 (1984) ......................................................................8

*State* v. *Duke*, 42 Tex. 455 (1875)...........................................................................12

*State v. Langford*, 10 N.C. (3 Hawks) 381 (1824) ...................................................33

*State v. Lanier*, 71 N.C. 288 (1874)..........................................................................33

*State v. Norris,* 2 N.C. 429 (1796)............................................................................28

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017)......................................8

*The King v. Oneby,* 92 E.R. 465 (Court of the King's Bench 1727).........................23

Plaintiffs' Response to Defendant's Supplemental Brief
(19-cv-01662-BEN-JLB)

*U.S. v. Miller*, 307 U.S. 174 (1939).........................................................................21

*U.S. v. Mitchel* 2 U.S. 348 (Pennsylvania circuit court 1795)................................28

*U.S. v. Vigol* 2 U.S. 346 (1795) ...............................................................................28

*United States v. Hare*, 26 F. Cas. 148 (C.C.D. Md. 1818)......................................23

*Warder v. Arell* 2 Va. 282 (1796)...........................................................................28

*Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017)...............................10

*Young v. Hawaii*, 45 F.4th 1087 (9th Cir. 2022) .......................................................2

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) (*en banc*), *cert. granted, judgment*

    *vacated and case remanded*, 142 S.Ct. 2895 (2022) ............................................10

**STATUTES**

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127 .........13

1860 Terr. of N. M. Laws §§1-2, p. 94 .....................................................................12

1871 Tex. Gen. Laws ch. 34, §1 ................................................................................12

*Acts Passed at the Annual Session of the General Assembly of the State of Alabama*

    (Tuscaloosa: Hale & Eaton, 1838 [1839]) .............................................................12

California Penal Code § 16590(m)...............................................................................1

California Penal Code § 18010(b) ................................................................................1

California Penal Code § 22210.....................................................................................1

California Penal Code § 22290.....................................................................................1

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28

    (1896) available at The Making of Modern Law: Primary Sources Ordinances of

the City of Fresno, § 8 ..........................................................................14

Statute of Northampton 2 Edw. 3, c. 3 (1328) ...........................................21

William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions

of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of

Modern Law: Primary Sources. 1878 Ordinances of the City of Los Angeles, § 36

........................................................................................................14

**OTHER AUTHORITIES**

1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978) ......................3

2 Wilson 300 (1804) ..............................................................................27

3 Wilson 155 (1804) ..............................................................................27

3 Wilson 59 (1804) ...............................................................................27

4 Blackstone 175 (1803) .........................................................................26

5 Blackstone 148 (1803) .........................................................................24

5 Blackstone 169 (1803) .........................................................................26

5 Blackstone 254 (1803) .........................................................................25

5 Blackstone 256 (1803) .........................................................................25

5 St. George Tucker, Blackstone's Commentaries: with Notes of Reference, to the

Constitution and the Laws, of the Federal Government of the United States; and

of the Commonwealth of Virginia 146 1803 ..........................................33

An Universal Etymological Dictionary (R. Ware, W. Innys and J. Richardson, J.

Knapton (and twelve others)) (1675) ....................................................26

*Babylonian Talmud*, Sanhedrin 74a (I. Epstein ed., Jacob Schacter & H. Freedman

   trans., Soncino Press 1994) ...................................................................17

Bernard, *Practical Holiness: A Second Look* 284 (1985) ........................................17

Bernton, *Students Urged to Shape World: Dalai Lama Preaches Peace in Portland*,

   SEATTLE TIMES, May 15, 2001 ......................................................................17

Cao et al, Willingness to Shoot: Public Attitudes Toward Defensive Gun Use, 27

   Am J Crim Just 85 (2002) ......................................................................17

*Catechism of the Catholic Church*,

   https://www.vatican.va/archive/ENG0015/__P7Z.HTM......................................17

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN

   KENTUCKY 482 (1822) ......................................................................31

D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev.

   205 (2018) ......................................................................6

David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*,

   DET. L. C. REV. 789 (1982) ......................................................................30

F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852) .26, 32

Gastil, *Queries on the Peace Testimony*, Friends J, Aug. 1992 ..............................17

Giles Jacob, The law-dictionary 149 (P. Bryne 1811 first American from the second

   London edition) (1811) ......................................................................28

James Wilson, WORKS OF THE HONOURABLE JAMES WILSON (Bird Wilson

   ed., 1804)......................................................................30

John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) .........................................30

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN

    ANGLO-AMERICAN RIGHT 104-05 (1994).......................................................30

N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)

    .............................................................................................................................4

O. Hogg, Clubs to Cannon 19 (1968) .......................................................................35

Smith, Mark W., "Not all History is Created Equal": In the Post-Bruen World, the

    Critical Period for Historical Analogues is when the Second Amendment was

    Ratified in 1791, and not 1868 (October 1, 2022) Available at SSRN:

    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297. .........................11

*The Code of Maimonides*, Book Eleven, The Book of Torts 197-98 (Hyman

    Kleintrans, Yale Univ Press 1954).......................................................................17

The Collegiate Law Dictionary (James John Lewis ed., The American Law Book

    Company 1925) (1925) .......................................................................................27

The Cyclopedia Law Dictionary (Walter a. Shumaker and George Foster

    Longsdorf, ed. Callaghan and Company 1922) (1901).......................................27

Timothy Cunningham, A new and complete law-dictionary, Affray, 1789 ...........22

Volokh, Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the

    Rights to Keep and Bear Arms and Defend Life, 62 Stan. L. Rev. 199 (2009) .....9

Yoder, *Nevertheless: The Varieties of Religious Pacifism* 31 (1971).....................17

WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND

148-49 (1769) .............................................................................................. 30

William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE

MISDEMEANORS 271 (1826) ................................................................ 31

Plaintiffs' Response to Defendant's Supplemental Brief
(19-cv-01662-BEN-JLB)

## I.      Introduction

As a preliminary matter, Plaintiffs pray for an injunction of Section 22210 "and any other relevant California law which bans the acquisition, possession, carrying or use of billies as applied to Plaintiffs and additionally against other similarly situated law abiding persons." *Complaint* at Prayer for Relief. California Penal Code § 22210, in relevant part, prohibits the ownership of billies which are also known as batons. California Penal Code § 16590(m) designates a billy as a "generally prohibited weapon." A billy is also designated a] "nuisance," subject to confiscation and summary destruction by law enforcement under California Penal Code § 18010(b) pursuant to California Penal Code § 22290. These laws amount to an unconstitutional infringement on Plaintiffs' Second Amendment rights.  They are all challenged in this lawsuit and Plaintiffs seek an injunction against all these laws.

## II.    Argument

### A. Billies Are Presumptively Protected by the Second Amendment

California's analysis misstates the Supreme Court's holding in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). California claims that as a threshold matter, the burden to prove the Second Amendment's protection for people keeping or bearing arms for self-defense falls on Plaintiffs.  California mistakenly claims that it follows from this that Plaintiffs bear the burden of demonstrating that batons are arms protected by the Second Amendment. Def. Br. at 14 ("Plaintiffs cannot demonstrate that the "plain text" of the Second Amendment

covers their proposed course of conduct ... because they are not protected "Arms"

"commonly used" for self-defense.")  The Defendant admits the "Supreme Court

had 'little difficulty' concluding that the 'plain text' of the Second Amendment

protected the course of conduct that the Bruen plaintiffs wished to engage in –

'carry[ing] handguns publicly for self-defense' ..." Def. Br. at 10.[1]

But Plaintiffs burden is to only to demonstrate that California law burdens the

right to keep or bear an "Arm."  After that "the government must affirmatively prove

that its firearms regulation is part of the historical tradition that delimits the outer

bounds of the right to keep and bear arms[,]"[2] and demonstrate that the arm at issue

is not protected by the Second Amendment.  This Court recognized as much in its

last order:

> The Attorney General says that the state should not have the initial
> burden of proving a billy is *not* commonly possessed for lawful
> purposes. But this is exactly wrong. The constitutional imperative is on
> the government to not infringe. The correct starting orientation is that
> no arm may be prohibited. The presumption in favor of rightfully
> possessing a citizen's arm was made during the adoption of the Second
> Amendment. Here, there is no evidence that a billy is uncommon or
> commonly owned only for unlawful purposes. Because the government
> bears the burden, these arms are presumptively lawful to own.

*Fouts v. Bonta*, 561 F. Supp. 3d 941, 947 n.8 (S.D. Cal. 2021).  *Bruen* has not

---

[1] Defendant has not disputed that the Plaintiffs here are not part of the "ordinary, law-abiding, adult citizens" and therefore "part of 'the people' whom the Second Amendment protects."  Def. Br. at 10, citing *Bruen* at 2134.

[2] *Young v. Hawaii*, 45 F.4th 1087, 1092 (9th Cir. 2022) (quoting *Bruen*, 142 S. Ct. 2111, 2127) (O'Scannlain, dissenting).

"fundamentally altered"[3] the legal landscape on this issue. As Justice Alito stated in his concurrence in *Bruen*, "[o]ur holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess." *Bruen* at 2157 (Alito, J., concurring).[4]  Therefore, this Court's prior holding is still a correct statement of law.

Post-*Bruen*, the Second Amendment still "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). *Bruen* expressly reaffirmed this statement in its opinion. *Bruen* at 2132. The Supreme Court further stated that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen* at 2132.

There can be no dispute that a baton is an "arm."  *Heller* cited to two Colonial Era dictionaries to define the word. "The 1773 edition of Samuel Johnson's dictionary defined 'arms' as '[w]eapons of offence, or armour of defence.' 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978) (hereinafter Johnson). Timothy

---

[3] Defendant's Supplemental Br. at 1.
[4] See also *Oregon Firearms Federation, Inc., et. al. v. Katherine "Kate" Brown, et. al.*, No. 2:22-CV-01815-IM, 2022 WL 17454829, at *7, n. 9 (D. Or. Dec. 6, 2022) ("To the extent that the first step of a court's pre-*Bruen* analysis mirrors the first step of a court's post-*Bruen* analysis, these cases remain persuasive authority on whether the Second Amendment protects large-capacity magazines.").

Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary; see also N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar)." *Heller* at 581.

Batons can be borne by an individual to strike another. It is undisputedly an arm and the plain text of the Second Amendment "prima facie" protects their possession. *Bruen* dictates that it is California's burden to demonstrate billy clubs are not protected arms. This California has failed to do. "Here, there is no evidence that a billy is uncommon or commonly owned only for unlawful purposes. Because the government bears the burden, these arms are presumptively lawful to own." *Fouts* at 947 n.8.[5] California must then demonstrate that there is a historical tradition of allowing a complete ban on the possession of these protected arms. Despite California's argument to the contrary, California is not entitled to rely on analogies.

**B. <u>California Is Not Entitled to Rely on Analogical Reasoning</u>**

California claims that it can rely on laws that are analogous to its ban on billies.

---

[5] Defendant claims this Court "already established [billies] are not commonly owned for lawful purposes." Def. Br. at 19-20. However, this Court looked at an "altered bat" and a club "with nails driven into the larger end[.]" *Fouts* at 958-9. Plaintiffs have not requested to possess and carry a nail-covered club or some altered bat, but a "same type of baton/billy policeman are usually issued and expandable baton for self-defense and other lawful purposes..." Complaint at ¶¶ 47, 59. Altered bats and a nail-driven club are not appropriate comparators to normal billies or expandable batons.

However, this is contrary to what the Supreme Court said in *Bruen*. When an issue has existed since the Colonial Era, a court's only task is to see if similar laws existed during the Founding Era. Here, as in *Bruen*, the historical analysis is "fairly straightforward" and "simple." *Bruen* at 2131–32. The historical analysis is straightforward when, for instance, "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen* at 2131. The historical analysis is also straightforward when "the Founders themselves could have adopted [a 'distinctly similar' historical regulation to the challenged law] to confront that problem" but did not. *Id.* "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.*

*Heller* and *Bruen* "exemplifie[d] this kind of straightforward historical inquiry." *Bruen* at 2131. Both examined laws enacted to remedy centuries-old problems. Both found that those laws lacked a historical analogue. Both, accordingly, struck those laws as unconstitutional. In *Heller*, the District of Columbia law at issue "addressed a perceived societal problem—firearm violence in densely populated communities" by banning handgun possession in the home. *Bruen* at 2131. Although "the Founders themselves could have adopted [a similar law] to confront that problem," they did not. *Id.* In striking down the District of Columbia's ban on

handguns in *Heller*, the Supreme Court found it dispositive that no "Founding-era historical precedent" banned handgun possession in the home. *Id*. *Bruen* examined New York's proper cause requirement for obtaining a carry permit, which "concern[ed] the same alleged societal problem addressed in *Heller*: handgun violence, primarily in urban area[s]." *Id*. (quotation marks omitted). In striking down New York's proper cause requirement, the Supreme Court deemed it controlling that the law lacked an analogue from "before, during, and even after the Founding." *Id*. at 2131–32.

These same points apply equally to billies. At the time of the Founding, the preferred means of addressing the threat of violence was to require law-abiding individuals to be armed. States "typically required that arms be brought to churches or to all public meetings," and "statutes required arms carrying when traveling or away from home." *See* D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 232 (2018) (cited with approval in *Bruen* at 2133). There is no "well-established and representative" tradition of banning the possession of billies. *Bruen* at 2133.

Courts are to engage in analogical reasoning when dealing with "distinctly modern firearm regulation[.]" *Bruen* at 2132. In *Bruen*, the Court acknowledged that "that "applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins."" *Bruen* at 2134 (quoting *Heller v. District of Columbia*, 670 F. 3d 1244, 1275 (CADC 2011) (Kavanaugh, J., dissenting)).

However, when dealing with an issue, such as whether batons and other clubs can be owned, "that inquiry will be fairly straightforward[.]" *Bruen* at 2131. Here, billies do not represent an unprecedented societal concern or dramatic technological change. Therefore, California is not entitled to engage in analogical reasoning. Rather it must point to direct historical antecedents to its ban on billies. California has failed to do this.

California has cited to a string of cases that deal with restrictions on the carry of clubs. And as California fully concedes these "anti-club laws enacted in the 18th century and earlier focused on the carrying of clubs by enslaved people." Def. Br at 28. These laws fail on two grounds. First, they deal with restrictions on carry. That has nothing to do with the *possession* of clubs. If possession and carry were legally the same thing, then there would have been no need for the Supreme Court to decide *Bruen*. The trial court in *Bruen* would have simply cited to *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) to strike New York's proper cause law. These laws are insufficient to uphold California law on those grounds alone. Similarly, California should not be able to rely on wholly racist laws, enacted purely to prevent enslaved or newly-freed African Americans from carrying arms, in order to justify its modern-day law.

"Some Colonial and Reconstruction Era governments made it illegal to sell guns to enslaved or formerly enslaved people and members of Native American tribes. *See NRA of Am. v. Bureau of Alcohol*, 700 F.3d 185, 200 (5th Cir. 2012)

(collecting examples); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (same)." *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 (3d Cir. 2021) (footnote omitted). If these discriminatory and racist bans on the ownership of firearms could be used to justify a modern-day ban, then *Heller* would have been decided differently.

"As then-Judge Barrett once observed, '[i]t should go without saying that such race-based exclusions would be unconstitutional today.'" *Id*. n. 8. (quoting *Kanter v. Barr*, 919 F.3d 437, 458 n.7 (7th Cir. 2019) (Barrett, J., dissenting).[6] California cannot rely on laws which disarmed slaves to justify their ban on billies. Billy and baton-like instruments existed at the time of the Founding. California has not and cannot point to a colonial law which prohibited them.  The analysis should end there and this Court should strike California's baton ban as unconstitutional. In doing so this Court's reasoning would have many parallels to the Oregon Supreme Court's opinion in *State v. Delgado*, 298 Or. 395 (1984).

There, the Oregon Supreme Court found that Oregon's ban on the possession of switchblades violated the Oregon Constitution's right to arms:

> In early colonial America the sword and dagger were the most commonly used edged weapons. During the American colonial era every colonist had a knife. As long as a man was required to defend his life, to obtain or produce his own food or to fashion articles from raw

---

[6] In *McDonald v. City of Chicago*, the Supreme Court pointed to  licensing laws from Florida and Mississippi as examples of the "systematic efforts" of "the States of the old Confederacy" to "disarm . . . blacks." 561 U.S. 742, 771 (2010); *see also Bruen* at 2151 ("After the Civil War, of course, the exercise of this fundamental right by freed slaves was systematically thwarted.").

materials, a knife was a constant necessity.

*Delgado*, at 613-614.  It then found that a switchblade is constitutionally protected based on these historical antecedents[7]:

> We are unconvinced by the state's argument that the switch-blade is so "substantially different from its historical antecedent" (the jackknife) that it could not have been within the contemplation of the constitutional drafters. They must have been aware that technological changes were occurring in weaponry as in tools generally. The format and efficiency of weaponry was proceeding apace. This was the period of development of the Gatling gun, breach loading rifles, metallic cartridges and repeating rifles. The addition of a spring to open the blade of a jackknife is hardly a more astonishing innovation than those just mentioned.

*Delgado*, at 614. Similarly, this Court should strike California's billy ban with no further ado. It simply is not a "regulation[]" that would have been "unimaginable at the founding." *Bruen* at 2132.

Even if California could engage in analogical reasoning, there is no comparable historical analog to a complete ban on all club-like weapons. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'central'" considerations when engaging in an analogical inquiry." *Bruen* at 2133. Here,

---

[7] *See also State v Blocker*, 291 Or 255, 257-258 (1981) (same as to billies), *citing State v Kessler*, 289 Or 359 (1980); *also Barnett v State*, 72 Or App 585, 586 (1985) (same as to blackjacks). "Thus, the Oregon courts - and some other recent authorities - are right in concluding that weapons such as knives and billy clubs, which are less lethal than guns, should be considered arms alongside guns. They are designed as weapons. They are useful as weapons for self-defense." *See* Volokh, Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life, 62 Stan. L. Rev. 199, 219-220 (2009).

Plaintiffs' Response to Defendant's Supplemental Brief
(19-cv-01662-BEN-JLB)

California's argument suffers from a fatal defect at the onset. California misinterprets the phrase "dangerous and unusual" to argue that this refers to unusual types of weapons. As will be explained below that phrase refers to restrictions on carrying weapons in a threatening or unusual manner. Even setting that aside, California's historical analogs are inapplicable because they are largely from the Nineteenth Century.

The Supreme Court "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen* at 2137. The Ninth Circuit has also held that the courts must look to the Colonial Era to find a historical tradition. See, e.g., *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (*en banc*), *cert. granted, judgment vacated and case remanded*, 142 S.Ct. 2895 (2022); *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016), *cert. denied,* 138 S.Ct. 945 (2018). *Accord Teixeira v. County of Alameda,* 873 F.3d 670, 682 (9th Cir. 2017) (*en banc*), *cert. denied,* 138 S.Ct. 1988 (2018). That is a faithful reading of *Heller* and is in line with the Seventh Circuit's decision in *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) ("…1791, the year the Second Amendment was ratified—the critical year for determining the amendment's historical meaning…"), and with the D.C. Circuit in *Wrenn v. District of Columbia,* 864 F.3d 650, 668 (D.C. Cir. 2017) ("our opinion does little more than trace the boundaries laid in 1791 and flagged in *Heller I*"). Both *Moore* and *Wrenn* were cited with approval in *Bruen*. See *Bruen* at

2127, 2135.[8] The Colonial Era is the relevant time period. All of California's colonial laws are inapplicable for the reasons laid out above. And the remainder are not relevant because they are too late in time.

Even if this Court looked to the Reconstruction Era for an historical analog, the result would be the same. As California notes, some Nineteenth Century laws placed restrictions on billies. However, most of the laws California cites to deal with the concealed carry of billy clubs and other weapons, not bans on mere possession. The general rule from the line of 19th Century cases *Heller* discusses is that concealed carry can be restricted if open carry is allowed.

*Heller* points out that *Aymette v. State*, 21 Tenn. 154 (1840), "held that the state constitutional guarantee of the right to 'bear' arms did not prohibit the banning of concealed weapons." *Heller* at 613. Similarly, *Nunn v. State*, 1 Ga. 243, 246 (1846), also cited in *Heller* at 612, recognized an exemption for the open carry of bowie knives, holding that "no person or persons shall be found guilty of violating the before-recited act, who shall openly wear, externally, bowie-knives, dirks, tooth-picks, spears, and which shall be exposed plainly to view." *Nunn,* 1 Ga. at 246. *Heller* also relied on *State* v. *Reid*, 1 Ala. 612, 616-617 (1840), which held that "[a] statute which, under the pretence of regulating, amounts to a destruction of the right, or

---

[8] *See also* Smith, Mark W., "Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868 (October 1, 2022) Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297.

Plaintiffs' Response to Defendant's Supplemental Brief
(19-cv-01662-BEN-JLB)

which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."[9] *Heller*, 554 U.S. at 629.

These cases stand for the proposition that concealed carry can be banned when the government allows for the open carry of arms. There are only two jurisdictions, New Mexico and Texas, mentioned by the dissent in *Bruen*, which did not turn on this distinction between open carry and concealed carry. "[T]he Territory of New Mexico appears to have banned all carriage whatsoever of "any class of pistols whatever," as well as "bowie kni[ves,] . . .Arkansas toothpick[s], Spanish dagger[s], slung-shot[s], or any other deadly weapon." 1860 Terr. of N. M. Laws §§1-2, p. 94. *Bruen* at 2186 (Breyer, J., dissenting). "And Texas made it a misdemeanor to carry in public any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense absent reasonable grounds for fearing an [immediate and pressing] unlawful attack." 1871 Tex. Gen. Laws ch. 34, §1." *Id.* at 2188. (Breyer, J., dissenting) (punctuation omitted).

However, the dissent's reliance on these two instances was rejected by the majority in the *Bruen*. *Bruen* at 2153. Specifically, the Court found that the two Texas cases -- *English* v. *State*, 35 Tex. 473 (1871), and *State* v. *Duke*, 42 Tex. 455 (1875) – were outliers and therefore "provide little insight into how postbellum

---

[9] Similarly, Alabama had a ban on the concealed carry of bowie knives but allowed for their open carry. *See Acts Passed at the Annual Session of the General Assembly of the State of Alabama* (Tuscaloosa: Hale & Eaton, 1838 [1839]), chap. 77, 67-68.

courts viewed the right to carry protected arms in public." *Id*. The New Mexico statute was both an outlier, (*Bruen* at 2147 n.22), and distinguishable, (*id*. at 2154 n.29), as it expressly allowed an exception for self-defense. Clearly, if these restrictions on pistol carry were irrelevant, then they are likewise irrelevant with respect to the possession of billies in general.

Finally, California's reliance on twentieth laws is contradicted by *Bruen*. Even if modern laws alone could demonstrate a broad tradition of a regulation, there must at least be a strong showing that such laws are common in the states, *i.e.*, many more than six states. *See Kennedy v. Louisiana*, 554 U.S. 407, 423–26 (2008) (only six states permitting death penalty for child rapists shows national consensus against it).The 19th century California laws which California cites to are similarly inapposite. None of the cited to laws prohibited the possession or carry of billies or other clubs for lawful self-defense. The cited to laws are generally of two varieties. They deal with carrying weapons for criminal purposes. E.g. 1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127 ([I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.") *See* Spitzer Declaration Exhibit C at *8. Or they deal with the concealed carry of weapons. E.g. L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources

Ordinances of the City of Fresno, § 8. *See* Spitzer Declaration Exhibit C at *11. These laws are all inapposite to the possession ban at issue in this litigation.

Plaintiffs do not wish to engage in criminal conduct. Rather they wish to possess and carry billy clubs for lawful self-defense which is the right protected by *Heller*. Similarly, the concealed carry bans are not relevant because as discussed above, these laws allowed for self-defense by allowing of the open carry of weapons. These laws cannot be used to justify a ban on possession of billies for self-defense.

At least one of the 19th century California law cited to appears to be a complete ban the carry of weapons. E.g.  William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878 Ordinances of the City of Los Angeles, § 36 ("In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise"). However, this law does not even mention the carry of billies and expressly bans the carry of handguns. The Supreme Court, in *Bruen* held that there is a right to carry handguns and found that the handful of historical examples of handgun carry bans were not relevant. And again, this law deals with carry, not possession. If this law could be relied upon, then *Bruen* would have been decided otherwise.  None of the cited to California laws support California's modern day ban on the possession of all clubs.

Plaintiffs submit the Expert Rebuttal of Clayton Cramer to rebut California's submitted declarations. *See* Exhibit "1" Rebuttal of Clayton Cramer ("Cramer"). Cramer has identified numerous issues with California's submissions. "Spitzer provides no credible evidence that laws regulating impact weapons during the *Bruen* delimited years prohibited simple possession of impact weapons absent some other criminal nexus or outside one's home." Cramer at 41. Spitzer "[o]ften [cites] bans on concealed carry of impact weapons, and often grouped with arms that the Court has ruled are protected by the Second Amendment" for the proposition that billies can be banned. *Id*. at 40.  He also relies on laws which punished "other crimes committed while armed". And he relies on "[l]aws disarming slaves". *Id*. None of these are proper historical precedent to support a ban on the ownership of billies by law abiding citizens which as Plaintiffs.

"Spitzer claims many antebellum statutes are evidence that impact weapons were not considered lawful for civilian ownership." However, Mr. Cramer demonstrates that none of these laws were applicable to possession by law abiding citizens. *See* Cramer at 16-28. Many deal with the ownership of weapons by slaves. *See e.g.* Virgina (1792): "No *negro or mulatto* whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever…" [emphasis added]. *Id.* at 16. Others deal with criminal conduct. *Id.* E.g. Maine (1786): "An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof" None deal with a prohibition on the ownership of billy clubs. Some of the cited to laws do not

appear to even exist. *See* e.g. "Alabama (1805): There is no reference to such a statute in Exhibit C, nor could there be: The first session of the Alabama Territorial Legislature took place in February, 1818." Cramer at 18.  The Spitzer Declaration simply does not establish that there is any historical tradition of banning billy clubs.[10] And the other declarations rely on it.  This Court should find that California has failed its burden to demonstrate that there is historical tradition of banning billy clubs. As the rebuttal of Mr. Cramer demonstrates, California's position is contradicted by history.  And California's legal arguments are contradicted by precedent.

California claims that the "minimal burdens imposed by Section 22210 and its historical analogues stand in stark contrast to the burdens imposed by the laws at issue in *Heller*."  This statement is directly contradicted by *Heller* itself. Justice Breyer's dissent in *Heller* made clear that "the District's law does not prohibit possession of rifles or shotguns". *Heller* at 710. (Breyer, J., dissenting). The District made the same argument as California does here and claimed that the ban on handguns was permissible in light of the other arms which were available.

The Supreme Court rejected this argument and found "[i]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. There are many reasons that a citizen may prefer a handgun for home defense." *Heller* at 629. Similarly, a complete ban on all club-like implements for self-defense is impermissible.  There

---

[10] Professor Barron's analysis fails for similar reasons. *See* Cramer at 38-39.

are many reasons why a person may want to wield a billy over a firearm. Some people, for instance, have religious or ethical compunctions about killing. For example, noted Mennonite theologian John Howard Yoder, noted Pentecostalist theologian David K. Bernard, and the Dalai Lama have expressed the view that while one ought not use deadly force even in self-defense, self-defense using nondeadly force is permissible.[11] Some members of other religious groups, such as Quakers, share this view.[12] Other religious and philosophical traditions, such as the Jewish and Catholic ones, take the view that defenders ought to use the least violence necessary.[13]

Other people might feel they will be emotionally unable to pull the trigger on a deadly weapon, even when doing so would be ethically defensible. Thus, for instance, Cao et al, Willingness to Shoot: Public Attitudes Toward Defensive Gun Use, 27 Am J Crim Just 85, 96 (2002), reports that 35 percent of a representative sample of Cincinnati residents aged 21 and above said they would not be willing to

---

[11] *See* Yoder, *Nevertheless: The Varieties of Religious Pacifism* 31 (1971); Yoder, *What Would You Do?* 28-31 (1983); Bernard, *Practical Holiness: A Second Look* 284 (1985); Bernton, *Students Urged to Shape World: Dalai Lama Preaches Peace in Portland*, SEATTLE TIMES, May 15, 2001, at B1 (paraphrasing the Dalai Lama).

[12] *See* Gastil, *Queries on the Peace Testimony*, Friends J, Aug. 1992, at 14, 15 (noting the views of some Quakers); *Czubaroff v Schlesinger*, 385 F Supp 728, 739–40 (ED Pa, 1974) (describing a conscientious objector application that expressed such a view as a matter of humanist philosophy).

[13] *See Catechism of the Catholic Church*, https://www.vatican.va/archive/ENG0015/__P7Z.HTM ¶ 2264 (accessed December 6, 2022); *Babylonian Talmud*, Sanhedrin 74a (I. Epstein ed., Jacob Schacter & H. Freedman trans., Soncino Press 1994); *The Code of Maimonides*, Book Eleven, The Book of Torts 197-98 (Hyman Kleintrans, Yale Univ Press 1954).

shoot a gun at an armed and threatening burglar who had broken into their home. (The fraction at an armed and threatening burglar who had broken into their home. was higher for women respondents. *Id* at 100.) It seems likely that many of the 35 percent feel they would be psychologically unprepared to shoot an attacker, even if they were ethically permitted to do so.

Others might worry about erroneously killing someone who turns out not to be an attacker. Still others might be reluctant to kill a particular potential attacker, for instance when a woman does not want to kill her abusive ex-husband because she does not want to have to explain to her children that she killed their father, even in self-defense. Others might fear a gun they own might be misused, for instance by their children or by a suicidal adult housemate. Still others, such as people with past criminal convictions, may be barred from owning firearms. And even people who own guns may still want to have both a gun and a baton accessible, so that they can opt for a nonlethal response whenever possible, and a lethal one when necessary. This, of course, is part of the reason that police officers carry both kinds of weapons. These are not just aesthetic preferences, such as a person's desire to have a particular handgun that he most likes when other handguns are available. [14] These are preferences that stem from understandable and even laudable moral belief systems, emotional reactions, or pragmatic concerns. It is an infringement for California to

---

[14] Of course, Plaintiffs are not saying the government has any right to dictate which handguns people can buy and artificially limit the available handguns to choose from, like California already does with its handgun roster.

force Plaintiffs and other California residents to forgo an entire class of effective self-defense tools because guns are available.

For the same reasons the Supreme Court found the District's ban on handguns to be unconstitutional, it is no answer for California to claim that it allows residents access to firearms. The Second Amendment gives people the right to have less than lethal weapons, such as batons, to defend themselves. This Court should reject California's flawed argument. It is contradicted by precedent and as a practical matter, banning batons is still an infringement on Plaintiffs' Second Amendment rights.

The Defendant then offers a few current restrictions on billies (which they say also applies to police batons). Def. Br. at 21. In addition to California, Defendant identified New York, Tennessee (which prohibits "carrying of a 'club' 'with the intent to go armed'") and Illinois. *Id*. Taking Defendant at his word, we are left with the proposition that four states currently ban billies (or a "club", or a bludgeon which is a "police baton"). Out of 50 states, Defendant identified four. *Bruen* struck New York's "proper cause" heightened need, when a total of "six States, including New York" required a "showing of some additional special need." *Bruen* at 2122. If six states were not significant enough to change the Supreme Court's opinion, then four is less significant.

**C. <u>The Mere Possession of a Billy Does Not Implicate the Tradition of Carrying Dangerous and Unusual Weapons</u>**

Unsatisfied with the Supreme Court, Defendant rewrites the Supreme Court's opinions in both *Heller* and *Bruen* regarding "dangerous and unusual weapons." Def. Br. at 22.   Defendant deleted the word "and" and substituted the word "or", completely changing the meaning of the phrase.  But it is not our place to "tell the Supreme Court it was out to lunch when it last visited a constitutional provision." *Silveira v. Lockyer*, 328 F.3d 567, 569 (9th Cir. 2003) (Kozinski, J., dissenting).  The Supreme Court used "dangerous and unusual," which as the *Caetano* "*per curiam* opinion recognize[d], this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring).

Defendant claims that "governments have enacted restrictions on certain weapons deemed to be susceptible to criminal misuse and to pose significant dangers to the public, provided that law-abiding citizens retained access to other arms for effective self-defense." [15]   *Id*.   While it is true that "government have enacted restrictions on" all kinds of different weapons, that does not lead to the logical conclusion that those restrictions are constitutional, or *Heller* would not exist, but it

---

[15] Justice Breyer would have agreed, stating that "handguns, which are specially linked to urban gun deaths and injuries, ... are the overwhelmingly favorite weapon of armed criminals*...*" *Heller* at 682. (Breyer, J., dissenting). If the Second Amendment was tied solely to the ability for criminals to misuse "arms," *Heller* would have been decided the other way.  And secondly, handguns being the "favorite weapon of armed criminals" would mean that billies are not the "favorite weapon of armed criminals," even though a criminal could misuse one, just like a criminal could misuse a car, a computer, a lighter, or gasoline.

does because the District banned operable handguns.  And as *Heller* stated, "[i]t is no answer to say ... that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller* at 629.

This Court should also not find batons are dangerous and unusual weapons because the term historically did not apply to types of arms.[16] *Heller*'s prohibition on the carrying of dangerous and unusual refers to a prohibition on certain types of conduct. Writing for the Court in *Heller*, Justice Scalia stated:

> [w]e also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." [*U.S. v. Miller*, 307 U.S. 174, 179 (1939)]. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

*Heller* at 627.  The prohibition on carrying dangerous and unusual weapons is derived from the Statute of Northampton 2 Edw. 3, c. 3 (1328) which is a statute that banned carrying in certain situations, such as affrays.

This law is cited by several of the commentators on which *Heller* relies. For example, Timothy Cunningham is cited by the *Heller* Court (*see* 554 U.S. at 581). Timothy Cunningham's 1789 law dictionary defines "affray" as follows:

> Affray, Is derived from the French word effrayer, to affright, and it formerly meant no more, as where persons appeared with armour or weapons not usually worn, to the terror of others; and so is the word used in the statute of Northampton []. It is now commonly taken for a skirmish, or fighting between two or more. … Yet, as it is there said, they differ in this, that where an assault is but a wrong to the party, an

---

[16] Defendants discussed dangerous "or" unusual weapons.  While bound by the Supreme Court's "dangerous **and** unusual" terminology, Plaintiffs provide the following analysis if the Court deems it necessary to delve into the history.

affray is wrong to the commonwealth, and therefore both inquirable and punishable in a leet. … Beside this signification, it may be taken for a terror wrought in the subject by an unlawful fight or violence, &c. as if a man shew himself furnished with armour or weapons not usually worn, it may strike a fear into others unarmed; and so it is used in flat 2 Ed 3 c 3. But altho' no bare words, in the judgement of law, carry in them so much terror as to amount to an affray, yet it seems certain, than in some cases there may be an affray, where there is no actual violence, as where a man arms himself with dangerous and unusual weapons in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at the Common law and is strictly prohibited by Statute.

*See* Timothy Cunningham, A new and complete law-dictionary, <u>Affray</u>, 1789.

Cunningham defines riding armed, with dangerous and unusual weapons as:

an offense at Common law. [citation omitted] By the stat. 2 Ed. 3. Cap. 3. None shall ride armed by day or night to the terror of the people; or come with force and arms before the King"s justices...but men may wear common arms according to their quality and fashion, and have attendants with them armed agreeable to their characters; all persons may ride or go armed take felons, suppress riots, execute the King's process…

Cunningham, *supra*, <u>Riding</u>.

As shown below, this is a prohibition against carrying in a threatening manner which disturbs the public, not simply carrying a weapon outside one's home, whereas carrying in an unusual manner was generally not allowed. The Supreme Court of North Carolina correctly interpreted the dangerous and unusual language in the historical context as to how it was originally understood. *See e.g. State v. Dawson*, 272 N.C. 535 (1968).[17]

---

[17] "It has been remarked that a double-barrel gun, or any other gun, cannot in this
(continued…)

The term "dangerous weapon", in the English common law, is a legal term of art that usually included weapons designed or able to kill human beings. In this context, the Common Law's definition of "dangerous" was any item that could be used to take human life through physical force. *See United States v. Hare*, 26 F. Cas. 148, 163-64 (C.C.D. Md.1818) ("[S]howing weapons calculated to take life, such as pistols or dirks, putting [the victim] in fear of his life … is … the use of dangerous weapons."). *See also The King v. Oneby* 92 E.R. 465 (Court of the King's Bench 1727) ("Any dangerous weapon, as a pistol, hammer, large stone, &c. which in probability might kill B. or do him some great bodily hurt."). Therefore, as the trial judge said in a separate case, "[a]t bottom, guns are dangerous." *Miller v. Bonta*, No. 19-cv-1537-BEN (JLB), 2021 U.S. Dist. LEXIS 105640, at *105 (S.D. Cal. June 4, 2021).  This is historically supported because common arms, such as pistols, are "dangerous" arms and all arms are "dangerous" within this context.

---

country come under the description of 'unusual weapons,' for there is scarcely a man in the community who does not own and occasionally use a gun of some sort. But we do not feel the force of this criticism. A gun is an 'unusual weapon,' wherewith to be armed and clad. No man amongst us carries it about with him, as one of his everyday accoutrements -- as a part of his dress -- and never, we trust, will the day come when any deadly weapon will be worn or wielded in our peace-loving and law-abiding State, as an appendage of manly equipment. But although a gun is an 'unusual weapon,' it is to be remembered that the carrying of a gun, *per se*, constitutes no offense. For any lawful purpose -- either of business or amusement -- the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people." *State v. Dawson*, 272 N.C. 535, 544-45 (1968) (citation omitted).

Timothy Cunningham's 1789 law dictionary defined an affray as "to affright, and it formerly meant no more, as where persons appeared with armour or weapons not usually worn, to the terror." When discussing forcible entry or detainer, Blackstone stated, "so that the entry now allowed by law is a peaceable one; that forbidden is such as is carried on and maintained, with force, with violence, and unusual weapons." 5 Blackstone 148 (1803). It would make little sense to think that the distinction was being drawn between peaceable entry and entry with weapons that are difficult to purchase or hard to find. Instead, the term "unusual weapons" means weapons that are being used in a threatening or shocking manner, or weapons that are being used to facilitate an unlawful endeavor.

This position is supported by case law. In an English case, *Baron Snigge v. Shirton*, a tenant was in a dispute with his landlord, and "kept the possession [of the house he rented] with drum, guns, and halberts". *See generally Baron Snigge v. Shirton* 79 E.R. 173 (1607). "(The drum was only to give notice if any came to enter, but no body offered to enter.)" *Id.* This was considered keeping "his house with unusual weapons against a purchaser". *Id.*

In another English case, a sailor fired warning shots with a "musqet and ball" across the bow of another ship as a signal and killed a man. *See generally Rex v. Rowland Phillips* 98 E.R. (1385). The Court found "[t]he firing was not done in an uncommon manner, or with unusual weapons." *Id.* And held "[i]t is impossible upon this special verdict to say, that the defendant is guilty of more than manslaughter.

For it is expressly found, that he fired in the usual manner to bring vessels to, and to hit the hallyards." *Id*.  In both cases, the weapons were in common use at the time. However, in one case, the weapon was unusual, while in the other case, it was not. The relevant difference between the cases is whether the use of force was reasonable.

This definition of unusual is supported by Blackstone's discussion of forfeited recognizance. "A recognizance for the good behavior may be forfeited … by going armed with unusual attendance, to the terror of the people." 5 Blackstone 256 (1803). At Common Law, just as people could legally own weapons, large groups of people could legally gather, so long as their purpose was lawful. It is when those groups of people became threatening (or terrifying), that those groups were labeled as unusual attendance to the terror of the public and became unlawful. Similarly, when the manner in which one carries a weapon becomes threatening, it is labeled an unusual weapon.

When used to describe weapons, the word, "unusual" is not being used in a different way than when it is being used to describe attendance. Blackstone states, "Any justice of the peace may… bind all those… who make any affray; or threaten to kill or beat another; or contend together with hot and angry words; or go about with unusual weapons or attendance, to the terror of the people" 5 Blackstone 254 (1803). Just as the common law is not outlawing the assembly of unusual people, the common law is not referring to the type of weapon involved when it mentions unusual weapons. The historical phrase, "dangerous and unusual weapons" does not refer to

classes of weapons as the lower courts have erroneously held.  Rather it describes a class of behavior when carrying weapons.

Other, stricter laws outlawed specific types of weapons for certain individuals. "The keeping or carrying any gun-powder, shot, club, or other weapon, whatsoever, offensive or defensive, by any negroe or mulatto whatsoever (except in certain special cases) is an offence, for which the gun or other weapon may be seized, and the offender whipped, by order of a justice of the peace." 4 Blackstone 175 (1803). Similarly, King George III issued a statute outlawing the possession of "pistol, hanger, cutlass, bludgeon, or other offensive weapon with intent feloniously". 5 Blackstone 169 (1803). And declared, "such a person shall be deemed a rogue and a vagabond". *Id*. If the term dangerous and unusual weapons meant a type of prohibited arm, then the legislature would have used that phrase with these laws.  Rather the carrying of dangerous and unusual weapons refers to a class of conduct with protected arms.

Historically, this class of conduct was that which caused terror. Terror in this context means carrying in a threatening manner. A 1675 dictionary defined terror as "dread, great fear or fright". An Universal Etymological Dictionary (R. Ware, W. Innys and J. Richardson, J. Knapton (and twelve others)) (1675). An affray may not be committed in private because then, the public would not be terrified. F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). The Cyclopedia Law Dictionary from 1922 defined terror as:

> That state of mind which arises from the event or phenomenon that may serve as a prognostic of some catastrophe; affright from apparent danger. One of the constituents of the offense of riot is that the acts of the persons engaged in it should be to the terror of the people, as a show of arms, threatening speeches, or turbulent gestures; but it is not requisite, in order to constitute this crime, that personal violence should be committed.

The Cyclopedia Law Dictionary (Walter a. Shumaker and George Foster Longsdorf, ed. Callaghan and Company 1922) (1901).

The Collegiate Law Dictionary from 1925 defined terror as "1. The state of mind which arises from the event or phenomenon that may serve as a prognostic of some catastrophe. 2. Affright from apparent danger." The Collegiate Law Dictionary (James John Lewis ed., The American Law Book Company 1925) (1925). Historically, "terror" was an apprehension of harm to come. In describing a mugging, James Wilson wrote, "If one assault another with such circumstances of terror as to put him in fear, and he, in consequence of his fear, deliver his money; this is a sufficient degree of violence". 3 Wilson 59 (1804).

Later, Wilson described arson as "a crime of deep malignity … The confusion and terror which attend arson, and the continued apprehension which follows it, are mischiefs frequently more distressing than even the loss of the property." *Id* at 63. In describing an ideal judge, Wilson writes, "He ought, indeed, to be a terror to evil doers". 2 Wilson 300 (1804). Wilson wrote, in describing interrogation methods, "terror is frequently added to fraud. The practice… is said… to have been derived its origin from the customs of the inquisition." 3 Wilson 155 (1804).

Giles Jacob's law dictionary states, when describing a legal device known as

27

a Surety of the Peace (which appears to be a promise not to harm), "the demand of the Surety of the Peace ought to be soon after the cause of fear; for the suffering much time to pass before it is demanded, shews that the party has been under no great terror." Giles Jacob, The law-dictionary 149 (P. Bryne 1811 first American from the second London edition) (1811). Jacob further described the difference between mere fear and terror while defining the word, "robbery". Jacob wrote,

> [a]nd when it is laid to be done by putting in fear, this does not imply any great degree of terror, or affright in the party robbed. It is enough that so much force, or threatening by word or gesture, be used, as might create an apprehension of danger, or induce a man to part with his property without or against his consent.

*Id* at 546. From these sources, "terror" is more than mere apprehension of danger; it might more aptly be described as the apprehension of an extreme danger or a catastrophe.

Some American case law comports with the above view. A 1795 case describes "a defence based upon the ground of duress and terror". *U.S. v. Vigol* 2 U.S. 346 (1795). Another 1795 case stated, "raising a body of men to …oppose and prevent by force and terror, the execution of a law, is an act of levying war." *U.S. v. Mitchel* 2 U.S. 348 (Pennsylvania circuit court 1795). However, other old American cases treat the word "terror" as if it were synonymous with the word "threat". One case mentioned people "armed with all the terrors of forfeiture" *Warder v. Arell* 2 Va. 282 (1796). Another case mentioned "the terror of public censure". *State v. Norris* 2 N.C. 429 (1796). A third case mentioned "the terrors of a law-suit". *Neilson & Sarrazin v.*

*Dickenson* 1 Des. 133 (1785).

Either way, as historically understood, the prohibition against carrying dangerous and unusual weapons requires an arm to be carried in a threatening manner. The longstanding prohibition on the carrying of "dangerous and unusual weapons" thus refers to types of conduct with weapons. "A man has a clear right to protect himself when he is going singly or in a small party upon the road where he is traveling or going for the ordinary purposes of business. But I have no difficulty in saying you have no right to carry arms to a public meeting, if the number of arms which are so carried are calculated to produce terror and alarm". *Rex v. Dewhurst*, 1 State Trials, New Series 529 (1820). A necessary element of this common law crime of affray, to which the "dangerous and unusual" prohibition refers, had always required that the arms be used or carried in such manner as to terrorize the population, rather than in the manner suitable for ordinary self-defense.

*Heller*'s first source on the topic, Blackstone, offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769) (emphasis added). Blackstone referenced the 1328 Statute of Northampton, which, by the time of the American Revolution, English courts had long limited to prohibit the carrying of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of*

*the Individual to Bear Arms: A Recent Judicial Trend*, DET. L. C. REV. 789, 795 (1982) (citing *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)). "[N]o wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people," by causing "suspicion of an intention to commit an[] act of violence or disturbance of the peace." TREATISE ON THE PLEAS OF THE CROWN, ch. 63, § 9 (Leach ed., 6th ed. 1788); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s additional citations regarding the "dangerous and unusual" doctrine are in accord. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people*." James Wilson, WORKS OF THE HONOURABLE JAMES WILSON (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people*." John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added).

Charles Humphreys stated, that:

[r]iding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land … But here it should be remembered, that in this country the constitution guar[]anties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people

unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also Heller*, at 588 n.10 (quoting same).  It is the *manner* of how the right is exercised, not the type of weapon that is carried, that constitutes the crime.  Said another way, just because a firearm or other weapon is in common usage at the time does not make the *manner* in which the right is exercised excused or excusable simply due to the type of firearm or weapon carried.

"[T]here may be an affray … where persons arm themselves with dangerous and unusual weapons, in such manner as will naturally cause a terror to the people." William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826). But:

> it has been holden, that no wearing of arms is within [meaning of Statute of Northampton] unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons … in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.

*Id*. at 272.  The Supreme Court then referred to F. Wharton's, A Treatise on the Criminal Law of the United States:

> An affray ... is the fighting of two or more persons in some public place, to the terror of the citizens. [] There is a difference between a sudden affray and a sudden attack. An affray means something like a mutual contest, suddenly excited, without any apparent intention to do any great bodily harm. [] … yet it seems certain that in some cases there may be an affray where there is no actual violence; as where a man arms himself

> with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute.

F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).

Wharton also includes a manner requirement to the rule against dangerous and unusual weapons. If a man armed himself with a dangerous and unusual weapon in such a manner that did not naturally cause a terror to the people, he would not be guilty of an affray. After discussing the King's statute, Wharton stated:

> It has been said generally, that the public and open exhibition of dangerous weapons by an armed man, to the terror of good citizens, is a misdemeanor at common law... On the same general reasoning, it has been held indictable to drive a carriage through a crowded street, in such a way as to endanger the lives of the passers-by; [] to disturb a congregation when at religious worship; [] to beset a house, with intent to wound, tar and feather; [] to raise a liberty-pole, in the year 1794, as a notorious and riotous expression of ill-will to the government; [] to tear down forcibly and contemptuously an advertisement set up by the commissioners of a sale of land for county taxes; [] to break into a house in the day-time, and disturb its inhabitants; [] and to violently disturb a town-meeting, though the parties engaged were not sufficient in number to amount to a riot.

F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).

All of Wharton's examples compare the reasoning behind outlawing riding with dangerous weapons to the terror of the public with behavior that caused a disruption to the public peace by engaging in behavior that disrupts others' peace. This supports the proposition that carrying dangerous and unusual weapons to the terror of the people is a manner of carry which disturbs others rather than a particular type of weapon. Notably, Wharton referenced rioting. In order to be charged with

rioting, a certain number of people must be involved. Blackstone defined a riot as follows:

> [r]iots, routs, and unlawful assemblies, must have three persons at least to constitute them (footnote omitted) … A riot is where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel (footnote omitted): as if they beat a man; or hunt and kill game in another's park, chase, warren, or liberty; or do any other unlawful act with force and violence; or even do a lawful act, as removing a nuisance, in a violent and tumultuous manner.

5 St. George Tucker, Blackstone's Commentaries: with Notes of Reference, to the Constitution and the Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia 146 1803.  The rule against riots is meant to help preserve the public peace and to avoid unruly mobs. Similarly, to preserve the peace, the common law has outlawed reckless displays of firearms in public.

The other sources *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. *See O'Neill v. State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State v. Langford*, 10 N.C. (3 Hawks) 381, 383-384 (1824) (affray "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people*") (emphasis added); *English v. State*, 35 Tex. 473, 476 (1871) (affray "by terrifying the good people of the land").  In fact, one does not even need to be armed with a firearm to commit the crime of affray under the dangerous and unusual doctrine.  *See State v. Lanier*, 71

N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed).

And in *Simpson v. State*, the Supreme Court of Errors and Appeals of Tennessee dismissed an indictment alleging that "William Simpson, laborer, with force and arms being arrayed in a warlike manner, in a certain public street or highway situate, unlawfully, and to the great terror and disturbance of divers good citizens, did make an affray . . . ." *Simpson v. State*, 13 Tenn. Reports (5 Yerg.) 356, 361 (1833). The Attorney General sought to rely on Hawkins' claim that "there may be an affray . . .where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people, which is said always to have been an offence at common law, and is strictly prohibited by many statutes." *Id* at 358.

The court held that the indictment was insufficient as it failed to allege the elements of an affray of fighting between two or more persons. The *Simpson* court repeated Hawkins' comment about the Statute of Northampton that "persons of quality are in no danger of offending against this statute by wearing their common weapons, or having their usual number of attendants with them, for their ornament or defence, in such places and upon occasions in which it is the common fashion to make use of them without causing the least suspicion of an intention to commit any act of violence or disturbance of the peace." *Id at* 358-59 citing Hawkins, Pleas of the Crown, book 1, ch. 28, sec. 4. 40.

The traditional right to arms "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller* at 626. It was a right to keep and carry weapons for usual purposes such as self-defense. This Court should find that batons are not dangerous and unusual weapons and are protected by the Second Amendment.

### III.   California Does Not Need More Time to Create a Record

California's argument that it should receive more time fails from the onset. It claims that "here, the challenged law addresses "unprecedented societal concerns or dramatic technological changes,"" *See* State Supplemental Brief at 36. That is a patently false claim. Clubs of all sorts are covered by the billy law and were in existence at the time of the Founding. *See State v. Kessler*, 289 Or. 359, 371–72(1980) ("The club is considered the first personal weapon fashioned by humans.") (citing O. Hogg, Clubs to Cannon 19 (1968). There is no argument that California's ban on them constitute a dramatic technological change or an unprecedented societal concern.

More to the point, California claims that it requires more time to develop the record. However, it does not go into any specifics about what it would do to do that. And it is unclear how the record needs to be further developed. California has already retained three historians and submitted hundreds of pages of historical information. California's request is an attempt to drag out the litigation. It should be ignored by this Court.

Dated: December 22, 2022

/s/ Alan Alexander Beck                /s/ Stephen D. Stamboulieh
Alan Alexander Beck                   Stephen D. Stamboulieh