ALAN ALEXANDER BECK
LAW OFFICE OF ALAN BECK
2692 HARCOURT DRIVE
SAN DIEGO, CA  92123
(619) 905-9105
STATE BAR NO. 276646
ALAN.ALEXANDER.BECK@GMAIL.COM
ATTORNEYS FOR PLAINTIFFS
RUSSELL FOUTS AND
TAN MIGUEL TOLENTINO

STEPHEN D. STAMBOULIEH
STAMBOULIEH LAW, PLLC
P.O. BOX 428
OLIVE BRANCH, MS  38654
(601) 852-3440
STEPHEN@SDSLAW.US
MS BAR NO. 102784
 *ADMITTED PRO HAC VICE

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL FOUTS and TAN MIGUEL TOLENTINO,<br><br>                              Plaintiffs,<br><br>          v.<br><br>ROB BONTA, in his official capacity as the Attorney General of the State of California,<br><br>                              Defendant. | 19-cv-01662-BEN-JLB<br><br>**EXPERT REBUTTAL OF CLAYTON CRAMER**<br><br>Judge:         Hon. Roger T. Benitez<br>Courtroom:   5A<br>Action Filed:  September 1, 2019<br>Hearing Date: N/A |

Exhibit "1"

1

## I.      Purpose

This Expert Declaration and Report examines Prof. Spitzer's Expert Declaration of historical claims concerning the legal status of various striking weapons, including "billy clubs, bludgeons, and slingshots…"

It also examines Prof. Dennis Baron's Expert Declaration of how large scale databases of English and their use of words for various impact weapons can inform our understanding of how these objects were understood.

I am paid $75/hour for my analysis and testimony on this matter.

## II.     Prof. Spitzer's Expert Declaration

Spitzer's education and professional career are in Political Science, not History, which explains the many historical errors and omissions in his opinion. That he has long been interested in the subject of "gun control," and has written extensively about them does not make him an "expert" on weapon regulation any more than my 50+ years interest in amateur astronomy makes me an astronomer.

### A Club is not a Baton is Not a Billy is Not a Sap

While all of these are impact weapons they vary in their purpose. A club is the most basic and simplest of weapons. Archaeologists working near Lake Turkana in Kenya recently found the remains of 12 individuals found apparently where they

died and not buried post-mortem, about 10,000 years ago.  Of these "five died from blunt-force trauma to the head… two cases of multiple fractures to the right hand, and a case of fractured ribs."[1]

Regardless of whether a club starts out as a tree branch or an animal bone, it can have multiple uses besides a weapon.  What we name an object, or how it is marketed matters far less than what it does.  The comparison of "assault weapons" to semiautomatic weapons used for sport and self-defense should be obvious.

A baseball bat can certainly be used as an offensive weapon; it is after all, a big club.  Studies of baseball bat injuries confirm this.  "The baseball bat, according to Baltimore City police crime statistics, is a commonly used weapon."[2]  Assessing results of patients who were well enough to end up in the Emergency Room, not the morgue: "From January 1989 through December 1990, 74 patients were admitted to our urban level I trauma center with injuries inflicted by baseball bats…. The mortality in our study was 3%. Four percent of the patients were left with some degree of permanent disability."[3]  While it is manufactured and marketed for knocking the ball out of the park, not for knocking out a robbery victim, it is an

---

[1] Mirazón Lahr, M., Rivera, F., Power, R., Mounier, A., Copsey, B., Crivellaro, F., Edung, J., et al. (2016). *Inter-Group Violence Among Early Holocene Hunter-Gatherers of West Turkana, Kenya*, 529 NATURE 394-398 (2016).
[2] Groleau, G. A., Tso, E. L., Olshaker, J. S., Barish, R. A., & Lyston, D. J. (1993), Baseball bat assault injuries. 34(3), *Journal of Trauma*,  366–372 (1993).
[3] Berlet, A. C., Talenti, D. P., & Carroll, S. F. (1992). *The Baseball Bat: A Popular Mechanism of Urban Injury*. 33(2) JOURNAL OF TRAUMA 167–170 (1992).

effective deadly weapon,[4] and yet I doubt that California police are making regular

arrests at Little League games.  The severity of the problem is nationwide:

> Baseball bats -- cheap, legal and readil [sic] available -- are increasingly a weapon of choice in Philadelphia and elsewhere for crimes of assault, and some lawmakers would like to define them as such.

> Bats, both wooden and metal, are extremely popular because under the law, they are not a weapon but a recreational tool, law enforcement officials say. Drug dealers and jealous lovers in Pennsylvania know that if they use bats, they will not be treated as severely by the judicial system as if they had used a gun, which carries a five-year mandatory sentence. ….

> State Sen. Stewart J. Greenleaf, who is sponsoring the legislation, said that when he introduced the bill in the spring, many colleagues were unaware that baseball bats "were a serious problem."...

> Bats, which sell for as little as $8, are second only to guns as the favored weapon in aggravated assaults in many of Philadelphia's neighborhoods.

> Baseball-bat assaults are not limited to Philadelphia, according to Ms. Abraham. "It's a phenomenon all over," she said.[5]

Any piece of hard wood or steel 12" long is a "club" or "baton" even if it is

marketed as a "dowel rod" or "pipe."  Does California prosecute hardware stores for

selling these deadly weapons?  A 5-cell aluminum body Maglite flashlight is hard to

distinguish functionally for a club or baton.  Both make splendid devices for beating

---

[4] Linda Loyd, *Baseball bats moving from recreation to 'instruments of crime' in U.S. cities*, Baltimore Sun, Sep. 23, 1992.

[5] Linda Loyd, *Baseball Bats Moving From Recreation to 'Instruments Of Crime' in U.S. Cities*, BALTIMORE SUN, Sep. 23, 1992, https://www.baltimoresun.com/news/bs-xpm-1992-09-24-1992268113-story.html, last accessed December 9, 2022.

something (or someone) to a bloody pulp, or for blocking a blow from an attacker's contact weapon (such as a club, a knife, or a fist). When I resided in California, I never worried that having a Maglite in my car would risk my liberty.

Commercial truck drivers use something called a "Tire Checker Bat" or sometimes a "tire-thumper" to do a quick evaluation of whether truck tires are adequately inflated.   A typical one offered for sale is 17" long and is made of aluminum.[6]   It is hard to see how these differ from a club or baton in its capability as an offensive or defensive arm.   Yet, during my years living in California, I have repeatedly seen truck drivers use these clubs with impunity.

Most people think of a hatchet as a cutting weapon, but the other side of the head makes an effective impact weapon as well, and California has not banned hatchets.   I suppose we should be glad that street gangs have not yet realized the intimidating capacity of this tool.

**Bruen's Historical Analysis By Year Schema**

Spitzer's opinion explains that the California Dept. of Justice asked him to "render an opinion on the history of restrictions on blunt weapons enacted in the

---

[6] *Tire Checker Bat*, https://www.raneystruckparts.com/tire-checker-bat/, last accessed December 5, 2022; *How to Use a Tire Thumper/Beater*, https://www.shippingcontainertool.com/how-to-thump-tires-to-check-if-they-are-properly-inflated/, last accessed December 5, 2022.

nineteenth and early twentieth centuries."  This is however, the wrong question to ask.

Bruen established an analytical schema under which the constitutional "good fit" for a modern law is that it, or an analog, existed before 1791, when the states ratified the Second Amendment or before 1868, when the states ratified the Fourteenth Amendment, incorporating the Second Amendment against the states. Laws passed after the ratification of the Fourteenth Amendment are considered non-probative for establishing the intent of the authors of the Fourteenth Amendment and the states that ratified it.[7]

During oral arguments in Moore v. Harper (2022), counsel for Moore asserted

> But -- so it can be a confirming -- that subsequent history as in Bruen can be a confirming historical tradition that -- that -- but it can't undermine what the text and the founding era history show to be the case.

None of the Justices disputed that characterization.[8]

For this reason, the only laws that we need examine are those in effect before 1868.

---

[7] ""Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." … The Second Amendment was adopted in 1791; the Fourteenth in 1868."  New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2119 (2022).
[8] Oral Arguments, Dec. 7, 2022, Moore v. Harper (2022).

Expert Rebuttal of Clayton Cramer
(19-cv-01662-BEN-JLB)

**Impact Weapons in Colonial America**

Prof. Spitzer's Expert Declaration at 4, consists of often lurid descriptions of impact weapons as "wicked, cowardly" and those who carried them "(excluding police) 'were called vicious, devils and lurking highwaymen." That these cowardly and wicked weapons lose these criminal characteristics once held by minions of the government is intriguing. They are *not* necessarily offensive weapons. While police officers may use them to force compliance by an arrestee, or for defense at close range, there is a well-recognized defensive use of batons.[9] Bruen recognized "an individual's right to carry a handgun for self-defense outside the home."[10] A baton or club can certainly be used in self-defense. It is potentially less dangerous when used for that purpose than a firearm, which carries the risk of injury to bystanders.

There is also historical precedent for lawful civilian use of billy clubs: "Two billy clubs made in Boston prior to the Civil War, and used by bodyguards of such abolitionists as William Lloyd Garrison, who were often mobbed when they appeared in public."

---

[9] Mursel Sevindik, FOR SECURITY PERSONNEL: DEFENSIVE BATON (2020); Worcester, Ma.. Police Department, Policy and Procedure No. 400.3, (April 13, 2007), https://www.worcesterma.gov/wpd-policy-manual/operations/service-baton-guidelines.pdf, last accessed December 8, 2022.

[10] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2122 (2022).

[11]

Unlike a firearm, baseball bats, tire-thumpers, or Maglites are contact weapons.  They can be used at contact range as a block or to inflict pain at arms' length.  They are not a hazard at any greater distance and no bystander need fear injury.  A person in fear can easily retreat out of range in a way that is simply not possible with a firearm or a crossbow.

Police use of clubs as less-than-lethal weapons argues that like other less-than-lethal weapons, they should be available to civilians for self-defense:

> London's first police department was founded in 1829 by Prime Minister Sir Robert Peel. His concept of a modern police force was based on the principle of "policing by consent:" earning the respect and compliance of the public instead of ruling by intimidation. The new police force would be unarmed except for the billy club, the signature tool of early police officers….
>
> The first London police officers were issued billy clubs as a tool for self-defense, but these tools can still cause great physical harm in the hands of a trained officer—especially when striking vulnerable areas such as the head, spine, or groin.
>
> A baton has numerous advantages as a striking weapon. Most notably, it preserves the hands which can be easily injured while

---

[11] *Billy Clubs*, Massachusetts Historical Society, https://www.masshist.org/database/1662, last accessed December 10, 2022.

Expert Rebuttal of Clayton Cramer
(19-cv-01662-BEN-JLB)

boxing, and can be used defensively to protect against blows from blunt and sharp objects.

Billy clubs differed in length depending on the officer's preferences and physical size. Historically, they ranged from about about 14 inches in length for close-quarters use, to over 36 inches for use in riots or by officers on horseback.[12]

The remainder of Spitzer's statement is a summary of Exhibit B. Exhibit B contains a table of "Dangerous Weapons Restrictions" by state and year such laws were first enacted. As we will see later, Spitzer is either unaware of or fails to grasp the significance of the repeal of one of these laws, in *California*. For this particular case, Exhibit B table laws are categorized as "Bludgeon", "Billy/Billie Clubs", "Clubs", "Slung Shot", "Sand Bag/Sand Club", "Any Concealed/Deadly/Dangerous Weapon." Neither Spitzer's opinion nor Exhibit B contain any reference to Exhibit C, titled "DANGEROUS WEAPONS LAWS," which according to p. 80 of Spitzer's Declaration come from the Duke University Firearms Law repository. (It appears that the reader is supposed to know that the state laws referenced in Exhibit B *may* be found in Exhibit C, and as we will see, "may" is italicized with good reason.)

As we will see later, *some* of these laws in isolation from their broader historical context are misleading. *Some* of the laws in Exhibit C are far removed from the problems of criminal violence, such as "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," at Exhibit C, 33, which

---

[12] Police1 Staff, *History and use of the billy club,* https://www.police1.com/police-history/articles/history-and-use-of-the-billy-club-lCrwpOflpDTkHY2B/, last accessed December 10, 2022.

required firearms manufactured in Massachusetts to be adequately tested before sale. The longstanding criticism of "Law Office History,"[13] applies especially well to this out of context use of laws—by a political scientist.

It appears that the reader should use the year and state from Exhibit B's table to look up the law in Exhibit C's collection. As we will see, looking up statutes in Exhibit C based on the years in Exhibit B's table shows many laws that reference these weapon types are:

1. Not bans on possession at all, but usually on concealed carry, *rarely* on both concealed and open carry. Even then, these bans have exceptions for the never-defined "travellers" and those at imminent risk.

2. Prohibitions on carrying weapons while committing crimes, or punishments for actions that are illegal in themselves and in which impact weapons are only one of the prohibited arms.

3. Most surprisingly of all, Spitzer cites laws that applied only to *slaves* or members of specific races. Unless California wishes to ban possession of batons by slaves or racial minorities, which California has done before,[14] their relevance is utterly meaningless, or perhaps even arguing against interest.

---

[13] Saul Cornell, *Heller, New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss"*, 56 UCLA LAW REVIEW, 1095-1125.
[14] *New Firearms Law Effective on August 7*, SAN FRANCISCO CHRONICLE, July 15, 1923  Advisor to KKK-endorsed California Governor Richardson persuaded him to sign a bill that contains the immediate ancestor of California's

(continued…)

Throughout the rest of this document, I have quoted statutes from Spitzer's Exhibit C unless otherwise identified. Spitzer's reliance on a secondary source shows a lack of appropriate historical care. Spitzer at Exhibit C, 5, cites two Alaska statutes prohibiting concealed carrying of many weapons, some of them impact weapons. While outside the year range relevant after Bruen, it shows his weakness as a historian. The first source, COMPILATION OF THE ACTS OF CONGRESS AND TREATIES RELATING TO ALASKA: FROM MARCH 30, 1867, TO MARCH 3, 1905 139 (1906) provides no clear record of the statute's age. It seems most unlikely that it was passed before ratification of the Fourteenth Amendment in 1868.

The second Alaska statute Spitzer cites presents other problems. "1896-99 ALASKA SESS. LAWS 1270, AN ACT TO DEFINE AND PUNISH CRIMES IN THE DISTRICT OF ALASKA AND TO PROVIDE A CODE OF CRIMINAL PROCEDURE FOR SAID DISTRICT, chap. 6, § 117." I was unable to find such an Alaskan Territorial session law; instead, I found a Congressional session law of that title with sec. 117 matching Spitzer's quoted text.[15]

---

current concealed weapon permit law because they would have a beneficial effect "in checking *tong* [gang] wars among the Chinese and vendettas among our people who are Latin descent." Also see California Assembly Concurrent Resolution No. 42. https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200920100ACR42, apologizing for "Among other things, these laws denied the Chinese in California the right to own land or property, the right to vote, and the right to marry a white person, denied children of Chinese descent access to public schools, denied *Chinese immigrants the right to bear arms.*" [emphasis added]

[15] An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, 55th Cong. 3d sess., ch. 429 (1899).

**Spitzer's Exhibit B Colonial Laws**

The only colonial era laws that Spitzer cites are Massachusetts (1750), New York (1664), New Jersey (1686).

"1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1." As the title suggests, it applies only to one category of persons. "If any persons to the number of twelve or more, being armed with clubs or other weapons. . . shall be unlawfully, riotously, or tumultuously assembled." In no way does it prohibit possession of clubs. This explicit identification of a group of malefactors suggests that the carrying of clubs by individuals is not a crime by itself. One must gather in a group of twelve or more carrying "clubs or other weapons…" and be "unlawfully, riotously, or tumultuously assembled" to constitute a crime. The weekly meeting of Ye Olde Club Collectors at the Toad-in-Hole Tavern would not qualify as such, nor would a man carrying a club by himself. John Adams' comments starting at page 14 provide additional evidence on this question.

Spitzer references a 1664 New York law: "And be it further enacted by the authority aforesaid that it shall not be lawful for any *slave* or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever…" [emphasis added]

New Jersey (1686): "that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines [a black knife, of Scottish origin], stilettoes, daggers or dirks, or other unusual or unlawful weapons within this Province…" This is a concealed carry ban, not a prohibition ban. It is not even a complete ban on carrying impact weapons.

**Colonial Practice**

What the laws prohibited or allowed may not tell us much about actual practice. A side effect of the 1689 Glorious Revolution in England was the overthrow of Gov. Andros of the short-lived Dominion of New England. One description of the insurrection tells us:

> I knew not any thing of what was intended, till it was begun; yet being at the north end of the town, where I saw boys run along the street with clubs in their hands, encouraging one another to fight…[16]

Clearly, possession of clubs was not prohibited unless these were fabricated at the start of the insurrection.

In the years immediately preceding the Revolution, many colonies experienced popular resistance to existing governments. Tenant uprisings against landlords in upstate New York appear repeatedly in the mid-eighteenth century. One such disturbance in 1766 aimed at obtaining more secure land tenure from the owner of

---

[16] Charles M. Andrews, ed. *NARRATIVES OF THE INSURRECTIONS: 1675-1690* 186 (1959).

Livingston Manor.  The tenants, armed only with sticks, were dispersed by forty men bearing guns.[17]  Sticks, again, are hard to distinguish from clubs or batons, except for the manufactured or marketed purpose.

Shortly before the Revolution, the Regulators of the backcountry of North Carolina sought to "regulate" the county governments, whose officials they believed were oppressing them with "excessive taxes, dishonest sheriffs, and extortionate fees."[18]  Colonel Spencer's letter to Governor Tryon of April 28, 1768 describes how the Regulators "came up to the Court House to the number of about forty armed with Clubs and some Fire Arms…."[19]   If being armed with clubs was unlawful, it is strange that Col. Spencer did not arrest these troublemakers.

Just before the Revolution, Tory Peter Oliver claimed that Bostonians were arming themselves with clubs because, "Guns they imagined were Weapons of Death in the Eye of the Law, which the meanest of them was an Adept in; but Bludgeons were only Implements to beat out Brains with."[20]

When John Adams defended the British soldiers accused of murder at the Boston Massacre, he described the Patriots who confronted the British soldiers as

---

[17] Edward Countryman, *A People in Revolution: The American Revolution and Political Society in New York, 1760-1790* (1981), 40.

[18] John S. Bassett, THE REGULATORS OF NORTH CAROLINA (1765-1771) 150 (1894).

[19] William L. Saunders, ed., 7 *Colonial Records of North Carolina* 723 (1890).

[20] Douglas Adair and John A. Schutz, eds., PETER OLIVER'S "ORIGIN AND PROGRESS OF THE AMERICAN REBELLION" 89 (1961).

people who "were coming from Royal exchange-lane, and other parts of the town, with clubs, and cord wood sticks…" In justifying the soldiers' use of deadly force, he acknowledged that the rioters were armed, but: "Here every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence, not for offence, that distinction is material and must be attended to."[21]

If the possession or carrying of clubs was unlawful, this would have been a strong argument in defense of the actions of the British soldiers opening fire on an violent and unruly crowd. Had Adams meant that there was a right to be armed with some other category of arms, but not clubs, this distinction would clearly have merited discussion.

Spitzer's claims about colonial laws fit perfectly with what individuals did, what lawyers said, and how public officials responded to "subversives." Clubs were lawful to carry and thus to possess.

---

[21] THE TRIAL OF WILLIAM WEMMS, JAMES HARTEGAN, WILLIAM M'CAULEY, HUGH WHITE, MATTHEW KILLROY, WILLIAM WARREN, JOHN CARROL, AND HUGH MONTGOMERY, SOLDIERS IN HIS MAJESTY'S 29TH REGIMENT OF FOOT, FOR THE MURDER OF CRISPUS ATTUCKS…, 156 (1781).

**Pre-1868 Early Republic Laws**

Spitzer claims many antebellum statutes are evidence that impact weapons were not considered lawful for civilian ownership. I will attempt to follow the year sequence of Exhibit B.

Ohio (1788):

> Burglary . . . If the person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention…

This only criminalizes possession as part of a burglary.

Virgina (1792): "No *negro or mulatto* whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever…" [emphasis added]

Delaware (1797):

> And be it further enacted by the authority aforesaid, That if any *Negro or Mulatto slave* shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back. [emphasis added]

Kentucky (1798):

> That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, swordcane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or

who shall, in any manner, unlawfully use the same, in any fight or quarrel…

The law punishes in the first clause what would today be considered brandishing, in the second clause assault with a deadly weapon. The statute does not punish the carrying of arms unless done in a manner likely to provoke violence. There are no impact weapons listed.

Maine (1786): "An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof" is identical to the 1750 Massachusetts riot statute at p. 12. Why this is listed under Maine, which did not separate from Massachusetts until 1820, eludes me.

New Jersey (1799):

That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwellinghouse or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

Possession of burglary tools with felonious intent to break into a building or in an area where it would appear the suspect intended burglary, or with "intent feloniously to assault any person," was a crime. Possession or even carrying outside these narrowly defined areas of criminal intent was not prohibited. This statute

appears in nearly identical form repeatedly and will henceforth be referred to as the burglary tools law.

Mississippi (1799)" "No *Negro or mulatto* shall keep or carry any gun, powder, shot, club or other weapon whatsoever…" [emphasis added]

Mississippi (1804): "No *Slave* shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with…" [emphasis added]

Indiana (1804): "That no *slave or mulatto* whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever…" [emphasis added]

Alabama (1805): There is no reference to such a statute in Exhibit C, nor could there be: The first session of the Alabama Territorial Legislature took place in February, 1818.[22]  This is the one of many mystifying signs of careless work by an "expert."

Maryland (1809): burglary tools law.

Louisiana (1813): "That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view…"  This banned concealed carry and makes

---

[22] Alabama Territory, ACTS PASSED AT THE FIRST GENERAL ASSEMBLY OF THE ALABAMA TERRITORY; IN THE FORTY SECOND YEAR OF AMERICAN INDEPENDENCE (1818).

no explicit reference to impact weapons; at best "deadly weapon" might include

impact weapons.  We will discuss this question in more detail starting on p. 21.

Georgia, 1816: burglary tools law.

Missouri Territory (1818): Spitzer missed this one from his Appendix C: "No

*slave or mulatto* whatsoever, shall keep or carry a gun, powder…" [emphasis added]

Indiana (1831): There is no entry in Exhibit C for this.  Fortunately, I have

written a book titled *Concealed Weapon Laws of the Early Republic*:[23]

> Sec. 58.  That every person, not being a traveller, who shall wear or
> carry any dirk, pistol, sword in a cane, or other dangerous weapon
> concealed, shall upon conviction thereof, be fined in any sum not
> exceeding one hundred dollars.[24]

The "expert" also missed its 1820 predecessor:

CHAPTER XXIII.

AN ACT to prohibit the wearing of concealed weapons.

Approved, January 14, 1820.

> Sec. 1.  *BE it enacted by the General Assembly of the State of Indiana*,
> That any person wearing any dirk, pistol, sword in cane, or any other
> unlawful weapon, concealed, shall be deemed guilty of a

---

[23] Clayton E. Cramer, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC:
DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999) cited in McDonald v.
Chicago, 561 U.S. 3133 (2010)

[24]. *Revised Laws of Indiana, in Which Are Comprised All Such Acts of a
General Nature as Are in Force in Said State; Adopted and Enacted by the General
Assembly at Their Fifteenth Session* (Indianapolis: Douglass & Maguire, 1831),
192.

19

misdemeanor, and on conviction thereof, shall be fined in any sum not exceeding one hundred dollars, for the use of county seminaries: *Provided however*, that this act shall not be so construed as to affect travellers.[25]

Both laws except the undefined "travellers." This exception appears repeatedly until after the Civil War, when the former Confederacy figured out that they could issue licenses instead to allow favored whites to carry concealed, but not blacks or other "undesirables."

The "expert" could have also added the Alabama (1837),[26] Georgia (1837),[27] Tennessee (1838),[28] Arkansas (1838),[29] Virginia (1838),[30] Alabama (1839)[31] concealed weapon statutes if he was not relying on the Duke Law Repository or had read what experts in the field have already published. The Arkansas, Alabama, and Tennessee laws are present in Exhibit C; Arkansas (1838) is in there, with the wrong year but Spitzer, when compiling Exhibit B list of "Any Concealed/Deadly/Dangerous Weapon" laws missed all three in his *own* secondary source.

_____

[25]. *Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly* (Jeffersonville: Isaac Cox, 1820), 39.

[26]. *Acts Passed at the Called Session of the General Assembly of the State of Alabama* (Tuscaloosa: Ferguson & Eaton, 1837), chap. 11, 7.

[27]. *Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837* (Milledgeville: P. L. Robinson, 1838), 90-91.

[28]. *Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-8* (Nashville: S. Nye & Co., 1838), 200-201.

[29]. *Acts of the General Assembly of Virginia, Passed at the Session of 1838* (Richmond: Thomas Ritchie, 1838), 76-77.

[30]. *Acts of the General Assembly of Virginia, Passed at the Session of 1838* (Richmond: Thomas Ritchie, 1838), 76-77.

[31]. *Acts Passed at the Annual Session of the General Assembly of the State of Alabama* (Tuscaloosa: Hale & Eaton, 1838 [1839]), chap. 77, 67-68.

20

Alabama (1839) banned concealed carry of a variety of weapons but *at most*, impact weapons might fit into the category "or any other deadly weapon." But what is a "deadly weapon"? Many states seem to shy away from statutorily defining "deadly weapon." This leads to many decisions attempting to define "deadly weapon" based on the particulars of the case.

Alabama did eventually statutorily define "deadly weapon": a century and a half later:

> In 1977 the legislature adopted the Alabama Criminal Code, which became effective in 1980. Ala.Code 1975, § 13A-1-1 et seq. For the first time, the legislature defined "deadly weapon" and "dangerous instrument." Section 13A-1-2(11) defines a "deadly weapon" as:
>
> "A firearm or anything manifestly designed, made or adapted for the purposes of inflicting death or serious physical injury, and such term includes, but is not limited to, a pistol, rifle or shotgun; or a switch-blade knife, gravity knife, stiletto, sword or dagger; or any billy, black-jack, bludgeon or metal knuckles."[32]

I was unable to find the phrase "deadly weapon" in *any* Alabama decision before 1900. If the 1839 statute included impact weapons under "deadly weapon," this is at best the "expert's" assumption, not factually based.

An interesting aspect of the Alabama (1839) statute that Spitzer missed is how the Alabama Supreme Court understood its relevance in State v. Reid (Ala. 1840). This appears to have been a test case. The defendant was the Sheriff of Montgomery County! There was no exception in the law for law enforcement officials. The statute

---

[32] Ex parte Cobb, 703 So. 2d 871, 875 (Ala. 1996)

prescribed "a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case" and a sentence not to exceed three months.  The Sheriff was fined the minimum fine allowed by law.  The jail term of six hours[33] presumably in his own jail suggests that it was a morning trial and the judge did not want the sheriff to get home late for dinner.

While the Alabama Supreme Court upheld the statute with the observation that: "in the case at bar, the defendant needed no arms for his protection, his official authority furnished him an ample shield," they acknowledged that the Alabama Constitution's right to keep and bear arms provision might yield a different result for someone without that "ample shield":

> We will not undertake to say, that if in any case, it should appear to be indispensable to the right of defence that arms should be carried concealed about the person, the act "to suppress the evil practice of carrying weapons secretly," should be so construed, as to operate a prohibition in such case.  But in the present case, no such necessity seems to have existed; and we cannot well conceive of its existence under any supposable circumstances.[34]

Arkansas (1835).  "No *slave or mulatto* whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever…" [emphasis added]

Alabama (1841): "Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of

[33] State v. Reid, 1 Ala. 612, 613 (Ala. 1840).
[34] State v. Reid, 1 Ala. 612, 623 (Ala. 1840).

firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey…"  This statute only prohibited *concealed carry*, not possession.  Even this prohibition provides what is a common exception in antebellum concealed weapon laws: "unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey…"   Whatever the evil was that Alabama sought to suppress, such exceptions show that it was not a general ban.

Maine (1841): This is a peace bond statute.  Justice Thomas' decision in Bruen is very clear on the relevance of such statutes:

> *Surety Statutes.* In the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public. Although respondents seize on these laws to justify the proper-cause restriction, their reliance on them is misplaced. These laws were not *bans* on public carry, and they typically targeted only those threatening to do harm.[35]

None of these peace-bond laws prohibit possession.  These are prohibitions on carrying (and in almost all cases only the *concealed* carry) of weapons.  For a far more detailed examination of the misrepresentation of such statutes, see my collection of these statutes, instead of quoted out of context (when they are even at the cited places): "Peace Bonds Laws in Antebellum America That Either Prohibit

---

[35] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2149 (2022).

Arms Carrying or Are Misrepresented As Doing So."[36]  Subsequent nearly identical statutes will be referenced as peace-bond statutes.

Louisiana (1842): This is an almost word for word copy of the Louisiana (1813) ban on concealed carry.

Illinois (1845): burglary tools statute.

Virginia (1847): peace-bond statute.

California (1849) punished "any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person…" How do you prove intent?  If there is a victim of assault or a direct or inferred statement of intent by the assaulter, a prosecutor might prove such intent, but in the absence of such evidence, this law did not prohibit possession or carrying of a weapon of any sort.  Regardless, to violate the law a "person shall have [arms] upon him."  This statute is irrelevant to any ban on possession inside your residence.

Massachusetts (1850): "Whoever when arrested upon a warrant of a magistrate issued against him for an alleged offense against the laws of this state, and whoever when arrested by a sheriff, deputy sheriff, constable, police officer, or watchman, while committing a criminal offense against the laws of this state, or a breach or

---

[36] *Peace Bonds Laws in Antebellum America That Either Prohibit Arms Carrying or Are Misrepresented As Doing So*, http://claytoncramer.com/primary/peacebonds/peacebonds.html, last accessed December 6, 2022.

disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, bills, or other dangerous weapon, shall be punished by fine…" This is only a prohibition on carry, and only if arrested.  It does not prohibit possession.

Pennsylvania (1851): "That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York…"  This is a carry prohibition, not a possession ban.

Hawaii (1852): "Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon…"  This is a ban on carrying a variety of weapons, not a ban on possession.  Laws passed by an independent kingdom are irrelevant for American law.

California (1853): Burglary tools statute.

Washington (1854): "Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon…"  This is a brandishing law.  Even concealed carry was not prohibited and certainly not possession.

Indiana (1855): "That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this

State…"  Not a limit of possession or carrying; only a punishment for a criminal misuse.

Nebraska (1858): "And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon with intent to assault any person…" Again "upon him".  This law requires the weapon be carried and requires evidence of "intent."

North Carolina (1858): Explicitly described in Exhibit C as "An Act Entitled Revenue." "Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation."  This is not even a ban but a tax on concealed carry.  How this tax was to be enforced except on the honor system is unclear.

Washington (1859): A word-for-word copy of the 1854 brandishing law.

Ohio (1859): "[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon…"  A concealed carry ban.

Kentucky (1859): "If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or *slave, or free negro*, he shall be fined fifty dollars. [emphasis added]

26

New Mexico (1859): "it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon…"  A concealed weapon statute.

Georgia (1860): "[A]ny person other than the owner, who shall sell or furnish to any *slave or free person of color*, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense…" [emphasis added]

Colorado (1862): "If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon…" A concealed carry ban.

Spitzer points to California (1864), but even gets the year wrong.

Chap. CCCCLXXXV. – An Act to prohibit the carrying of Concealed Weapons.

[Approved April 27, 1863.][37]

What he also seems to have missed is that California repealed the law in 1870.[38]  California provided no legislative explanation as to why it was repealing this

---

[37] Cal. Sess. Laws (1863), ch. 485.
[38] Charles H. Parker, comp., GENERAL LAWS OF THE STATE OF CALIFORNIA § 7920 (1871).

law.  Even more peculiar, the act repealing the law provided that any charges still pending would continue to trial "as if said Act had not been repealed."[39]

What is fascinating, however, is that some of the same newspapers that had supported passage of the law in 1863,[40] by 1869, realized that all the good intentions were not enough—that the law was in some respects counterproductive, violated the Second Amendment, and needed to be repealed.

Less than six years after an editorial from the *Daily Alta California* supporting the concealed weapons ban, the same newspaper ran an editorial arguing that the law was both impossible to enforce and unconstitutional because it violated the Second Amendment:

> The Federal Constitution says "the right of the people to keep and bear arms shall not be infringed." The purpose of that provision, it is well known, was to prevent the practice common in Europe in the last century of seizing all the arms in the possession of the common people, especially in times of political disaffection. As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure. Under the rules of general literary interpretation of the Constitutional provision, it is evident that the prohibition of carrying concealed weapons is an infringement of the right to bear arms.[41]

Along with a constitutional basis for this more than a century before Bruen, the editorial gave a pragmatic argument that the law:

---

[39] California sess. laws (1869-70), ch. 63.
[40] *City Items*, DAILY ALTA CALIFORNIA, Jun. 26, 1863, 1.
[41] *The Carrying of Concealed Weapons*, DAILY ALTA CALIFORNIA, Mar. 13, 1869, 2.

Expert Rebuttal of Clayton Cramer
(19-cv-01662-BEN-JLB)

bothers the good and assists the bad. It disarms the orderly citizen and places no obstruction in the way of the robber. Homicides were very common some years ago in California, and their frequency was partly due to the general custom among the miners of carrying revolvers and large knives. They were mostly single men, who would occasionally drink freely, and under the influence of strong liquor they did not hesitate to take life in case of a quarrel. But of late years, families have increased, dissipation has decreased, and drunken affrays are more rare. At the same time, robbery on the highway, and especially in this city, is more frequent. [42]

California (1861) statute in Exhibit C, that Spitzer missed, punished anyone "who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel…" This in no way prohibits possession of any impact weapon. Nor does it even regulate carry. It only prohibits assault with deadly weapons.

Kansas (1862): "For carrying or having on his or her person in a *concealed manner*, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city [Leavenworth]…" [emphasis added]

Idaho (1864): No statute appears for this year in Exhibit C. A search of Idaho Territorial session laws for 1864 for the word "weapon" found a criminal statute Sec. 133 that is one of those burglary tools statutes.[43] Other uses include: a provision for

---

[42] *The Carrying of Concealed Weapons*, DAILY ALTA CALIFORNIA, Mar. 13, 1869, 2.
[43] LAWS OF THE TERRITORY OF IDAHO, FIRST SESSION 467 (1864).

searching and disarming "a person charged with a felony" pending trial;[44] and a brandishing law.[45]

New York (1866):

> Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun..  The having possession of any of the weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

This law requires "use, or attempt to use" and even then requires "shall knowingly and secretly conceal on his person" as an element of the crime.  Even "willfully and secretly concealed on the person" is only presumptive evidence of a crime.

Virginia (1867): "If any person carrying about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind…"  Concealed weapon law, not a possession ban.

Alabama (1867) assessed a tax on possession of "pistols or revolvers… and on all bowie knives, or knives of the like description."  Again, there is no mention of

---

[44] LAWS OF THE TERRITORY OF IDAHO, FIRST SESSION 322 (1864).
[45] LAWS OF THE TERRITORY OF IDAHO, FIRST SESSION 322 (1864).

impact weapons.   If this was a general prohibition on weapons that Spitzer's Declaration at 4 calls "a disreputable family," it is odd that seized weapons "must be sold at public outcry before the court house door, after five days notice."  The year and the place suggest that this might have been an end-run around the Fourteenth Amendment's attempt to rein in Black Codes that attempted to disarm freedmen[46]:

> In November of 1865, Mississippi required all blacks "not in the military service of the United States Government" to obtain a license from the county's board of police to "keep or carry fire-arms of any kind, or any ammunition, dirk, or bowie-knife."… The same measure made it unlawful for "any white person" to "sell, lend, or give to any freedman, free negro, or mulatto, any fire-arms, dirk, or bowie-knife, or ammunition."… In December of 1865, *Alabama* enacted an even more severe penalty—and without any provision for the granting of a license….[47] [emphasis added]

This taxation of possession is facially race-neutral, but it does not take much imagination to see how a two-dollar tax on possession of a handgun or three dollars on a Bowie knife would lay more heavily on a freedman than a white, or that such laws might be enforced in a racially unequal manner.

Florida (1868).  It is unclear which of three 1868 Florida statutes Spitzer is referencing, but "Manufacturing or selling slung shot" only prohibits manufacturing

---

[46] Clayton E. Cramer, Nicholas J. Johnson, and George A. Mocsary, *"This Right Is Not Allowed By Governments That Are Afraid Of The People": The Public Meaning Of The Second Amendment When The Fourteenth Amendment Was Ratified,* 17 GEORGE MASON LAW REVIEW 823, 852-4 (2010),.cited in McDonald v. Chicago, 562 U.S. 3020, 3044 (2010).

[47] Clayton E. Cramer, Nicholas J. Johnson, and George A. Mocsary, *"This Right Is Not Allowed By Governments That Are Afraid Of The People": The Public Meaning Of The Second Amendment When The Fourteenth Amendment Was Ratified,* 17 GEORGE MASON LAW REVIEW 823, 853-4 (2010)

of slung-shots and metallic knuckles.   1868 Fla. Laws 2538 is a sentence enhancement for carrying various weapons when arrested for "committing a criminal offense or a breach or disturbance of the public peace…"  The third 1868 statute in Spitzer's laundry list is strictly a concealed carry ban.

**Out of the Date Range Set by Bruen**

Many of the rest of Spitzer's laundry list of deadly weapons laws are outside the range of dates relevant to the understanding of the Second Amendment, especially those after 1868, when the Fourteenth Amendment incorporated the Second Amendment against the states.  Considering the schema established by Bruen and Spitzer's misreading of his own collection of statutes, they hardly seen worth examining.

**III.   Prof. Baron's Expert Declaration**

**A. Qualifications**

Along with my qualifications in the history of weapons regulation in America, I have spent much of the last few years reading nineteenth century newspapers in two of the same collections as Prof. Baron: "Chronicling America (newspapers digitized by the Library of Congress); and the private subscription service, newspapers.com.

**B. What Years Matter?**

Prof. Baron acknowledges the criticism that much of the Corpus of Founding Era American English (COFEA) and the Corpus of Historical American English (COHA) represent elite texts. His response at 8 is to "rely as well on five digitized newspaper databases covering the period 1750–1900, focusing for this report on the Founding Era and on the period of Reconstruction after the passage of the Fourteenth Amendment."

The error is "on the period of Reconstruction after the passage of the Fourteenth Amendment." One would not rely on newspaper coverage of voting rights in the Jim Crow era as probative of the intent or understanding of the Fifteenth Amendment. Bruen narrowly focused the relevant dates before ratification of the Fourteenth Amendment.[48]

Laws in the pre-1868 period are specific enough as to have clear meaning. A law also reflects a majority vote.

A popular perception of 1900 or even 1880 tells us nothing about 1868 meaning, nor does our reading of published work tell us how widely that view was held; it might reflect the belief of the chattering classes more than a majority.

---

[48] ""Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." … The Second Amendment was adopted in 1791; the Fourteenth in 1868." New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2119 (2022).

Even a few years in a turbulent society can provoke startling change in popular sentiment.  In 2000, same-sex marriage was a sufficiently radical idea that only some elected officials supported it.  By 2022, it was sufficiently mainstream for many Republican Congressmen to vote for a federal law recognizing it.

Therefore, I consider Prof. Baron's post-1868 examples of limited value in determining popular perceptions.

**C. "Dog Bites Man is Not News; Man Bites Dog Is"**

Newspapers have always focused on the sensational, the shocking, and the novel.  "Johnnie Smith and the other thousand students in our school district made their ways to school without incident" would never be a news story.  "Johnnie Smith, 10, was struck dead by a car in the crosswalk at his school.  The driver, James Brown, 35, is being held by police on charges of Driving While Intoxicated."  Such an event is necessarily news.

Newspaper editors in nineteenth century America sometimes acknowledged this problem:

> It is-true we often see in our exchanges thrilling notices of duels, murders, acts of dishonesty, &c, but our opinion is that these are not that proper subjects to keep before the people. Were we to conduct a paper for an age we would seldom, if ever, notice such things. In the first place. we would not give the perpetrators of such crimes, such

notoriety, and in the next place we would not thus familiarize the public mind with crime.[49]

*Any* criminal use of a weapon will receive more attention than the millions of non-criminal uses or even simple possession of the same weapon. Relying on news coverage of criminal misuses of billy clubs, blackjacks, saps, and other impact weapons will necessarily produce a high match rate for criminal misuse.

## D. The Limitations of Big Data

Prof. Baron's search for references to "billy club" or "billy" necessarily misses the much simpler "club." This explains why Prof. Baron missed:

1. The use of "clubs" in the 1689 rebellion in Boston[50];

2. The 1768 use of clubs in the North Carolina Regulators' dispute with local authorities,[51] and

3. Most importantly, John Adams' defense of the British soldiers on trial for the Boston Massacre in which Adams acknowledged that the protesters being armed with clubs was lawful.[52]

---

[49] Editorial Responsibility, [Raleigh, N.C.] *Spirit of the Age*, Dec. 9, 1857, 1.
[50] Charles M. Andrews, ed. *NARRATIVES OF THE INSURRECTIONS: 1675-1690* 186 (1959).
[51] William L. Saunders, ed., 7 *Colonial Records of North Carolina* 723 (1890).
[52] THE TRIAL OF WILLIAM WEMMS, JAMES HARTEGAN, WILLIAM M'CAULEY, HUGH WHITE, MATTHEW KILLROY, WILLIAM WARREN, JOHN CARROL, AND HUGH MONTGOMERY, SOLDIERS IN HIS MAJESTY'S 29TH REGIMENT OF FOOT, FOR THE MURDER OF CRISPUS ATTUCKS..., 156 (1781).

At 12-13, Prof. Baron recognizes stick as weapons.  The search of corpora for references to them as weapons suffers from the problems to which he alludes at 11 when searching for the word "billy" alone.  Other impact weapons used for self-defense such as canes will not appear from corpora searches.  Yet canes were certainly carried by persons not police and of high status, such as Rep. Preston Brooks (D-SC) which he used to severely beat Sen. Charles Sumner (R-MA) in the Senate Chamber.  While Brooks' actions were certainly criminal, there were no legal consequences[53] and no one of the time would have regarded his appearance in the Senate Chamber as a criminal act.

There are parts of history that require more knowledge than just a few words, extracted out of their broader context.

**E. Even His Examples Sometimes Disprove His Claims**

At 20: "In this report, a bartender subdues some unruly patrons:

> Cully returned from behind the bar with a dirk knife, bull dog revolver, bung starter and billy club.

Reviewing the article in full:

---

[53] *Assault of Senator Charles Sumner,* Histort, Art, and Archives: United States House of Representatives, https://history.house.gov/Records-and-Research/Listing/hi_003/, last accessed December 17, 2022.

**The Very Latest.**

"Say, Cully," said one of a pair of pretty tough looking customers to the barkeeper in a Fifteenth saloon yesterday, "De nibs here and myself has laid de refreshments on a little proposition. Just pass de coffin varnish, decide de bet and one of us will settle."

Two large decoctions of tanglefoot were carefully measured out and dumped into the respective tanks of the tough pair.

"What's de bet, gents," asked the newly appointed referee.

"Come to de door, Cully, an' I'll explain," said the spokesman.

The party adjourned to the sidewalk, and without so much as a waver in his voice the talkative tramp said, pointing toward the depot:

"I've bet dat when de tower tumbles she goes kerflop to de north. Jimmy says she's certain to fall toward the Mason and Dixon line. Now what do you think?"

The pair were nearing the stock yards when "Cully" returned from behind the bar with a dirk knife, bull dog revolver, bung starter and billy club.

leaves some question as to whether this was fiction (often carelessly intermingled with real news in nineteenth century American newspapers) or news. If fiction, it is valueless as evidence of original understanding.  If news, Cully was armed with a billy club for self-defense.

At 21:

> "Billys" appear in news reports of domestic crimes as well in public attacks. In this item, a husband overpowers a housebreaker:

> The husband hasn't applied his billy-club to him, either, though he ought to have done it.

Reding the entire news account presents a different story:

---

[54] *Cheyenne Daily Leader*, Jan 19, 1889, at 3.

Expert Rebuttal of Clayton Cramer
(19-cv-01662-BEN-JLB)

> A WOMAN at Winfield recently went into a place where her husband was drinking "malt" and buying a bottel informed the keeper that she intended to have the liqı id analyzed and if it caused her husband to become drunk she would prosecute him. At this the dealer seized her arm and forced her violently out of the door, injuring her. The account states "the Winfielders have not horse-whipped the brute." The husband hasn't applied his billy-club to him, either, though he ought to have done it. There was a pair of brutes, but the husband was the greater one of the two.[55]

The writing is unclear, but this was not a domestic crime. That "the Winfielders [the people of the town] have not horse-whipped the brute" suggests the barkeeper was the brute; the article implies that the husband's failure to take immediate physical action with his billy-club in defense of his injured wife made him the greater brute of the two.

At 22, Prof. Baron discusses an 1866 New York ban on "Furtive Possession" of various weapons, including billys, but neglects to mention that the statute applied to "use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person…" Use, intent to use, attempted use, all required concealment of the weapon to constitute a crime. Open carry was not

---

[55] SALINE COUNTY JOURNAL (Salina Kan.), July 28, 1887, at 1.

prohibited.    The following section excepting police from provisions of the act specifically required the carrying "willfully and secretly carried on the person or knowingly and furtively carried thereon…"   It is also listed under the heading "Concealed weapons" in the New York State revised statutes.[56] If Prof. Baron wants to use a newspaper account of the passage of a law as a statement of evidence of how bills were seen, then reading the final version of the law *actually* passed is essential.

**F.  Use As a Police Weapon Does Not Exclude It From Lawful Civilian Use**

In several places, Prof. Baron gives examples that purportedly show that "billys" are peculiarly weapons of criminals.  At 15, we are told that " 'billy' is clearly a police weapon."  The referenced article does clearly show that the "billy" was used by a police officer.[57]

At 16: "Another article in the *New York Herald* records "billy" as a burglar's Tool."  The actual text shows that a person alleged to be a burglar was carrying a "Billy," but *not* that a Billy was a burglar's tool.

---

[56] DIGEST OF THE LAWS OF THE STATE OF NEW YORK 284 (1874).
[57] *A Desperate Rogue Felled*, NEW YORK DAILY HERALD, Feb. 2, 1842, 2.

A DESPERATE ROGUE FULLED —During Monday night, the cellar door of the dwelling of John Coyle, No. 116 Chatham street, was entered by forcing the padlock, and a small quantity of clothing stolen from the premises, valued at $3 96. Communication having been received at the Police office, officer Bowyer issued forth in search of the rogue, and in a short time placed his grapples on a strapping negro, named Lewis Van Dyke, a-longshore old one, who was standing in an alley in the neighborhood of the Points. Van Dyke made fight, and although Bowyer used his "billy" with all the force in his power, he was getting rather the best of him, when officer McGrath came to his assistance. They both had a severe struggle in securing the desperate rogue, but succeeded finally in getting him safe within the Tombs, when a portion of the stolen property was found on his person. He was fully committed on a charge of burglary.

That news articles often portray a billy as used by police or criminals in no way excludes that a law-abiding citizen might possess or carry such a weapon.  A century from now, news accounts referencing handguns in the 1960s will be found to disproportionately refer to a police officer or a criminal using a handgun; in no way would such disproportionate references exclude ownership and use of handguns by non-police and non-criminals in the 1960s.

## IV.    Summary

Spitzer's claims about regulation of impact weapon possession bans for the period rendered relevant by Bruen's delimiters entirely fail.  The laws he cites are:

1. Often bans on *concealed* carry of impact weapons, and often grouped with arms that the Court has ruled are protected by the Second Amendment.

2. Punishments of other crimes committed while armed.

3. Laws disarming slaves.

Baron's claims fail for several reasons:

1. His range of years examined go outside the range Bruen directs us to consider.
2. The limitation of his Big Data approach miss important counterexamples.
3. His examples of police and criminal-only references ignores that news coverage may fail to capture the necessarily more mundane civilian uses of such arms.
4. Some of his examples seem to be tendentiously read.

There are no bans for free whites on possession except when carrying on the person.  There are eight bans for blacks and one which prohibits transfers to minors.

Spitzer's Expert Declaration seems highly questionable:

1. He relies on secondary sources such as the Duke Firearms Law Repository which in turn relies on other collections, such as "The Making of Modern Law: Primary Sources," when most of the primary sources are readily available online.
2. He is unfamiliar with published work on early Republic weapon regulation.

Spitzer provides no credible evidence that laws regulating impact weapons during the Bruen delimited years prohibited simple possession of impact weapons absent some other criminal nexus or outside one's home.

Baron's claims fail for several reasons:

1. His range of years examined go outside the range Bruen directs us to consider.

2. The limitation of his Big Data approach miss important counterexamples.

3. His examples of police and criminal-only references ignores that news coverage may fail to capture the necessarily more mundane civilian uses of such arms.

4. Some of his examples seem to be tendentiously read.

5. References to police and criminal uses do not necessarily exclude lawful civilian uses.


December 21, 2022

Clayton E. Cramer

Expert Rebuttal of Clayton Cramer
(19-cv-01662-BEN-JLB)

# Clayton E. Cramer

36 Sunburst Road
Horseshoe Bend, ID 83629
(208) 793-3044
clayton@claytoncramer.com
http://www.claytoncramer.com

**EDUCATION:**

|  | Sonoma State University, Rohnert Park, California |
| --- | --- |
| June, 1998 | M.A. in History |
|  | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
|  | *Honors*: *cum laude* and With Distinction |

**AWARDS:**

| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize |
| --- | --- |
|  | First Place, Undergraduate Division |

**TEACHING EXPERIENCE:**

| Fall, 2017 – present | *Adjunct Faculty***:** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| --- | --- |
| Fall, 2014 – Spring, 2017 | Recovering from stroke |
| Spring, 2010 – Spring, 2014 | *Adjunct Faculty***:** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| Fall, 2009 – Summer 2010 | *Adjunct Faculty***:** ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**. |
| Fall, 2003 | *Adjunct Faculty***:** Boise State University, teaching **U.S. Constitutional History** and at George Fox University (Boise Center), teaching **America and the World**. |

1996      **Teaching Assistant:** Assisted Professor Peter Mellini in his course "Twentieth Century World." I graded quizzes, exams, and answered weekly written questions from students. I also prepared and lectured about the rise of totalitarianism in the period between the world wars.

**BOOKS:**

*Lock, Stock, and Barrel: The Origins of America Gun Culture*
Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,* editor
Library Research Associates, Inc., 1990

**SELECTED PUBLICATIONS:**

"Bellesiles' Arming America Redux: Does the Gunning of America Rewrite American History to Suit Modern Sensibilities?" Southern Illinois University Law Journal Spring 2017 Forthcoming "

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic."  *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241.  Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997.  "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002. "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

**WORKS CITED IN COURT DECISIONS:**

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

*"*Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester*, 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien*, 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008). In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010)*.*

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

Very basic reading competence in German.

**OTHER SKILLS:**

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance. I also have an unusually detailed knowledge of the physical sciences (for an historian), a deep interest in the history of science and technology, and how both influence society.