ALAN ALEXANDER BECK
LAW OFFICE OF ALAN BECK
2692 HARCOURT DRIVE
SAN DIEGO, CA  92123
(619) 905-9105
STATE BAR NO. 276646
ALAN.ALEXANDER.BECK@GMAIL.COM
ATTORNEYS FOR PLAINTIFFS
RUSSELL FOUTS AND
TAN MIGUEL TOLENTINO

STEPHEN D. STAMBOULIEH
STAMBOULIEH LAW, PLLC
P.O. BOX 428
OLIVE BRANCH, MS  38654
(601) 852-3440
STEPHEN@SDSLAW.US
MS BAR NO. 102784
 *ADMITTED PRO HAC VICE

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RUSSELL FOUTS and TAN MIGUEL TOLENTINO,**<br><br>　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>**ROB BONTA, in his official capacity as the Attorney General of the State of California,**<br><br>　　　　　　　　　Defendant. | 19-cv-01662-BEN-JLB<br><br>**PLAINTIFFS' SECOND SUPPLEMENTAL BRIEF**<br><br>Judge:　　　　Hon. Roger T. Benitez<br>Courtroom:　　5A<br>Action Filed:　September 1, 2019<br>Hearing Date:　N/A |

1

# **TABLE OF CONTENTS**

2

3

I.      Introduction ................................................................................1

II.     California Failed to Produce Well-Established and Representative
        Historical Analogues That Are Relevantly Similar to its Billy Club Ban...2

        a.  California's Use of Medieval Law ........................................3

        b.  The Colonial Laws Cited Only Prohibited Arms to Groups Which Were
            Not Afforded Any Second Amendment Rights.....................................9

        c.  Bans on the Concealed Carry of Batons Are Not Relevantly Similar...12

        d.  Laws After 1888.............................................................16

III.    Conclusion.................................................................20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# <u>TABLE OF AUTHORITIES</u>

2

**CASES**

*Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7, 2022)......................................................................4, 15

*Aymette v. State*, 21 Tenn. 154 (1840).....................................................................14

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)........................................................2

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................passim

*Fouts et al v. Becerra* 3:19-cv-01662-BEN-JLB Doc. No. [57] ...............................1

*In re Rameriz*, 193 Cal. 633, 226 P. 914 (1924)....................................................10

*McDonald v. City of Chi.*, 561 U.S. 742 (2010)........................................................2

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ....................passim

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ............................................................10

*Nunn v. State*, 1 Ga. 243 (1846) .............................................................................14

*People v. Rappard*, 28 Cal. App. 3d 302, 104 Cal. Rptr. 535 (1972) ....................10

*Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857) ...................................................10

*Siegel v. Platkin*, No. 22-7464 (RMB/AMD), 2023 U.S. Dist. LEXIS 15096 (D.N.J. Jan. 30, 2023) ......................................................................................................19

*State v. Duke*, 42 Tex. 455 (1875) ..........................................................................16

*State v. Reid*, 1 Ala. 612 (1840)..............................................................................14

*United States v. Combs*, No. 5: 22-136-DCR, 2023 U.S. Dist. LEXIS 17608, (E.D. Ky. Feb. 2, 2023)................................................................................................18

*United States v. Harrison*, 2023 U.S. Dist. LEXIS 18397 (W.D. Okla. Feb. 3, 2023) ..................................................................................................................9, 11

*United States v. Price*, No. 2:22-cr-00097, 2022 U.S. Dist. LEXIS 186571 (S.D. W. Va. Oct. 12, 2022) ..............................................................................................18

*United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 U.S. Dist. LEXIS 168329 (W.D. Tex. Sep. 19, 2022) ................................................................................12

iii

*United States v. Rahimi*, No. 21-11001, 2023 U.S. App. LEXIS 2693, at *18 (5th Cir. Feb. 2, 2023) ................................................................3, 10, 13, 17

*United States* v. *Verdugo-Urquidez*, 494 U.S. 259 (1990)........................................9

**STATUTES**

18 U.S.C. § 922(g)(1)...............................................................................................19

18 U.S.C. § 922(g)(3) ...........................................................................................9, 11

18 U.S.C. § 922(g)(8) ..............................................................................................13

18 U.S.C. § 922(k)..............................................................................................18, 19

18 U.S.C. § 922(n)....................................................................................................12

1860 Terr. of N. M. Laws §§1-2, p. 94. ..................................................................15

1871 Tex. Gen. Laws ch. 34, §1 ..............................................................................16

California Penal Code § 16590(m) ......................................................................1, 20

California Penal Code § 18010(b) .......................................................................1, 20

California Penal Code § 22210..................................................................................20

California Penal Code § 22290....................................................................................1

Metropolitan Police Act 1829 (10 Geo.4, c.44) ........................................................6

Statute of Winchester of 1285 (13 Edw. I, St. 2) ......................................................5

The Civil Rights Act of 1866 (14 Stat. 27–30, enacted April 9, 1866, reenacted 1870)...................................................................................................................10

The Indian Citizenship Act of 1924 Pub. L. 68-175 ...............................................10

**OTHER AUTHORITIES**

2 The Writings of Samuel Adams 119 (1904)............................................................7

*Acts Passed at the Annual Session of the General Assembly of the State of Alabama* (Tuscaloosa: Hale & Eaton, 1838 [1839]), chap. 77, 67-68 ................................14

Archibald MacGregor's Lecture upon the Art of Defence (1791)..............................6

Assembly Concurrent Res. No. 42, Ch. 79, Relative to Chinese Americans in California (2009).

https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200920100ACR42 ........................................................................................................... 10

Assize of Arms of 1181 ..................................................................................... 5

Assize of Arms of 1252 ..................................................................................... 5

Brief Instructions on my Paradoxes of Defence (c.1605 ) ......................................... 6

Cotton Titus Ms. (British Museum, MS Titus A. xxv, f. 105) .................................... 6

Donald MacBane's The Expert Swordsman's Companion (1728) ............................. 6

Egypt. Thorpe, Nick; James, Peter (1995). Ancient inventions. New York City:
    Ballantine Books. ISBN 0-345-40102-6 .................................................... 4

Fischer, Henry G. "Notes on Sticks and Staves in Ancient Egypt." *Metropolitan
    Museum Journal*, vol. 13, 1978, pp. 5–32. *JSTOR*, https://doi.org/10.2307/1512707. 5

Frederick MacKenzie, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON
    37 (Allen French ed., 1926) ..................................................................... 7

George Silver's Paradoxes of Defence (1599) ........................................................ 6

Joseph Swetnam's The Schoole of the Noble and Worthy Science of Defence
    (1617) .................................................................................................... 6

O. Hogg, Clubs to Cannon 19 (1968) ................................................................... 4

R. G. Allanson-Winn and C. Phillipps-Wolley Broadsword and Singlestick with
    chapters on Quarterstaff, Bayonet, Shillalah, Walking-Stick, Umbrella and Other
    Weapons of Self Defence (1890) ............................................................... 7

Southern Slave Patrols as a Transitional Police Type by Philip L. Reichel available
    at https://bit.ly/3XZPv1j ......................................................................... 8

Speidel, Michael (1993), The fustis as a soldier's weapon. Antiquités africaines. 29.
    137-149. 10.3406/antaf.1993.1216 ........................................................... 5

*State v. Kessler*, 289 Or. 359, 614 P.2d 94 (1980) ............................................... 7

Stephen P. Halbrook, The Founders' Second Amendment 25 (2008) ....................... 7

The History of New York City Police Department 145539 (1993) available at
    https://bit.ly/3Ylb50d ............................................................................ 8

Thomas McCarthy's Quarter-staff: a practical manual (1883) ...................................6

W. Moore, *Weapons of the American Revolution*, 8 (1967) .....................................7

Zachary Wylde's The English Master of Defence (1711) .........................................6

Plaintiffs' Second Supplemental Brief
(19-cv-01662-BEN-JLB)

I.    Introduction

Pursuant to this Court's December 15, 2022 order, Plaintiffs file this supplemental brief to address the "survey of laws" California put together to ostensibly justify its ban on billy clubs.[1] As shown below, Defendant Bonta's ("California") statutory scheme, which bans the possession of billy clubs, is unconstitutional.  In this case, Plaintiffs pray for an injunction of Section 22210 "and any other relevant California law which bans the acquisition, possession, carrying or use of billies as applied to Plaintiffs and additionally against other similarly situated law abiding persons." *See* Complaint at p.13. California Penal Code § 22210, in relevant part, prohibits the ownership of billies which are also known as batons.

California Penal Code § 16590(m) designates a billy as a "generally prohibited weapon." A billy is also designated a "nuisance," subject to confiscation and summary destruction by law enforcement under California Penal Code § 18010(b) pursuant to California Penal Code § 22290. These laws amount to an unconstitutional infringement on Plaintiffs' Second Amendment rights.  Plaintiffs seek an injunction against these laws. And for the reasons laid out below, this Court should grant an injunction because California has failed to demonstrate a "well-established and representative historical analogue" pursuant to *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022).

As an initial matter, Plaintiffs note that California's "survey" does not comply

---

[1] *See Fouts et al v. Becerra* 3:19-cv-01662-BEN-JLB Doc. No. [57].

with this Court's Order.  The Court directed the defendant to "create ... a survey or spreadsheet of relevant statutes, laws, or regulations ... begin[ing] at the time of adoption of the Second Amendment..."  *See* Minute Entry, December 15, 2022.  As the Court can see from the spreadsheets filed by Defendant, California decided to go back to 1383, or 408 years prior to ratification.  *See* ECF# 60-1.  Plaintiffs noted as much on their "objections" to Defendant's spreadsheet.  *See* ECF# 60-3, p.1.

Plaintiffs noted in their objections, for every law that the Defendant is trying to use as an analogue, why each of them is irrelevant.  For instance, many of the laws right after the ratification of the Second Amendment deal with a prohibition on possession of certain types of weapons by slaves.  And for a supermajority, if not all, of these purported analogues, they are not "relevant" as Defendant claims in his fn. 2 of the spreadsheet.  *See* ECF# 60-1, fn.2.  Curiously, Defendant claims that California's laws are "commonsense firearms laws," but this case is not about firearms.  And in any event, "commonsense" is not the standard *Bruen* utilized, nor does that word even appear, *at all*, in *District of Columbia v. Heller*, 554 U.S. 570 (2008) or *McDonald v. City of Chi.*, 561 U.S. 742 (2010), or *Caetano v. Massachusetts*, 577 U.S. 411 (2016), or in *Bruen*.  In exactly zero places does our Supreme Court use (or allow to be used) "commonsense" in a Second Amendment challenge.

II.   <u>California Failed to Produce Well-Established and Representative Historical Analogues That Are Relevantly Similar to its Billy Club Ban</u>

Rather, the Supreme Court held that in a Second Amendment challenge, the

"government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127. The laws which the government rely on must be "relevantly similar" to the law at issue. *Id.* at 2132. Here, California has failed to do that, and instead cites to series of cases which prohibited clubs to persons which were not afforded any Second Amendment rights and bans/restrictions on concealed carry only which are too recent in vintage to be probative or are otherwise not relevantly similar. Billy clubs/batons have a rich history throughout the Western World. "The Government relies on laws of varying antiquity as evidence of its 'dangerousness' analogues. We sketch these chronologically, mindful that greater weight attaches to laws nearer in time to the Second Amendment's ratification." *United States v. Rahimi*, No. 21-11001, 2023 U.S. App. LEXIS 2693, at *18 (5th Cir. Feb. 2, 2023).

A. California's Use of Medieval Law

California cites to several Medieval English laws to justify their ban on billy clubs. Laws from Medieval England are too early in time and from the wrong country to be relevantly similar. As a federal court found in ruling on a challenge to New York's recently enacted carry laws, "In doing so, the Court would not have relied on two of the (purportedly) three 'more instances of laws involving fairs and markets' provided by the State Defendants (Dkt. No. 48, at 91), because they are from 1328 and 1534, and thus too remote from the relevant time period to shed light on the public understanding of the Second Amendment in 1791 and/or of the Fourteenth

Amendment in 1868." *See Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 201944, at *109 n.66 (N.D.N.Y. Nov. 7, 2022). Perhaps more importantly, California did not cite to a single historical law which prohibits the ownership of billy clubs. Instead, it cites to series of laws which prohibit the ownership of launcegays, crossbows, handguns, hagbutts (which is a type of pistol) and demy hakes (which are a smaller version of a hagbutt) in certain areas. We know that these laws are not relevantly similar or else *Heller* would have come out the other way as *Heller* dealt with a complete ban on handguns. The *Heller* Court did not find these laws relevant and neither should this court. Even if Medieval history was relevant, England and Colonial America did not outright ban clubs. Rather, clubs were commonly owned during these periods.

There have been sticks shaped like batons all throughout human history. The club is considered the first personal weapon fashioned by humans. O. Hogg, Clubs to Cannon 19 (1968). Batons were issued to Roman officers and this tradition continued throughout European history.[2,3,4] The police baton can trace its origins to

---

[2] Available at https://bit.ly/3oy4hwR (The first use of a baton to symbolize military power was by the Roman Legate, who wielded a white baton to represent his ultimate authority).

[3] Available at https://bit.ly/34jc8rg.

[4] A straight, fixed-length baton (also commonly referred to as a "straightstick" or short stick) is the oldest and simplest police baton design, known as far back as ancient Egypt. Thorpe, Nick; James, Peter (1995). Ancient inventions. New York City: Ballantine Books. ISBN 0-345-40102-6. "As a rule, short sticks were used in the Old, Middle, and New Kingdom for policing men or animals, and one Eighteenth Dynasty representation (Figure 29) shows a tax-collector holding one that has a loop

(continued…)

the 27BC Roman Empire during the reign of Augustus (Gaius Octavious – Great nephew to Julius Caesar).  During this era, the first non-military civilian police force was formed known as the "Vigiles Urbani" (Watchmen of the City), or "Cohortes Vigilum" (Cohorts of the Watchmen). They were typically armed with the "fustis" which was a type of club similar to the traditional policeman baton. *See* Speidel, Michael (1993), The fustis as a soldier's weapon. Antiquités africaines. 29. 137-149. 10.3406/antaf.1993.1216.[5]

Modern day policing, and with it the use of the baton, has its origins in the Assize of Arms of 1181, a proclamation of King Henry II of England, concerning the obligation of all freemen of England to possess and bear arms in the service of King. The Assize of Arms of 1252 was a proclamation of King Henry III of England concerning the enforcement of the Assize of Arms of 1181, and the appointment of constables to summon men to arms, quell breaches of the peace, and to deliver offenders to the sheriff. The Statute of Winchester of 1285 (13 Edw. I, St. 2) reformed the system of Watch and Ward (watchmen) of the Assize of Arms of 1252, and revived the jurisdiction of the local courts.  This "Watch and Ward" system of law enforcement remained in effect until the formation of the modern police with the

---

passed through a hole at one end, much like the police truncheon of our own day." See Fischer, Henry G. "Notes on Sticks and Staves in Ancient Egypt." *Metropolitan Museum Journal*, vol. 13, 1978, pp. 5–32. *JSTOR*, https://doi.org/10.2307/1512707. Accessed 5 Feb. 2023.

[5] Available at https://bit.ly/3GxQwUU.

passage of the Metropolitan Police Act 1829 (10 Geo.4, c.44).[6]   Citizens were expected to provide their own weapons when assisting law enforcement. This included clubs and other precursors to the modern baton due to stick fighting's prevalence in Common Law era England.

The English Common Law, from which our Second Amendment is derived, has a rich history of stick fighting. The English method of staff combat was recorded in several fencing manuals. The primary ones are George Silver's Paradoxes of Defence (1599)[7], Brief Instructions on my Paradoxes of Defence (c.1605 ), Joseph Swetnam's The Schoole of the Noble and Worthy Science of Defence (1617)[8] and Zachary Wylde's The English Master of Defence (1711),[9] with Donald MacBane's The Expert Swordsman's Companion (1728)[10] and Archibald MacGregor's Lecture upon the Art of Defence (1791)[11] providing some additional information. Even earlier is the Cotton Titus Ms. (British Museum, MS Titus A. xxv, f. 105)[12] from the late 15th century, which comes in two parts, the "Strokez off ij hand swerde" and "Strokes atte þe ij hande staffe". In addition, there are several later sporting staff manuals, including Thomas McCarthy's Quarter-staff: a practical manual (1883),[13]

---

[6] Available at https://bit.ly/3LeozFb.
[7] Available at https://bit.ly/3GwZ52s.
[8] Available at https://bit.ly/3HB4Cq3.
[9] Available at https://bit.ly/3uxT0jR.
[10] *See* https://bit.ly/3B6Ls8N. Available at https://bit.ly/3DDbN0M (last visited 1/17/2023).
[11] Available at https://bit.ly/3LiXu3S.
[12] Available at https://bit.ly/34oBPqf.
[13] Available at https://bit.ly/3LcqYjX.

R. G. Allanson-Winn and C. Phillipps-Wolley Broadsword and Singlestick with chapters on Quarterstaff, Bayonet, Shillalah, Walking-Stick, Umbrella and Other Weapons of Self Defence (1890).[14]

The use of clubs continued during the Founding Era in America. On the annual commemoration of the Boston Massacre in 1772, Bostonians attended Dr. Joseph Warren's stirring oration. Expecting the speech to upset the Redcoats in attendance, "almost every man [in the audience] had a short stick, or bludgeon, in his hand; and . . . many of them were privately armed." Frederick MacKenzie, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON 37 (Allen French ed., 1926). "The colonists suffered a severe shortage of firearms in the early years of the war, so many soldiers had to rely primarily on swords, hatchets, knives, and pikes (long staffs with a spear head). W. Moore, *Weapons of the American Revolution*, 8 (1967)." *State v. Kessler*, 289 Or. 359, 368, 614 P.2d 94, 98 (1980). And as Samuel Adams observed, "[i]t may be supposed that he had as good right, by the law of the land, to carry a stick for his own and his neighbor's defence, in a time of danger, as the Soldier who shot him had, to be arm'd with musket and ball, for the defence of himself and his friend the Centinel." Stephen P. Halbrook, The Founders' Second Amendment 25 (2008) (quoting 2 The Writings of Samuel Adams 119 (1904)).

Law enforcement was common throughout metropolitan colonial America. In what would be known as New York, during its Dutch era from 1625 to 1664, the first

---

[14] Available at https://bit.ly/3rtQhWK.

professional police department was created in New Amsterdam.[15] Police officers used hand rattles (the precursor to the modern police whistle) as they patrolled the streets to discourage crime and apprehend criminals.[16,17] Under British rule from 1664 to 1783, constables were charged with keeping the peace. They focused on such offenses as excessive drinking, gambling, prostitution, and church service disturbances.[1819]  Full uniforms were finally adopted in 1853.[20] Each officer was equipped with a baton that was 22 inches long and three-quarters of an inch thick.[21] And in the 1630s, Boston formed a watch that consisted of one constable and six watchman.[22,23,24] In 1854, Boston officers began to carry a 14-inch club.[25,26]  The

---

[15] For a comprehensive history of New York's police department see The History of New York City Police Department 145539 (1993) available at https://bit.ly/3Ylb50d (last accessed 2/1/2023).

[16] Available at https://washex.am/3J942jI.

[17] Available at https://bit.ly/3JcIF0C.

[18] Available at https://bit.ly/3ow0LTB.

[19] In the Colonial Era, rural South slave patrols evolved to encompass traditional law enforcement functions.  For a comprehensive discussion of this history see Southern Slave Patrols as a Transitional Police Type by Philip L. Reichel available at  https://bit.ly/3XZPv1j (starting at page 16 of the document) (last accessed 2/1/2023).

[20] The History of New York City Police Department 145539 (1993) at *6.

[21] *Id.*

[22] Available at https://bit.ly/3ov4Wz6.

[23] Available at https://bit.ly/3Jd2LIu (page 10).

[24] In July 1700, the Philadelphia Common Council established the night watch, a person who carried a bell to alert the constable about criminal activity. See https://bit.ly/3l8QayW  (last accessed 2/1/2023).

[25] Available at https://bit.ly/3L9r0ZE.

[26] The first attempt to establish professional policing in Baltimore was in 1784. The city authorized a night watch and a force of day constables to enforce town laws. *See* https://bit.ly/40jexKu (last accessed 2/2/2023). The department was founded in
(continued…)

8

above shows that club ownership was common throughout history.

B. <u>The Colonial Laws Cited Only Prohibited Arms to Groups Which Were Not Afforded Any Second Amendment Rights</u>

The only colonial laws which California produced which ban the possession of clubs were laws prohibiting the possession of arms by slaves and Indians.  These laws are not relevantly similar to California's total ban on billy clubs because during the Colonial Era, slaves and Indians were not considered part of "the People" which were afforded Second Amendment rights.[27] Thus, early American societies found it permissible to deprive them of weapons. However, this narrow racist exception did not apply to the general population, and consequently it cannot be used as grounds for upholding the present law in question.

"[I]n all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community[…]" *Heller* at 580.  "As we said in *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265 (1990):

> '[T]he people' seems to have been a term of art employed in select parts of the Constitution. . . .[Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national

---

its current form (with uniforms and firearms) in 1853 by the Maryland state legislature" to provide for a better security for life and property in the City of Baltimore". The state did not give the city the power to run its own police affairs. *See* https://bit.ly/3WWndDT (last accessed 2/2/2022).

[27] "... historical restrictions on slaves and Indians provide no insight into the constitutionality of § 922(g)(3). That is because neither slaves nor Indians were understood to be a part of the 'political community' of persons protected by the Second Amendment." *United States v. Harrison*, 2023 U.S. Dist. LEXIS 18397, at *41 (W.D. Okla. Feb. 3, 2023).

community or who have otherwise developed sufficient connection with
this country to be considered part of that community.

*Id.* During the Colonial Era, enslaved people and Indians simply did not have any
Second Amendment rights whatsoever[28, 29] because they were not considered part of
the People afforded Second Amendment rights.[30]

Thus, California cannot rely on "club" bans for these groups to justify their
modern billy club ban.  "These laws disarmed people thought to pose a threat to the
security of the state due to their perceived lack of loyalty or societal status." *See
United States v. Rahimi*, No. 21-11001, 2023 U.S. App. LEXIS 2693, at \*22 (5th Cir.
Feb. 2, 2023).[31] They were justified, not because clubs were unprotected by the

---

[28] *See Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857) (finding that enslaved individuals are not part of the citizenry).

[29] *See e.g.* US Const., art. 1, sec. 1 & 3. House of Reps shall be chosen by the people of the US, apportionment shall be determined by the "whole number of free persons," excluding "Indians not taxed." *See also* The Civil Rights Act of 1866 (14 Stat. 27–30, enacted April 9, 1866, reenacted 1870) (which is generally considered a precursor to the 14th Amendment) "That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States…" Available at https://bit.ly/3X10lTF (last accessed 1/15/2023).  Native Americans were not granted citizenship until the passage of The Indian Citizenship Act of 1924 Pub. L. 68-175.

[30] California had its own tradition of disarming minority groups which it did not consider part of the body politic. Historically, California "denied Chinese immigrants the right to bear arms." Assembly Concurrent Res. No. 42, Ch. 79, Relative to Chinese Americans in California (2009). https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200920100ACR42 (last visited (1/16/2023). *See also In re Rameriz*, 193 Cal. 633, 226 P. 914 (1924) (upholding ban on unnaturalized aliens owning firearms). This ban was eventually overturned by *People v. Rappard*, 28 Cal. App. 3d 302, 104 Cal. Rptr. 535 (1972).

[31] *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200-01 (5th Cir. 2012) (discussing relevant scholarship), *abrogated by Bruen*, 142 S. Ct. at 2126-30.

---

10

Second Amendment, but because slaves and Indians were not considered to be part of "the People" at that time.  Obviously now any law like that would (or should be) immediately struck as unconstitutional.  It should also be noted that these are not complete bans as the slave could still use a "gun, pistol, sword, club, or other kind of weapon" if he were in the "presence and at the direction of their Master or Mistress." *See* ECF# 60-1 Number 5 (1664 New York law).

In *United States v. Harrison*, No. CR-22-00328-PRW, 2023 U.S. Dist. LEXIS 18397 (W.D. Okla. Feb. 3, 2023), the Western District of Oklahoma struck 18 U.S.C. § 922(g)(3) as unconstitutional.  There, the "United States point[ed] to seven laws— one 1655 law from colonial Virginia and six state or territorial laws enacted between 1868 and 1899—that it argues 'categorically prohibit[ed]' the intoxicated 'from possessing firearms.'" *Id* at *12. That court distinguished these cases because "no one's right to armed self-defense was restricted based on the mere fact that he or she was a user of intoxicants" and that "none of the laws appear to have prohibited the mere possession of a firearm. Third, far from being a total prohibition applicable to all intoxicated persons in all places, all the laws appear to have applied to public places or activities (or even a narrow subset of public places), and one only applied to a narrow subset of intoxicated persons. Importantly, none appear to have prohibited the possession of a firearm in the home for purposes of self-defense." *Id* at *13. (footnotes omitted).  Thus, the court found that the laws relied upon by the United States were not "comparable" to 18 U.S.C. § 922(g)(3). *Id.*  This is like

California's attempts to justify their ban on billies on laws that banned slaves or mulattos from carrying weapons.[32]

But Plaintiffs, on the other hand, are "law-abiding, responsible citizens" entitled to full Second Amendment protection. *Heller* at 635. Therefore, California cannot rely on laws prohibiting weapons for slaves and Indians because these laws are not relevantly similar to a modern law which bans billy club possession for individuals with Second Amendment rights.

C. Bans on the Concealed Carry of Batons Are Not Relevantly Similar

California cites to a second group of laws which the carry of weapons under certain circumstances.  Most of these are prohibitions on concealed carry and others pertain to carrying *while in engaged in criminal activity*. Most do not deal with billy clubs at all and are restrictions on other types of weapons. None of these laws are relevant for at least one of the following reasons:

First, none of the laws deal with possession bans. They deal primarily with the *carry* of clubs and thus, they are not relevantly similar. "For instance, a green truck and a green hat are relevantly similar if one's metric is 'things that are green.' ...They are not relevantly similar if the applicable metric is 'things you can wear.'" *Bruen* at

---

[32] In striking 18 U.S.C. § 922(n) as unconstitutional a federal court in Texas also rejected the use of law disarming former slaves and other minority groups to justify modern weapons laws. *See United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 U.S. Dist. LEXIS 168329, at *26 (W.D. Tex. Sep. 19, 2022) ("That pretextual disarmament wrenched away black residents' "individual right to self-defense"—"the central component" of their Second Amendment right.")

2132. Here the applicable metric is things you can own. California's use of laws on things you cannot concealed carry, is not relevantly similar because in the places these laws applied, you could still own the weapon itself and perhaps carry the weapon openly.[33]

Second, these laws are too late in time.  Virtually all these laws are from the 1830s and later. But 1791, is the appropriate timeframe for evaluating the propriety of laws in Second Amendment challenges.  The Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen* at 2137. Furthermore, most of these laws are not relevantly similar because they deal with the *concealed carry* of arms. As *Bruen* teaches, historical concealed carry restrictions were insufficient to justify bans on the carry of arms today. Justice Breyer relied on some Nineteenth Century laws which placed restrictions certain other weapons in his dissent in *Bruen*. *Bruen*, at 2186 (Breyer, J., dissenting).  Those laws dealt with the concealed carry of bowie knives and other

---

[33] California cites to several surety-type laws, but they are all post-1791. "Where the surety laws imposed a conditional, partial restriction on the Second Amendment right, [18 U.S.C.] § 922(g)(8) works an absolute deprivation of the right, not only publicly to carry, but to *possess* any firearm, upon entry of a sufficient protective order. At bottom, the historical surety laws did not impose 'a comparable burden on the right of armed self-defense[.]'" *United States v. Rahimi*, No. 21-11001, 2023 U.S. App. LEXIS 2693, at *27 (5th Cir. Feb. 2, 2023). Because billies are outright banned in California, a ban on types of *carry* (even with a surety) does not pose a comparable burden as that of a possession ban.

weapons, not bans on possession. The general rule from the line of 19ᵗʰ Century cases *Heller* discusses is that the carry of arms such as bowie knives could be regulated, but not banned outright.

For example, *Heller* points out that *Aymette v. State*, 21 Tenn. 154 (1840), "held that the state constitutional guarantee of the right to 'bear' arms did not prohibit the banning of concealed weapons." *Heller* at 613. Similarly, *Nunn v. State*, 1 Ga. 243, 246 (1846), also cited in *Heller* at 612, recognized an exemption for the open carry of bowie knives, holding that "*no person or persons shall be found guilty of violating the before-recited act, who shall openly wear, externally, bowie-knives, dirks, tooth-picks, spears, and which shall be exposed plainly to view*." *Nunn* at 246. *Heller* also relied on *State v. Reid*, 1 Ala. 612, 616-617 (1840), which held that "[a] statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."[34] *Heller* at 629.

These cases stand for the proposition that concealed carry could be restricted when the government allows for the open carry of arms. *Bruen* teaches that restrictions on carry are not sufficient to justify complete bans on carry. Thus, these and other laws which California cite to which deal with restrictions on carrying with

---

[34] Similarly, Alabama had a ban on the concealed carry of bowie knives but allowed for their open carry. *See Acts Passed at the Annual Session of the General Assembly of the State of Alabama* (Tuscaloosa: Hale & Eaton, 1838 [1839]), chap. 77, 67-68.

a criminal purpose and other similar restrictions are not relevantly similar to a complete ban on carry for the same reason as concealed carry ban are insufficient to justify such. All these laws provided a law-abiding citizen an avenue to carry the restricted arm unlike California law which bans even mere possession.

California does cite to a handful of laws which completely banned the carry of certain arms.  These laws are from a handful of towns and municipalities. They are outlier laws. *See Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 201944, at *15 (N.D.N.Y. Nov. 7, 2022) ("less weight is generally given to 'bare . . . localized restrictions' (or city laws unaccompanied by similar laws from states), because they 'cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry.') (citation omitted).  Similar laws were already rejected in *Bruen*. Two jurisdictions, New Mexico and Texas, were mentioned by the dissent in *Bruen*, completely banned the carry of certain arms.  The *Bruen* majority rejected these laws as insufficient to justify New York' "proper cause" law.  "[T]he Territory of New Mexico appears to have banned all carriage whatsoever of 'any class of pistols whatever,' as well as 'bowie kni[ves,] . . . Arkansas toothpick[s], Spanish dagger[s], slung-shot[s], or any other deadly weapon.' 1860 Terr. of N. M. Laws §§1-2, p. 94." *Bruen*, at 2186 (Breyer, J., dissenting). And "Texas made it a misdemeanor to carry in public 'any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense' absent

'reasonable grounds for fearing an [immediate and pressing] unlawful attack.' 1871 Tex. Gen. Laws ch. 34, §1." *Bruen*, at 2188. (Breyer, J., dissenting) (punctuation omitted).

However, the dissent's reliance on these two instances was rejected by the majority in the *Bruen.  Bruen*, at 2153. Specifically, the Court found that the two Texas cases -- *English* v. *State*, 35 Tex. 473 (1871), and *State v. Duke*, 42 Tex. 455 (1875) – were outliers and therefore "provide little insight into how postbellum courts viewed the right to carry protected arms in public." *Id*. The New Mexico statute was both an outlier (*Bruen* at 2147 n.22) and distinguishable (*id*. at 2154 n.29) as it expressly allowed an exception for self-defense. The laws of a smattering of townships are similarly outliers and irrelevant because they are not possession bans.

D. Laws After 1888

Finally, California cites to laws from 1888 all the way to the Twentieth Century. As briefed above, these laws should be disregarded because they are far too recent to justify a historical tradition of billy club possession bans. As Justice Breyer explained in dissent "The Court disregards '20th-century historical evidence.'" *Bruen* at 2189. (Breyer, J., dissenting).  California will undoubtedly focus in on footnote 28 of *Bruen* which states that, "[a]s with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen* at 2154 n.28.  And then claim that their evidence is not contradicted

by earlier evidence. However, they would be wrong to do so. The Supreme Court was suggesting that if there were prior laws which were relevantly similar then perhaps a government entity could cite to later laws to show that these laws have an unbroken pedigree. Here, where the historical record demonstrates that the possession of billy clubs was not historically banned (other than the exceptions discussed above) the record does contradict these modern laws. Thus, California cannot rely on its post-1888 laws to justify its current ban on the possession of billy clubs.

Finally, batons and billies do not pose some "dramatic technical change" or "unprecedented societal concern[.]" *See Bruen* at 2132 ("While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."). "When the challenged regulation addresses a 'general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.' [*Bruen*] at 2131. Moreover, 'if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.'" *United States v. Rahimi*, No. 21-11001, 2023 U.S. App. LEXIS 2693, at *14 (5th Cir. Feb. 2, 2023).

And as a recent district court from the Eastern District of Kentucky stated, "[i]f

the district court concludes that [an individual's] proposed course of conduct is covered by the plain text of the Second Amendment, it should then determine whether historical evidence . . . demonstrates that the [regulation is] consistent with the nation's historical tradition of firearm regulation." *United States v. Combs*, No. 5: 22-136-DCR, 2023 U.S. Dist. LEXIS 17608, at *9 (E.D. Ky. Feb. 2, 2023) (citing *Oakland Tactical Supply, LLC v. Howell Twp*., No. 21-1244, 2022 U.S. App. LEXIS 21744 (6th Cir. Aug. 5, 2022)).  Similarly, in *United States v. Price*, No. 2:22-cr-00097, 2022 U.S. Dist. LEXIS 186571 (S.D. W. Va. Oct. 12, 2022) the Court struck 18 U.S.C. § 922(k) as unconstitutional. The "societal problem[s]" addressed by Section 922(k) appear to be crime, including crime involving stolen firearms, and assisting law enforcement in solving crime. It is difficult to imagine that this societal problem did not exist at the founding. While firearms then were not the same as firearms today, there certainly were gun crimes that might have been more easily investigated if firearms had to be identifiable by a serial number or other mark. *Id* at *13-14.

"Even assuming the societal problem addressed by the regulation is "unprecedented," such that it would have been "unimaginable at the founding" or is based on "dramatic technological changes," *id.* at 2132, it is the Government's burden to show that there were analogous regulations at the time to support Section 922(k)'s constitutionality." *Id.* at *14. "As for its argument that restrictions on certain types of weapons are constitutional, the Government starts and stops by explaining that the

Court in *Heller* acknowledged three permissible limits: the firearms must be "bearable arms" to receive protection, the arms must not be "dangerous or unusual weapons," and the arms must be kinds in "common use." [ECF No. 17, at 12-13]. The Government makes no attempt to explain how any of these limits are analogous to Section 922(k)'s prohibition on possessing a firearm without a serial number, and I find no apparent analogue." *Id* at \*15, "And the founders addressed the 'societal problem' of non-law-abiding citizens possessing firearms through 'materially different means'—felon disarmament laws like [18 U.S.C. §] 922(g)(1). *Bruen*, 142 S. Ct. at 2131. Under *Bruen*, this is "evidence that [the] modern regulation is unconstitutional." *Id* at \*16-17. Clubs have existed since the time of the Founding. Historically, there were no laws which disarmed law abiding citizens from owning clubs.  That is more than enough for this Court to find California's ban on billy clubs is unconstitutional.[35]

As can be seen from the Defendant's spreadsheet, a "club" restriction makes it first appearance in 1606 England and 1664 New York, but only for slaves without permission.  A "billy" makes it first appearance in 1863, in the City of Leavenworth, Kansas, but only prohibited "carrying [] concealed[.]"  ECF# 60-1, No. 70.  1866 New York prohibited "using, attempting to use, concealing, or possessing ... [a]

---

[35] See also *Siegel v. Platkin*, No. 22-7464 (RMB/AMD), 2023 U.S. Dist. LEXIS 15096 (D.N.J. Jan. 30, 2023) striking several of New Jersey's newly enacted sensitive places law using similar reasoning.

billy[.]" *Id*. at No. 74.[36]  1868 Florida prohibited carrying a "bill[y]... if arrested for committing a criminal offence or disturbance of the peace." *Id*. at No. 82.  1871 City of St. Louis, Missouri prohibited the "carrying of a concealed ... billy... without written permission from the Mayor."  *Id*. at No. 91. 1872 City of Annapolis, Maryland prohibited the concealed carry of a billy.  *Id*. at No. 95.  1872 City of Nebraska, Nebraska prohibited generally the carry of a billy, but not possession of a billy.  *Id*. at No. 96. 1876 Colorado banned "carrying with intent to assault" a "bludgeon" but did not outright ban possession.  *Id*. at No. 113.

III.   <u>Conclusion</u>

This Court should enjoin Penal Code §§ 22210, 16590(m), § 18010(b) and § 22290 as they pertain to billy clubs.

Dated: February 10, 2022

<u>*/s/ Alan Alexander Beck*</u>                    <u>*/s/ Stephen D. Stamboulieh*</u>
Alan Alexander Beck                         Stephen D. Stamboulieh

---

[36] From Defendant's spreadsheet, it appears that the only state to outright ban possession is New York in 1868.  The remainder appear to only be prohibitions or restrictions on concealed carry or who cannot possess ("slave", "negro", "mulatto", "Indian") various weapons, and some allow those same individuals to possess if they have a "special license" or permission from their "Master."