ROB BONTA
Attorney General of California
BENJAMIN M. GLICKMAN
Supervising Deputy Attorney General
ANTHONY P. O'BRIEN
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his
official capacity as Attorney General of the
State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **RUSSELL FOUTS et al.,**<br><br>Plaintiff,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>Defendant. | Case No. 3:19-cv-01662-BEN-JLB<br><br>**DEFENDANT'S BRIEF IN RESPONSE TO THE COURT'S ORDER ENTERED ON DECEMBER 15, 2022**<br><br>Courtroom:    5A<br>Judge:           Hon. Roger T. Benitez<br>Action Filed:   September 1, 2019 |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................... 1

Argument ....................................................................................................... 3

I.    California's Billy Restrictions Do Not Burden Conduct Covered by the "Plain Text" of the Second Amendment .................................... 3

II.    Section 22210's Restrictions on Billies Are Consistent with the Nation's Traditions of Weapons Regulation .......................................... 6

    A.    *Bruen* Permits Reasoning by Analogy ....................................... 7

    B.    The Surveys of Relevant Dangerous Weapons Laws ................. 8

        1.    Medieval to Early Modern England (1300–1776) ......... 10

        2.    Colonial and Early Republic (1600–1812) .................... 11

        3.    Antebellum and Reconstruction Periods (1813–1877) ................................................................................. 12

        4.    Late 19th and Early 20th Centuries (1878–1930s) ........ 15

    C.    The Surveyed Weapons Restrictions Are Relevantly Similar to Section 22210's Billy Restrictions .......................... 16

Conclusion ................................................................................................... 19

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Aymette v. State*
   21 Tenn. 154 (1840) .......................................................................... 14

*Bliss v. Commonwealth*
   12 Ky. (2 Litt.) 90 (1822) ................................................................. 13

*Defense Distributed v. Bonta*
   2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ...................................... 3

*District of Columbia, et al. v. Heller*
   554 U.S. 570 (2008) ................................................................... *passim*

*Dred Scott v. Sandford*
   19 How. 393 (1857) ........................................................................... 9

*Duncan v. Bonta*
   19 F.4th 1087 (9th Cir. 2021) ............................................................. 5

*Duncan v. Bonta*
   No. 3:17-cv-01017-BEN-JLB (S.D. Cal. Nov. 10, 2022).................... 17

*Ezell v. City of Chicago*
   651 F.3d 684 (7th Cir. 2011) ............................................................ 15

*Fouts v. Bonta*
   561 F. Supp. 3d 941 (S.D. Cal. 2021) ....................................... *passim*

*Lawrence v. State*
   475 Md. 384 (2021) .......................................................................... 15

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
   142 S. Ct. 2111 (2022) ............................................................. *passim*

*Ocean State Tactical, LLC v. State of Rhode Island*
   2022 WL 17721175 (D.R.I. Dec. 14, 2022).................................... 4, 6

*Or. Firearms Fed'n, Inc. v. Brown*
   2022 WL 17454829 (D. Or. Dec. 6, 2022)........................... 3, 4, 6, 17

ii

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3
4

*People v. Canales*
   12 Cal. App. 2d 215 (1936) ................................................................. 5

5
6

*People v. Davis*
   214 Cal. App. 4th 1322 (2013) ........................................................... 5

7
8

*People v. Grubb*
   63 Cal. 2d 614 (1965) ........................................................................ 6

9
10

*People v. Lisciotti*
   219 Cal. App. 4th Supp. 1 (2013) ....................................................... 5

11

*People v. Mercer*
   42 Cal. App. 4th Supp. 1 (1995) ......................................................... 5

12
13

*Rupp v. Bonta*
   No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Jan. 6, 2023) ...................... 14

14
15

*State v. Mitchell*
   3 Blackf. 229 (Ind. 1833) ................................................................. 13

16
17

*State v. Reid*
   1 Ala. 612 (1840) .............................................................................. 14

18
19

*United States v. Kelly*
   2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ......................... 7, 8

20
21

*United States v. Miller*
   307 U.S. 174 (1939) ........................................................................... 4

22

*United States v. Reyna*
   2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ............................ 3, 4

23
24

**STATUTES AND ORDINANCES**

25

California Penal Code
   § 22210 ...................................................................................... *passim*

26
27

1783 Mass. Acts 37, § 2 ................................................................ 11, 18

28

iii

1

2

### TABLE OF AUTHORITIES
#### (continued)

Page

3

4

1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and
    the Safe Keeping of Gun Powder, chap. 25, § 1 ......................................... 12, 18

5

Ordinances of the City of Chicago, Ill., ch. 16, § 1 (1851) ............................. 13, 18

6

Ordinances of the City of St. Paul, Minn., ch. 21, § 1 (1858).......................... 13, 18

7

8

Acts Passed at the First Session of the Twenty First General Assembly
    for the Commonwealth of Ky. (1813) ................................................................ 13

9

10

Laws of the State of Indiana, Passed at the Fourth Session of the
    General Assembly, at 39 (1820) ......................................................................... 13

11

1831 Ind. Rev. Stat. 192, Chapter 24....................................................................... 13

12

1886 Md. Laws, Chapter 375 ................................................................................... 15

13

1784 Laws of N.Y. 627, ch. 28................................................................................. 18

14

15

1836 Conn. Acts 105, ch. 1, § 20 ............................................................................ 18

16

**CONSTITUTIONAL PROVISIONS**

17

Ky. Const. Article XIII, § 25 (1850) ....................................................................... 13

18

19

United States Constitution
    Second Amendment...............................................................................*passim*
    Fourteenth Amendment ........................................................................*passim*

20

    Thirteenth Amendments ..................................................................................... 9

21

**OTHER AUTHORITIES**

22

23

Adam Winkler, *Racist Gun Laws and the Second Amendment*,
    135 Harv. L. Rev. F. 537 (2022). ........................................................................ 9

24

25

William Baude & Stephen E. Sachs, *Originalism and the Law of the
    Past*, 37 L. & Hist. Rev. 809 (2019)................................................................... 9

26

27

Adam Winkler, Gunfight: The Battle Over the Right to Bear Arms in
    America (2011) ............................................................................................ 11, 19

28

William Baude, *Constitutional Liquidation,* 71 Stan. L. Rev. 1 (2019) ................. 12

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic*
(1999)................................................................................................................ 13

v

**INTRODUCTION**

California's restrictions on the acquisition, manufacture, and possession of billy clubs (also known as billies), set forth at California Penal Code section 22210 ("Section 22210"), fully comport with the Second Amendment.[1]  The surveys of relevant historical laws submitted in accordance with the Court's December 15 Order only reinforce that conclusion.  *See* Dkt. 60.  Those surveys list hundreds of laws, ordinances, and authorities that demonstrate a robust tradition of regulating certain specified weapons deemed by the government to be uniquely dangerous to the public and susceptible to criminal misuse.  From before the founding through the 19th century, state and local governments restricted specific, concealable weapons that were contributing to rising homicide rates and crime.  As this Court previously determined, California's restrictions on billy clubs are part of a long line of accepted state regulations of billies dating back to 1866, shortly before the ratification of the Fourteenth Amendment.  *Fouts v. Bonta*, 561 F. Supp. 3d 941, 954–58 (S.D. Cal. 2021), *vacated on other grounds*, 2022 WL 4477732, at *1 (9th Cir. Sept. 22, 2022).  The Court's prior historical analysis of billy restrictions remains valid following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  The surveyed laws regulating other types of weapons further confirm that California's billy restrictions are part of a robust tradition of weapons regulation spanning American history.

In *Bruen*, the Supreme Court adopted a new standard "rooted in the Second Amendment's text, as informed by history," 142 S. Ct. at 2127, but reaffirmed that the Second Amendment right is "not unlimited," *id.* at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).  The Second Amendment does not protect an unfettered "right to keep and carry any weapon whatsoever."  *Id.* at 2128

---

[1] The Attorney General incorporates by reference his Supplemental Brief in Response to the Court's Order of October 17, 2022 ("Def.'s Suppl. Br.") and the declarations submitted therewith.  *See* Dkt. 51.

(citation omitted).  Rather, the Second Amendment protects only those "weapons 'in common use' today for self-defense."  *Id.* at 2134 (citation omitted).

Under *Bruen*, California's billy club restrictions comport with the Second Amendment at both the textual and historical stages of the analysis.  Plaintiffs cannot show that the "plain text" of the Second Amendment covers their proposed conduct of acquiring and possessing billy clubs.  They provide no evidence of the prevalence of billies in the United States or their use in or suitability for self-defense.  But even if Plaintiffs could meet their initial burden, the Attorney General has shown that California's billy restrictions are "consistent with the Nation's historical tradition of firearm [and weapons] regulation."  *Bruen*, 142 S. Ct. at 2130.  This Court has already effectively held that this is the case.  The Court's prior analysis "end[ed] at step one" of the prior two-step framework, *Fouts*, 561 F. Supp. 3d at 948, and the Supreme Court noted that "[s]tep one of the [prior] framework [was] broadly consistent with *Heller*," *Bruen*, 142 S. Ct. at 2117–18.  At step one, this Court determined that "[t]he weapon known as a billy has been the subject of regulation in at least twenty states—beginning in the 1800's and continuing to the present"—and that this "historical prevalence of nationwide restrictions is sufficient to conclude that government regulation of a billy has long been accepted by the public."  *Fouts*, 561 F. Supp. 3d at 958.  California's billy restrictions are analogous to billy restrictions dating back to 1866, and the surveyed laws in the record show a robust tradition of regulating other dangerous weapons dating back even earlier to the Nation's founding.

This Court should again uphold California's billy club restrictions under the Second Amendment.[2]

---

[2] This brief responds to the Court's December 15 Order, but the Attorney General notes that there is no motion pending, and it appears that the Court has denied the Attorney General's request for limited discovery.  *See* Def.'s Suppl. Br. at 35–36.  The Attorney General objects to the current post-remand proceedings and maintains that a reasonable discovery period would be appropriate under *Bruen*.

1

**ARGUMENT**

2

**I.**   **CALIFORNIA'S BILLY RESTRICTIONS DO NOT BURDEN CONDUCT COVERED BY THE "PLAIN TEXT" OF THE SECOND AMENDMENT.**

3

4    Plaintiffs' challenge to Section 22210 fails at the threshold, textual stage of the

5   *Bruen* analysis.[3]  The Court does not proceed to the historical step of the text-and-

6   history standard unless the party challenging the law first establishes that the "plain

7   text" of the Second Amendment covers the conduct in which the party wishes to

8   engage.  *See Defense Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022

9   WL 15524977, at *5 (C.D. Cal. Oct. 21, 2022) ("Much as [the plaintiff] would like

10  to move history and tradition forward in the course of relevant analysis under

11  *Bruen*, its attempt does not survive a careful, and intellectually-honest, reading of

12  that decision.").  As previously discussed, Plaintiffs bear the initial burden of

13  demonstrating that the text of the Second Amendment presumptively protects their

14  desired conduct.  *See* Def.'s Suppl. Br. at 15–17.  Plaintiffs' burden is not simply to

15  "demonstrate that California law burdens the right to keep or bear an 'Arm,'" Pls.'

16  Resp. to Def.'s Supp. Br. ("Pls.' Suppl. Br.") (Dkt. 59) at 2, but rather they must

17  show that the weapon is in common use for self-defense.[4]  Recent federal district

18  court cases applying the text-and-history standard support this interpretation.  *See*

19  *Or. Firearms Fed'n, Inc. v. Brown*, __ F. Supp. 3d __, No. 2:22-cv-01815-IM, 2022

20

21   Nevertheless, the material submitted here is sufficient to show that California's
billy restrictions comport with the Second Amendment.

22   [3] While this supplemental brief "focus[es] on relevant analogs," Dkt. 57, it
also addresses Plaintiffs' shortcomings at the threshold textual stage of the analysis.

23

24   [4] Plaintiffs' proposed course of conduct cannot be characterized generally as
mere possession of a weapon.  *See* Pls.' Suppl. Br. at 3.  Otherwise, the textual

25  stage of the *Bruen* analysis would be superfluous.  *See United States v. Reyna*, No.
3:21-CR-41 RLM-MGG, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022)

26  (cautioning against defining the proposed conduct generally as "mere possession,"
because "any number of other challenged regulations would similarly boil down to

27  mere possession, then promptly and automatically proceed" to the historical stage
of the *Bruen* analysis).

28

WL 17454829, at *9 (D. Or. Dec. 6, 2022) (holding that "*Plaintiffs have not shown*, at this stage, that magazines specifically capable of accepting more than ten rounds of ammunition are necessary to the use of firearms for self-defense" (emphasis added)), *notice of appeal filed*, No. 22-36011 (9th Cir. Dec. 7, 2022); *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *12 (D.R.I. Dec. 14, 2022) ("Although *it is their burden* to show that large-capacity magazines fall within the purview of the Second Amendment, *the plaintiffs* offer no expert opinion on the meaning of the word 'Arms.'" (emphasis added)).  Both cases held that the plaintiffs failed to establish a likelihood of succeeding on their Second Amendment claims because the plaintiffs failed to show the instruments they wished to possess were "in common use" for self-defense.  *Or. Firearms Fed'n*, 2022 WL 17454829, at *10–11; *Ocean State Tactical*, 2022 WL 17721175, at *15.

The Supreme Court has explained that "the Second Amendment right, whatever its nature, extends only to certain types of weapons."  *Heller*, 554 U.S. at 623.  The "Arms" protected by the plain text of the Second Amendment are only those weapons that are "'in common use at the time' *for lawful purposes like self-defense*."  *Heller*, 554 U.S. at 624 (emphasis added) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see also Bruen*, 142 S. Ct. at 2134 (referencing whether the subject "weapons [are] 'in common use' today for self-defense" (quoting *Heller*, 554 U.S. at 627)).  Thus, a weapon is not covered by the plain text of the Second Amendment "if the weapon is uncommon or unusually dangerous or not typically used by law-abiding people for lawful purposes." *Reyna*, 2022 WL 17714376, at *3.

Here, Plaintiffs have offered no evidence suggesting that billies are commonly used for self-defense, such that they would qualify as a protected "Arm" under the plain text of the Second Amendment.  And as *Bruen* make clear, the test for Second Amendment protection of a particular weapon is common *use*, not common

*ownership*.  *See* 142 S. Ct. at 2138 (referring to "commonly *used* firearms for self-defense" (emphasis added)); *id.* at 2144 n.13 (finding that pocket pistols were "commonly *used* at least by the founding" (emphasis added)); *id.* at 2143 (noting that certain belt and hip pistols "were commonly *used* for lawful purposes in the 1600s" (emphasis added)); *id.* at 2156 (describing the "right to bear commonly *used* arms in public subject to certain reasonable, well-defined restrictions" (emphasis added)); *accord Heller*, 554 U.S. at 636 (holding that the government could not impose an "absolute prohibition of handguns held *and used* for self-defense" (emphasis added)).  The "common use" test must take into account actual uses and suitability for self-defense.  *See Duncan v. Bonta*, 19 F.4th 1087, 1127 (9th Cir. 2021) (Berzon, J., concurring) ("Notably, however, *Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon."), *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022); *see also Heller*, 554 U.S. at 629 (explaining the "reasons that a citizen may prefer a handgun for home defense," including that handguns are easier to store in a location that is readily accessible in an emergency, are easier to lift and aim than a long gun, and can be used with one hand while the other dials the police).

   This Court, citing California case law, has already established that "the arms prohibited by § 22210 are *not* commonly owned for lawful purposes." *Fouts*, 561 F. Supp. 3d at 958 (discussing *People v. Lisciotti*, 219 Cal. App. 4th Supp. 1, 5 (2013)).[5]  Indeed, Section 22210 regulates weapons that, in private hands, were "ordinarily used for criminal and unlawful purposes." *People v. Davis*, 214 Cal.

---

[5] The California case law relied on by the Court was not limited to the altered bat and a nail-driven club at issue in *Liscotti* and *People v. Canales*, 12 Cal. App. 2d 215, 217 (1936), respectively, as Plaintiffs' try to argue.  Pls.' Suppl. Br. at 4 n.5.  Those cases were cited as examples of the California courts' interpretations of "the arms prohibited by § 22210," which "federal courts must respect." *Fouts*, 561 F. Supp. 3d at 958.  Other cases have held that California's billy restrictions encompass police batons, including collapsible batons. *See People v. Mercer*, 42 Cal. App. 4th Supp. 1, 6 (1995).

App. 4th 1322, 1331 (2013) (noting that the argument that billies are not protected by the Second Amendment is supported by California case law explaining the reasons for the restrictions); *see also People v. Grubb*, 63 Cal. 2d 614, 620 (1965) (noting that the State's anti-billy legislation "obviously sought to condemn weapons common to the criminal's arsenal").  Moreover, the use of the traditional billy's modern variants—such as PR-24s or ASP batons, used by sworn peace officers for specialized purposes—does not show that such weapons are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624–25.

Because Plaintiffs have not shown that Section 22210 burdens conduct covered by the Second Amendment, the Court should uphold it at the textual stage of the *Bruen* analysis. *See Or. Firearms Fed'n*, 2022 WL 17454829, at *8–11; *Ocean State Tactical*, 2022 WL 17721175, at *11–15.

## II. SECTION 22210'S RESTRICTIONS ON BILLIES ARE CONSISTENT WITH THE NATION'S TRADITIONS OF WEAPONS REGULATION

Even if Plaintiffs satisfied their initial burden of showing that billy clubs are covered by the "plain text" of the Second Amendment and the original public meaning of that text (they have not), the Attorney General has amply shown that section 22210's billy club restriction is consistent with the Nation's traditions of weapons regulation.  In accordance with the Court's Order, Dkt. 57, the Attorney General assembled surveys of hundreds of relevant laws and authorities that show that, from pre-founding America through the 1930s, state and local governments regularly enacted restrictions on certain enumerated weapons viewed at the time to be particularly dangerous. *See* Dkt. 60.  These laws are relevantly similar to California's billy restrictions.  Some of them, like Section 22210, expressly regulated billies. *See* Dkt. 60-1 [70, 74, 82, 91, 95, 96, 105, 140, 147, 148, 160, 165, 166, 167, 170, 171, 175, 176, 178]; Dkt. 60-2 [183, 187, 188, 189, 190, 193, 194, 201, 209, 212, 216, 218, 221, 227, 229, 230, 232, 233, 234, 235, 236, 237,

238, 239, 240, 241, 243, 245, 246, 247, 248, 249].[6]  Other laws identify different weapons, including impact weapons like slungshots [179] and fighting knives like Bowie knives [28], for heightened regulation.  These dangerous weapons laws impose a comparably modest burden on the right to armed self-defense, by restricting weapons and devices that are not particularly useful for self-defense while ensuring access to other arms that may be kept and borne for effective self-defense.  Moreover, those minimal burdens are comparably justified by public-safety concerns, stemming from the increased criminal use of such weapons.  *See* Dkt. 51-1 (Decl. of Dennis Baron) ¶¶ 46–54.

### A.   *Bruen* Permits Reasoning by Analogy

In any case that proceeds to the historical stage of the *Bruen* analysis, the government need not identify a "historical *twin*" or a "dead ringer"; it can justify a modern restriction by identifying a "relevantly similar" restriction enacted when the Second or Fourteenth Amendments were ratified.  *Bruen*, 142 S. Ct. at 2132–33; *United States v. Kelly*, No. 3:22-cr-00037, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) (noting that, even when the challenged law addresses a problem existing at the time of ratification, "a . . . nuanced approach" is required (ellipsis in original)).  Plaintiffs misread *Bruen* in arguing that the Attorney General is not permitted to engage in analogical reasoning.  Pls.' Suppl. Br. at 4–7.  While courts must engage in a "*more* nuanced" approach when assessing laws that implicate "unprecedented societal concerns or dramatic technological changes," *Bruen*, 142 S. Ct. at 2132 (emphasis added), the government need only "identify a well-established and representative historical *analogue*," *id.* at 2133.

In evaluating the historical tradition of weapons regulation, the identification of relevant laws is the first step.  The laws must then be contextualized historically

---

[6] Numbers in brackets refer to the numbers assigned to the laws listed on Defendants' surveys of historical analogues.  *See* Dkt. 60-1 [1–180]; Dkt. 60-2 [181–250].

1    and compared to modern laws within an appropriate analytical framework.  *Bruen*

2    requires a reading that focuses "not on a minutely precise analogy to historical

3    prohibitions, but rather an evaluation of the challenged law in light of the broader

4    attitudes and assumptions demonstrated by those historical prohibitions." *Kelly*,

5    2022 WL 17336578, at *5 n.7.  And while there are numerous laws relevantly

6    similar to Section 22210's restrictions on billies, it should be noted that the absence

7    of a precise analogy in the historical record would not necessarily mean that a

8    modern firearms restriction is inconsistent with the Second Amendment.  Under

9    *Bruen*, the Second Amendment does not "forbid all laws other than those that

10   *actually existed* at or around the time of the [Second Amendment's] adoption," but

11   rather "the Second Amendment must, at most, forbid laws that *could not have*

12   *existed* under the understanding of the right to bear arms that prevailed at the time."

13   *Id.*  Thus, a mere "list of the laws that *happened to exist* in the founding era"—such

14   as the laws identified in the surveys—"is not the same thing as an exhaustive

15   account of what laws would have been theoretically *believed to be permissible* by

16   an individual sharing the original public understanding of the Constitution." *Id.* at

17   *2.  In any event, the laws identified by the Attorney General are relevantly similar

18   to section 22210 according to the two metrics identified in *Bruen*:  "how and why

19   the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*,

20   142 S. Ct. at 2133.

21       **B.   The Surveys of Relevant Dangerous Weapons Laws**

22       The Court ordered the Attorney General to "create, and the plaintiffs shall

23   meet and confer regarding, a survey or spreadsheet of relevant statutes, laws, or

24   regulations in chronological order" that shall "begin at the time of the adoption of

25   the Second Amendment and continue through twenty years after the Fourteenth

26   Amendment." Dkt. 57.  The Order also permitted the Attorney General to create a

27   second survey "covering a time period following that of the first list." *Id.*  The

28   Attorney General prepared and filed two surveys of all known relevant laws—one

8

from the pre-founding era through 1888 and another from 1888 through the 1930s, Dkts. 60-1, 60-2—and submitted a third survey that included Plaintiffs' positions concerning the relevance of those laws, Dkt. 60-3.[7]

These surveys identify over 200 state and local laws, including laws enacted by the District of Columbia, and six additional laws and authorities from pre-founding England, which regulated, or authorized the regulation, of certain enumerated weapons and items.[8]  As explained in the Attorney General's prior supplemental brief, this history shows that governments have been free to adopt laws like Section 22210, consistent with the Second Amendment—restricting

---

[7] During the December 12 hearing, the Court characterized an 1888 cut-off as "an arbitrary and capricious number."  Dec. 12, 2022 Hr'g Tr. at 30.  In *Bruen*, the Supreme Court did not specify a 20-year limit after the ratification of the Fourteenth Amendment.  *See Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring) (noting that the Court did not answer the question of "[h]ow long after ratification may subsequent practice illuminate original public meaning?").

[8] The vast majority of these laws were generally applicable, but some restrictions applied only to certain groups.  Twelve of the surveyed laws were based on race, nationality, or enslaved status and were enacted before ratification of the Thirteenth and Fourteenth Amendments [5, 12, 13, 14, 15, 18, 19, 23, 24, 45, 63, 66].  These laws are morally repugnant and would obviously be unconstitutional today.  They are provided only as additional examples of laws identifying certain weapons for heightened regulation, and they are consistent in this respect with the other generally applicable laws.  The Attorney General in no way condones laws that target certain groups on the basis of race, gender, nationality, or other protected characteristic, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees.  *See Bruen*, 142 S. Ct. at 2150–51 (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)).  Reference to a particular historical analogue does not endorse the analogue's *application* in the past.  Rather, it can confirm the *existence* of the doctrine and corresponding limitation on the Second Amendment right.  *See* William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past *doctrine*, not to that doctrine's role in past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide *some* basis for recognizing that lawmakers have a degree of regulatory authority over guns.").  Though these 12 status-based restrictions are relevant, they will not be included in the historical analysis that follows.

9

particular weapons and weapons configurations that pose a danger to society and are especially likely to be used by criminals, so long as the restriction leaves available other weapons for constitutionally protected uses.  Def.'s Supp. Br. at 24–32.  The enactments identified by the Attorney General show that Section 22210's restrictions on billies are a constitutionally permissible exercise of California's police powers.[9]

### 1.   Medieval to Early Modern England (1300–1776)

In pre-founding England, the right to keep and bear arms was limited to arms "allowed by law" [7, 9], and the Crown prohibited the possession of certain enumerated weapons, like launcegays [1, 2], crossbows, handguns, hagbutts, and demy hakes [3, 4].  These laws are part of the tradition inherited from England when the Second Amendment was ratified.  *See Bruen*, 142 S. Ct. at 2127 (noting that the Second amendment "codified a right inherited from our English ancestors" (quoting *Heller*, 554 U.S. at 599)); *see* Def.'s Supp. Br. at 25–28.  The 1689 English Bill of Rights was the "predecessor to our Second Amendment," *id.* at 2141 (quoting *Heller*, 554 U.S. at 593), and although it was "initially limited" to Protestants and "matured" by the founding, *id.* at 2142, there is no indication that the "as allowed by law" qualification was written out of the right when the Second Amendment was ratified.

---

[9] To the extent the surveys do not provide information on repeal status or judicial review, it is Plaintiffs' burden to rebut the historical record assembled by the Attorney General and provide potentially adverse information about the analogues.  This Court's Order did not impose the burden of identifying any repeal or adverse judicial opinions solely on the Attorney General, but rather required Plaintiffs to provide information that they view as relevant to the Court's analysis in this regard.  *See* Dec. 12, 2022 Hr'g Tr. at 9–12 ("So I would suggest *both sides*, if you can, please do that for me." (emphasis added)).  And *Bruen* itself did not envision defendants providing the entire historical record for review, but rather viewed this as a task of all parties; the Court noted that judges may be "relatively ill equipped" to "engage in 'searching historical surveys,'" but that they may "decide a case based on the historical record compiled by *the parties*." *Bruen*, 142 S. Ct. at 2130 n.6 (emphasis added) (citation omitted).

Pre-ratification English law is relevant, especially where it is consistent with laws contemporaneous with the enactment of the Second or Fourteenth Amendments. *Id.* at 2136 (suggesting that it is permissible for "courts to 'reach back to the 14th century' for English practices that 'prevailed up to the 'period immediately before and after the framing of the Constitution'" (cleaned up)); *id.* ("A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice."). Pre-founding English law was evaluated in *Bruen*, *McDonald*, and *Heller*, and it remains relevant here.

## 2. Colonial and Early Republic (1600–1812)

"Gun safety regulation was commonplace in the American colonies from their earliest days." Adam Winkler, Gunfight: The Battle Over the Right to Bear Arms in America 115 (2011). During this period, some jurisdictions prohibited the carrying of certain listed weapons, including a 1686 New Jersey law prohibiting the carrying of any pocket pistol, skein, stiletto, dagger, or dirk [6] and other laws prohibiting the carry of certain weapons in certain circumstances [8, 17]. In addition, several jurisdictions enacted restrictions on the storage of gunpowder and loaded firearms. *See* 1783 Mass. Acts 37, § 2 (prohibiting the possession of any "fire arms," among other devices, loaded with any gun powder); 1784 Laws of N.Y. 627, ch. 28 (prohibiting any person to keep any quantity of gun powder exceeding 28 pounds and required storage in separate containers). These additional laws demonstrate the breadth of the government's police powers in being able to regulate arms, even inside the home, to protect public safety.

Plaintiffs argue that *every single one* of the laws identified by the Attorney General—during this period and any period for that matter—is "[o]utside ratification" or outside the time period designated by the Court's Order. *See* Dkt. 60-3. They go so far as to claim that a law enacted just three years before 1791 [11] is too early and that every law enacted after 1791 [16] is too late. Dkt.

11

60-3 at 2.  This is not a proper reading of the Court's Order setting the time period for consideration, nor is it consistent with *Bruen*.  *See Bruen*, 142 S. Ct. at 2136 (noting that "[h]istorical evidence that *long predates* either [1791 or 1868] may not illuminate the scope of the right").  And laws enacted after ratification of the Second Amendment during this period are relevant in confirming the original understanding of the scope of the right, especially where the laws were enacted during the framers' lifetimes.  Moreover, post-ratification practice can "liquidate" indeterminacies in the meaning of constitutional provisions.  *Id.* at 2136.  The Supreme Court has not determined "[h]ow long after ratification may subsequent practice illuminate original public meaning." *Id.* at 2163 (Barrett, J., concurring). But some period of time post-ratification must be relevant because constitutional "liquidation" required time for "successive Legislative bodies, through a period of years and under varied ascendancy of parties," to sanction post-ratification practice and for the public to accede to those practices.  William Baude, *Constitutional Liquidation,* 71 Stan. L. Rev. 1, 18–20 (2019) (emphasis and citation omitted). Plaintiffs' overly restrictive view of the relevant history should be rejected.

### 3.    Antebellum and Reconstruction Periods (1813–1877)

During the period before and after the ratification of the Fourteenth Amendment, state and municipal weapons restrictions proliferated in response to prevailing threats to public safety.  Prior to the ratification of the Fourteenth Amendment, state and local governments enacted a range of restrictions on certain weapons, particularly "fighting knives," like Bowie knives and Arkansas toothpicks, and pistols.  *See* Def.'s Suppl. Br. at 29–31.  These laws prohibited the carrying or use of certain specified weapons [10, 11, 16, 17, 20, 21, 22, 25, 27, 29, 31, 35, 36, 37, 40, 41, 43, 44, 46, 47, 51, 52, 53, 57, 58, 62, 64], and taxed certain weapons, like Bowie knives [26, 42, 48, 49, 54, 59, 75, 76].  In addition, at least three laws were enacted during this period to restrict the possession of gunpowder. *See* 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe

12

Keeping of Gun Powder, chap. 25, § 1; Ordinances of the City of Chicago, Ill., ch. 16, § 1 (1851); Ordinances of the City of St. Paul, Minn., ch. 21, § 1 (1858).

From 1813 to the Mexican War, nine states and territories (Kentucky, Louisiana, Indiana, Alabama, Georgia, Florida, Tennessee, Arkansas, and Virginia) restricted the concealed carrying of particular weapons, namely Bowie knives, pistols, dirks, and sword canes.[10]  Though the Kentucky Supreme Court invalidated Kentucky's 1813 concealed weapons law, *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822), the Kentucky Constitution was amended in 1850 to allow the "pass[age of] laws to prevent persons from carrying concealed arms."  Ky. Const. art. XIII, § 25 (1850).  The state reenacted its concealed weapons law in 1854.  *See* Clayton E. Cramer, Concealed Weapon Laws of the Early Republic 62 (1999).

These concealed weapons laws were "not intended as a solution to a general problem of violence," but instead "were a solution to one very specific type of violence":  murders and assaults that spread throughout the South at that time as a consequence of anti-dueling measures and contributed to an alarming increase in homicides.  *See id.* at 7; *see also id.* at 64-65 ("[A]ttempts to suppress dueling usually predate, and sometimes immediately predate, passage of concealed weapon laws.").  Without the ability to duel, individuals turned to concealable weapons, including pistols, dirks, and Bowie knives, to ambush their political rivals or settle scores in spontaneous fights.  *Id.*  Concealed weapons laws targeted the specific weapons commonly used in these types of crimes.  *See* Suppl. Expert Report &

---

[10] In addition to the surveyed laws [21, 27, 28, 31, 35, 36], Kentucky enacted a similar concealed weapons law in 1813, *see* Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky, at 100–01 (1813), and Indiana did the same in 1820 and 1831, *see* Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly, at 39 (1820); 1831 Ind. Rev. Stat. 192, ch. 24.  Indiana's concealed carry regime was upheld in *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833).

Decl. of Randolph Roth ("Roth Decl.") ¶¶ 23–27, *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Jan. 6, 2023).[11]

The term "billy" first appeared in newspapers in 1842.  Baron Decl. ¶ 9. Notably, just two years before the ratification of the Fourteenth Amendment, New York prohibited "furtively possess[ing]" and carrying any billy, slungshot, sandclub, metal knuckles, and dirk [74].  After ratification of the Fourteenth Amendment, state and local governments continued to regulate enumerated, unusually dangerous weapons.  In 1873, Massachusetts enacted a prohibition on the carrying of a billy, slungshot, and metallic knuckles if arrested [99], and in 1875, the Commonwealth of Pennsylvania enacted a prohibition on the concealed carrying of a "handy-billy," among other concealable weapons, with the intent to injure another, Pa. P.L. 33 (1875).  During this time, numerous localities also restricted billies:  Leavenworth, Kansas enacted a restriction on billies in 1863 [70], St. Louis, Missouri enacted a ban on the concealed carrying of billies in 1871 [91]; Annapolis, Maryland and the City of Nebraska enacted bans on the concealed carrying of billies in 1872 [95, 96]; and New Jersey City enacted a ban on the concealed carrying of a billy in 1874 [105].

After ratification of the Fourteenth Amendment, governments continued to restrict the carrying of specific, listed weapons in a variety of ways [80–123], and taxed specific weapons, particularly Bowie knives [90, 103, 106, 107, 108].  In the run-up to the ratification of the Fourteenth Amendment, it was understood that states retained the power "to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens." *Aymette v. State*, 21 Tenn. 154, 159 (1840); *see also State v. Reid*, 1 Ala. 612, 616 (1840) (noting that the

---

[11] Professor Roth's declaration in *Rupp* was prepared after the filing of Defendants' prior supplemental brief and includes testimony relevant to this action. Defendants respectfully submit Professor Roth's declaration in this action so that it may comprise part of the record assessed by this Court and on appeal.  It is attached as Exhibit 1 to the accompanying Declaration of John D. Echeverria.

Legislature retained the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals"), and this understanding continued after 1868.  This period is especially important because the scope of the states' police powers "depends on how the right [to keep and bear arms] was understood when the Fourteen Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).

### 4.    Late 19th and Early 20th Centuries (1878–1930s)

From the end of Reconstruction to the end of the 19th century, states and localities continued to enact restrictions on certain enumerated weapons, like billies, slungshots, and Bowie knives.  Notably, the following states enacted a variety of regulations of billies, among other enumerated weapons, during the late 18th century:  New York prohibited the concealing of a billy in 1881 [139]; West Virginia banned the carrying (openly or concealed) of any billy in 1882 [147], *Fouts*, 561 F. Supp. 3d at 957, and again in 1891 [194]; Maryland banned the carrying (openly or concealed) of any billy in 1886, *Lawrence v. State*, 475 Md. 384, 402 (2021) (citing 1886 Md. Laws, ch. 375);[12] Michigan prohibited the concealed carrying of a "pocket billy" in 1887 [170], *Fouts*, 561 F. Supp. 3d at 957, and any "billie" in 1891 [193]; Florida prohibited the concealed carrying of a billy if arrested for a crime in 1888 [175]; the Territory of Oklahoma prohibited the carrying (openly or concealed) of any billy in 1890 [190], *Fouts*, 561 F. Supp. 3d at 957; Rhode Island prohibited the concealed carrying of a billy in 1893 and again in 1896 [209].

In addition to those state and territorial enactments, the following cities regulated billies along with other listed weapons:  Sioux City, Iowa prohibited the concealed carrying of any billy in 1882 [146]; Independence, Kansas prohibited the concealed carrying of a billy in 1887 [169]; Baltimore, Maryland prohibited the

---

[12] *Lawrence* was cited in *Fouts*, 561 F. Supp. 3d at 957, but the 1886 Maryland law was inadvertently excluded from the Attorney General's survey.

1    carrying of a billy if arrested for intoxication in 1888 [177], followed by a broader

2    prohibition on the concealed carrying of any billy in 1890 [187]; Johnstown,

3    Pennsylvania prohibited the concealed carrying of a "handy billy" in 1889 [183];

4    Omaha prohibited the concealed carrying of a billy in 1890 [188]; Saint Joseph,

5    Missouri prohibited the concealed carrying of any billy in 1897 [212]; Oregon

6    prohibited the carrying of any billy in 1898 [216]; Fairfield, Nebraska prohibited

7    the concealed carrying of any billy in 1899 [218].

8          During the early 20th century, dangerous weapons laws continued to

9    proliferate, including more prohibitions on the possession of certain weapons [230,

10   233, 234, 236, 237, 239, 240, 241, 243].  State and local restrictions continued into

11   the 20th century [221, 227, 229, 232, 233, 234, 235, 236, 237, 239, 240, 241, 243,

12   245, 246, 247, 248, 249].  Among these restrictions, New York, California, and

13   Nevada enacted prohibitions on the possession of any billy in 1908, 1917, and

14   1925, respectively.  *Fouts*, 561 F. Supp. 3d at 956.  These early 20th century laws

15   are relevant because they are *consistent* with earlier enacted laws, in identifying

16   certain types of weapons for heightened regulation.  *Cf. Bruen*, 142 S. Ct. at 2154

17   n.28 (discounting probative value of 20th century laws that "contradict[ed] earlier

18   evidence").

19        **C.    The Surveyed Weapons Restrictions Are Relevantly Similar to
             Section 22210's Billy Restrictions**
20

21          The surveyed dangerous weapons laws enacted from the pre-founding era

22   through the early 20th century are relevantly similar to California's billy restrictions

23   in light of their comparable burdens and justifications.  Def.'s Suppl. Br. at 32–35.

24   The Second Amendment does not protect a right to any particular arm, but instead

25   protects a more general right to armed self-defense.  *See Bruen*, 142 S. Ct. at 2133;

26   *see also Heller*, 554 U.S. at 603.  The surveyed laws and Section 22210 comparably

27   burden that right and are comparably justified.

28

Defendant's Brief in Response to the Court's Order Entered on December 15, 2022
(3:19-cv-01662-BEN-JLB)

1    **First**, Section 22210's restrictions on billies, first enacted in 1917 [236], are

2    relevantly similar to other statewide and territorial restrictions on billies dating back

3    to 1866 [74, 99, 140, 148, 160, 171, 190, 193, 194, 201, 209, 221, 227, 230, 232,

4    233, 234, 236, 239, 240, 241, 243, 245, 246, 248, 249].  The challenged law is also

5    relevantly similar to municipal ordinances restricting billies [70, 91, 95, 96, 105,

6    147, 166, 170, 175, 183, 187, 188, 189, 212, 216, 218].  These billy restrictions are

7    consistent with restrictions on other dangerous weapons laws [3, 4, 6], including the

8    restrictions on concealable weapons enacted during the 1800s, *see supra* n.10.

9    These laws "impose[d] a comparable burden on the right of armed self-defense,"

10   *Bruen*, 142 S. Ct. at 2133—a modest burden given that the analogues did not

11   restrict weapons that are well-suited to self-defense and left available alternative

12   weapons to be used for effective and lawful self-defense.  The Supreme Court noted

13   that the antebellum dangerous weapons laws did not "operate[] to prevent law-

14   abiding citizens with ordinary self-defense needs from carrying arms in public,"

15   *Bruen*, 142 S. Ct. at 2150, and Section 22210 does the same.  *See Or. Firearms*

16   *Fed'n*, 2022 WL 17454829, at *13 (determining that the ban on possession of

17   large-capacity magazines imposed a comparable burden on "the right to self-

18   defense" as laws regulating "certain types of weapons, such as Bowie knives, blunt

19   weapons, slungshots, and trap guns because they were dangerous weapons

20   commonly used for criminal behavior and not for self-defense"); *id.* at *13 n.19

21   (summarizing many of the same laws surveyed in this case and crediting Professor

22   Spitzer's declaration filed in *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB

23   (S.D. Cal. Nov. 10, 2022), Dkt. 118-9).

24        While it is true that many of these laws regulated the carrying of certain

25   weapons, nothing in *Bruen* requires a historical regulation to use the same mode of

26   regulation to qualify as an analogue; it need only "impose a comparable burden on

27   the right of armed self-defense" that is "comparably justified."  *Bruen*, 142 S. Ct. at

28   2133.  Indeed, the Supreme Court has indicated that historical restrictions on the

17

1   carrying of certain weapons can support limits on what arms may be possessed,

2   provided the burdens are comparable:  the "important limitation" on the "right to

3   *keep* and carry" weapons "is fairly supported by the historical tradition of

4   prohibiting *the carrying* of 'dangerous and unusual weapons." *Bruen*, 142 S. Ct. at

5   2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 627) (emphasis

6   added).

7        This Court previously held that Section 22210's billy restrictions are

8   sufficiently analogous to carry restrictions dating back to 1866 to constitute a

9   "longstanding, accepted regulation" under step one of the prior Second Amendment

10  framework.  *Fouts*, 561 F. Supp. 3d at 957–58.  The Court should do so again under

11  the new *Bruen* standard, with the added context of the other dangerous weapons

12  laws enacted around the same time, which date back to the founding.

13       ***Second***, the gunpowder and loaded-weapon restrictions enacted around the

14  ratification of the Second and Fourteenth Amendments are also relevantly similar to

15  Section 22210, to the extent that they regulated the possession of arms, including

16  inside the home.[13]  But the gunpowder storage laws were far more burdensome,

17  particularly Massachusetts' 1783 prohibition on the possession of a loaded firearm.

18  *See* 1783 Mass. Acts 37, § 2.  Given how "time-consuming the loading of a gun

19  was in those days," this restriction "imposed a significant burden on one's ability to

20

21      [13] *See* 1783 Mass. Acts 37, § 2 (prohibiting the possession of any "fire arms,"
    and among other devices, loaded with any gun powder); 1784 Laws of N.Y. 627,
22  ch. 28 (prohibiting any person to keep any quantity of gun powder exceeding 28
    pounds and required storage in separate containers); 1821 Me. Laws 98, An Act for
23  the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25,
    § 1 (prohibiting any person from possessing any gunpowder, in any quantity, unless
24  permitted under local rules and regulations); 1836 Conn. Acts 105, ch. 1, § 20
    (authorizing the local court of common counsel to prohibit and regulate the storage
25  of gunpowder); Ordinances of the City of Chicago, Ill., ch. 16, § 1 (prohibiting the
    keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent
26  written permission of the authorities); Ordinances of the City of St. Paul, Minn.,
    ch. 21, § 1 (prohibiting the keeping, sale, or giving away of gun powder or gun
27  cotton "in any quantity" without authorization and paying a fee).

28

18

1    have a functional firearm available for self-defense inside the home," and yet "there

2    is no record of anyone's complaining that this law infringed the people's right to

3    keep and bear arms."  Winkler, Gunfight, *supra*, 117.  There can be no doubt that

4    gunpowder was "in common use" at the founding, and yet governments regulated

5    the quantity and storage of gunpowder.  Though these laws were primarily aimed at

6    preventing accidental explosions or fires, they sought to protect the public from

7    accidental injury.  California's billy restrictions also address weapons that are

8    susceptible to causing unintended injuries or even death when used improperly.  *See*

9    Dkt. 22-3 (Decl. of Brian Fichtner) ¶ 26 (emphasizing need for effective baton

10   training to avoid serious injury or death when deploying an ASP baton); Dkt. 51-2

11   (Decl. of Robert Escobar) ¶¶ 27–30 (same).

12       Accordingly, Section 22210's restrictions on billies is consistent with the

13   Nation's tradition of weapons regulation.

## CONCLUSION

15       For these reasons, the Court should uphold Section 22210's billy restrictions

16   under the Second Amendment.[14]

---

[14] If the Court is inclined to rule in Plaintiffs' favor, the Attorney General respectfully request a stay of any judgment, at least for a sufficient period to allow the Attorney General to seek a stay from the Ninth Circuit.

Dated:  February 10, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
BENJAMIN M. GLICKMAN
Supervising Deputy Attorney General
ANTHONY P. O'BRIEN
Deputy Attorney General

*s/ John D. Echeverria*

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California*

Defendant's Brief in Response to the Court's Order Entered on December 15, 2022
(3:19-cv-01662-BEN-JLB)