Rob Bonta
Attorney General of California
Benjamin M. Glickman
Supervising Deputy Attorney General
John D. Echeverria
Deputy Attorney General
Anthony P. O'Brien
Deputy Attorney General
State Bar No. 232650
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-6002
  Fax:  (916) 324-8835
  E-mail:  Anthony.OBrien@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his
official capacity as Attorney General of the
State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **RUSSELL FOUTS et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>Defendant. | Case No. 3:19-cv-01662-BEN-JLB<br><br>**DEFENDANT'S BRIEF IN RESPONSE TO PLAINTIFFS' BRIEF FILED ON FEBRUARY 10, 2023**<br><br>Courtroom:     5A<br>Judge:         Hon. Roger T. Benitez<br> Action Filed:   September 1, 2019 |

**INTRODUCTION**

California's restrictions on the acquisition, manufacture, and possession of billy clubs (also known as billies) (Cal. Penal Code § 22210) fully comport with the Second Amendment at both stages of the text-and-history standard adopted in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022). Plaintiffs' brief does not address their burden at the textual stage of *Bruen*. As to history, Plaintiffs argue that past laws are not relevant because they do not involve identical restrictions on identical weapons. But *Bruen* does not require a "historical twin" for a law to survive Second Amendment challenge. *Id.* at 2133 (emphasis omitted). Rather, the State can show that a historical law is "analogous enough" by "impos[ing] a comparable burden on the right of armed self-defense" that is "comparably justified." *Id.* Applying essentially that standard, this Court already concluded that laws like Section 22210 are part of a tradition of government regulation of billies that "has long been accepted by the public." *Fouts v. Bonta*, 561 F. Supp. 3d 941, 958 (S.D. Cal. 2021). Plaintiffs' brief offers no sound basis for reaching a different conclusion.

**ARGUMENT**

**I.   PLAINTIFFS FAIL TO SHOW THAT CALIFORNIA'S BILLY CLUB RESTRICTIONS BURDEN CONDUCT COVERED BY THE PLAIN TEXT OF THE SECOND AMENDMENT**

Plaintiffs fail to meet their initial burden of demonstrating that the text of the Second Amendment presumptively protects their desired conduct—*i.e.*, that the regulation at issue prevents any "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes, U.S. Const. amend. II. *See* Def.'s Br. at 3–4.[1] Plaintiffs must show that the weapon in question—here, a billy club—is an "Arm[]," meaning that it is commonly used for self-defense. *See Bruen*, 142 S. Ct. at 2156 (Second Amendment guarantees "the right to bear *commonly used arms* in public subject to

---

[1] The Attorney General here incorporates pages 3–6 of Defendant's Brief in Response to the Court's Order Entered on December 15, 2022, Dkt. No. 63 ("Def.'s Br.").

1

certain reasonable, well-defined restrictions" (citing *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008)) (emphasis added)).  But Plaintiffs have not made such a showing, nor could they.  This Court has already concluded that "the arms prohibited by [California Penal Code] § 22210 are *not* commonly owned for lawful purposes."  *Fouts*, 561 F. Supp. 3d at 958–59 (emphasis in original) (citing *People v. Liscotti*, 219 Cal. App. 4th Supp. 1, 5 (2013), and *People v. Canales*, 12 Cal. App. 2d 215, 217 (1936)).[2]

## II.  CALIFORNIA'S BILLY CLUB RESTRICTIONS ARE CONSISTENT WITH THE NATION'S TRADITIONS OF FIREARM REGULATION

### A.  Section 22210 Is Relevantly Similar to Historical Restrictions on the Billy Club and Other Dangerous Weapons

Even if Plaintiffs could satisfy their burden at the textual stage of the *Bruen* analysis, they cannot prevail on their Second Amendment claim because the billy club restrictions are part of a historical tradition of regulation.  Under *Bruen*, the State need not identify a "historical twin" or a "dead ringer" for the challenged regulation; rather, a "relevantly similar" tradition of regulation is adequate to support the challenged law.  *Bruen*, 142 S. Ct. at 2132–33; *see also United States v. Kelly*, 2022 WL 17336578, at *5 n.7 (M.D. Tenn. Nov. 16, 2022) (analysis does not require a "minutely precise analogy to historical prohibitions").

Applying that historical analysis, the Attorney General established in prior briefing (Dkt. 51, 63, 64) that California's billy club restrictions are consistent with historical laws regulating weapons that posed particular public safety dangers.  For instance, concealed weapons laws enacted in several Southern states during the

---

[2] Plaintiffs' Complaint (Dkt. 1) identifies only California Penal Code Section 22210 as the challenged law in this matter.  However, Plaintiffs' Supplemental Brief, filed on February 10, 2023 (Dkt. 62; "Pls.' Supp. Br.") attempts to expand the constitutional challenge to California Penal Code §§ 16590(m), 18010(b) and 22290.  *See* Dkt. 62 at 1.  While such a change is improper without the filing of an amended complaint, any challenge to these additional billy club restrictions still fails for the reasons stated in this and prior briefs.

antebellum period[3] followed a marked rise in the use of such weapons (specifically Bowie knives, pistols, dirks, and sword canes) for dueling and fighting.  *See* Clayton E. Cramer, Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform 7, 62, 64–65 (1999).  The billy club restrictions likewise followed increased use for criminal purposes.  *See* Decl. of Robert Escobar (Dkt. 51-2) ¶ 35; Decl. of Dennis Baron (Dkt. 51-1) ¶¶ 45–54 (detailing reports of increased use of billies for criminal activity between 1850– 1910); *Fouts*, 561 F. Supp. 3d at 959 (quoting *Liscotti*, 219 Cal. App. 4th at Supp. 5) (noting the "homemade criminal and improper purpose" of the billy). Based on that history, this Court has already concluded that "[t]he historical prevalence of nationwide restrictions" on the billy club—"beginning in the 1800's and continuing to the present"—"is sufficient to conclude that government regulation of a billy has long been accepted by the public."  *Fouts*, 561 F. Supp. 3d at 958.

## B.  Plaintiffs' Objections to Section 22210's Historical Tradition Misread *Bruen*

Plaintiffs' response to that historical tradition is unpersuasive.  In their brief, they dismiss every historical analogue because the laws are from the pre-founding era; because they restrict different weapons; or involve carry restrictions. Pls.' Suppl. Br. at 3–20; *see also* Pls.' Disagreements re Def't.'s Survey of Relevant Statutes (Dkt. 60-3).  That analysis misapplies *Bruen*.

### 1.  Pre-Founding Laws Are Relevant

First, Plaintiffs object to any reference to pre-founding laws, arguing that those laws are too early in time and from the "wrong country."  Pls.' Suppl. Br. at 3–8.  This argument, however, ignores the Supreme Court's own review of

---

[3] *See* Dkt. 60-1 [21, 27, 28, 31, 35, 36]; *see also* Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky, at 100–01 (1813); Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly, at 39 (1820); 1831 Ind. Rev. Stat. 192, ch. 24; *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833) (upholding Indiana's concealed carry laws).

"English history dating from the late 1600s," and its holding that the Second Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 599). Under *Bruen*, English and colonial traditions that were accepted by the time the Second Amendment was ratified inform the scope of that right. Though "[h]istorical evidence that *long* predates either [1791 or 1868] may not illuminate the scope of the right," *id*. at 2136 (emphasis added), historical evidence from the period leading up to the founding is relevant, and even a "*long*, unbroken line" of English precedent "stretching from Bracton to Blackstone" may illuminate the scope of the right inherited from England, *id.* (emphasis added).

The pre-founding laws are part of such a long, unbroken line of regulation up to the adoption of the Second Amendment. *See Bruen*, 142 S. Ct. at 2136 (quoting *Funk v. United States*, 290 U.S. 371, 382 (1933)) (allowing review of laws from "back into antiquity" so long as "evidence shows that medieval law survived to become our Founders' law"). The laws establish a historical tradition of government regulation over several dangerous weapons. Dkt. 60-1 at [1–4, 7, 9] (regulating launcegays, crossbows, and demy hakes). That tradition carries over to the laws contemporaneous with the adoption of the Second Amendment, which also regulated the use of dangerous weapons, including clubs, "pocket pistol[s], skeines, stilletoes, daggers, dirks, or other unusual or unlawful weapons." The Grants, Concessions, and Original Constitutions of The Province of New Jersey 289–90 (1881) (1686) (Dkt. 60-1 at [6]); *see also* Dkt. 60-1 at [8, 10] (1750 and 1786 Massachusetts laws regulating the carrying of a club or other weapon).

Plaintiffs also argue that "[t]here have been sticks shaped like batons all throughout human history" without laws banning or regulating their use. Pls' Suppl. Br. at 4–8; *see also id*. at 17–20 (same). Plaintiffs' argument incorrectly assumes that billy clubs are the same as sticks. To the contrary, "a billy is a dedicated weapon" that can be easily concealed, and was traditionally used solely

as a fighting tool, as opposed to a cane or a walking stick.  Escobar Decl. ¶¶ 14–15, 39.  This Court noted the different histories between the ordinary stick and the billy, stating that "while wooden sticks may have been used as weapons since the dawn of Man, the weapon known as a billy apparently did not exist at the time of the founding of our nation."  *Fouts*, 561 F. Supp. 3d at 950.  The differences between sticks and billies also bear out in the latter's use as a criminal weapon.  *See id*. at 958–59 (quoting *Liscotti*, 219 Cal. App. 4th at Supp. 5 (noting that billies include an "altered bat . . .'which, by its very nature, increases the risk of violence in any given situation, is a classic instrument of violence, and has a homemade criminal and improper purpose'")).  And while there may be relatively few regulations against the use of clubs over the course of history, this Court correctly noted that "[a] survey of state law provides a picture of many states placing prohibitions or regulations on billies for over a century."  *Fouts*, 561 F. Supp. 3d at 956.  The specific use of the billy as a dangerous weapon—and an extensive history of regulating dangerous impact weapons—provides the historical tradition supporting Section 22210's restrictions here.[4]

### 2.    Colonial-Era Laws Provide Examples of Government Regulation of Dangerous Weapons

Plaintiffs next argue that colonial-era laws (Dkt. 60-1 at [6–8, 10–16]) prohibited arms only for groups not afforded Second Amendment rights.  *See* Pls.' Suppl. Br. at 9–11.  But that is not true.  For example, the 1686 New Jersey law prohibited carrying certain weapons without regard to status, *see* Dkt. 60-1 at [6]; the 1750 and 1786 Massachusetts laws prohibited the carrying of a club or other

---

[4] Plaintiffs' argument equating billies with sticks or clubs contradicts their earlier objections to relevantly similar laws cited by Defendant.  For instance, Plaintiff objected to Defendant's citation to a 1750 Massachusetts law prohibited the carrying of a club while "unlawfully, riotously, or tumultuously assembling (Dkt. 60-1 at [8]), claiming that such a law "has nothing to do with the type of weapon at issue." Dkt. 60-3 at [8]; *see also id*. at [4, 5, 10] (raising similar objections to other laws regulating use of clubs).

weapon, *see id*. at [8, 10]; and the 1801 Tennessee law prohibited the private carrying of any "dirk, large knife, pistol, or any other dangerous weapon" without posting a surety, and without regard to status, *id*. at [17]. These laws, like the other colonial-era laws, generally reflect a tradition of heightened regulation for certain dangerous weapons.[5]

### 3. Prohibitions on the Carrying of Billy Clubs Are Relevantly Similar to Section 22210

Plaintiffs' next argument, that historical bans on the concealed carry of clubs are not relevantly similar to California's ban on the possession of billy clubs (Pls.' Suppl. Br. at 12–14), again seeks to impose an overly-narrow standard of comparison that is not required under *Bruen*. This Court considered several of the same restrictions cited in Defendant's survey in concluding that Section 22210 is analogous to the carry restrictions dating back to 1866. *Fouts*, 561 F. Supp. 3d at 956–57 (citing bans on the carrying of billies from New York (1866), West Virginia (1882), Maryland (1886), and Michigan (1887)). *See also* Dkt. 60-1 at [74, 148, 167, 171] (listing same laws). When this Court concluded that "government regulation of a billy has long been accepted by the public," *Fouts*, 561 F. Supp. 3d at 958, it did not distinguish between historical regulations barring the possession or carrying of billy clubs. Rather, this Court correctly focused on the States' police power to regulate such weapons, noting that such regulation was generally accepted as not burdening conduct protected by the Second Amendment. *Id*.

That is consistent with the historical analysis that *Bruen* requires. Under *Bruen*, the "'central' considerations" are "whether modern and historical

---

[5] As noted in the prior briefing, dangerous weapons laws applicable to only certain groups may still reflect a relevant tradition of firearm regulation, even if those laws were morally repugnant and would be unconstitutional today under the Equal Protection Clause or other provision of the Constitution. *See* Def.'s Br. at 9 n.8. By enumerating specific weapons for heightened regulation, those historical laws provide additional evidence of a regulatory tradition, even if the tradition was applied more narrowly and in an otherwise unconstitutional manner. *See id.*

regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), and *Heller*, 554 U.S. at 599). As this Court has already acknowledged, the burdens imposed by the possession and carry restrictions are comparable: either leaves ample means for effective self-defense by law-abiding citizens. *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 627) (noting that the "important limitation" on the "right to *keep and carry*" weapons "is fairly supported by the historical tradition of prohibiting the *carrying* of dangerous and unusual weapons" (emphasis added)). And both possession and carriage restrictions are comparably justified: they are intended to prevent criminal activity and preserve the public safety. *See* Baron Decl. ¶¶ 46–54.

### 4. The Cited Municipal Laws Are Relevant to the Historical Tradition Supporting Section 22210

Plaintiffs acknowledge that "a handful of laws" "completely banned the carry of certain arms." Pls.' Suppl. Br. at 15. But they assert that those examples are "outlier" laws from towns and municipalities that are insufficient to establish a relevant historical tradition of regulation. That characterization is incorrect. Defendant identified several state laws, in addition to the municipal regulations, that banned possession of billy clubs. *See* Dkt. 60-1 at [74] (1866 New York law), [136] (1881 Illinois law), [160] (1885 New York law); *see also* Dkt. 60-2 at [230] (1911 New York law), [233] (1913 New York law), [234] (1915 North Dakota law), [236, 237] (1917 California laws).[6] Moreover, many of the possession bans on dangerous weapons that serve as historical analogues to Section 22210 did not originate from territories with sparse populations (like those that were not persuasive in *Bruen*, 142 S. Ct. at 2154), but from states that, at that time, had the

---

[6] Plaintiffs also argue (Pls.' Supp. Br. at 13) that the laws are "too late in time," which is incorrect. *Infra* at 8–9.

7

largest populations in the United States.  *See* Dkt. 60-1 at [74] (1866 New York law banning "furtive" possession of a billy, [136] (1881 Illinois law banning possession of a slungshot or other deadly weapon).[7]

In any event, *Bruen* does not categorically reject municipal laws as possible historical analogues.  In conducting the historical analysis of public carriage laws, the Court observed that town laws in Western territories that barred public carriage of firearms were not persuasive to the historical inquiry necessary there because those laws conflicted with "the overwhelming evidence of an otherwise enduring American tradition" that authorized public carry.  *Bruen*, 142 S. Ct. at 2154.  In contrast, here, the town laws barring possession of billies do not conflict with any American tradition authorizing their use.

### 5.  The 20th Century Billy Possession Bans Are Consistent with Historical Analogues Regulating Dangerous Weapons

Plaintiffs also contend that laws from the 20th century are too recent in time to be considered historical analogues.  Pls.' Suppl. Br. at 16–19.  But those laws (*see* Dkt. 60-2) are consistent with earlier-enacted laws that identify certain types of weapons for heightened regulation.  *Cf. Bruen*, 142 S. Ct. at 2154 n.28 (discounting the probative value of 20th Century laws that "contradict[ed] earlier evidence").

The billy club possession bans passed in several states between 1900 and 1930 (*see* Dkt. 60-2 at [230, 233, 236, 237, 239, 240]) followed a tradition of governments regulating dangerous weapons, especially after an increase in criminal activity associated with the use of those weapons.  Billy regulations in California

---

[7] *See* Ninth Census – Volume 1—The Statistics of the Population of the United States (June 1, 1870), *available at* National Archives <https://babel.hathitrust.org/cgi/pt?id=osu.32435070003447&view=1up&seq=5> (last accessed Feb. 17, 2023) (reporting New York as the most populous state in 1870 U.S. Census, with a population of 4,382,759); *see also* Francis A. Walker and Henry Gannett, General Discussion of the Movements of Population—1790 to 1880 (June 1, 1880), *available at* United States Census Bureau <https://www2.census.gov/library/publications/decennial/1880/vol-01-population/1880_v1-02.pdf> (last accessed Feb. 17, 2023) (identifying 88 Illinois communities as "urban" [population of 4,000 or more] in 1880).

1   and other states closely followed the increase in criminal activity involving the use

2   of billies beginning in the 1850s.  *See* Baron Decl. ¶ 57 (listing state, territorial, and

3   municipal laws regulating billies enacted between 1868 and 1875); *see also Fouts*,

4   561 F. Supp. 3d at 952 (noting that "possessing a billy has been a subject of

5   criminal law regulation for a very long time").  Similarly, government regulation of

6   other dangerous weapons—such as Bowie knives—followed their increased use in

7   dueling and fights in the South during the antebellum period.  *See* Dkt. 60-1 at [27–

8   45]; *see also supra* at 2-3.

9                                    **CONCLUSION**

10        For these reasons, and for the reasons stated in Defendant's prior briefs, the

11  Court should uphold Section 22210 under the Second Amendment.[8]

12

13  Dated:  February 21, 2023                    Respectfully submitted,

14                                               ROB BONTA
                                                 Attorney General of California
15                                               BENJAMIN M. GLICKMAN
                                                 Supervising Deputy Attorney General
16                                               JOHN D. ECHEVERRIA
                                                 Deputy Attorney General
17

18                                               */s/ Anthony P. O'Brien*

19                                               ANTHONY P. O'BRIEN
                                                 Deputy Attorney General
20                                               *Attorneys for Defendant Rob Bonta, in*
                                                 *his official capacity as Attorney*
21                                               *General of the State of California*

22

23

24

25

26

---

27        [8] Defendants respectfully repeat their request for a stay of any judgment in
    Plaintiffs' favor for a sufficient period to allow Defendants to seek a stay from the
28  Ninth Circuit.  Dkt. 63 at 19 n.14.

                                                 9