1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL FOUTS, et al.,<br><br>                               Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>                               Defendant. | Case No.:  19-cv-1662-BEN-JLB<br><br>**DECISION** |

## I.  INTRODUCTION

        This case is about a California law that makes it a crime to simply possess or carry a billy.[1]  This case is not about whether California can prohibit or restrict the use or possession of a billy for unlawful purposes.  The law does not define a "billy."

---

[1] California Penal Code § 22210 states:

". . . any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any leaded cane, or any instrument or weapon of the kind commonly known as a *billy*, blackjack, sandbag, sandclub, sap, or slungshot, is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170."  (Emphasis added.)

Historically, the short wooden stick that police officers once carried on their beat was known as a billy or billy club.[2]  The term remains vague today and may encompass a metal baton, a little league bat, a wooden table leg, or a broken golf club shaft, all of which are weapons that could be used for self-defense but are less lethal than a firearm.

Americans have an individual right to keep and bear arms, whether firearms or less lethal arms.[3]  The Second Amendment to the United States Constitution "guarantee[s] the individual right to possess and carry weapons in case of confrontation."[4]  The Second Amendment is incorporated against California through the Due Process Clause of the Fourteenth Amendment.[5]  Some people have made the personal decision to not keep and carry a deadly firearm for self-defense.  Instead, they sometimes wish to keep or carry a less lethal arm for self-defense.  Plaintiffs are two such citizens.

Plaintiffs desire to keep and carry a billy or baton for self-defense, but the State considers that against the best interests of the State and defines it as a serious crime.  Perhaps an allegory may illustrate the constitutional defect in the statute Plaintiffs' challenge:

A young girl is walking home from school one evening.  She is walking through a part of town where robberies, assaults, and rapes have occurred; where youth gangs are known to frequent; and where unrestrained dogs are known to roam.

The young girl is wearing a baggy, oversized sweatshirt sometimes associated with gang affiliation.  In her hand, she is holding a billy—a baton just like the ones law enforcement officers often carry for their protection.  An officer sees her walking and sees that she is in possession of the baton.  The officer arrests her for violating California

---

[2] *See Fouts v. Bonta*, 561 F. Supp. 3d 941, 951–53 (S.D. Cal. 2021).
[3] *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008).
[4] *Id.* at 606.
[5] *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

Penal Code § 22210.  She is handcuffed, placed in the back of a police car, transported to the police station, booked, fingerprinted, and initiated into the juvenile court system.

Although there is no evidence that she has ever struck or threatened to strike anyone with the baton or that she is in danger of hurting herself with it, her mere possession of it is enough.  That she was in possession of the billy to protect herself in self-defense from human or animal predators is not determinate.  It is irrelevant.  And why does California elect to make this girl a criminal?  Because there is a risk, no matter how small, that the girl might use it for an unlawful purpose, or that others may use similar weapons for unlawful purposes.  The United States Constitution prohibits such intrusions into an otherwise law-abiding citizen's choice for self-defense.

The plaintiff in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), used a less than lethal stun gun to protect herself.  The Supreme Court held that her use of the stun gun was protected by the Second Amendment for her self-defense.  "By arming herself, Caetano was able to protect against a physical threat that restraining orders had proved useless to prevent.  And, commendably, she did so by using a weapon that posed little, if any, danger of permanently harming either herself or the father of her children."  *Id.* at 413 (Alito, J. concurring).  If our hypothetical schoolgirl or the Plaintiffs in California choose to have a billy for self-defense, they will find themselves in the same unenviable position of Ms. Caetano, who "[u]nder Massachusetts law . . . Caetano's mere possession of the stun gun that may have saved her life made her a criminal."  *Id.*

Though California Penal Code § 22210 criminalizes the possession of a less lethal billy for self-defense, federal courts protect the Constitution, and the Constitution protects this citizen choice.  The Second Amendment, "is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense."[6]  The American tradition is

---

[6] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 26 (2022).

rich and deep in protecting a citizen's enduring right to keep and bear common arms, whether they be rifles, shotguns, pistols, knives, or less lethal arms like stun guns and billies.  It is "this balance—struck by the traditions of the American people—that demands our unqualified deference."[7]

## II.  REMAND FOR *BRUEN* REVIEW

Previously, summary judgment was entered in favor of Defendant and the case was appealed.[8]  That decision was based on the conclusion that the state statute (in effect since 1923) was "longstanding," and because it was deemed "longstanding" under older circuit precedent, no further historical inquiry was to be done.[9]  For example, in *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), a state statute imposing a firearm purchase waiting period in existence since 1923 was thought of as sufficiently longstanding.  In the same way, *Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2014), suggested that several state statutes from the early twentieth century might nevertheless demonstrate a longstanding regulation.  This was the precedent that the Ninth Circuit had decided, and this was the precedent this Court followed.  After these decisions, the Supreme Court decided *Bruen*.

This case was remanded from the United States Court of Appeals for the Ninth

---

[7] *Id.*

[8] *Fouts*, 561 F. Supp. 3d at 941.

[9] *Id.* at 945–46 ("This Court agrees that Cal. Penal Code § 22210 is a longstanding regulation.  Under Ninth Circuit precedent, that ends the matter."); *id.* at 948 (describing the one-step analysis for longstanding regulations set out in *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (*en banc*)) ("Laws restricting conduct that can be traced to the founding era and are historically understood to fall outside of the Second Amendment's scope may be upheld without further analysis.  Accordingly, a regulation does not burden conduct protected by the Second Amendment if the record contains evidence that the subjects of the regulations have been the subject of longstanding, accepted regulation.").

Circuit specifically to consider the challenged law in light of *Bruen*.[10]  Under *Bruen*, the government must affirmatively prove that its criminal statute prohibiting possession of a billy is part of our historical traditions.  It is the text, history, and tradition standard the Court used in *Heller* and *McDonald*.  What is different today is that a statute enacted in 1923 is no longer given a pass for being "longstanding."  Important for this case, it is clear now that the critical time period is not the early twentieth century.  The most important period is the years following the adoption of the Second Amendment (1791), and of lesser importance, the years around the adoption of the Fourteenth Amendment (1868).  For this case, changing the relevant time period changes the outcome.

### A. Covered by the Text of the Second Amendment

Plaintiffs are law-abiding citizens who want to possess a commonly-owned billy or baton[11] for lawful purposes.  Plaintiffs would acquire, possess, carry and use a billy to protect themselves, their homes, their families and their businesses.[12]  A billy is not an unusual weapon and both sides have previously agreed that a billy is an "arm."[13]  Therefore, Plaintiffs have met their burden of showing that the prohibited conduct comes within the text of the Second Amendment.  The State takes issue with this starting point.  While it does not contest the fact that Plaintiffs are law-abiding citizens who wish to

---

[10] *Fouts v. Bonta*, No. 21-56039, 2022 WL 4477732, at *1 (9th Cir. Sept. 22, 2022) ("This case is remanded to the district court for further proceedings consistent with the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2228 (2022).").

[11] At least one court has found that an expandable baton is not a billy.  *People v. Starks*, 130 N.E.3d 556, 564 (Ill. App. 2019) ("Further, a collapsible metal baton is not a specific type of billy.").  Whether a collapsible baton is a billy need not be decided here in order to judge the constitutionality of § 22210 as it applies to a billy.

[12] Complaint, ¶¶ 58, 75.  Beyond simple possession, § 22210 makes it a crime to manufacture, import, keep for sale, sell, or loan a billy.  Plaintiffs do not allege an intention to engage in any of these other activities with a billy.

[13] Def's Supp. Br., Dkt. 51, at 17 n.12 ("Here, the Attorney General does not dispute that the billy is an 'arm' as described by the Second Amendment.").

possess a billy, the State contends that a billy is not commonly *used* for self-defense.[14] But the State has offered no credible evidence. Even if such evidence did exist, it would only be an argument if the Second Amendment said, "the right of the people to keep and bear only those Arms that are commonly used for self-defense, shall not be infringed." Of course, that is not the case. Use is not required for Second Amendment protection.

In *Caetano*, the fact that Ms. Caetano did not actually energize and fire her stun gun made no difference to the Supreme Court. She simply displayed the weapon. According to the Supreme Court, "[s]he stood her ground [and] displayed the stun gun."[15] Absent from the opinion is any discussion of the average number of times a stun gun is energized in an average self-defense scenario. Absent from the opinion is any objective metric counting the frequency with which stun guns have been energized and fired. Instead, the measure of constitutional protection was that the stun gun was "used" in the sense that stun guns are widely owned to satisfy a subjective need for protection and that the number in existence was in the hundreds of thousands. The Constitution recognizes that citizens may simply keep an "arm" against the day when they might want or need to carry or actively use the weapon.[16]

**B. <u>The Burden Shifts to the Government</u>**

*Bruen* instructs courts to next assess whether the initial conclusion is confirmed by the historical understanding of the Second Amendment. For this phase, the burden shifts fully onto the shoulders of the government. Plaintiffs do not shoulder the burden of proving they are entitled to enjoy Second Amendment rights. The command of the Amendment is that the right to keep and bear arms "shall not be infringed." It follows

---

[14] Def's Supp. Br., Dkt. 51, at 2, 15–22 ("[T]he Attorney General submits that billies are not protected 'arms' under the Second Amendment because they are not commonly used for self-defense purposes.").

[15] *Caetano*, 577 U.S. at 413, (Alito, J., concurring).

[16] *See generally Duncan v. Bonta*, 17-cv-1017 BEN-JLB, Decision (9/22/23) Dkt. 149, at 20–25.

that when a citizen complains, in a facial challenge, that the government is infringing, then it is the government that must carry the burden of justifying its restriction of Second Amendment rights.  To borrow a phrase from *Teter v. Lopez*, whether a billy is a "dangerous and unusual" arm is a contention as to which California bears the burden of proof in the second prong of the *Bruen* analysis.[17]  Today, the government is short on evidence.  Evidence that billies are not commonly possessed by law-abiding citizens for lawful purposes, and, evidence of a historical tradition of prohibiting possession of a billy as a crime.  In terms of summary judgment, there are no genuine issues of material fact.

### C. <u>Nuanced Analogical Reasoning is Unwarranted</u>

*Bruen* identifies a number of guidelines for conducting the historical inquiry.  The parties agree that "in some cases . . . this historical inquiry will be 'fairly straightforward,' such as when a challenged law addresses a 'general societal problem that has persisted since the 18th century.'"[18]  On the other hand, where a state law concerns a thoroughly modern weapon or an attempt to deal with a modern social ill, courts may have to engage in more nuanced reasoning and consider historical analogues.[19]  While both parties agree on the standard, they disagree on which part of the standard to apply here.  Plaintiffs see it as a straightforward historical inquiry.  The State contends a nuanced analogical approach is needed.  If the State is correct, then it need not identify a historical twin; it may instead resort to regulatory analogues.

---

[17] *Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, No. 20-15948, 2024 WL 719051 (9th Cir. Feb. 22, 2024).  The government in *Teter* argued that a butterfly knife was not an "arm" and that the plaintiff had the burden to prove it is covered by the Second Amendment's text.  The court said, "whether butterfly knives are 'dangerous and unusual' is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis."
[18] *See, e.g.*, Def's Supp. Br. in Resp., Dkt. 51, at 13 (quoting *Bruen*, 142 S. Ct. at 2131).
[19] Def's Supp. Br. in Resp., Dkt. 51, at 13 (quoting *Bruen*, 142 S. Ct. at 2132) ("[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach.").

The State contends "the [§ 22210] law addresses 'unprecedented societal concerns' and 'dramatic technological changes,'"[20] but the contention is unconvincing. The State does not identify an unprecedented societal concern. It does propose that the development of metal or synthetic batons is a dramatic technological change. Using metal or synthetic substances in place of wood for a billy may be a change, but it is doubtful whether a weapons expert would say that type of change qualifies as either dramatic or technological.

This case concerns a technologically-simple weapon—in essence a wooden stick—and an age old social ill: criminally assaulting another with a stick. So, the *Bruen* inquiry is straightforward. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."[21] This is precisely the context presented by the billy prohibition.[22]

To be clear, this particular case could go a different direction if historical analogues like prohibitions on sword canes and slungshots must be considered. They do not, because *Bruen* takes the approach that when an early American weapon is prohibited by current law and the modern social ill is the same as the early American social ill, then courts need only take a straightforward look at how the particular weapon was regulated in early America. A billy was used for self-defense and keeping the peace and (unsurprisingly) sometimes, for criminal purposes in early America.[23] The State's expert

---

[20] Def's Supp. Br. in Resp., Dkt. 51, at 24.

[21] *Bruen*, 142 S. Ct. at 2131.

[22] The State is somewhat vague as to the social ill the California legislature intended to remedy. In its post-remand briefing, the State says, "Section 22210 regulates weapons that are especially likely to be used for criminal purposes," but it offers no statistics on the criminal use of billies in either historical or modern times.

[23] "Common sense tells us that all portable arms are associated with criminals to some extent." *Teter*, 76 F.4th at 950; *see also* Declaration of Dennis Baron, Dkt. 51-1, at ¶ 47.

Dennis Baron says that in the 1800s the billy was considered both a criminal's tool and as a symbol of law and order.[24]  Because both the weapon and the societal ill existed in early America, analogical reasoning is not necessary.  Only straightforward historical prohibitions on possessing billy clubs are relevant.

Disagreeing, the State points to historical analogues regulating other handheld weapons in support of its 21st century billy restriction.[25]  In so doing, the State engages in 30,000 feet high generalities.  In other words, California argues that if states historically regulated weapon A, then by analogy it can regulate weapon B.  And if a state can regulate how a weapon can be used, then it can regulate how a weapon may be carried.  And if a state can regulate how a weapon may be carried, then it can regulate whether a weapon can be possessed, at all.  However, the State's argument sits in tension with *Bruen*'s instructions, so nuanced analogical reasoning is not applied here.

## D. <u>The Most Significant Historical Period is 1791, and Secondarily 1868</u>

This case could also go a different direction if the most significant time period came long after the adoption of the Fourteenth Amendment and into the early 20th century.  That would also be a misreading of *Bruen*.  *Bruen* teaches that the most significant historical evidence comes from 1791, and secondarily 1868.  For the Second Amendment (and other protections in the Bill of Rights), "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."[26]

---

[24] Declaration of Dennis Baron, Dkt. 51-1, at ¶ 45.

[25] Once again, the State contends "the Attorney General need only show that Section 22210 has relevantly similar historical analogues."  Def's Supp. Br. in Resp., Dkt. 51, at 24; *Id.* ("*Bruen* does not require the Attorney General to identify a 'historical twin' or 'dead ringer' for Section 22210.  That is because the law addresses 'unprecedented societal concerns' and 'dramatic technological changes.'").

[26] *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35); *cf. Kennedy v. Bremerton*, 142 S. Ct. 2407, 2428 (2022) ("[T]his Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings.  The line . . . has to accord with history and faithfully reflect the understanding of the Founding

The Second Amendment was adopted in 1791. "[W]e have generally assumed that the scope of the [Second Amendment] protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."[27] Courts are to "afford greater weight to historical analogues more contemporaneous to the Second Amendment's ratification."[28] British sources pre-dating the Constitution are not particularly instructive because the American Revolution was a rejection of British rule. And sources post-enactment are not particularly helpful.[29] "[T]o the extent later history contradicts what the text says, the text controls . . . . Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text."[30] Late 19th century evidence is not particularly instructive. "[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'"[31]

---

Fathers.") (cleaned up); *Riley v. California*, 573 U.S. 373, 403 (2014) ("Our cases have recognized that the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era.").

[27] *Bruen*, 597 U.S. at 37.

[28] *Rahimi*, 61 F.4th at 456; *contra Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023) ("For most cases, the Fourteenth Amendment Ratification Era understanding of the right to keep and bear arms will differ from the 1789 understanding. And in those cases, the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States.").

[29] *Bruen*, 597 U.S. at 35 ("Similarly, we must also guard against giving postenactment history more weight than it can rightly bear.").

[30] *Id.* at 36 (citations omitted) (cleaned up).

[31] *Id.* (quoting *Heller*, 554 U.S. at 614). There is little reason to rely on laws from the later part of the 1800s or the 1900s rather than ones put into effect at the time of the founding. *See Worth v. Harrington*, No. 21-cv-01348-KMM-LIB, 2023 WL 2745673, at *12 (D. Minn. Mar. 31, 2023) ("But the Commissioner offers no persuasive reason why

### E. __The State's List of Relevant Laws__

The State has had lots of opportunity to discover, identify, and highlight historical laws prohibiting the possession of a billy.  There is little.  To aid in the task of looking for a national "historical tradition of firearm regulation," the State was directed to create a list of relevant laws regulating arms dating from the time of the adoption of the Second Amendment (1791) to twenty years after the adoption of the Fourteenth Amendment (1868 + 20).  A list of 250 laws was produced.[32]  The list begins with an English law prohibition on possessing a launcegay in 1396.  [1]  In fact, among the list of laws proffered by the State seven are from the 1300s to the 1600s.  From the important historical period between 1791 and 1868, the State's list of laws includes 71 entries.[33]  Only two state laws during that time period concerned a billy and both laws came after the Civil War.

The Supreme Court focuses on the original understanding of the Second Amendment and thus requires courts to give the greatest weight to evidence from the time period of its adoption.  That is because not all history carries the same value.  "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."[34]  The Founders and citizens of our country at the time of the adoption of the Bill of Rights had a general understanding of whether the Second

_____

this Court should rely upon laws from the second half of the nineteenth century to the exclusion of those in effect at the time of the founding in light of *Bruen*'s warnings not to give post-Civil War history more weight than it can rightly bear."); *Firearms Pol'y Coalition, Inc. v. McCraw*, No. 4:21-cv-01245-P, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 25, 2022); *United States v. Harrison*, No. CR 22-00328-PRW, 2023 WL 1771138, at *8 (W.D. Okla. Feb. 3, 2023) (quoting *Bruen*, 142 S. Ct. at 2136 (Barrett, J., concurring)); *but see Hanson*, No. CV 22-2256-RC, 2023 WL 3019777, at *16 ("In this case, it is appropriate to apply 20th century history to the regulation at issue.").

[32] *See* Dkt. 60-1 (filed 1/11/23).  Statutes in the State's List of Laws are referred to herein by their number on the list as follows: [##].

[33] On the State's list 166 laws came after 1868 and up to 1932.

[34] *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35).

Amendment would protect the right to possess and carry a billy.

However, of the 39 representatives who signed the Constitution in 1787, none were alive fifty years later. Both Thomas Jefferson and John Adams died on July 4, 1826. James Monroe died on July 4, 1831. James Madison, known as the "Father of the Constitution" lived the longest, passing away in 1836. During the time the Founders were alive and all of the way up to the end of the Civil War in 1865, there were no state restrictions in any of the states or territories on possessing or carrying a billy. This is the most persuasive evidence that the original understanding of the Second Amendment protects a person's right to keep and carry a billy.

## F. No Billy Laws Before the End of the Civil War

### 1. *Linguistics*

The Civil War began in 1861 and ended in 1865. The first billy statute appeared in 1866 and the second in 1868. Neither statute prohibited simply possessing or openly carrying a billy in the extreme way that California Penal Code § 22210 does. The State's expert linguist, Professor Baron, says that the weapon named the "billy" is found in English sources and American newspapers at least as early as the 1840s, and opines that this indicates the general public was already familiar with the term.[35] Professor Baron also says, "[i]t is clear from these early citations that by the 1840s, in the U.S., 'billy' referred to both a common, even stereotypical, police weapon and to a weapon used offensively by criminals."[36] A State expert on martial arts and history, Robert Escobar, says that the billy and the baton existed long before the 1840s. Escobar observes, "[l]ong before England's invention of modern policing by Sir Robert Peel in 1829, blunt weapons, including billy clubs . . . and batons took on countless variations."[37] In fact, "[b]atons of various sorts were symbols of authority in Europe for centuries prior to the

---

[35] Declaration of Dennis Baron, Dkt. 51-1, at ¶¶ 34–39.
[36] *Id.* at ¶ 39, 58.
[37] Declaration of Robert Escobar, Dkt. 51-2, at ¶ 34.

establishment of the United States."[38]  While Professor Baron or Escobar may have found news accounts of criminal attacks with a billy in 19th century newspapers, evidence of misuse does not disprove the common sense observation that law-abiding citizens may have kept billies for lawful uses.  Clayton Cramer, Plaintiffs' expert, observes that any criminal misuse of a weapon will receive more attention by news media than the many non-criminal uses or simple possession of the same weapon.[39]  Consequently, with the billy's presence and use in America throughout the 1800s, statutory analogues for other weapons are not relevant.

### 2.  *The States in 1866 and 1868*

After the Civil War, New York enacted the first billy restriction anywhere in the United States (in 1866).  It criminalized *concealing or furtively possessing* any of eight weapons when done so *with the intent to use the weapon against a person*. [74]  The weapons included the: slung-shot, *billy*, sand club, metal knuckles, dirk or dagger, sword-cane, and air-gun.  [74]  Simple *open* possession of a billy was not prohibited as it is under § 22210.  To be clear, laws that penalize the criminal misuse of a weapon, such as California Penal Code § 245 (assault with deadly weapon)[40] are not constitutionally prohibited nor do they suffer from the same infirmity.  These kinds of laws promote and preserve a peaceful and orderly society.  Florida enacted the second state law—a sentencing enhancement—in 1868 for being armed with a billy while committing a criminal offense.  [82]  Simple possession of a billy in any other circumstance was

---

[38] *Id.* at ¶ 34 (citing "Portrait of Emperor Domitian" holding a baton, by Barnardino Campi).

[39] Expert Rebuttal of Clayton Cramer, Dkt. 59-1, at 34–35.

[40] The California Supreme Court in *People v. Grubb*, 63 Cal.2d 614, 621 (1965), described how criminal intent matters for § 22210: "the statute would encompass the possession of a table leg, in one sense an obviously useful item, when it is detached from the table and carried at night in a 'tough' neighborhood to the scene of a riot.  On the other hand the section would not penalize the Little Leaguer at bat in a baseball game." *Id.*

unregulated.  In 1873, Massachusetts enacted a sentencing enhancement like Florida's for having a billy if arrested while committing a crime.  [99]  Like New York and Florida, Massachusetts did not prohibit the simple possession of a billy.  Even if three states did prohibit simple possession of a billy (they did not), three states are insufficient to demonstrate a history and tradition of regulation.  But it does not matter here.

No other state laws concerning a billy are found in the most important period of history, *i.e.*, 1791 to 1868.  Neither the New York law nor the Florida statute, and the few others like it that would come later, offer much insight about the original meaning of the Second Amendment.  Rounding out the list of state laws concerning a billy in the 1800s, there is an 1886 Maryland law about possessing a billy at an election day polling place[41] [167], two concealed carrying restrictions: 1887 Michigan [171], 1893 Rhode Island [201], and a 1890 Oklahoma territorial law [190].

### 3.  *Most of the State's Laws Come Too Late*

The State's strongest evidence comes in the form of a dozen or so statutes from the years *after* 1868 and up to the 1930s.  But those laws are too recent to establish an earlier tradition of billy regulation, and reliance on these late 19th and 20th century laws cannot bear the weight.  *Bruen* instructs clearly that "[b]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into the original meaning as earlier sources.'"[42]  Justice Barret reinforces this point in her *Bruen* concurrence, "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of

---

[41] Although not on the State's list of laws, in 1886, Maryland may have enacted another law prohibiting the concealed carrying of a billy.  *See Lawrence v. State*, 475 Md. 384, 402–03 (Ct. App. Md. 2021) (describing an 1886 concealed carrying law including a billy and 1972 amendment removing billy from the list of regulated weapons).

[42] *Id.*

Rights."[43]

### 4.  *State v. Workman Illustrates the Problem With Late 19th Century Practice*

*State v. Workman*, 35 W. Va. 367, 373 (W. Va. 1891), provides a perfect example of why these later laws cannot be counted on to represent the original constitutional understanding.  Exactly 100 years after the adoption of the Second Amendment, and 55 years after the last Founder passed away, the first court to consider the constitutionality of a statute prohibiting the carrying of a billy misapprehended the kinds of arms constitutionally protected.  In 1882, West Virginia enacted a prohibition on carrying a pistol, dirk, bowie knife, razor, slungshot, metal knuckles or billy. [148]  This is one of the late 19th century statutes the State relies on.  When a defendant was convicted of carrying a pistol, the state supreme court considered the types of weapons protected by the Second Amendment.  Unfortunately, the *Workman* court got it half wrong.  *Workman*, 35 W. Va. at 373.  The state court mistakenly did not regard the pistol or the billy to be the sorts of arms protected by the Second Amendment.  Instead, only weapons of war were covered by the Constitution, according to *Workman*.  As to other kinds of arms, *Workman* incorrectly observed,

> in regard to the kind of arms referred to in the [Second] amendment, it must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets,—arms to be used in defending the State and civil liberty,—*and not to pistols*, bowie-knife, brass knuckles, *billies*, and such other weapons . . . .

(Emphasis added.).  In short, *Workman* held that weapons of war *are* protected by the Second Amendment but found weapons like the billy are not weapons of war, and

---

[43] *Bruen*, 597 U.S. at 82 (Barret, J., concurring).

therefore are not protected.[44]

*Workman* was wrong in concluding the Second Amendment does not cover arms like the pistol and the billy.  But, if that was its viewpoint in 1891, it explains why the state legislature may have (also incorrectly) thought it was not infringing on its citizens' Second Amendment rights by prohibiting the simple possession of a billy.  Apparently, too many years had passed since the nation's founding.  Along the way, the meaning of the Constitution had become muddled.  The *Workman* case provides a reason to suspect that other state legislatures during the late 1800s may have likewise incorrectly regarded a billy as beyond the ambit of the Second Amendment.  *Workman* is exactly the reason *Bruen* looks to Founding-era laws, not post-Civil War laws, to understand the Bill of Rights.

### 5.  *No Tradition is Evident in the 1800s*

To summarize, there were no billy laws before the Civil War and in the years following the Civil War through the end of the 1800s, a billy was the subject of seven state laws and one territorial law.  Three states prohibited carrying a billy *concealed.*  Two states provided *sentencing enhancements*.  One prohibited possession only within 300 yards of a polling place on an *election day*.  Only one state law prohibited simple possession of a billy (West Virginia in 1882) and in that case the state supreme court misconstrued the Second Amendment.

Having reviewed each of the 250 laws listed by Defendant, it is quite clear that

_____

[44] *See also United States v. Miller*, 307 U.S. 174, 178 (1939) (recognizing Second Amendment protection for weapons useful in warfare, unlike a short-barreled shotgun) ("In the absence of any evidence tending to show that possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.  Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.").

there is no national historical tradition of prohibiting the simple possession, or the open carrying, of a billy evident during the important period of history when lawmakers still had an unmolested conception of the original meaning of the Second Amendment.  There is no genuine issue of material fact as to this most important fact.  The most that can be said is that there was the beginning of a late-breaking post-Civil War tendency to prohibit the concealed carrying of a billy.[45]

### 6.  *The Late 1800s*

Only seven states in the 1800s had billy restrictions.  So, why does the State and its expert witness say *fourteen* states had "anti-billy club laws" in the 1800s?[46]  The sentence is inaccurate.  The assertion is misleading.  And it is important.  By giving the impression that fourteen states had adopted anti-billy laws in the 1800s, the State implies that state laws were numerous enough to represent a historical tradition.  A different story is told by the State's own list of laws.  A different story is told by the expert's own data.  The problem with the "fourteen states" claim is that there were actually half that.

Where does one find these *other* so-called state laws?  It is a bit of rhetorical legerdemain.  Beyond the seven already discussed, there were no other state-wide anti-billy laws in the 1800s.  However, there were municipal ordinances in mostly very small cities.  Consequently, when the State's expert says, "[f]ourteen states enacted such [billy] laws in the 1800s,"[47] it is more accurate to say that there were seven state laws and seven

---

[45] Also listed were a handful of municipal ordinances affecting billies, but like territorial laws, city ordinances shed very little light on whether a national tradition of regulation existed.  *See, e.g.*, the City of St. Louis, Missouri passed a municipal ordinance in 1871 prohibiting concealed carrying of a billy without permission from the mayor.  [91]  Two other cities followed suit in 1872 [95, 96], and a fourth city in 1874.  [105]

[46] *See* Def's Supp. Br. in Resp., Dkt. 51, at 5 ("By 1900, fourteen states (out of 45 plus the District of Columbia) had passed anti-billy club laws.  Spitzer Decl., ¶ 10, Ex. B"); *Id.* at 29–30 ("Throughout the 1800s . . . 14 states restricted "billies' during this period by name.").

[47] Declaration of Robert Spitzer, Dkt. 51-3, at ¶ 10.

city ordinances.  Through the end of the 1800s, seven state legislatures had enacted three concealed carry laws, two sentencing enhancements, one election-day law, and one constitutionally-suspect West Virginia carrying prohibition.[48]  And when the State's expert says, "the earliest law appears to have been enacted in Kansas in 1862,"[49] what is meant is that it was the city of Leavenworth, Kansas (pop. 12,606) that had a municipal ordinance (against concealed carrying).[50]  No state law, anywhere, about a billy existed before the end of the Civil War.  The State's attorneys embrace and repeat this rhetorical flourish, writing about the 1800s:

> In addition, 14 states restricted "billies" during this period of time by name.  Many of these laws were enacted shortly before and after the ratification of the Fourteenth Amendment.[51]

But the Court reads the history differently.  Once again, there were not fourteen states (there were seven), and only two laws came close in time to the ratification of the Fourteenth Amendment in 1868 (not what most would consider "many").[52]  The rest

---

[48] Professor Spitzer's chart (Exh B) lists the following states and years, but a cursory review of the underlying statutes and ordinances makes clear that his reference to Kansas is about an ordinance limited in application to the city of Leavenworth, Kansas (Dkt. 51-3, at 25).  Other municipal ordinances in Spitzer's chart in order of age are: Missouri – St. Louis (1871) and St. Joseph (1897) (Dkt. 51-3, at 37–38); New Jersey – Jersey City (1871) (Dkt. 51-3, at 45); Maryland – City of Annapolis (1872) (Dkt. 51-3, at 29, 31); Nebraska – Nebraska City (1872), Omaha (1890), Fairfield (1899) (Dkt. 51-3, 42–43); Iowa – Sioux City (1882) (Dkt. 51-3, at 23–24); Pennsylvania – Johnstown (1897) (Dkt. 51-3, at 61–62); and Oregon – Oregon City (1898) (Dkt. 51-3, at 60).
[49] *Id.*
[50] *See* Declaration of Robert Spitzer, Dkt. 51-3, at Exh C, p.25; *Bevis v. City of Naperville*, 2023 WL 2077392, *11 (N.D. Ill. Feb. 17, 2023) ("The city of Leavenworth, Kansas passed the first law regulating the billy club in 1862.").
[51] *See* Def's Supp. Br. in Resp., Dkt. 51, at 30 (citing Spitzer Decl. ¶¶ 9–12, Exh B).
[52] One statute was enacted shortly before the Fourteenth Amendment (New York's 1866 carrying a concealed weapon law [74]) and one statute was enacted the same year as the Fourteenth Amendment (Florida's 1868 law punishing possessing a billy while committing another crime [82]).

came trickling in with one in 1873 and a handful of others in the 1880s and 1890s.  Here is another example of the State's departure from precision in its briefing.  The State writes:

> Defendant identified several state laws, in addition to the municipal regulations that banned possession of billy clubs. *See* Dkt. 60-1 at [74] (1866 New York law), [136] (1881 llinois law), [160] (1885 New York law); see also Dkt. 60-2 at [230] (1911 New York law), [233] (1913 New York law), [234] (1915 North Dakota law), [236, 237] (1917 California laws).[53]

The parties may read this discussion as overly-pedantic.  But for this case, it is important to know *if* there are historical state laws that banned *possession* of a billy club like California Penal Code § 22210 bans possession of a billy club.  Unfortunately, the examples cited are not simple possession bans.  The State cites the 1866 New York law[54] [74], but that statute did not prohibit simple possession.  The New York law prohibited *concealing or furtively possessing* a billy while using, attempting to use, or i*ntending to use a billy against another person*.  Next, the State cites an 1881 Illinois law[55] [136], but that statute did not mention a billy.  Three more iterations of New York's law (1885 [160], 1911 [230], 1913 [233]) are listed next,[56] but like the predecessor statute, these versions still regulated using and concealing as opposed to simple possession of a billy.  Finishing up the list of examples given by the State, is a 1915 North Dakota law[57] [234].  However, the North Dakota law applied to concealing, rather than simple possession, and *expressly permitted possession* "to effect a lawful and legitimate purpose."[58]  To sum up, based on the State's own excerpts of historical statutes (provided by State expert

---

[53] Def's Br. in Resp., Dkt. 67, at 7:19–23.

[54] *Id.* at 7:20.

[55] *Id.* at 7:21.

[56] *Id.* at 7:21–22.

[57] *Id.* at 7:22.

[58] *See also State v. Brown*, 38 N.D. 340 (N.D. 1917).

19

Professor Spitzer and attached to his declaration), of the seven state laws the State claims "banned the possession of billy clubs," only one did—California's own 1917 statute.[59]

It makes it difficult to properly perform the *Bruen* analysis when the State's expert who has studied gun regulations for thirty years is imprecise in his language, and when the State's briefing employs a mischaracterization.[60]  After all, the subject of the regulatory "what and when" is the central historical tradition inquiry under *Bruen*.  More importantly, it is the government's central burden to show a national tradition of regulation by reference to state laws and court decisions in effect during the most important historical time period.

### 7.  *The Historical Laws Were Already Known, and Little has Changed*

This Court had already identified five of these post-Civil War billy statutes in its previous decision.[61]  If the existence of these late 19th century statutes were sufficient to justify California's billy prohibition, why did the court of appeals remand the case for further consideration in light of *Bruen*?  Apparently, it was to give the government an opportunity to identify earlier billy prohibitions and an earlier tradition.  As it turns out, there is nothing.  Though given lots of opportunity to do so, the State has not shown a tradition of prohibiting the simple possession of a billy during the most important historical time period.  There is no genuine issue of material fact.  Plaintiffs are entitled to summary judgment as a matter of law.

### 8.  *Dirks, Daggers, and Bowie Knives*

The State needed to identify laws that are similar to its restrictions on a billy—not just on any weapon.  The search is straightforward.  After all, it can hardly be argued that: (1) a billy represents a dramatic change in technology; or (2) that the State is attempting

---

[59] Def's Br. in Resp., Dkt. 67, at 7:23.

[60] *See* Def's Supp. Brief in Resp., Dkt. 51, at 5 ("By 1900, fourteen states (out of 45 plus the District of Columbia) had passed anti-billy club laws.  Spitzer Decl., ¶ 10, Ex. B").

[61] *See Fouts*, 561 F. Supp. 3d at 956–57 (citing New York 1866, West Virginia 1882, Maryland 1886, Michigan 1887, Oklahoma Territory 1891).

to address a "modern" societal danger with its 100-year-old law; or (3) the danger of using a non-lethal weapon against another is a danger about which the Founders had no experience.

Nevertheless, the State pushes the 30,000 feet high view that historical restrictions on *other* weapons may be wheeled in as analogues to justify its ban on the billy.  After all, there is something of a tradition of concealed carrying regulation for *other* hand-held weapons.  Quite a few states prohibited the concealed carrying of dirks, daggers, bowie knives, bludgeons, swords, sword canes, and slungshots in the important years between 1791 and 1868.  In fact, even California enacted an 1863 law prohibiting the concealed carrying of a dirk, a pistol, a sword cane, or a slungshot. [72]  It is significant that California did not include a billy at that time.  Perhaps the legislature understood that the Second Amendment protected possession of a billy for lawful purposes like self-defense.[62]

Today, California heavily regulates a number of other non-firearm weapons such as: a dirk or dagger in § 21310, a ballistic knife in § 21110, a writing pen knife in § 20910, a lipstick case knife in § 20610, a cane sword in § 20510, and metal knuckles in § 21810, to name a few.  Some of these current prohibitions may be justified by a historical tradition of regulating these particular weapons.  But it is not a correct application of *Bruen* to lump all such arms together in some sort of regulatory potpourri where a traditional prohibition on carrying a dirk or dagger is sort-of-similar-enough to justify criminalizing a person's possession of a billy.

First, a billy is a most basic weapon.  A billy can be improvised from common wood sticks, table legs, broom handles, or dowel rods.  To manufacture a billy, one does not need metal working skills like one needs to make prohibited metal knuckles.  A billy does not require sharpening skills like one requires to fashion prohibited dirks, daggers,

---

[62] After realizing it hurt law-abiding citizens, California's statute was repealed in 1870. *See* Rebuttal of Clayton Cramer, Dkt. 59-1, at 28–29.

or bowie knives.  A billy does not require blacksmith skills as a person would need to forge a prohibited sword cane.  And a billy does not require the tools and leather crafting skills like those required to create a prohibited lead sap or slungshot.

Second, it is black letter law that penal statutes are to be drafted and interpreted with specificity so as to give notice to ordinary citizens about what is prohibited to afford due process.  That is because "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."[63]

Consequently, when the State imprecisely argues that regulations on "launcegays" and "demy hakes" suffice to justify a prohibition on a billy,[64] it does so in the face of an American tradition of employing greater precision of language when defining and proscribing crimes.  If state legislatures wanted to include the billy in their lists of regulated hand-held weapons, they surely knew how to do so.  From the State's own briefing comes a handy example.  Today, Illinois prohibits the carrying of a billy with the intent to use it unlawfully against another but does not prohibit simple possession.  *See* 720 Ill. Comp. Stat. 5/24-1(a)(2).  At the same time, Illinois prohibits the simple possession of other weapons including a bludgeon, black-jack, slung-shot, sand-bag, and metal knuckles.  *See* 720 Ill. Comp. Stat. 5/24-1(a)(1).  The legislature knew how to distinguish a bludgeon in subsection (1) from a billy in subsection (2).  Being criminal statutes, the Illinois courts are careful to respect these statutory distinctions.  In two different cases the Illinois courts distinguished between possession of "a simple nightstick or billy" (permissible) and a bludgeon (prohibited).  *People v. Starks*, 130 N.E.3d 556 (Ill. 2019); *People v. Fink,* 419 N.E.2d 86 (Ill. 1981).  That California (from 1863 to 1870), like many other states, specified numerous prohibited weapons by name,

---

[63] *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).
[64] Def's Br. in Resp., Dkt. 67, at 4.

but did not specify as prohibited the billy, is substantial unrebutted evidence that a person had a right to carry the basic everyday arm.

Third, even if knife regulations were relevant, they would not help the State much. There were laws restricting bowie knives in some states in the 1800s, but not the vast majority of states. There is little evidence of actual prosecutions for simply possessing a bowie knife, much less a judicial opinion on its purported constitutionality. In fact, one court observed that the Tennessee bowie knife law was generally disregarded.[65] The argument that a cluster of laws prohibiting the carrying of dangerous knives could justify a gun ban, lost its wind in *McDonald*. If the regulation of knives was not a sufficient basis for restricting handguns in Chicago, neither are historical regulations of dirks, daggers, and bowie knives useful for justifying a prohibition on possessing a billy in California.

### G. Severability

California Penal Code § 22210 prohibits the making, selling, and possessing of a long list of non-firearm weapons, including the billy. The prohibitions regarding the billy are unconstitutional. The question then becomes whether the unconstitutional part of § 22210 can be severed from the rest. It can.

"'Severability is of course a matter of state law.' To determine whether a state statute is severable, we are bound by state statutes and state court opinions." *Project Veritas v. Schmidt*, 72 F.4th 1043, 1063 (9th Cir. 2023) (citations omitted). In California, courts first look to a severability clause. *See Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1325 (9th Cir. 2015) (*en banc*) (*citing Cal. Redev. Ass'n v. Matosantos*, 53 Cal. 4th 231 (Cal. 2011). Section 22210 does not have a severability clause.

---

[65] *See, e.g.*, *Day v. State*, 37 Tenn. 496, 499 (Tenn. 1858) ("It is a matter of surprise that these sections of this act, so severe in their penalties, *are so generally disregarded* in our cities and towns.") (describing state law prohibiting the concealed carrying of bowie knives) (emphasis added).

Nevertheless, there are three additional criteria that may be considered: whether the invalid provision is grammatically, functionally, and volitionally separable. *Cal. Redev. Ass'n*, 53 Cal. 4th at 271.

Here, all three criteria are met. First, removing "billy" from the list in § 22210, does not change the grammatical structure. Grammatical separability exists because the invalid part (billy) can be removed as a whole without affecting the wording or coherence of what remains and the revised provision is perfectly coherent. *Id.* Second, there is functional separability because the remainder of the statute is complete. *Id.* Third, the volitional separability test is met because it seems obvious that the remainder of § 22210 would have been adopted by the legislature, had it foreseen the partial invalidation of the statute. *Id.*; *see also Sam Francis Found.*, 784 F.3d at 1326. Accordingly, the term "billy" is hereby severed from the remainder of § 22210.

## III. CONCLUSION

The Second Amendment protects a citizen's right to defend one's self with dangerous and lethal firearms. But not everybody wants to carry a firearm for self-defense. Some prefer less-lethal weapons. A billy is a less-lethal weapon that may be used for self-defense. It is a simple weapon that most anybody between the ages of eight and eighty can fashion from a wooden stick, or a clothes pole, or a dowel rod. One can easily imagine countless citizens carrying these weapons on daily walks and hikes to defend themselves against attacks by humans or animals. To give full life to the core right of self-defense, every law-abiding responsible individual citizen has a constitutionally protected right to keep and bear arms like the billy for lawful purposes. In early America and today, the Second Amendment right of self-preservation permits a citizen to "'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent that injury.'"[66] The Founders of our country anticipated that as our

---

[66] *Heller*, 554 U.S. at 594.

nation matured circumstances might make the previous recognition of rights undesirable or inadequate.  For that event, the Founders provided a built-in vehicle by which the Constitution could be amended, but a single state, no matter how well intended, may not do so, and neither can this court.

Plaintiffs in this case challenge California Penal Code § 22210 as it applies to a billy.  It is declared that the prohibition on a billy unconstitutionally infringes the Second Amendment rights of American citizens and it is hereby enjoined.

**IT IS HEREBY ORDERED that:**

Summary judgment is entered for Plaintiffs.  The following permanent injunction is effective immediately:

1.  Defendant Attorney General Rob Bonta, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order or know of the existence of this injunction order, are enjoined from implementing or enforcing California Penal Code § 22210 as it applies to a billy.

**IT IS SO ORDERED.**

Dated: February 23, 2024

_____
**HON. ROGER T. BENITEZ**
Senior United States District Judge

25

19-cv-1662-BEN-JLB